**EXHIBIT D**


Dockets.Justia.com

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2321

September Term, 2004

————————————————————

MARYCLE, LLC, ET AL.

v.

FIRST CHOICE INTERNET, INC., ET AL.

————————————————————

Salmon,
Adkins,
Barbera,

JJ.

————————————————————

Opinion by Adkins, J.

————————————————————

Filed: January 26, 2006

59

This case requires us to consider how established law governing personal jurisdiction and the Commerce Clause applies in cyberspace. Asserting claims for both monetary and injunctive relief, appellants MaryCLE, LLC (MaryCLE) and NEIT Solutions, LLC (NEIT) filed suit against appellees First Choice Internet, Inc. and Joseph Frevola, the president of First Choice, in the Circuit Court for Montgomery County. Appellants maintained that appellees, whom we designate as "First Choice,"[1] violated the Maryland Commercial Electronic Mail Act ("MCEMA"), Md. Code (1975, 2005 Repl. Vol.), § 14-3001 *et seq.* of the Commercial Law Article (CL), by sending them 83 unsolicited false and misleading commercial emails.

First Choice responded by filing a "Motion to Dismiss, or Alternatively, Motion for Summary Judgment," alleging that (1) MCEMA violates the "dormant Commerce Clause" of the United States Constitution, (2) the circuit court lacked personal jurisdiction over First Choice and Frevola, (3) Frevola could not be sued individually, and (4) First Choice had not violated MCEMA. After a hearing, the circuit court granted the motion to dismiss and issued a written opinion in which it ruled that (1) MCEMA violates the "dormant Commerce Clause" of the U.S. Constitution as applied in this case, (2) Maryland lacks personal jurisdiction over First Choice and Frevola, and (3) no cause of action was stated against

---

[1]Although we generally refer to First Choice Internet, Inc. and its president, Frevola, collectively as "First Choice," in some contexts we shall distinguish between the corporation and the individual. Similarly, we refer to appellants collectively as "MaryCLE," but also sometimes refer to each appellant separately.

Frevola individually.  In doing so, the circuit court considered affidavits submitted by the parties.  Accordingly, we treat the motion as one for summary, judgment as required by Md. Rule 2-322(c).

As discussed in detail below, we shall reverse because we conclude that personal jurisdiction over First Choice is proper and that MCEMA as applied in this case does not offend the Commerce Clause.  We also determine that there were material disputed facts concerning the individual liability of Frevola that rendered the grant of summary judgment in his favor erroneous.  *See* Md. Rule 2-501.

### FACTS AND LEGAL PROCEEDINGS

#### The Parties

_____MaryCLE, LLC (pronounced "miracle"), an acronym for "Maryland Consumer Legal Equity," describes itself as a "consumer protection firm" that "protects consumers wronged by online . . . marketers[.]"[2]  MaryCLE was founded by Eric Menhart, who at the time of the proceedings below, was a third-year law student at the George Washington University Law School.  MaryCLE maintains a website on which it states its mission to "protect[] consumers via promotion of responsible marketing practices, mediation, and

---

[2]On review of a motion for summary judgment, we resolve all factual inferences against appellees, as the moving parties. *See* *Merchants Mortgage Co.* v. *Lubow*, 275 Md. 208, 217 (1975).  This summary of facts reflects that standard.

litigation." First Choice, on the other hand, describes MaryCLE as
a company that

> set up Internet email accounts to receive
> emails from Internet marketing companies . . .
> and, when it received a substantial number of
> email solicitations, [] contact[ed] the
> targeted marketing company and demand[ed] a
> substantial payment as "settlement" of its
> statutory damages claims under MCEMA in return
> for MaryCLE's promise not to file a lawsuit[.]

Although MaryCLE is registered in Maryland and has a Maryland
mailing address, which is Mr. Menhart's home address in Adelphi,
Maryland, the complaint and MaryCLE's own website and letterhead
list its principal place of business as Washington, D.C.  One of
the email addresses "registered to and used by MaryCLE" is
emj@maryland-state-resident.com.[3]

_____NEIT Solutions, LLC is an interactive computer service
provider ("ISP") that provides internet services, including the
hosting of web space and use of email addresses, to MaryCLE.  NEIT
is a registered Maryland limited liability company that is located
in Frederick, Maryland, although its computer servers are located
in Colorado.

