three cases decided by other courts to help shape our reasoning.

## 1.
## The Reasoning Of Three Other Courts

In a case in which the defendant corporation sent **one** commercial email to the plaintiff, a Utah resident, the Court of Appeals of Utah decided that the one email was sufficient to warrant the exercise of personal jurisdiction in a cause of action for violation of Utah's commercial email statute. *See Fenn v. MLeads Enters., Inc.,* 103 P.3d 156, 164 (Utah Ct. App. 2004), *cert. granted* 109 P.3d 804 (Utah 2005). The Utah court, considering that the Utah long arm statute (like Maryland's) extends as far as the limits of due process, found that the defendant "directed its agent [a marketing company] to solicit business, and that direction instantiates the purpose that makes the connection more than an 'attenuated nexus.'" *Id.* at 162 (citation omitted). The court further determined that, even though the sender of the email did not know where geographically the email was opened, it was reasonable for the defendant to expect to be haled into court "wherever its email[s] were received." *Id.* Finally, the court concluded that Utah had an interest in "preventing its residents

_____

[20](...continued)
     cognizable in the State's courts.

*Id.* at 715.

We conclude that the result is the same no matter which of these tests is applied.

from receiving noncompliant email" and that this interest, among others, outweighed the burden placed on the out-of-state defendant. *See id.* at 163-64.

The U.S. District Court for the Southern District of Mississippi reached a similar conclusion in a case in which the defendant sent an unsolicited email to people "all over the world, including Mississippi residents, advertising a pornographic web-site." *See Internet Doorway, Inc. v. Parks,* 138 F. Supp. 2d 773, 774 (S.D. Miss. 2001). The defendant altered the email so that it appeared to have been delivered from an email address held by the plaintiff corporation. *See id.* The corporation complained that the emails caused it to suffer damages in the form of losing goodwill in the community and expending time and resources in responding to the complaints of people who received the offensive email. Applying the Mississippi long arm statute, which is similar to Maryland's, the court determined:

> [W]hen [the defendant] allegedly transmitted the e-mail to a recipient or recipients in Mississippi, it was an attempt to solicit business for a particular web-site. Thus, [the defendant] committed a purposeful act that occurred in Mississippi, just as if she had sent via United States Mail a letter to a Mississippi resident advertising a particular product or service.

*Id.* at 776.

The federal court went on to explain that, in sending emails all over the world, the defendant "had to have been aware that the

e-mail would be received and opened in numerous fora, including Mississippi." *Id.* at 779. Thus, it was fair for Mississippi to exercise personal jurisdiction.

> By sending an e-mail solicitation to the far reaches of the earth for pecuniary gain, one does so at her own peril, and cannot then claim that it is not reasonably foreseeable that she will be haled into court in a distant jurisdiction to answer for the ramifications of that solicitation.

*Id.* at 779-80.

The U.S. District Court for the Eastern District of Virginia has also decided that email solicitations can constitute the basis for the exercise of personal jurisdiction. *See Verizon Online Servs. Inc. v. Ralsky,* 203 F. Supp. 2d 601, 622-23 (E.D. Va. 2001). In *Verizon Online,* the court considered the defendants' argument that they had not purposefully availed themselves of the laws of Virginia because they did not know, or have any way of knowing, that they were sending commercial emails to Virginia residents or through a server located in Virginia. *See id.* at 612. In a carefully reasoned opinion, the court found that the emails were "knowing and repeated commercial transmissions" that the defendants knew would be routed through Verizon's servers in Virginia because the defendants sent their emails to Verizon-based domain names. *See id.* at 617-18 (citations omitted).

When the defendants compared their emails to the placement of an item in the stream of commerce, which a plurality of the Supreme

Court has rejected as the sole basis for the exercise of jurisdiction, *see Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 112, 107 S. Ct. 1026, 1032 (1987), the federal court rejected the argument. In its view, "[d]efendants' conduct and connections to Virginia were of their own choosing, not someone else's . . . They cannot seek to escape answering for these actions by simply pleading ignorance as to where the servers were physically located." *Id.* at 620. The court further concluded that, considering Virginia's interests in adjudicating the claim, which was filed by a Virginia corporation under a Virginia statute governing email use, jurisdiction was constitutionally reasonable. *See id.* at 621-22.

