# EXHIBIT M

Gordon v. Virtumundo Inc et al										Doc. 41 Att. 13
Case 2:06-cv-00204-JCC			Document 41-14			Filed 11/02/2006		Page 1 of 3

of Riverside, California are exceptional. Riverside has been fortunate to have dynamic and dedicated community leaders who willingly and unselfishly give their time and talent and make their communities a better place to live and work. Don Harriger, General Manager of the Western Municipal Water District is one of these individuals. On Wednesday, January 28, 2004, he will be honored at a special retirement dinner.

Don was appointed General Manager in 1989, and has been responsible for the planning, direction, management, and overall supervision of the activities and operations of the District.

Prior to his appointment as General Manager, Don served the District as Assistant General Manager. In that previous position, he was appointed by the court to two Watermaster Committees, appointments he currently still holds. The Western-San Bernardino and the Santa Ana River Watermaster Committees were established as part of the 1969 Stipulated Judgments that settled the massive water rights issues in the Santa Ana Watershed. In June of 2003, Don was elected chairperson of the Santa Ana River Watermaster Committee.

Before joining Western, Don was Chief Engineer and Assistant Manager of the Santa Ana Watershed Planning Agency, the forerunner of the present-day Santa Ana Watershed Project Authority (SAWPA), a joint powers agency responsible for regional water resources planning and project implementation. At SAWPA, he was primarily responsible for the technical direction of the development of the Santa Ana Watershed Basin Plan. Prior to his position at SAWPA, Don was associate engineer with the State of California, Department of Water Resources.

A California registered professional engineer, Don received his Bachelor of Science Degree in Civil Engineering from the University of Illinois and his Master of Science Degree from California State University Sacramento. He and his wife Arvina reside in Riverside.

Don's leadership at the Western Municipal Water District has contributed immensely to the betterment of the District and the community of Riverside, California. I am proud to call Don a fellow community member, American and friend. I know that many community members are grateful for his service and salute him as he retires.

HONORING JUDGE JOSEPH MATTINA UPON THE OCCASION OF HIS RETIREMENT

## HON. THOMAS M. REYNOLDS

OF NEW YORK
IN THE HOUSE OF REPRESENTATIVES

Wednesday, January 28, 2004

Mr. REYNOLDS. Mr. Speaker, as the Western New York community gathers tonight to celebrate the life and career of the Honorable Judge Joseph Mattina, I rise to pay tribute to this outstanding jurist and dedicated public servant.

Throughout his career, Judge Mattina has been an exemplary community leader. Over his 40 years as a Supreme Court and Surrogate Court Judge, he has displayed a selfless commitment to our fellow citizens and to the betterment of our community. He has truly served our society with tireless devotion, and his community contributions distinguish him as an example for us all.

As a judge, his name has become well known throughout both New York State and our nation. He has presided over significant and challenging trials, such as the Attica Prison Rebellion. He has also been influential in overseeing important programs throughout the State.

But Judge Mattina is known not only for his contributions to his profession, but for his contributions to our community. He is a decorated awardee, recipient of such awards as "Outstanding Citizen of the Year" and the "National Brotherhood" award. He has been honored by Time Magazine and has been inducted as a charter member of the Hall of Honor at the National Judicial College. He will be honored yet again this year when a state-of-the-art medical center located in Buffalo, NY is named after him: the Judge Joseph S. Mattina Medical Center. This is in recognition of his more than 35 years of service as a volunteer and as an important advocate of the construction of this facility.

Judge Mattina has earned a legacy of outstanding leadership and superb dedication. He has made significant and considerable contributions to our community, for which we are all incredibly thankful.

Mr. Speaker, I ask that this Congress join me in honoring Judge Joseph Mattina, and wish him the best of luck upon his retirement.

