Gordon v. Virtumundo Inc et al Doc. 53

Douglas E. McKinley, Jr.
PO Box 202
Richland WA, 99352
(509) 628-0809

MERKLE SIEGEL & FRIEDRICHSEN, P.C.
Robert J. Siegel
1325 Fourth Ave., Suite 940
Seattle, WA 98101
(206) 624-9392

THE HON. JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON, SEATTLE

| | |
|---|---|
| **JAMES S. GORDON, Jr., a married individual, d/b/a 'GORDONWORKS.COM',**<br><br>**Plaintiff,**<br><br>v.<br><br>**VIRTUMUNDO, INC, a Delaware corporation, d/b/a ADNOWLEDGEMAIL.COM; ADKNOWLEDGE, INC., a Delaware corporation, d/b/a ADKNOWLEDGEMAIL.COM; SCOTT LYNN, an individual; and JOHN DOES, I-X,**<br><br>**Defendants.** | **NO. CV06-0204JCC**<br><br>**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

MERKLE SIEGEL & FRIEDRICHSEN
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

Dockets.Justia.com

## The Relevant Facts

The material facts of this matter are uncontested. Defendant Virtumundo is a large, highly successful, privately held corporation whose primary business consists of sending billions of commercial electronic mail messages over the internet (hereafter "commercial emails," "emails", "spam emails," or "spam") to hundreds of millions of people throughout the United States and the world.[1] The Wall Street Journal estimates that by sending this massive volume of spam Defendant Virtumundo generates annual revenues as high as one hundred million dollars ($100,000,000.00).[2] Approximately 13,000 of Defendants' spam were received by a small Internet Access Service located in Washington State owned and operated by the Plaintiffs, James S. Gordon Jr. and Omni Innovations (hereafter collectively "Gordon"). 7,890 of these emails form the basis of this motion.[3]

The information the Defendant placed in the "From" line of these emails does not accurately identify the sender of the emails. Instead, the Defendant placed ambiguously worded advertising copy in the "From" line of the header, followed by an ambiguous email address that provides no further indication of the actual name of the sender. When received by a typical email user, only the advertising copy is shown, and the recipient has no way of knowing who sent the email without opening it. These emails, showing this header information, are set forth as

---

[1] Defendant Virtumundo estimated at depositions that it sends up to 1.5 billion emails per month

[2] The Defendants have declined to state their income, however, the press has set forth this estimate. See http://kansascity.bizjournals.com/kansascity/stories/2001/12/31/story2.html

[3] The Plaintiff realizes that the Plaintiff has been inconsistent in setting forth the total number of spam sent by the Defendants. The Declaration of James S. Gordon, Jr. sets forth the reasons for these inconsistencies.

MERKLE SIEGEL & FRIEDRICHSEN
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

Exhibit A to the declaration of James S. Gordon, Jr. filed concurrently herewith (hereafter the "Gordon declaration"). Examples of the complete "from" line from these emails include the following:

**From: "Criminal Justice"** <CriminalJustice@vm-mail.com>

**From: "Public Safety"** <PublicSafetyDegrees@vmadmin.com>

**From: "Trade In"** <TradeIn@vm-mail.com>

In each of these emails, as is the case with all 7,890 emails at issue here, no actual sender is identified in the "From" line in any meaningful sense.

**The Issue Before the Court**

The Plaintiffs' contend that the information Defendants place in the "From" fields of these commercial emails violates the `Controlling the Assault of Non-Solicited Pornography and Marketing Act (15 U.S.C. 7701, et seq., Public Law No. 108-187, (hereafter "the Act" or "the CAN-SPAM ACT"), and the Washington State's Commercial Electronic Mail Act, (RCW 19.190 et seq. (hereafter "CEMA") because a typical user is unable to identify the sender of the email without opening the email. Accordingly, this motion presents the following question of statutory interpretation:

*Does a commercial electronic mail message that does not accurately identify the sender of the email in the "From" field of the header comply with the CAN SPAM Act and/or CEMA?*

On first impression, this may appear to be a trivial question. It is not. The internet, and specifically email, is rapidly becoming the preferred and most utilized mode of communication in the U.S. for both commercial and personal purposes. Not coincidentally, the spam industry