First Choice is an Internet marketing company based in New
York that describes its purpose as "promot[ing] products for
various third-party customers through 'opt-in' email mailings and
promotions[.]"  Joseph Frevola, who lives in New York, is the

---

[3]"EJM" are Mr. Menhart's initials.

President of First Choice.

## Background

_____Before the events in this case began, First Choice entered into a partnership agreement with a company called Wow Offers, LLC.[4]  Wow Offers supplied First Choice with email addresses of people who had allegedly "opted-in" to Wow Offers' services.  First Choice asserts that ejm@maryland-state-resident.com was registered on a website called www.idealclick.com, which in turn provided that email address to Wow Offers.  First Choice engaged the services of Master Mailings, LLC,[5] to send promotional emails, including those at issue in this case, to the email addresses obtained through Wow Offers.  First Choice alleges that Master Mailings is located in Virginia.[6]

MaryCLE denies signing up for any "opt-in" services through www.idealclick.com or in any other way giving the email address ejm@maryland-state-resident.com to Wow Offers or First Choice.  Nevertheless, on September 18, 2003, First Choice sent an email to MaryCLE at that address.  The "From" line of the email indicated that the sender was "Exceptional Deals," with an email address of promotions@firstchoiceinternet.com.   The "Subject" line of the

---

[4]Wow Offers, LLC is not a party to this action.

[5]Master Mailings, LLC is not a party to this action.

[6]We can find no affidavit or other support for this contention in the record.

63

email was "Interest Rates are at a 36 Year low – Act Now."

Although the email contained an "unsubscribe" link as well as a postal mailing address to which requests to be removed from the email list could be sent, MaryCLE did not avail itself of the "unsubscribe" option.  Instead, it attempted to "Reply" to the email and requested to be removed from the mailing list.  The reply was returned to MaryCLE as "undeliverable."  MaryCLE did not send any written communications to the postal address contained in the email.  Instead, for reasons not explained in the record, MaryCLE attempted to find a street mailing address for "Exceptional Deals" through the United States Postal Service.  The Postal Service indicated that it had no address for "Exceptional Deals."

MaryCLE then utilized the free "WHOIS" feature on www.networksolutions.com, a website on which any member of the public can find contact information for the registrants of domain names.[7]  After entering the domain "firstchoiceinternet.com," MaryCLE obtained Mr. Frevola's name, as well as an email and mailing address for First Choice.  MaryCLE attempted to contact First Choice using this email address, but this email was also

---

[7]A "domain name" is the "address of a computer network connection . . . that identifies the owner of the address," or ISP, such as "verizon.net" or "hotmail.com."  See The American Heritage Dictionary of the English Language, 4th ed. 2000, http://www.bartleby.com/61/18/D0331850.html (last visited Jan. 13, 2005).  See also Verizon Online Servs., Inc. v. Ralsky, 203 F. Supp. 2d 601, 605 (E.D. Va. 2002)("Subscribers use the ISP's domain name, . . . together with their own personal identifier to form a distinctive e-mail mailing address").

returned as "undeliverable." MaryCLE did not attempt to contact First Choice by postal mail at this point.

By September 30, 2003, MaryCLE had received an additional 23 emails from First Choice. MaryCLE maintains that it replied to each email with a request to be removed from the mailing list, but each time the reply was returned as "undeliverable."

MaryCLE next visited the First Choice website, www.firstchoiceinternet.com. On this site, MaryCLE found a working email address and phone number. MaryCLE sent an email to the email address, joe@firstchoiceinternet.com,[8] and left a voice mail at the phone number to inform First Choice that it did not wish to receive further emails. This email was not returned as undeliverable, which led MaryCLE to conclude that an email had finally been received by First Choice. MaryCLE's phone message was not returned.

Despite these efforts, MaryCLE continued to receive 59 additional emails throughout the month of October, at a rate of approximately two per day. MaryCLE maintains that all 83 of the emails it received were opened in either Maryland or Washington, D.C. Examples of subject lines from these emails include "Urgent: Claim Now or Forfeit" and "Confirmation #87717." MaryCLE asserts that it replied to every email, and each time its reply bounced back as "undeliverable." At no time, however, did MaryCLE click on

---

[8]We assume this to be the email address of Mr. Frevola.