We find the reasoning of these three cases instructive, and rely on them in performing our analysis under the three-part inquiry adopted by the Court of Appeals in *Beyond Systems*.[21]

---

[21]We have found that other cases in which emails have not served as a sufficient basis for personal jurisdiction are easily distinguishable from this case and therefore not instructive. *See, e.g., Burleson v. Toback,* 391 F. Supp. 2d 401, 421-22 (M.D.N.C. 2005)(email from defendant to plaintiff insufficient for personal jurisdiction where plaintiff had not shown relationship between email and claim asserted, or that email created the cause of action); *Bible & Gospel Trust v. Wyman,* 354 F. Supp. 2d 1025, 1031 (D. Minn. 2005)(email not authorized by out-of-state defendant but received by him and forwarded to Minnesota resident was not sufficient contact for exercise of jurisdiction); *Hydro Eng'g, Inc. v. Landa, Inc.,* 231 F. Supp. 2d 1130, 1135-36 (D. Utah 2002)(in a libel suit, there was no proof that emails were received in Utah to constitute "publication" in Utah, so exercise of jurisdiction was improper); *Reliance Nat'l Indem. Co. v. Pinnacle Cas. Assurance Corp.,* 160 F. Supp. 2d 1327, 1333 (M.D. Ala. 2001)(emails not sent
(continued...)

## 2.
### Claim Arising Out Of Forum Activities

We begin with the second factor, as it is the simplest. "If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts." *Compuserve, Inc. v. Patterson,* 89 F.3d 1257, 1267 (6th Cir. 1996). Here, the "connection to [Maryland] is the claim itself – the transmission of [email] to Maryland residents." *Verizon Online,* 203 F. Supp. 2d at 620. MaryCLE's claims are based upon First Choice's action in sending emails to MaryCLE in Maryland. Thus, First Choice's alleged contacts with Maryland are related to the "operative facts" of this case. In other words, "[b]ut for [First Choice's] alleged transmission of this spam," MaryCLE and NEIT "would not have suffered an injury." *Id.* at 621. This requirement for personal jurisdiction is therefore met.

## 3.
### Purposeful Availment

We next address the first factor, purposeful availment. The Supreme Court has emphasized that the "quality and nature" of the defendant's contacts are critical to the question of purposeful availment. *Hanson,* 357 U.S. at 253, 78 S. Ct. at 1240. Looking to the quality and nature of First Choice's contacts, we observe that

---

[21](...continued)
to Alabama residents but forwarded to them were insufficient for exercise of jurisdiction).

First Choice admits that it sent "hundreds of thousands" of email advertisements to recipients all over the country.

First Choice contends that, although it sent emails everywhere, it did not purposefully avail itself of "the privilege of conducting business in Maryland." We disagree. This argument resembles the one made in *World-Wide Volkswagen,* 444 U.S. at 295, 100 S. Ct. at 566, that "foreseeability" that a product would cause injury in another state was insufficient for jurisdiction. In *World-Wide Volkswagen,* the Supreme Court did conclude that "mere" "foreseeability" that a product (in that case, an automobile), would "find its way into the forum State" was not enough **on its own** to exercise jurisdiction. *See id.,* 444 U.S. at 297, 100 S. Ct. at 567. It cautioned, however, that jurisdiction could be proper when "the defendant's conduct and connection with the forum State" rendered it foreseeable that he might be expected to answer for his actions in that State.[22]   *See id.*

---

[22]Several years later, a plurality of the Supreme Court clarified the meaning of *World-Wide Volkswagen.*  *See Asahi Metal Indus. Co. v. Superior Ct. of Cal.,* 480 U.S. 102, 112, 107 S. Ct. 1025, 1032 (1987). The plurality rejected cases decided after *World-Wide Volkswagen* that interpreted it to mean that jurisdiction could be founded on the foreseeability that a product would enter other states because of its placement in the stream of commerce. *See id.,* 480 U.S. at 111, 107 S. Ct. at 1032. The plurality determined that, because the exercise of jurisdiction requires that the defendant have purposefully directed some action towards the forum, "[t]he placement of a product into the stream of commerce, **without more,** is not an act of the defendant purposefully directed toward the forum State." *Id.,* 480 U.S. at 112, 107 S. Ct. at 1032. The plurality did advise, however, that jurisdiction could be
(continued...)