S. 877– CONTROLLING THE ASSAULT OF NON-SOLICITED PORNOGRAPHY AND MARKETING ACT OF 2003– CAN-SPAM ACT OF 2003 (PL 108–187)

## HON. JOHN D. DINGELL

OF MICHIGAN
IN THE HOUSE OF REPRESENTATIVES

Wednesday, January 28, 2004

Mr. DINGELL. Mr. Speaker, this statement represents my views as well as the views of W.J. "BILLY" TAUZIN, Chairman of the Committee on Energy and Commerce, on S. 877 the Can-Spam Act of 2003 ("the Act"). Our views on Sections one through five of the Act are contained in a separate statement submitted today by Chairman TAUZIN.

Section 6 of the legislation prohibits a person from allowing commercial e-mail messages in violation of section (5)(a)(1) to be sent by a third party if that person had knowledge of such promotion, expected to receive economic benefit from such promotion, and took no action to prevent the transmission of the e-mail messages or report such messages to the Federal Trade Commission. This section should not be interpreted to preclude any action brought under section 5 arising out of the same conduct.

Section 7 of the legislation sets forth enforcement provisions for the Act.

Subsection (a) provides for enforcement of the Act by the Federal Trade Commission (FTC) under section 18(a)(1)(B) of the Federal Trade Commission Act.

Subsection (b) provides for enforcement of the Act by certain other Federal functional regulators.

Subsection (e) provides the FTC and the Federal Communications Commission (FCC) may seek injunctive relief or cease and desist orders without the showing of knowledge otherwise required under this Act.

Subsection (f) sets forth enforcement of the legislation by the States.

Paragraph (1) provides that the attorney general, or other official or agency of the State, may bring civil actions exclusively in Federal district court to enjoin violations of section 5 of the Act or obtain damages on behalf or residents of the State, equal to the greater of actual damages or statutory damages as determined under paragraph (3).

Paragraph (2) provides that State attorneys general may seek injunctive relief without the showing of knowledge otherwise required under the Act.

Paragraph (3) sets forth statutory damages.

Subparagraph (A) provides that for purposes of paragraph (1)(B)(ii) damages are determined by multiplying the number of violations, with discrete separately addressed unlawful messages each counting as a separate violation, by up to $250.

Subparagraph (B) limits the damages a state attorney general may recover for violations of section 5, other than section 5(a)(1) to no greater than $2,000,000.

Subparagraph (C) allows the court, in its discretion, to increase the amount of damages awarded under subparagraph (b) to three times the amount set therein if the court finds that the defendant's conduct was willful and knowing or the defendant's unlawful activity includes one or more of the aggravating violations set forth in section 5(b).

Subparagraph (D) provides for a reduction of damages. In assessing damages under subparagraph (A), the court may consider factors including whether the defendant has established and implemented, with due care, commercially reasonable practices and procedures designed to prevent violations of section 5. The court may consider whether the violation occurred despite commercially reasonable efforts to maintain compliance with the practices and procedures designed to prevent such violations.

Subsection (f) also provides that in the case of a successful action under paragraph (1), the court, in its discretion, may award costs of the action and reasonable attorney's fees to the State.

Subsection (g) provides for a limited right of action by bona fide Internet service providers. Paragraph (1) grants to Internet service providers adversely affected by a violation of section 5(a)(1), 5(b), or 5(d) or a pattern or practice that violates paragraph (2), (3), (4), or (5) of section 5(a) the right to bring civil action in Federal district court. The term "Internet access service" is defined to have the same meaning given that term in section 231(e)(4) of the Communications Act of 1934.

Subsection (g)(2) contains a special definition of "procure" for purposes of ISP enforcement actions that includes a scienter requirement with regard to whether a person who initiates commercial email on their behalf is engaging or will engage in a pattern or practice that violates this Act. It is the intent, with regard to the falsification violations of Section 5(a)(1), that "conscious avoidance of actual knowledge" be construed broadly in a manner consistent with a fundamental purpose of this Act to prohibit and deter falsification techniques in commercial e-mail. Therefore if the procurer has an indication that the initiator is

or has engaged in any falsified spamming technique prohibited by Section 5(a)(1) or 18 U.S.C. 1037, the Act is intended to be read so that such a procurer meets the standard of "conscious avoidance of actual knowledge" of violations of the Act by an initiator unless the procurer and takes reasonable steps to prevent such violations by the initiator.