**MERKLE SIEGEL & FRIEDRICHSEN**
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

has become pervasive, both in its size and in its impact. Other Courts have noted that the cost of spam to the US economy is substantial; "deleting unwanted email costs nearly $22 billion in lost productivity." *MaryCLE, LLC v. First Choice Internet, Inc.*, 166 Md.App. 481, 890 A.2d 818, 836 (Md. Spec. App. Jan. 26, 2006). The Court's ruling in this case will determine how multi-million dollar email marketing corporations like the Defendants must address the trillions of emails they send to the general public. This, in turn, will determine how these trillions of emails will appear in the inboxes of hundreds of millions of email users throughout the United States. Since the Court's ruling will clarify both the Federal and State standard for how the "From" line of these spam emails is displayed to the American public, the Court's ruling will determine the amount of time and effort hundreds of millions of email users will have to expend to accurately distinguish between the flood of unwanted commercial emails that they wish to delete and/or filter from their inboxes, and the vastly smaller volume of non-spam email messages which the recipient actually wants to open and read as part of their private and professional lives.

While the time and energy associated with each of these individual decisions may be small, cumulatively the time and expense is monumental. The sheer size of the spam industry, and the massive volume of the spam that it generates, insures that even seemingly inconsequential differences in how easily spam can be identified and deleted by the recipient add up to enormous amounts of time and money wasted doing so. National surveys have shown that 22.9 million hours a week are wasted on Spam. *Id.* at 836. Thus, the Court's ruling determine whether the US economy endures billions of dollars in wasted time and lost productivity, an economic impact that will dwarf the amount in dispute between these parties.

**MERKLE SIEGEL & FRIEDRICHSEN**
**1325 Fourth Ave., Suite 940**
**Seattle, WA 98101**
**Phone: 206-624-9392**
**Fax: 206-624-0717**

**Legal Standard**

A court should grant summary judgment when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. A court must regard the evidence in the most favorable light to the nonmoving party. *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir.2004). Once a summary judgment motion is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). There are no material facts in dispute, and this case is ripe for summary judgment as to the issues presented here.

**Argument**

Avoiding billions of dollars of lost productivity is not a sufficient reason alone for the Court to rule that the CAN SPAM Act and CEMA require spam to accurately identify the person who sent the email in the "From" field of the header. Rather, the Court should hold that substituting the name of the "person who initiated" the email for advertising copy in the "From" field of the header violates the CAN-SPAM Act and CEMA because that was the clear intent of Congress and of the Washington State legislature in enacting the respective statutes.

**THE CAN-SPAM ACT**

The CAN SPAM statute demonstrates conclusively that the accurate identification of the actual sender of a commercial electronic mail message in the "header" portion of that email is both required under, and central to, Congress' scheme to regulate commercial email. A "header" is defined at 15 USC 7702(8):

**MERKLE SIEGEL & FRIEDRICHSEN**
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

(8) HEADER INFORMATION- The term `header information' means the source, destination, and routing information attached to an electronic mail message, including the originating domain name and originating electronic mail address, and any other information that appears in the line identifying, or purporting to identify, a person initiating the message. (emphasis added)

While the definitions section of the Act does not define the term "from line," 15 USC 7704(a)(1)(B) provides that:

(B) a `from' line (the line identifying or purporting to identify a person initiating the message) that accurately identifies any person who initiated the message shall not be considered materially false or materially misleading; (emphasis added).

Taken together, these definitions demonstrate Congress' understanding that the "From" line in a "header" is used to "identify a person initiating the message." The convention that the "From" line is to be used to identify the person who sent the email is thus explicit in the Act, and is entirely consistent with the everyday experience of millions of email users. Assuming arguendo, that "person" is understood to include entities such as the Defendant corporation, the fact that Defendant Virtumundo here failed to identify itself in the "From" line, but instead falsely displayed its identity as advertising copy, is indisputable.

**"From" Lines in E-Mail Headers**

To fully appreciate the Congressional intent behind the Act, and why the Defendant's conduct violated the Act, it is helpful to have a more detailed understanding of how a "From" line actually operates. A useful explanation has been provided by the email marketing industry itself. Roving Software Incorporated, d/b/a Constant Contact, describes itself as "the leading provider of email marketing services to small businesses, associations, and nonprofits." As explained by Constant Contact on their website, the "From" line in the header has two parts:

MERKLE SIEGEL & FRIEDRICHSEN
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

Part one is the "From Name" - the name, such as "Constant Contact's Email Marketing Diva, Michelle Keegan" also identified in some programs as the "Sender." Part two is the "From Address" - the electronic address including "@" such as, tips@constantcontact.com.[4] As explained by Constant Contact, "Your recipients may see just the From Name, just the From Address, or both depending on their email client or reader."