6

the "unsubscribe" link located within the emails or send any written requests via postal mail to be removed from the mailing list. MaryCLE explains that it did not do so because "'unsubscribe' links are notoriously unreliable, and have been recognized by many to be a method via which marketers collect 'live' e-mail addresses to be resold to other marketers."

On October 28, 2003, MaryCLE sent a second email to joe@firstchoiceinternet.com, and for the first time followed up with a letter sent via postal mail to Frevola. The letter was entitled "Notification of Violation of Maryland Law."[9] On October 29, 2003, the emails to MaryCLE ceased. On November 10, 2003, Mr. Frevola sent MaryCLE a letter in which he stated that MaryCLE's email address had been removed from First Choice's mailing list and that First Choice had ceased *all* of its mailings indefinitely.

### Court Proceedings

On December 31, 2003, MaryCLE and NEIT filed suit against First Choice and Frevola in the Circuit Court for Montgomery County. They alleged two counts for statutory damages under the Maryland Commercial Electronic Mail Act, and one count for injunctive relief. Before filing an answer, First Choice and Frevola filed a "Motion to Dismiss or, Alternatively, Motion for Summary Judgment," and MaryCLE filed a response. *See* Md. Rule 2-322(a). A hearing was held on October 13, 2004, and on December 9,

---

[9]This letter is not contained in the record.

2004, the circuit court entered an order granting the motion to dismiss.

Relying on the Maryland long arm statute, the circuit court determined that First Choice had not caused tortious injury in Maryland. Nor had it "regularly conduct[ed] business, engage[d] in persistent conduct or derive[d] revenues from Maryland." *See* Md. Code (1974, 2002 Repl. Vol. 2005 Cum. Supp.), § 6-103(b)(3)-(4) of the Courts and Judicial Proceedings Article (CJP).[10]  The circuit court also declared that the exercise of personal jurisdiction over First Choice would violate its right to due process, because First Choice "did not intentionally direct their emails to the Plaintiffs in Maryland because the Defendants did not even know, and had no ability to know, where the Plaintiffs would actually open the email."  The court explained that the geographic options were limitless.

> The email addresses of MaryCLE are connected
> to a computer registered in Virginia,
> MaryCLE's principal place of business is in
> Washington, D.C. and MaryCLE is a registered
> Maryland corporation.  The Defendants had no
> way of knowing whether MaryCLE would receive
> its email in Virginia, D.C., Maryland, or any
> other state for that matter.  Thus, the
> Defendants did not "purposely" direct their

---

[10]In 2000, the General Assembly added subsection (c) to Md. Code (1975, 2005 Repl. Vol.), section 6-103 of the Commercial Law Article (CL), which states that its provisions apply to "computer information and computer programs in the same manner as they apply to goods and services."  "Computer information" is defined in CL section 22-102 as "information in electronic form which is in a form capable of being processed by a computer."

emails to Maryland residents.

In considering the constitutionality of MCEMA, the circuit court explained that, "[o]n its face, [the] language [of MCEMA] does not discriminate against residents from other states." It determined, however, that, "when the language **is applied to the case at bar** it does violate the dormant Commerce Clause because the law crosses state boundaries to reach persons who open their email in other states." *Id.* (emphasis added). The court reasoned that First Choice "had no contact with the State of Maryland because their emails were sent from New York, routed through Virginia and Colorado, and finally were received in Washington, D.C." It explained that MCEMA violates the Commerce Clause because it regulates conduct occurring wholly outside Maryland borders.

> The statute does not provide that the email must be received in Maryland, instead the statute pertains to situations where an email sender in one state[] sends an email to a Maryland resident living or working in another state. Thus, the statute, *as applied in this case,* seeks to regulate the transmission of commercial email between persons in states outside of Maryland, even when the email never enters Maryland, as long as the recipient is a Maryland resident. (Emphasis added.)

The circuit court finally ruled that Frevola had no personal liability for the alleged MCEMA violations. It reasoned that, under Maryland law, an officer of a corporation can only be held personally liable for a tort if he "specifically directed the particular act to be done or participated or co-operated therein."