84

First Choice's emails did not merely "find [their] way" into
Maryland the way a car, sold in one state by the defendant, might
find its way to another because the **plaintiff** drove it into another
state. *See id.* Rather, First Choice **directly** caused the emails to
be sent to Maryland, among other states. It is thus reasonable for
First Choice to expect to answer for those emails in Maryland, or
any other state to which they were sent. *See Fenn,* 103 P.3d at
162; *Internet Doorway,* 138 F. Supp. 2d at 776.

The Court of Appeals has explained that there is a difference
between a merchant who purposefully "sends a product" into another
jurisdiction and one that simply receives business from another

---

[22](...continued)
justified if "[a]dditional conduct of the defendant [] indicate[s]
an intent or purpose to serve the market in the forum State, for
example . . . **advertising** in the forum State, . . . or **marketing**
the product through a distributor[.]" *Id.*

Four justices disagreed and joined in the opinion of Justice
Brennan, who wrote separately to explain their belief that *World-
Wide Volkswagen* does in fact stand for the proposition that
foreseeability that a product would enter another state through the
stream of commerce **is, by itself, enough** for jurisdiction. *See id.*
at 116-21 (Brennan, J., concurring in part and concurring in the
judgment). Justice Brennan reasoned that

> [t]he stream of commerce refers not to
> unpredictable currents or eddies, but to the
> regular and anticipated flow of products from
> manufacture to distribution to retail sale.
> As long as a participant in this process is
> aware that the final product is being marketed
> in the forum State, the possibility of a
> lawsuit there cannot come as a surprise.

*Id.,* 480 U.S. at 117, 107 S. Ct. at 1034 (concurring opinion).

85

state.    In *Camelback Ski Corp. v. Behning,* 312 Md. 330, 340-41,

*cert. denied,* 488 U.S. 849, 109 S. Ct. 130 (1988)("*Camelback II*"),

the Court elaborated:

> [A] significant difference exists between
> regularly placing goods into a stream of
> commerce with knowledge they will be sold in
> another state on the one hand, and knowingly
> accepting the economic benefits brought by
> interstate customers on the other hand.
> Ordinarily, one who **purposefully sends a
> product into another jurisdiction for purposes
> of sale may reasonably expect to be haled into
> court in that State** if the product proves to
> be defective and causes injury there.    In
> addition to having caused a direct injury
> within the forum State, **that manufacturer or
> distributor has purposefully availed himself
> of the laws of the forum State that regulate
> and facilitate such commercial activity.**    The
> same cannot be said of the fixed-site merchant
> who is simply aware that a portion of his
> income regularly is derived from the patronage
> of customers coming from other states . . .
> Although he may cause an indirect impact on
> the forum State by injuring one of its
> residents, he causes no direct injury in the
> State, and does not avail himself of the
> protection or assistance of its laws.
> (Emphasis added.)

The Court in *Camelback II* concluded that jurisdiction was not

proper. *See id.* at 343.    The defendant in *Camelback II,* however,

was a "fixed-site" ski resort whose limited contacts with Maryland

included mailing brochures to Maryland ski shops **upon the request**

**of the Maryland shops.**[23]  *See id.* at 341.    In contrast, First Choice

---

[23]Camelback's other "involvement" with Maryland included
awareness that

(continued...)

**reached out** to other jurisdictions, including Maryland, by sending their uninvited advertisements there.[24]

Additionally, unlike *Camelback II* and *World-Wide Volkswagen*, **the emails themselves were the product.** First Choice made its money by the very act of identifying email account holders

---

[23](...continued)
> others, for their own economic purposes, were publicizing the Camelback resort within the Washington and Baltimore metropolitan areas; that wire services routinely carried information concerning snow conditions on its slopes and that this information was reproduced in Maryland newspapers; that Maryland residents could, and probably were, using a toll-free telephone number to obtain information concerning snow conditions at the resort[.]