Actual knowledge or conscious avoidance of actual knowledge could be evidenced, for example, by information obtained by the procurer directly from an initiator, or via a complaint, warning or cease and desist communication received from a recipient, Internet access service, or law enforcement alerting the procurer that an initiator to whom the procurer is providing consideration is violating the law. Conscious avoidance of actual knowledge could also be evidenced, for example, by: (1) Doing little or nothing to determine whether suspect initiators who are marketing partners, resellers, affiliates, agents or contractors of the procurer are violating or have violated Federal or State law; (2) failing to follow the procurer's stated policies or procedures prohibiting illegal e-mail advertising methods by initiators who are marketing partners, resellers, affiliates, agents or contractors; (3) repeatedly allowing initiators who are engaged in illegal e-mail advertising methods to provide false information or to fail to identify themselves when they sign up to conduct e-mail advertising for the procurer's products or services; (4) repeatedly paying initiators whom the procurer has terminated for violating the procurer's e-mail policies prohibiting illegal spamming methods; or (5) allowing initiators who have been terminated for violating the procurer's policies prohibiting illegal e-mail activities repeatedly to sign up for new accounts. The above is not an exhaustive list of ways in which the requisite state of mind can be evidenced.

Subparagraphs (f) and (g) allow enforcement actions for violations of certain parts of Section 5 to be brought by States and ISPs only for a "pattern or practice" of violations. The Act regulates a wide variety of commercial e-mail practices, some of which are deemed more deplorable than others and subject to higher penalties.

Such action may seek to enjoin further violations by defendants, or collect certain limited monetary damages. It is our intention that these cases be based on bona fide violations and not used as tools for anti-competitive behavior among competitors. Additionally, we intend that Internet access service providers provide actual Internet access service to customers.

Statutory damages for Internet service providers are at a lower level than those provided to federal and state regulators.

Section 8 provides for the effect of the legislation on other law.

Section (b) provides for preemption of state laws that expressly regulate the use of e-mail to send commercial messages, including laws that regulate the form or manner of sending commercial e-mail (e.g. labeling requirements). It does not preempt statutes dealing with fraud, falsity, or deception in any portion of a commercial e-mail message or attachment thereto. Thus, State opt-in spam laws, such California S.B. 186 enacted in the fall of 2003, state opt-out spam laws, and state ADV labeling requirements for commercial e-mail would be entirely preempted, except to the limited extent that those laws also prohibited use of falsification techniques or deception such as those prohibited in 18 U.S.C.1037, Section 5(a)(1) and Section 5(a)(2) of this Act. Similarly, State anti-spam laws, such as Virginia's, that expressly regulate or criminalize e-mail falsification techniques would not be preempted. In addition, Section 8(b) is not intended to preempt general purpose State deceptive trade practice laws, or State common law rules, such as State trespass to chattels theories, that have been used in anti-spam litigation. Nor does Section 8(b) preempt State laws relating to acts of fraud or computer crime. However, to the extent any State or local law regulates the manner of sending commercial e-mail, the mere titling of the law as an "anti-fraud statute" or the combination of commercial e-mail regulation provisions with actual falsification or computer crime provisions in the same statute is not sufficient to avoid preemption of those regulatory provisions by this Act.

Section 9 provides the FTC with authority to establish a do not e-mail registry.

The provision requires the FTC to set forth a plan and timetable for establishing a national do not e-mail registry. The FTC is required to report to the Congress on any practical, technical, security, privacy, enforceability or other concerns the FTC may have with such a registry.

We expect that the FTC will proceed with due care in this important inquiry. In particular, the FTC should take care not to inadvertently adopt a do not e-mail registry that would facilitate the availability of working e-mail addresses to persons who might use them in violation of this Act.