Thus, there are two parts to the "From" line portion of the header referenced at 15 USC 7704(a)(1)(B); the "From name" which should identify the name of the actual person or entity who sent the email, i.e., the sender, and the "From address" which is the return email address of the sender. These two bits of information can be distinguished by their function, and by their intended audience. The "From name" of the sender is entirely informational, and exclusively directed to human beings. The only proper function of the "From name" is to inform a human recipient of the true identity of the sender. The "From address," on the other hand, is primarily functional. It provides an address for a reply email, and is written using the syntax used by computers to route email across the internet. The "From address" is thus information that is primarily used by computers. The "From name" can thus be distinguished from the "From address" because the only purpose of the "From name" portion of the "from line" is to display, and thereby reveal, the name of the actual sender to the human being who receives the email without the recipient having to actually open the email. The Court should note that, unlike the spam Defendant sent to Gordon, the headers in internal Virtumundo corporate email that Virtumundo employees use to send email to and from one another correctly include the name of

---

[4] http://www.constantcontact.com/learning-center/hints-tips/volume7-issue5.jsp

MERKLE SIEGEL & FRIEDRICHSEN
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

the actual person who sent the email in the "from name" field, so that the recipient will know who it is from without having to open it. (See Exhibit B to Gordon Declaration). This is typically the case with emails sent by and between individuals and entities when they are not trying to hide their identities.

**Displaying "From Lines" in Email Programs**

The significance of the "From name" and "From address" to the spam industry lies in how this information is displayed to an email recipient. As set forth in the Gordon Declaration, it is typical for an email recipient to see only the "From name" portion of the header, and not the "From address" portion. In the instant case, only the "From name" portion of the emails were displayed to Mr. Gordon by his email program, Eudora, as shown in Exhibit C of the Gordon declaration. As seen in the exhibit and the example below, Gordon's email program only displays the "From name" portion of the header in the "who" field, and does not display the "From address" portion at all.

Gordon's view of these emails is typical. Most email programs display only the "From name" portion of the header, and do not display the "From address" portion at all. (Paragraph 18 Gordon declaration). Gordon's declaration is buttressed by an article published June 2, 2003, during the months leading up to Congress' passage of the Act, where email marketer "EmailLabs" provided a chart of the main email clients, and how those email clients displayed

**MERKLE SIEGEL & FRIEDRICHSEN**
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

the "From name" and the "From address." (Exhibit D Gordon declaration)[5] As shown in the EmailLabs chart, each and every email client in use at the time, with the sole exception of AOL, displayed the "from name" either exclusively, or at least first, in the email client inbox.

There is also no doubt that the email marketing industry was and is keenly aware of the importance of the "From name" in getting their emails opened. An industry publication article from Constant Contact opens with the following quote:

> According to the DoubleClick Consumer Email Study released in late 2002, 60% of respondents cite the "From" line as the most important factor motivating them to open emails, while 35% cited the "Subject" line.

(See Gordon declaration Exhibit "E")

The EmailLabs article (Gordon declaration Exhibit "D") agrees, stating:

> Among the many challenges of distributing email newsletters and campaigns are the varying ways that email clients render your From and Subject lines. Why is optimizing the From and Subject lines so important? It's simple, really. The From line is what recipients use to determine whether to delete an email. The Subject line is what motivates people to actually open the email.

**Congressional Recognition of the "From Line" Portion of the Header**

It is clear from the legislative history that Congress understood the significance of the "From name" portion of the header, and the distinction between the "From name" and the "From address." It is also clear that Congress intended that the Act compel the sender to accurately identify themselves in the header of the email, <u>beyond simply providing an ambiguous return email address</u>, regardless of whether such address may actually be registered to the otherwise disguised sender.

---

[5] http://www.emaillabs.com/email_marketing_articles/article_optimizeforclients.html

MERKLE SIEGEL & FRIEDRICHSEN
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

> "If enacted, S. 877 would require senders of all commercial e-mail to include a valid return e-mail address and other header information with the message that accurately identifies the sender and Internet location from which the message has been sent." Sen. Rep. No. 108-102, at 7 (2003) (emphasis added).

Thus, the importance of the "From" line to both email marketers, and the Congressional scheme to regulate email marketers, cannot be overstated.

For commercial email to achieve its intended result, it first must be received by a recipient. As a result, a virtual arms race has developed between the email marketers, sometimes known as "spammers" and their targets, with the spammers continuingly developing ever more nefarious ways to circumvent spam filter countermeasures. Once a spam has reached a targeted email inbox, it is critical that the spammer induce the recipient to actually open and read the spam email. Tricking recipients into actually clicking on, and thereby opening spam, is a critical skill for a successful spammer. Thus, the information in the "From name" is critical to preventing a recipient from deleting the spam, and then enticing the recipient to open it.