9

68

*Shipley v. Perlberg,* 140 Md. App. 257, 265-66, *cert. denied,* 367 Md. 90 (2001). The court decided, as a matter of law, that Mr. Frevola "did not specifically direct First Choice to send an email to MaryCLE or to any Maryland residents."

### QUESTIONS PRESENTED

MaryCLE poses three questions for our review:

> I. Did the circuit court err when it determined that Maryland lacks personal jurisdiction over First Choice and Frevola?
>
> II. Did the circuit court err when it determined that, as applied in this case, the Maryland Commercial Electronic Mail Act violates the Commerce Clause of the U.S. Constitution?[11]
>
> III. Did the circuit court err when it determined that Mr. Frevola could not be held personally liable for the statutory violations alleged by MaryCLE?[12]

---

[11]The circuit court decided the constitutional issue first, and then addressed jurisdiction "to further substantiate" its ruling. We will address the jurisdictional question first, for if we have no jurisdiction, then the constitutional issue is not properly before us. *See, e.g., Curran v. Price,* 334 Md. 149, 171 (1994) ("If a decision on a constitutional question is not necessary for proper disposition of the case, we will not reach it").

[12]MaryCLE framed the issues in a different manner:

> I. Whether the trial court erred, as a matter of law, when it granted Appellees' Motion to Dismiss and found the MCEMA violative of the dormant Commerce Clause because it regulated conduct occurring wholly outside of Maryland and unduly burdened interstate commerce, even though the MCEMA applied by its very terms only

(continued...)

Because we conclude that jurisdiction is proper and that this application of MCEMA does not offend the Commerce Clause, we will reverse the grant of summary judgment in favor of First Choice. We also reverse the circuit court's order granting summary judgment in favor of Frevola.

## DISCUSSION

### Standard Of Review

Whether the circuit court erred in granting summary judgment

------------------

[12](...continued)
to entities who send spam to Maryland residents.

II.  Whether the trial court erred, as a matter of law, when it held that Maryland could not exercise personal jurisdiction over Appellees because they did not purposefully direct their electronic mail to Maryland residents, despite the fact that the Complaint clearly stated the facts essential to the exercise of jurisdiction and the court made its own independent, unsupported findings of fact regarding Appellees' connections to Maryland without allowing jurisdictional discovery.

III. Whether the trial court erred, as a matter of law, when it held that Appellee Frevola could not be held personally liable for fraudulent and misleading email sent to Petitioners although the Complaint clearly stated Frevola's personal involvement in sending the spam and the court was required to assume the truth of all well-pleaded facts contained in the complaint, as well as the logical inferences that flow from those allegations.

11

70

in favor of First Choice and Frevola is a question of law that we review on the same record as the motion court, to determine if its decision was legally correct. *See Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 591 (1990). Summary judgment is proper where there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Md. Rule 2-501.

### The Maryland Commercial Electronic Mail Act

The Maryland Commercial Electronic Mail Act ("MCEMA," or "the Act") was passed by the Maryland General Assembly in 2002, and became effective October 1 of that year.[13] *See* CL § 14-3001 *et seq.* The Court of Appeals has recognized that this statute was passed "to curb the dissemination of false or misleading information through unsolicited, commercial e-mail, as a deceptive business practice." *Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC,* 388 Md. 1, 16 (2005). At the time of its enactment, 21 other

---

[13]Federal legislation to control the proliferation of unwanted email also exists. In 2003, Congress passed the "Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003" ("CAN-SPAM Act"), which became effective January 1, 2004. *See* 15 U.S.C. § 7701 *et seq.* This law expressly supercedes all state regulation of email "except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto." 15 U.S.C. § 7707(b)(1).

The circuit court determined that because the federal law specifically reserves to states the right to control fraudulent and deceptive emails, which the Maryland statute does, the analysis in this case should focus on MCEMA. Neither party disputes this approach, and thus we also focus on the Maryland Act.

71.

states had enacted laws to curb the proliferation of "spam"[14] email, or "UCE" (unsolicited commercial email).[15]  *See id.*  "Spam is the twenty first century version of junkmail and over the last few years has quickly become one of the most popular forms of advertising over the Internet, as well as one of the most bothersome."  *Verizon Online Servs., Inc. v. Ralsky,* 203 F. Supp. 2d 601, 606 (E.D. Va. 2002).