*Camelback II,* 312 Md. at 341.    None of this "involvement" constitutes attempts by the resort itself to reach out to Maryland residents.    Indeed, the *Camelback II* Court indicated that Camelback rejected Maryland as a target for its business:

> Camelback did not devote its energy or financial resources to the marketing of Maryland.    It allocated no part of its advertising budget to Maryland, and following one very brief and unsuccessful attempt to solicit business in this State in 1982, it abandoned any attempt to include Maryland in its primary marketing area, or to conduct any active solicitation here.

*Id.*

[24]Although First Choice alleges that MaryCLE "opted-in" to its mailings, at this juncture we must view the parties' contentions in the light most favorable to MaryCLE as the non-moving party.  *See Faya v. Almaraz,* 329 Md. 435, 443 (1993).  MaryCLE pleaded that it never submitted its email address to www.idealclick.com or First Choice.

87

nationwide, and transmitting emails from one state to residents of other states, including Maryland. Without the information identifying email addresses and transmittal to those addresses, First Choice **had no product**. In contrast, Camelback's product was a ski resort located in Pennsylvania, and World-Wide Volkswagen's product was a car sold to a New York customer in New York, and driven **by the customer** to Oklahoma, the forum in which the plaintiff tried to sue for injuries allegedly caused by a defect in the car.

We also reject First Choice's claim that jurisdiction is not proper because, even if it knew where the recipients **reside**, it had no idea where the emails would **be opened**. This allegation has little more validity than one who contends he is not guilty of homicide when he shoots a rifle into a crowd of people without picking a specific target, and someone dies. *See Digital Equip. Corp. v. AltaVista Tech., Inc.,* 960 F. Supp. 456, 469 n.27 (D. Mass. 1997)(likening the sending of advertisements via the Internet to a gunman "repeatedly firing a shotgun into a crowd across the state line, not aiming at anyone in particular, but knowing nonetheless that harm in the forum state may be caused by its actions outside it"). *Cf.* Charles E. Moylan, Jr., *Criminal Homicide Law* § 3.25 (MICPEL 2002)("Where a wide-ranging lethal attack is unleashed, even though its primary intended target is a single person in the killing zone or target area, there may be a

murderous *mens rea* with respect to all persons who are also coincidentally in the line of fire. . . . [T]here is a concurrent murderous intent directed towards all who are in harm's way").

In *Digital Equipment,* a trademark infringement case, the federal court reasoned that jurisdiction was proper because,

> **[w]here the case involves torts that create causes of action in a forum state . . . the threshold of purposeful availment is lower.** The defendant allegedly causing harm in a state may understandably have sought no privileges there; instead **the defendant's purpose may be said to be the targeting of the forum state and its residents.**

*Digital Equip.,* 960 F. Supp. at 469 (emphasis added). First Choice's purpose in sending commercial emails was likewise the targeting of its email recipients, who included Maryland residents.

In sum, First Choice cannot plead lack of purposeful availment because the "nature" of the Internet does not allow it to know the geographic location of its email recipients. *See Verizon Online,* 203 F. Supp. 2d at 620. Rather, when considering the "nature" of First Choice's contacts, our focus should be on the fact that the emails are communications specifically and deliberately designed to convince the recipients to engage the services of First Choice and to promote the products of its customers. Although First Choice did not deliberately select Maryland or any other state in particular as its target, it **knew** that the solicitation would go to Maryland residents. Its broad solicitation of business

30

89

"instantiates the purpose that makes the connection more than an 'attenuated nexus,'" and thus it should be subject to jurisdiction "wherever its email[s] were received." *Fenn*, 103 P.3d at 162 (citations omitted).

### 4.
### Constitutional Reasonableness

We also conclude that the exercise of jurisdiction over First Choice would be constitutionally reasonable. To determine what is reasonable, we look to several factors:

> the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief . . . , the interstate judicial system's interest in obtaining the most efficient resolution of controversies[,] and the shared interest of the several States in furthering fundamental substantive social policies.

*World-Wide Volkswagen*, 444 U.S. at 292, 100 S. Ct. at 564 (citations omitted). The Supreme Court has asserted that, once purposeful availment has been established, a defendant must make a "compelling case" that it is unreasonable or unfair to require it to defend a suit out of State. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S. Ct. 2174, 2184-85 (1985).