Section 14 requires the FCC to promulgate rules to prevent the sending of unsolicited e-mail messages to wireless customers, without the express consent of such customers.

———

S. 877– CONTROLLING THE ASSAULT OF NON-SOLICITED PORNOGRAPHY AND MARKETING ACT OF 2003– CAN-SPAM ACT OF 2003 (PL 108–187)

## HON. W.J. (BILLY) TAUZIN
OF LOUISIANA
IN THE HOUSE OF REPRESENTATIVES

Wednesday, January 28, 2004

Mr. TAUZIN. Mr. Speaker, this statement represents my views as well as the views of the Ranking Member of the Committee on Energy and Commerce, JOHN DINGELL, on S. 877, the CAN-SPAM Act of 2003 ("the Act"). The House passed S. 877 by unanimous consent on December 8, 2003, and the President signed S. 877 into law on December 16th 2003 (Public Law 108–187). These views are in addition to those included in the November 21, 2003 and December 16, 2003, floor debate on S. 877.

The purpose of the CAN-SPAM Act of 2003 is to prohibit certain predatory and abusive practices used to send commercial e-mail, provide consumers with the ability to more easily identify and opt-out of receiving other unwanted commercial e-mail, and to give such opt-outs the force of law. The legislation provides enforcement tools to the Federal Trade Commission (FTC), the Department of Justice (DOJ), other Federal regulators, States' Attorneys General and bona fide Internet service providers (ISPs) to enforce compliance with the Act.

The Act's scope provides extensive jurisdiction over commercial e-mail by, among other things, cross-referencing definitions of terms such as "protected computer" as that term is used in Section 1037(e) of Title 18, United States Code. This jurisdiction may be interpreted to extend extraterritorially. It is the intent of the Act to broadly assert jurisdiction over commercial e-mails—from any source—that are sent to U.S. recipients or that use protected computers in the U.S. to affect any of the deceptive spamming activities prohibited in Section 1037 of Title 18 or Section 5(a)(1) of the Act's civil provisions, as well as jurisdiction over computers and computer servers engaged in communication with the United States which are used to send such commercial e-mails that otherwise cause harm to commerce in the United States. However, the managers also recognize that because of the nature of the Internet, commercial e-mail which is in no way falsified may transit the United States as a matter of routine conveyance without the knowledge of the initiator or sender, without being received by any U.S. consumers and with minimal impact here. For example, a travel agency located in Spain using computers that are sometimes in communication with the United States might send unfalsified commercial e-mail promoting travel specials exclusively to consumers in Chile but those e-mails would be routed as a matter of course through computer servers located in California without the knowledge of the initiator or sender. The Act is not intended to regulate the contents of such legitimate commercial e-mail messages (by, for instance, imposing the Act's required inclusions and opt-out regime) merely because they transit the United States or are sent from computers in communication with the United States, provided such commercial e-mails are not falsified in a manner prohibited by Section 1037 of Title 18, or Section 5(a)(1) or directed to or received by U.S. consumers and do not otherwise cause harm here.

Section 1 of the legislation sets forth the short title, the CAN-SPAM Act of 2003.

Section 2 of the legislation sets forth various Congressional findings and determinations. Such findings and determinations are in addition to those in this statement.

Section 3 sets forth definitions.

The term "Commercial electronic mail message" is defined as any e-mail message, the primary purpose of which is commercial advertisement or promotion of a commercial product or service. The definition of commercial electronic mail message does not include transactional e-mail. The purpose of this provision and its relationship to the definition of "transactional or relationship message" is to exclude from most of the requirements of the legislation, e-mail messages that are pursuant to existing transactional relationships between a consumer and an e-mail sender.

The term "Electronic mail message" is intended to capture e-mail messages sent to a unique electronic mail address as that term is commonly understood and should be read to include messages sent to a unique electronic mail address where the reference to the Internet domain or "domain part" in the message is implicit and does not appear or is not displayed explicitly. This is not intended to expand or contract the commonly understood

ADK 001229