The vast majority of e-mail users decide whether to read the email message, or to delete it as spam, based only upon two pieces of information: the "from name" and the subject line. For the spammer hoping to have their email opened and read, these two fields in a spam header represent their only opportunity to convince the target to open it and read it. It is no surprise that sophisticated, multi-million dollar spammers like the Defendants here would not want to waste this valuable space revealing their actual identity. Instead, they use that space to falsify their identity by replacing it with advertising copy. The only surprise is that the Defendants think they can convince the Court that doing so is legal.

**MERKLE SIEGEL & FRIEDRICHSEN**
**1325 Fourth Ave., Suite 940**
**Seattle, WA 98101**
**Phone: 206-624-9392**
**Fax: 206-624-0717**

**Congress Did Not Intend to Force Consumers To Open Spam**

Congress explicitly recognized the importance of providing email recipients with information necessary to accurately identify the sender and the subject of commercial email without having to open unwanted spam emails to find this information. 15 USC 7701(b)(2) & (3) explicitly sets forth the Congressional intent for the Act:

> "the Congress determines that … senders of commercial electronic mail should not mislead recipients as to the source or content of such mail" (emphasis added)

15 USC 7701(a)(7) & (8) recites the Congressional findings upon which this intention is based:

> (7) Many senders of unsolicited commercial electronic mail purposefully disguise the source of such mail.
> (8) Many senders of unsolicited commercial electronic mail purposefully include misleading information in the messages' subject lines in order to induce the recipients to view the messages. (emphasis added).

Congress thus explicitly recognized in the Act that part of the problem with the spam industry was that spammers used deception to induce recipients to open emails that they would not otherwise open. Congress further articulated the reasons for Congress' concern that consumers were being forced or tricked into opening spam messages in the legislative history of the Act.

> "The inconvenience and intrusiveness to consumers of large volumes of spam are exacerbated by the fact that, in many instances, the senders of spam purposefully disguise the source or content of the e-mail by falsifying or including misleading information in the e-mail's "From", "reply-to", or "subject" lines. Thus, the recipient is left with no effective ability to manage the constant inflow of spam into an e-mail inbox because he or she cannot often tell without opening the individual messages who is sending the messages or what they contain…" Sen. Rep. No. 108-102, at 3 (2003) (emphasis added).

**MERKLE SIEGEL & FRIEDRICHSEN**
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

"Furthermore, headers continued to be falsified, not only to trick ISPs' increasingly sophisticated spam filters, but also to lure consumers into mistakenly opening messages ..." Id. at 3. (emphasis added).

"Additionally, many spam messages contain "Web bugs" or other hidden technological mechanisms to immediately notify spammer via the Internet with an unsolicited message has been opened. Far short of replying to a spam message, a consumer's mere act of opening a spam message containing a web bug may eventually cause that consumer to receive more spam as a result of confirming to the spammer his or her willingness or susceptibility to open unsolicited e-mail." Id. at 4. (emphasis added).

Congress also provided reasons for the policy of forcing spammers to identify themselves without requiring a recipient to open their email directly in the Act. For example, 15 USC 7701(a)(5) notes:

"Some commercial electronic mail contains material that many recipients may consider vulgar or pornographic in nature."

Plainly, Congress was trying to provide the public with a way to identify pornographic and vulgar emails without having to open them.

"In its recent report, the FTC found that more than 40% of all pornographic spam either did not alert recipients to images contained in the message or contain false subject lines, thus "making it more likely that recipients would open the messages without knowing that pornographic images will appear." Unsuspecting children who simply open e-mails with seemingly benign subject lines may be either a front-end with pornographic images in the e-mail message itself, or out automatically and instantly taken - without requiring any further action on their part (like clicking on a link) - to an adult webpage exhibiting sexually explicit images." Sen. Rep. No. 108-102, at 4 (2003) (emphasis added).

Congress had good reasons to protect the public from being tricked into opening spam emails in addition to unwanted exposure to vulgarity and pornography. Opening email from an unknown source carries a substantial risk. In addition to the "web bugs" Congress discussed in the legislative history, email is a primary means by which malicious computer viruses are

**MERKLE SIEGEL & FRIEDRICHSEN**
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

distributed. Opening an email message from an unknown source can have catastrophic consequences. Malicious viruses carried by spam emails can not only destroy an unsuspecting recipient's computer by causing it to "crash", but can also hijack the recipient's computer to replicate and send out copies of themselves to all of the recipient's contacts. The mere act of opening malicious emails has resulted in untold damages to computer resources worldwide. (Exhibit F to Gordon Declaration). It is notable, perhaps, that one of the most well known and destructive viruses in 2005 was actually named after Defendant "VirtuMundo." (Exhibit G to Gordon Declaration). Given the notoriety of this virus, it is perhaps understandable that these Defendants do not want to identify themselves in their "From" lines. But that doesn't make it legal.