MCEMA provides that a person may not "initiate," "conspire to," or "assist in" the "transmission of commercial electronic mail" either **from** a computer within Maryland or **to** an email address "that the sender knows or should have known is held by a resident of" Maryland, if the mail "[c]ontains false or misleading information" about either the origin or transmission path of the email, *see* CL § 14-3002(b)(2)(ii),[16] or "in the subject line" of the email, *see* § 14-3002(b)(2)(iii).  "Commercial electronic mail" is

---

[14]The term "spam" originates from a skit by the British comedy troupe Monty Python, in which a group of Vikings, singing about the Hormel Foods meat product SPAM, "sang a chorus of 'spam, spam, spam . . .' in an increasing crescendo, drowning out other conversation. Hence, the analogy applied because [spam email] was drowning out normal discourse on the Internet." Spam and the Internet, http://www.spam.com/ci/ci_in.htm (last visited Jan. 16, 2006).  *See also Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC,* 388 Md. 1, 16 n.12 (2005)(spam can be either commercial or noncommercial).

[15]Because not all spam is UCE, and because MCEMA only regulates UCE, we will be cautious in our use of these terms throughout this opinion.

[16]In this section, unless otherwise noted, all citations to statutory sections refer to the Commercial Law Article.

72

defined as "electronic mail that advertises real property, goods, or services for sale or lease." § 14-3001(b)(1).

The Act contains a presumption that the sender of UCE knows the recipient is a Maryland resident "if the information is available on request from the registrant of the Internet domain name contained in the recipient's electronic mail address." § 14-3002(c). The statutory damages allowed by the Act are the greater of $500 or actual damages to the recipient of the email, and the greater of $1000 or actual damages to the ISP. *See* § 14-3003(1) and (3). The Act also provides for the recovery of reasonable attorneys' fees. *See* § 14-3003.

## I.
## Personal Jurisdiction

### A.
### Constitutional Framework

The question of whether a Maryland court can exercise personal jurisdiction over an out-of-state defendant starts with a two-part inquiry. *See Beyond Sys.,* 338 Md. at 14. "First, we consider whether the exercise of jurisdiction is authorized under Maryland's long arm statute," which is CJP section 6-103. *Id.* "Our second task is to determine whether the exercise of jurisdiction comports with due process requirements of the Fourteenth Amendment" of the Federal Constitution. *Id.* at 15. With respect to this two-part test, Maryland courts "have consistently held that the purview of the long arm statute is coextensive with the limits of personal

14

73

jurisdiction set by the due process clause of the Federal Constitution." *Id.* Thus, "our statutory inquiry merges with our constitutional examination." *Id.* at 22.

In order to pass constitutional muster under the Due Process Clause, the defendant must have "minimum contacts" with Maryland such that our exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)(citation omitted). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities" within Maryland. *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958). While the "nature" of the defendant's contacts with Maryland are important, *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 416-17, 104 S. Ct. 1868, 1872-73 (1984), we must additionally consider "the relationship among the defendant, the forum, and the litigation," *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S. Ct. 2569, 2580 (1977), to determine whether the defendant "should reasonably anticipate being haled into court" in Maryland. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S. Ct. 559, 567 (1980).

Generally, there are two types of jurisdiction: "specific" and

74

"general."[17] "If the defendant's contacts with [Maryland also] form the basis for the suit," then Maryland courts have specific jurisdiction. *Beyond Systems,* 388 Md. at 26. "If the defendant's contacts . . . are not the basis for the suit," then the defendant must have "continuous and systematic" contacts with Maryland such that we may exercise general jurisdiction. *Id.* at 22 (citations omitted).

Because First Choice's email contacts with Maryland also form the basis of this suit, our analysis will be focused on whether Maryland can exercise specific jurisdiction over First Choice.[18] The Court of Appeals has adopted the Fourth Circuit's three-part test for determining whether specific jurisdiction exists:

> In determining whether specific jurisdiction exists, we consider (1) the extent to which

---

[17]The Court of Appeals has explained that sometimes cases do not fit "neatly" into one category or the other. *See Camelback Ski Corp. v. Behning,* 312 Md. 330, 338-39, *cert. denied,* 488 U.S. 849, 109 S. Ct. 130 (1988) (*"Camelback II"*). If this is the case, then

> there is no need to jettison the concept, or to force-fit the case. In that instance, the proper approach is to identify the approximate position of the case on the continuum that exists between the two extremes, and apply the corresponding standard, recognizing that the quantum of required contacts increases as the nexus between the contacts and the cause of action decreases.