First Choice contends that the burden on it to comply with MCEMA is too great because there is no way to know where the emails will be received. It disputes MaryCLE's contention that it can discover the location of the email recipient by looking up the domain name registrant's address on searches such as the one

31

90

available on www.networksolutions.com, explaining that in cases where the domain is a common one, such as "hotmail," it is impossible to figure out where an individual recipient of an email would be located.

We reject First Choice's argument for two reasons. First, while it might be impossible to determine the location of an email recipient in cases of common domain names such as "hotmail," in this case that is not true. MaryCLE has demonstrated that a search on www.networksolutions.com indicates that "maryland-state-resident.com" is, unsurprisingly, registered in Maryland.

Second, we reject First Choice's approach to analyzing the "burden" imposed on it. The burden of complying with MCEMA is to disseminate truthful, non-deceptive emails; it is **not** to determine the location of email recipients. *See Washington v. Heckel,* 24 P.3d 404, 411 (Wash.), *cert. denied,* 534 U.S. 997, 122 S. Ct. 467 (2001)(discussed *infra* in Section II). First Choice remains free to send emails into Maryland so long as it does not violate the truth requirements of MCEMA. This is not a great burden to meet. First Choice attempts to distract us from the real burden here – sending only truth – by arguing that it is impossible to determine residency or location of receipt. "This focus on the burden of *non*compliance" misses the point. *See id.* at 411; *see also Ferguson v. Friendfinders, Inc.,* 94 Cal. App. 4th 1255, 1265 (Cal. Ct. App. 2002)(rejecting argument that burden imposed by UCE statute to

32

91

determine residency is too great; concluding that real burden is to comply with statute's substantive terms).

Turning to Maryland's interest in adjudicating this dispute, we observe that MCEMA was passed largely because the financial and social burden of UCE on Maryland consumers is great.  Maryland certainly has an interest in protecting its consumers, not only from the costs associated with UCE proliferation, but also from becoming the victims of fraud and schemes initiated by false and misleading email.  *Cf. Verizon Online,* 203 F. Supp. 2d at 621-22 ("Virginia has a strong interest in resolving this dispute because it involves a Virginia resident and Virginia law.  Indeed, Virginia recently enacted [a computer crime statute] to specifically address the conduct Defendants are accused of committing"); *Heckel,* 24 P.3d at 411 (state has a legitimate interest in creating a penalty for sending false and misleading spam to its residents).

Additionally, as the State of Maryland and the United States Internet Service Provider Association ("US ISPA") point out in the *amici* briefs filed in this case, the financial costs of spam and UCE are great.[25]  To this effect, a recent University of Maryland study concluded that deleting unwanted email costs nearly $22 billion annually in lost productivity.  *See* National Survey Finds 22.9 Million Hours a Week Wasted on Spam, http://www.rhsmith.umd.edu/ntrs/) (last visited Jan. 16, 2006).

---

[25]Again, we observe that not all spam is UCE.

*92*

Congress has similarly concluded that "spam would cost corporations over $113 billion by 2007." S. Rep. No. 108-102 (2003), http://www.thomas.loc.gov/cgi-bin/cpquery/T?&report=sr102&dbname108/ (last visited Jan. 16, 2006). The costs associated with spam or UCE can largely be explained by the time and effort that must be expended to delete it. Each unwanted email that a recipient attempts to respond to "instantly becomes three separate e-mail messages (and additional computer log entries)[.]" *Heckel,* 24 P.3d at 410 n.8. This is

> because: (1) the ISP server that is the victim of the fraudulent return address or domain name sends an error message back to the Internet user and their ISP announcing that the return path was invalid, (2) a message is sent to the server administrator requesting an investigation of the return address for potential problems, and (3) a message is sent to the server log in case the ISP wishes to track down the problem later.