Congress explicitly recognized that the mere act of reviewing and discarding the tremendous volume of spam email imposes a significant cost on the economy, even if that spam does not contain malicious computer viruses and pornography. At 15 USC 7701(a)(2), (3) & (4) the Act recites the Congressional findings:

> (2) The convenience and efficiency of electronic mail are threatened by the extremely rapid growth in the volume of unsolicited commercial electronic mail. Unsolicited commercial electronic mail is currently estimated to account for over half of all electronic mail traffic, up from an estimated 7 percent in 2001, and the volume continues to rise. <u>Most of these messages are fraudulent or deceptive in one or more respects</u>.
>
> (3) The receipt of unsolicited commercial electronic mail may result in costs to recipients who cannot refuse to accept such mail and who incur costs for the storage of such mail, <u>or for the time spent accessing, reviewing, and discarding such mail</u>, or for both.
>
> (4) The receipt of a large number of unwanted messages also decreases the convenience of electronic mail <u>and creates a risk that wanted electronic mail messages, both commercial and noncommercial, will be lost, overlooked, or discarded amidst the larger</u>

MERKLE SIEGEL & FRIEDRICHSEN
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

> volume of unwanted messages, thus reducing the reliability and usefulness of electronic mail to the recipient. (emphasis added).

Thus, there can be no question that Congress intended to force email marketers to provide email users with accurate identifying information that would allow them to minimize "the time spent accessing, reviewing, and discarding" unwanted email. Congress explicitly recognized that commercial electronic mail was purposefully designed to "induce the recipients to view the messages." Congress also explicitly recognized that "most of these messages are fraudulent or deceptive in one or more respects" and that they "create a risk that wanted electronic mail messages… will be lost, overlooked, or discarded amidst the larger volume of unwanted messages." Accordingly, it is beyond dispute that one of Congress' goals for the regulatory scheme set up by the Act was to require the sender of commercial emails to provide header information that would allow email users to immediately and accurately recognize the actual identity of the sender of the email and the subject *without having to take the time and energy to actually open the unwanted spam emails*. Consequently, Congress achieved this goal the only way that it could, by regulating the only part of the email that a recipient could view without opening the email: the content of the headers.

**Congress Intended to Force Email Marketers To Accurately Identify Themselves in the Header Information**

The requirement is set forth at 15 USC 7704(a)(1):

> (a) REQUIREMENTS FOR TRANSMISSION OF MESSAGES-
> (1) PROHIBITION OF FALSE OR MISLEADING TRANSMISSION INFORMATION- It is unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message, or a

MERKLE SIEGEL & FRIEDRICHSEN
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

> transactional or relationship message, that contains, or is accompanied by, header information that is materially false or materially misleading…

If the Court accepts the premise that Congress intended and assumed that the "From name" field is supposed to be used to accurately identify the sender of an email, it becomes indisputable that the information provided by the Defendants in their "From name" fields is false and deceptive. Under the Act, the only information that could be used in a "From name" field that would not be false is the actual, accurate identity of the person or entity who actually sent the e-mail, or perhaps the actual, accurate identity of the person or entity who hired the Defendant to send the email on their behalf. But here, the information Defendant put in the "From" field does not identify any person or an entity at all. The information provided by Defendant is therefore false by definition.

**Header Information Is "Materially False Or Misleading" If It *Impairs* The Recipient From Identifying The Sender Without Opening The Email**

Given that the Defendant put false information in the "From" field of the header, the only question that remains is whether Defendant's false information is "material," as that term is used and intended in the Act. If it is "material," then it violates the Act's prohibition against "materially" false or "materially" misleading header information.

Nowhere does the Act provide an exhaustive listing of what is meant by "materially false or materially misleading." Rather, when taken as a whole, the statutory language clearly indicates that Congress intends to leave the interpretation open to various unforeseen possibilities. The Act does provide several examples of things that would be considered "materially misleading" under section 7704(a)(1). Subsections (A) and (C) of 7704(a)(1)

MERKLE SIEGEL & FRIEDRICHSEN
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

provide two such examples. The Plaintiff does not claim that either of these two subsections apply to the Defendants' spam, so they need not be considered further. At 15 USC 7704(a)(1)(B) the Act takes the opposite approach, and provides a "safe harbor" by defining information not considered "materially misleading":

> (B) a `from' line (the line identifying or purporting to identify a person initiating the message) that accurately identifies any person who initiated the message shall not be considered materially false or materially misleading;...