*Id.* at 339.

[18]Neither party specifically addresses the type of jurisdiction that would or would not be appropriate here, although MaryCLE's argument more closely resembles one for specific jurisdiction.

16

75

> the defendant has purposefully availed itself
> of the privilege of conducting activities in
> the State; (2) whether the plaintiffs' claims
> arise out of those activities directed at the
> State; and (3) whether the exercise of
> personal        jurisdiction        would        be
> constitutionally reasonable.

*Id.* at 26 (citing *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.,* 334 F.3d 390, 397 (4th Cir. 2003)). We will discuss each prong of this test, and its application to First Choice, in the sections that follow.

## B.
## The Parties' Contentions

MaryCLE's argument in favor of personal jurisdiction boils down to the allegation that "sending 'hundreds of thousands' of commercial email messages would lead any rational marketer to believe that his messages would be received and read by residents in most any state in the nation." MaryCLE analogizes First Choice's email contacts with Maryland residents to "traditional mail, telephone calls, or even advertisements placed in a newspaper," which it contends Maryland courts have found to be sufficient contacts to meet jurisdictional requirements. MaryCLE further points out that, under the terms of MCEMA, the sender of a commercial email is presumed to know that the recipient of the email is a resident of Maryland if the information about the holder of the email account is available upon request from the domain name registrant. *See* CL § 14-3002(c). Referring to free searches available on websites such as www.networksolutions.com, MaryCLE

17

explains that the domain name registry for "maryland-state-resident.com" contains a Maryland address.

First Choice, on the other hand, maintains in its brief that there is no way of knowing where the owner of an email address resides or where he might open up his email. It argues that the fact that it could have found out that "maryland-state-resident.com" was registered in Maryland does not mean that it "knew that the emails would be *received* in Maryland[.]" At oral argument, First Choice conceded that it knew some emails would be opened in Maryland, but insisted that, because its emails were being distributed across the country, it was not **purposefully** availing itself of any particular jurisdiction.

## C.
## Jurisdiction Over First Choice Is Proper In Maryland

This case amply demonstrates that "[e]ach new development in communications technology brings new challenges to applying the principles of personal jurisdiction." *Verizon Online,* 203 F. Supp. 2d 601, 604 (E.D. Va. 2002). *See also McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 222-23, 78 S. Ct. 199, 201 (1957)(recognizing that advances in communications and technology have expanded the "permissible scope of personal jurisdiction"); *Hanson*, 357 U.S. at 250-51, 78 S. Ct. at 1238 ("As technological progress has increased the flow of commerce between States, the need for jurisdiction over nonresidents has undergone a similar increase"); *World-Wide*

18

77

*Volkswagen,* 444 U.S. at 293, 100 S. Ct. at 565 (observing that, since *McGee,* "historical developments" have further relaxed the limits of due process).

Maryland state appellate courts have not had many opportunities to consider the application of personal jurisdiction law to cases concerning email and the Internet. *Beyond Systems* involves both, but is quite unlike this case.[19] Indeed, at oral argument, each party acknowledged that, because of the factual differences, *Beyond Systems* did not advance its arguments here. In the absence of an analogous email case, we will apply the three-part test adopted in *Beyond Systems,*[20] *see* 338 Md. at 26, using

---

[19]In *Beyond Systems,* the Court of Appeals affirmed the Circuit Court for Montgomery County's dismissal of an MCEMA-based lawsuit on the grounds that the defendants did not have sufficient minimum contacts with Maryland. *Beyond Systems*, 388 Md. at 28. Unlike First Choice, the defendants in *Beyond Systems* did not direct the sending of the allegedly MCEMA-violative emails, and the connection between the sender of the email and the defendants was distant and tenuous. These contacts are markedly more attenuated than those in this case, and thus *Beyond Systems* is not particularly instructive, beyond its statement of the general principles.

[20]The circuit court relied on a more specific personal jurisdiction test for cases involving the Internet, articulated by the Fourth Circuit in *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707 (4th Cir. 2002). Under this test,

> a State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action
>
> (continued...)

78