*Id.* With mass mailings such as those sent by First Choice, "these messages snowball to clog ISP resources, and ISPs have little choice but to purchase additional equipment at a significant cost." *Id.* The cost is then passed onto consumer subscribers of Internet services. *See also Heckel,* 24 P.3d at 409-11 (detailing the costs associated with spam); *Ferguson,* 94 Cal. App. 4th at 1267-68 (same); 15 U.S.C. §§ 7701(a) (Congressional findings for the CAN-SPAM Act on the costs associated with spam).

With respect to MaryCLE's interest in obtaining relief, we similarly conclude that Maryland is the appropriate forum. MaryCLE

has a financial interest in recovering for the injury it allegedly suffered and has also asserted a claim for injunctive relief. Maryland is the state in which MaryCLE suffered that injury.[26] The Supreme Court has reasoned that jurisdiction is proper in the state in which "the brunt of the injury would be felt[.]"[27] *Calder v. Jones,* 465 U.S. 783, 789-90, 104 S. Ct. 1482, 1487 (1984). First Choice is aware that by sending potentially false and misleading emails, any injuries caused by those emails would be felt in the state in which they were received, rather than the state from which they were sent. *See Verizon Online,* 203 F. Supp. 2d at 617-18, 621-22.

Regarding the interstate judicial system's interest in obtaining the most efficient resolution of controversies, we conclude that because this claim is based on a Maryland state statute, the most efficient locus for the suit is Maryland itself. As we explained above, the Maryland legislature created a private cause of action to further the state's financial and social goals

---

[26]Although it admits that some of the emails were opened in Washington, D.C., MaryCLE alleged that some were opened in Maryland at Mr. Menhardt's residence. Further, NEIT Solutions, MaryCLE's ISP, is a Maryland corporation located in Maryland.

[27]This case, along with *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S. Ct. 1473 (1984), establish what has become known as the Supreme Court's "effects test" in personal jurisdiction cases. *See Verizon Online,* 203 F. Supp. 2d at 613. Under this approach, jurisdiction is proper if the "brunt of the injury," or the effects of the defendant's wrongful conduct, is felt most in the forum State. *See Calder v. Jones*, 465 U.S. 783, 789-90, 104 S. Ct. 1482, 1487 (1984).

94

in reducing the number of deceptive emails sent here. The
interstate judicial system has an interest in Maryland adjudicating
this claim because it seeks to enforce a Maryland prohibitory
statute. Maryland courts can do so most efficiently because they
are familiar with the Maryland statute.

We also consider that there is no showing in the record that
this is a case in which the defendant will be required to bring
numerous witnesses from another state. *See Burger King,* 471 U.S.
at 483, 105 S. Ct. at 2188. This is simply not a case in which
defending the suit in Maryland is "'so gravely difficult and
inconvenient' that [First Choice] unfairly is at a 'severe
disadvantage' in comparison" to MaryCLE, or a disadvantage of
"constitutional magnitude." *Id.,* 471 U.S. at 476, 484, 105 S. Ct.
at 1285, 1288.

Finally, we look at the shared interest of the several states
in furthering fundamental substantive social policies. In doing
this aspect of the analysis, we consider whether there might be a
potential conflict between two states' social policies that would
impact the exercise of jurisdiction. *See Burger King,* 471 U.S. at
477, 105 S. Ct. at 2185. We observe that New York has no
commercial email or spam statute; thus, there is no potential
conflict with respect to the two states' "social policies." *See*
David E. Sorkin, Spam Laws, http://www.spamlaws.com/state/ny/shtml
(information verified through Mar. 20, 2005)(last visited Jan. 16,

95

2006).

If we were to accept First Choice's argument that jurisdiction is not proper in Maryland because it is impossible to determine the residency of an email recipient, that would be equivalent to saying that First Choice could only be sued in New York. While certainly New York courts are capable of adjudicating a suit based entirely on a Maryland statute, limiting jurisdiction to New York does not promote Maryland's social policies *or* efficiency, particularly when the alleged harm occurs in Maryland. Applying similar reasoning, the federal court in *Verizon Online* commented that jurisdiction is proper in the state in which the harm is suffered, especially considering that many states have enacted anti-spam laws:

> [P]ermitting Defendants to escape personal jurisdiction simply because they claim they were unaware that Verizon's e-mail servers were located in Virginia would be fundamentally unfair. Setting such a precedent would allow spammers to transmit UBE[28] with impunity and only face suit if the injured party had the resources to pursue the litigation where the tortfeasor resides rather than where the injury occurred. . . . [A]llowing the spammer to evade personal jurisdiction in the forum where their conduct causes the greatest harm would frustrate [anti-spam] laws.