In this case, Defendant chose not to utilize this safe harbor. Had the Defendant chosen to "accurately identify the person who initiated" their spam, the emails would have complied with the Act. Instead, Defendant purposely chose not to do so. The only reasonable conclusion is that Defendant, widely known as a notorious spammer (and even sharing the name of a notorious computer virus), knows that if it accurately described itself as the sender in the "From name" portion of the header, a much larger percentage of their spam would get deleted without ever being opened.

Finally, 15 USC 7704(a)(6) provides that:

> (6) MATERIALLY- For purposes of paragraph (1), the term `materially', when used with respect to false or misleading header information, includes the alteration or concealment of header information in a manner that would impair the ability of an Internet access service processing the message on behalf of a recipient, a person alleging a violation of this section, or a law enforcement agency to identify, locate, or respond to a person who initiated the electronic mail message or to investigate the alleged violation, or the ability of a recipient of the message to respond to a person who initiated the electronic message.

By its own terms, 15 USC 7704(a)(6) does not provide an exhaustive list of that which would be considered "materially" false or misleading. The word "includes" in the statute can

**MERKLE SIEGEL & FRIEDRICHSEN**
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

only be interpreted to mean that the scenarios set forth in 15 USC 7704(a)(6) are only some examples of "materially" false or misleading information, and that other possibilities exist.

> "The district court, in a carefully written and thoughtful opinion, construed "including" to mean, essentially, "such as." Because this construction is consistent with the plain meaning of the language employed by Congress, the legislative history surrounding these provisions, and the reasonable interpretation given the language by the agency Congress directed to supervise the distribution of the funds at issue, we affirm. *Arizona State Board For Charter Schools v. U.S. Dept. of Edu.*, 464 F.3d 1003, 213 Ed. Law Rep. 114, 06 Cal. Daily Op. Serv. 9047 (2006)

15 USC 7703 (d)(2), which sets forth the criminal offenses under the Act, contains a nearly identical definition of "materially," except that the word "includes" is omitted. Comparing the two sections, it becomes clear that Congress intended to have a wider variety of false and misleading information be considered as "material" in the standard set forth for civil violations set forth under 15 USC 7704(a)(6) than in the standard for criminal violations set forth under 15 USC 7703 (d)(2).

Even if the Act's use of the word "includes" is ignored, and the more restrictive standard set forth in criminal section 7703 (d)(2) is "imported" to the civil section 7704(a)(6) and then applied, it is still clear that the Defendants violated that standard by substituting advertising copy for their name in the "from name" portion of their headers. Under this stricter standard, to be "materially false or misleading," all that is required is "the alteration or concealment of header information in a manner that would <u>impair</u> the ability of … a person … to identify .. a person who initiated the electronic mail message." 15 USC 7704(a)(6) (emphasis added). The Act doesn't require the false information "prevent" the recipient from identifying the sender. All that is required is that the false information to "impair" that ability.

**MERKLE SIEGEL & FRIEDRICHSEN**
**1325 Fourth Ave., Suite 940**
**Seattle, WA 98101**
**Phone: 206-624-9392**
**Fax: 206-624-0717**

"Impair" is defined as "to cause to diminish, as in strength, value, or quality: *an injury that impaired my hearing; a severe storm impairing communications. The American Heritage® Dictionary of the English Language, Fourth Edition*, Houghton Mifflin Company, 2004. 06 Dec. 2006. Replacing the actual, accurate name of the sender in the header with advertising copy meets this standard because it serves to "diminish" the "strength, value or quality" of the header information in identifying the person who initiated the electronic mail message. Given that the Defendants have deliberately, and admittedly hidden their true identity and replaced it with advertising copy, how could it not?

The Federal Trade Commission (FTC), the entity charged by Congress with interpreting and enforcing the Act, has set forth the requirements of the "From" line is a manner entirely consistent with Gordon's position. In the FTC's guidance to commercial emailers, the FTC states that the "From" line "must be accurate and *identify the person* who initiated the email."[6] (emphasis added)

> The CAN-SPAM Act: Requirements for Commercial Emailers
>
> What the Law Requires
>
> It bans false or misleading header information. Your email's "From," "To," and routing information – including the originating domain name and email address – must be accurate <u>and identify the person who initiated the email</u>. (emphasis added).