*Verizon Online,* 203 F. Supp. 2d at 622.

Because we determine that all three parts of the jurisdictional test are met, we conclude that personal jurisdiction

---

[28]"UBE" is "unsolicited *bulk* email."

over First Choice is proper.  Our next step is to examine First
Choice's challenge to MCEMA under the Commerce Clause of the
Federal Constitution.

## II.
## The Commerce Clause

### A.
### Constitutional Framework

The Commerce Clause, U.S. Const., art. I, § 8, cl. 3, empowers
Congress "to regulate Commerce with foreign Nations, and among the
several States."  "The Clause is both an affirmative grant of
legislative power to Congress and an implied limitation on the
power of state and local governments to enact laws affecting
foreign or interstate commerce."  *Bd. of Trs. of the Employees'
Ret. Sys. of Baltimore City v. Mayor and City Council of Baltimore,*
317 Md. 72, 131 (1989), *cert. denied,* 493 U.S. 1093, 110 S. Ct.
1167 (1990)(citations omitted).  "The aspect of the Commerce Clause
which operates as an implied limitation upon state and local
government authority is often referred to as the 'dormant' or
'negative' Commerce Clause."  *Id.*

In *Pike v. Bruce Church,* 397 U.S. 137, 142, 90 S. Ct. 844, 847
(1970), the Supreme Court established a two-part inquiry for
determining whether a state statute violates the dormant Commerce
Clause.  A reviewing court must first decide whether "the statute
regulates evenhandedly to effectuate a legitimate local public
interest, and its effects on interstate commerce are only

38

97

incidental[.]"    *Id.    See County Comm'rs of Charles County v.
Stevens,* 299 Md. 203, 208 (1984). In *Brown-Forman Distillers Corp.
v. N.Y. State Liquor Auth.,* 476 U.S. 573, 579, 106 S. Ct. 2080,
2084 (1986), the Court explained that, if the statute does not
regulate evenhandedly, or, in other words, discriminates against
out-of-state commerce, then the statute is unconstitutional.

If the statute survives the first part of the test, a court
must then engage in a balancing test to determine whether "the
burden imposed on such commerce is clearly excessive in relation to
the putative local benefits." *Pike,* 397 U.S. at 142, 90 S. Ct at
847. With respect to both parts of the *Pike* test, the Supreme
Court has held that "the critical consideration is the overall
effect of the statute on both local and interstate activity."
*Brown-Forman Distillers,* 476 U.S. at 579, 106 S. Ct. at 2084.

In several cases applying the *Pike* test, the Supreme Court has
invalidated statutes on the grounds that their "extraterritorial
effect" rendered them unconstitutional.[29] *See* Jack L. Goldsmith &
Alan O. Sykes, *The Internet and the Dormant Commerce Clause,* 110
Yale L.J. 785, 804-06 (2001)(examining cases and commenting on
extraterritoriality jurisprudence). In *Healy v. Beer Institute,*

---

[29]We are mindful that some legal scholars have concluded that
the Supreme Court's extraterritoriality jurisprudence, the major
decisions of which are plurality opinions, are "unsettled and
poorly understood[.]" Jack L. Goldsmith & Alan O. Sykes, *The
Internet and the Dormant Commerce Clause,* 110 Yale L.J. 785, 789
(2001).

491 U.S. 324, 336-37, 109 S. Ct. 2491, 2499-2500 (1989)(plurality opinion), the Supreme Court explained its extraterritoriality jurisprudence:

> The principles guiding [an extraterritoriality] assessment, principles made clear in *Brown-Forman* and in the cases upon which it relied, reflect the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States with their respective spheres. Taken together, our cases concerning the extraterritorial effects of state economic regulation stand at a minimum for the following propositions: First, **the "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State"** . . . . Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. **The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State.** Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by **considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.** Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State. (Emphasis added; citations and footnotes omitted.)

99