The FTC's interpretation of the Act is entirely consistent with the intention of the Congress, and requires that the header accurately identify the person who actually initiated the email.

---

[6] http://www.ftc.gov/bcp/conline/pubs/buspubs/canspam.htm

**MERKLE SIEGEL & FRIEDRICHSEN**
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

**Omega World Travel v. Mummagraphics**

No discussion of CAN-SPAM would be complete without recognizing the Fourth Circuit Federal Court of Appeals recent holding in Omega World Travel v. Mummagraphics, Inc. No. 05-2080, 4th Cir., Nov. 17, 2006. In Omega, the Fourth Circuit held that the specific inaccuracies in the email header at issue in that case were not "materially false or materially misleading." The Omega decision never discloses what, if anything, the defendant "Cruise.com Inc." put in the "from name" portion of the email header. It is therefore impossible to discern from the opinion how the emails at issue would have actually appeared to a recipient in a typical email in-box. Furthermore, the domain name "cruise.com" used in the "from address" of the header discussed in Omega was identical to the actual corporate name of the defendant, "Cruise.com Inc." These facts readily distinguish Omega from the present case.

Ignoring these factual distinctions, Gordon still argues that the Fourth Circuit's holding in Omega failed to apply black letter law of statutory construction, misconstrued the intent of Congress, and should not be followed by this or any other Court. Most troubling of all, the Omega Court determined whether information in the header was "materially false or materially misleading" by comparing it to information contained within the body of the spam email itself. The effect of this rule is to require the recipient of a spam email from a sender who has hidden their identity in the header to actually open that spam email to determine whether it violates the Act. The rule has the dual effect of eviscerating the Act's prohibition against false or misleading header information, and forcing spam email recipients to expose their computers to the risks discussed above, inherent in opening spam messages, thereby frustrating Congresses' intent.

**MERKLE SIEGEL & FRIEDRICHSEN**
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

The Fourth Circuit also failed to adhere to the black letter law of statutory construction by erroneously interpreting 15 USC 7704(a)(6). Contrary to the Omega Court's holding, 15 USC 7704(a)(6) does NOT limit the possible meanings of the term "materially" to those described in the section. As discussed above, a plain reading of 15 USC 7704(a)(6) demonstrates that Congress intended that section to merely provide non-exclusive examples of what constituted false and misleading header information. Accordingly, the Fourth Circuit erred when it construed 15 USC 7704(a)(6) as providing a strictly limited definition of the term "materially" in 15 USC 7704(a)(1).

**The Fourth Circuit's Preemption of Oklahoma's Anti-Spam Statute.**

The Fourth Circuit in Omega preempted the Oklahoma statute governing spam. The Washington CEMA statute at issue in this case is different from the Oklahoma statute, and therefore distinguishable on its facts. However, the Fourth Circuit's analysis of pre-emption is fatally flawed, and should not be followed.

The Fourth Circuit correctly recognized that Congress created a national standard for commercial email with the CAN-SPAM Act. However, Congress plainly did NOT intend to have this standard apply in all areas governing commercial email. Congress explicitly stated:

> IN GENERAL- This Act supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto. 15 USC 7707(b)(1) (emphasis added).

**MERKLE SIEGEL & FRIEDRICHSEN**
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

The Omega Court simply ignored this language, and assumed that Congress intended that the national standard created by the Act would apply in all areas governing commercial email. However, it is clear that the Congress had no such intention. Rather, Congress specifically preserved the authority for the States to promulgate statutes, regulations, and/or rules prohibiting falsity or deception in any portion of a commercial electronic mail message or information attached thereto. The legislative history is clear on this issue.

> Thus, a State law requiring some or all commercial e-mail to carry specific types of labels, or to follow a certain format or contain specified content, would be preempted. By contrast, a state law prohibiting fraudulent or deceptive headers, subject lines, or content in commercial e-mail would not be preempted…
>
> Given the inherently interstate nature of e-mail communications, the Committee believes that this bill's creation of one national standard is a proper exercise of the Congress's power to regulate interstate commerce that is essential to resolving significant harms from spam faced by American consumers, organizations, and businesses throughout the United States. This is particularly true because, in contrast to telephone numbers, e-mail addresses do not reveal the State where the holder is located. As a result, a sender of e-mail as a no easy way to determine with which State law to comply. Statutes that prohibit fraud and deception in the e-mail do not raise the same concern, because they target behavior that a legitimate business trying to comply with relevant laws would not be engaging in anyway. Sen. Rep. No. 108-102, at 21-22 (2003) (emphasis added).

There is really no question that Congress intended to allow the States wide latitude in governing falsity and deception, and had no intention whatsoever of applying a national standard over these consumer protection aspects of commercial email.

**False or Misleading Headers That Violate CAN SPAM Also Violate CEMA**

Washington's Commercial Electronic Mail Act, RCW 19.190 et seq. (CEMA) is in most respects far more straightforward than the federal CAN SPAM Act. The specific provision that is relevant to show liability is RCW 19.190.020. It states:

**MERKLE SIEGEL & FRIEDRICHSEN**
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

(1) No person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message from a computer located in Washington or to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that:

(a) Uses a third party's internet domain name without permission of the third party, or otherwise misrepresents or obscures any information in identifying the point of origin or the transmission path of a commercial electronic mail message; or

(b) Contains false or misleading information in the subject line.

(2) For purposes of this section, a person knows that the intended recipient of a commercial electronic mail message is a Washington resident if that information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address.

All that Gordon need show is that 1) the emails sent by the Defendants "misrepresent or obscure any information in identifying the point of origin" and that 2) the "registrant of the internet domain name contained in the recipient's electronic mail address" will inform the Defendants that the recipient is a Washington resident. The Affidavits of individual email recipients who are users of the interactive computer service provided by Gordon submitted herewith establish the second requirement. All of the emails that form the basis of this Motion were sent to Gordon, or to one of the email addresses and internet domain names registered and owned by the forgoing affiants. All of these affiants have declared that, if asked, they would have identified themselves as the registrant of their domains, and as the owners of the email addresses as Washington residents. Further, all of these domain names and email addresses were operated on Gordon's server. All that remains to establish liability under CEMA is that Gordon must show the emails in question "misrepresent or obscure any information in identifying the point of origin." i.e., the "Sender".

**MERKLE SIEGEL & FRIEDRICHSEN**
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

Since the spam emails sent by Defendant violate Can-SPAM, they also violate CEMA. The information in the "From lines" of the Defendant's spam violates 15 USC 7704(a)(1) because it "contains, or is accompanied by, header information that is materially false or materially misleading." As such, it also violates CEMA because information in the "from lines" is supposed to identify the point of origin, and since the information in the "from lines" is "materially false or misleading" it also "misrepresents or obscures any information in identifying the point of origin." For the same reasons that the Court should rule that the spam emails sent by Defendant violates CAN SPAM, the Court should also rule that the spam emails sent by Defendant violates CEMA.

**Damages**

15 USC 7706(g)(3)(A)(ii) provides for damages of "up to $100, in the case of a violation of 5(a)(1)." Those damages may be tripled under 15 USC 7706(g)(3)(C)(i) "if the court determines that the defendant committed the violation willfully or knowingly." 15 USC 7706(g)(4) provides that the court may require the payment of reasonable attorney fees. RCW 19.190.040(2) provides that "(d)amages to an interactive computer service resulting from a violation of this chapter are one thousand dollars, or actual damages, whichever is greater." Defendant Virtumundo is one of the largest and most sophisticated email marketing companies in the world. Its conduct here was pervasive and intentional. If the words "willfully and knowingly" are to have any meaning whatsoever, they must, at a minimum, apply to this Defendant's conduct.

For each spam email message sent to Gordon's ISP, Gordon is entitled to $300 under CAN SPAM ($100 tripled), plus $1,000 under CEMA, ($1,000 + $300 = $1,300) or 8,082 times

**MERKLE SIEGEL & FRIEDRICHSEN**
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717

$1,300 = $10,506,600, plus attorney fees. Gordon therefore respectfully requests that the Court enter an Order awarding Gordon judgment in the amount of ten million five hundred six thousand six hundred dollars, plus reasonable attorney fees.

**RESPECTFULLY SUBMITTED** this 18th day of December, 2006.

DOUGLAS E. MCKINLEY, JR
Attorney at Law

/S/ Douglas E. McKinley, Jr.
Douglas E. McKinley, Jr., WSBA #20806
Attorney for Plaintiffs

MERKLE SIEGEL & FRIEDRICHSEN, P.C.

/S/ Robert J. Siegel
Robert J. Siegel, WSBA #17312
Attorney for Plaintiffs

Certificate of Service

I, hereby, certify that on December 18, 2006, I filed this affidavit with this Court via approved electronic filing, and served the following:
Attorneys for Defendants: Derek A. Newman, Newman & Newman .

Adana Lloyd

**MERKLE SIEGEL & FRIEDRICHSEN**
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-624-9392
Fax: 206-624-0717