Gordon v. Virtumundo
Motion for Partial Summary Judgment
Appendix 2

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

| | |
|---|---|
| OMEGA WORLD TRAVEL, INCORPORATED; CRUISE.COM, INCORPORATED; GLORIA BOHAN; DANIEL BOHAN, <br>                *Plaintiffs-Appellees,* <br><br> v. <br><br> MUMMAGRAPHICS, INCORPORATED, d/b/a Webguy Internet Solutions, d/b/a Webguy.net, d/b/a SueaSpammer.com, <br>                *Defendant-Appellant,* <br><br> and <br><br> MARK W. MUMMA, in his individual capacity, <br>                *Defendant.* | No. 05-2080 |

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-05-122)

Argued: September 21, 2006

Decided: November 17, 2006

Before WILKINSON and DUNCAN, Circuit Judges, and
Richard L. VOORHEES, United States District Judge for the
Western District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Duncan and Judge Voorhees joined.

## COUNSEL

**ARGUED:** Kelly O. Wallace, WELLBORN & WALLACE, L.L.C., Atlanta, Georgia, for Appellant. James P. Hodges, Leesburg, Virginia, for Appellees. **ON BRIEF:** Richard S. Toikka, METROPOLITAN LEGAL SERVICES, L.L.C., Rockville, Maryland, for Appellant. Thomas J. Powell, Fairfax, Virginia, for Appellees.

## OPINION

WILKINSON, Circuit Judge:

Countless commercial e-mail messages, known colloquially as "spam," pass through the Internet every day, inspiring frustration, countermeasures, and — as here — lawsuits. Based upon eleven commercial e-mail messages, Mummagraphics, Inc., a provider of online services, seeks significant statutory damages from Omega World Travel, Inc., a Virginia-based travel agency ("Omega"); Gloria Bohan, Omega's president and founder; and Cruise.com, Inc., a wholly owned subsidiary of Omega (collectively, "appellees"). Mummagraphics alleges that Cruise.com sent the messages in violation of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM Act"), 15 U.S.C. §§ 7701 *et seq.*, as well as Oklahoma law.

The district court awarded summary judgment to the appellees on all of Mummagraphics' claims and we affirm. The CAN-SPAM Act preempts Mummagraphics' claims under Oklahoma's statutes. In addition, Mummagraphics failed to allege the material inaccuracies or pattern of failures to conform to opt-out requirements that is necessary to establish liability under the CAN-SPAM Act. The CAN-SPAM Act addresses "spam" as a serious and pervasive problem, but it does not impose liability at the mere drop of a hat.

I.

Appellant Mummagraphics, Inc., d/b/a Webguy Internet Solutions, is an Oklahoma corporation with its only place of business in Okla-

homa City. According to Mark Mumma, the company's president, Mummagraphics hosts web pages, registers domain names, designs web pages and logos, and sets up computer servers. Mummagraphics also operates websites devoted to opposing "spam" messages including "sueaspammer.com." In addition, Mummagraphics runs a website, "OptOutByDomain.com," that lists Internet domain names — roughly seventy of 347 of which are operated by Mummagraphics — whose owners have indicated that they do not wish to receive unsolicited commercial e-mail messages. Mummagraphics owns the domain name webguy.net and uses the e-mail account inbox@webguy.net for company purposes.

Cruise.com operates a website selling cruise vacations and sends e-mail advertisements — dubbed "E-deals" — to prospective customers. It sent eleven "E-deals" containing travel offers to inbox@webguy.net between December 29, 2004 and February 9, 2005. Each message contained a line of text on which the recipient could click in order to be removed from future mailings, and each message also said that the recipient could opt-out of future e-mails by writing to a postal address contained in each message. Each message also contained a link to the Cruise.com website and a toll-free phone number for the company.

Mummagraphics claims that the messages contained several inaccuracies. First, each message stated that the recipient had signed up for the Cruise.com mailing list, but Mummagraphics alleges that it had not asked that inbox@webguy.net receive the company's offers. Second, while each message listed Cruise.com as the sending organization, each also included the address "FL-Broadcast.net" in its header information, even though Mummagraphics alleges that "FL-Broadcast.net" is not an Internet domain name linked to Cruise.com or the other appellees. In addition, the messages contained the "from" address cruisedeals@cruise.com, even though Cruise.com had apparently stopped using that address.

When Mark Mumma noticed the Cruise.com e-mails that inbox@webguy.net had received, he did not use the electronic opt-out link to remove the address from the Cruise.com e-mail list, but instead called John Lawless, Omega World Travel's general counsel, to complain. Mumma told Lawless that he had not asked to receive

the "E-deal" messages. He told Lawless that he refused to use e-mail opt-out mechanisms because "only idiots do that," and he believed opt-out mechanisms just led to more unwanted messages. Mumma told Lawless that his preferred removal procedure was to sue for violations of Oklahoma law. Lawless asked Mumma for his e-mail address, but Mumma did not provide it. Instead, he asked Lawless to remove from all future mailings every address containing a domain name listed on Mummagraphics' "OptOutByDomain.com" website. Lawless said he was "gonna take them down right now," but Omega's technical support division indicated that removing all the addresses would require considerable effort, and the addresses were not immediately removed.

On January 20, 2005, the day after speaking with Lawless, Mumma received another "E-deal" message at inbox@webguy.net. He sent a letter dated January 25, 2005 to Daniel Bohan of Omega World Travel, saying that he had received six unsolicited "E-deal" messages from Cruise.com, Omega's subsidiary, but again not specifying the e-mail address at which he had received the messages. The letter claimed that the messages violated federal and state laws and said that Mumma intended to sue Bohan's company for at least $150,000 in statutory damages unless Bohan settled the matter for $6,250. Mumma attached the Cruise.com e-mails to his letter, and after John Lawless noticed that the messages appeared to have been sent to inbox@webguy.net, he directed that the address be removed from the Cruise.com mailing list. The company subsequently removed the address.

After Omega World Travel failed to pay Mumma, postings on one of Mumma's "anti-spam" websites accused Omega, Cruise.com, and Daniel and Gloria Bohan of being "spammers" who had violated state and federal laws. The website posted a photo of the Bohans that had evidently been copied from the Omega website and described the couple as "cruise.com spammers." On the basis of these postings, Omega World Travel, the Bohans, and Cruise.com sued Mumma and Mummagraphics in federal court, claiming defamation, copyright infringement, trademark infringement, and unauthorized use of likeness. The district court granted Mummagraphics summary judgment on all these claims except the libel action, on which all the plaintiffs except Daniel Bohan, who is no longer a party, expect to proceed to trial.

Mummagraphics raised counterclaims against the appellees under Oklahoma and federal law, which are the only claims now before this court. Mummagraphics alleged, *inter alia*, that the Cruise.com e-mails contained actionable inaccuracies and that the appellees failed to comply with federal and state requirements that they stop sending messages to recipients who opted out through specified procedures. Both parties sought summary judgment on Mummagraphics' counterclaims, and the district court granted the appellees' motion. The court held that the CAN-SPAM Act preempted Mummagraphics' claims under Oklahoma's statutes. It further held, *inter alia*, that the appellees had not violated the CAN-SPAM Act because the alleged e-mail inaccuracies were not material and the appellees had not violated the opt-out provisions. Mummagraphics now appeals.

## II.

### A.

We turn first to the district court's determination that the CAN-SPAM Act preempted Mummagraphics' claims under Oklahoma's statutes regulating commercial e-mail messages. The basic principles of preemption are well settled, and we need not belabor them here. Our inquiry into the scope of a preemption clause is shaped by "two presumptions." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). First, under our federal system, we do not presume that Congress intends to clear whatever field it enters. Instead, we start from "the basic assumption that Congress did not intend to displace state law," *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981), and "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," *Medtronic*, 518 U.S. at 485 (citations omitted). Second, from this departure point, we address preemption issues in accordance with the "oft-repeated comment . . . that '[t]he purpose of Congress is the ultimate touchstone' in every preemption case." *Id.* (alteration in original) (citation omitted). Instead of imposing the narrowest possible construction on preemptive language when read in isolation, we seek "a fair understanding of congressional purpose," looking to "the language of the pre-emption statute and the statutory framework surrounding it," while also considering "the structure and purpose of the

6        OMEGA WORLD TRAVEL V. MUMMAGRAPHICS, INC.

statute as a whole." *Id.* at 486 (emphasis, citations, and internal quotations omitted).

### B.

Mummagraphics argues that it is entitled to damages because such damages are authorized by Oklahoma law and lie outside the CAN-SPAM Act's preemptive scope. The CAN-SPAM Act provides, in part,

> This chapter supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto.

15 U.S.C. § 7707(b)(1). The principal Oklahoma provision under which Mummagraphics seeks damages provides:

> It shall be unlawful for a person to initiate an electronic mail message that the sender knows, or has reason to know:
>
> 1. Misrepresents any information in identifying the point of origin or the transmission path of the electronic mail message;
>
> 2. Does not contain information identifying the point of origin or the transmission path of the electronic mail message; or
>
> 3. Contains false, malicious, or misleading information which purposely or negligently injures a person.

Okla. Stat. tit. 15, § 776.1A.[1]

---

[1] Mummagraphics also alleged that the appellees violated an Oklahoma provision requiring senders of unsolicited commercial e-mails to comply

OMEGA WORLD TRAVEL v. MUMMAGRAPHICS, INC.        7

Oklahoma courts appear not to have construed the state provision, but the language seems to reach beyond common law fraud or deceit. By its terms, the statute is not limited to inaccuracies in transmission information that were material, led to detrimental reliance by the recipient, and were made by a sender who intended that the misstatements be acted upon and either knew them to be inaccurate or was reckless about their truth. *Cf. Rogers v. Meiser*, 68 P.3d 967, 977 (Okla. 2003) (requiring those elements for Oklahoma fraud action); *see also Restatement (Second) of Torts* § 525, § 538 (1977).

The district court held that the Oklahoma statutes were preempted insofar as they applied to immaterial misrepresentations, and that this ruling disposed of Mummagraphics' Oklahoma statutory claims. Mummagraphics does not challenge the district court's reading of Oklahoma law or Mummagraphics' complaint, but it argues that the district court was incorrect to hold actions for immaterial error to be preempted because the CAN-SPAM Act permits states to "prohibit[ ] falsity or deception." *See* 15 U.S.C. § 7707(b)(1).

Whatever the precise scope of the Oklahoma provision might be, we cannot agree that Mummagraphics' action for immaterial errors survives preemption. To begin with, the language in the exception to the federal preemption provision upon which Mummagraphics relies is hardly as straightforward as the company suggests. The exception, as noted, allows states to prohibit "falsity or deception" in commercial e-mail messages. Those terms are not defined in the statute. However, "deception" requires more than bare error, and while "falsity" can be

---

with certain opt-out requests. *See* Okla. Stat. tit. 15, § 776.6E. We agree with the district court that this provision was preempted because it bears no arguable relationship to the subject matter excepted from preemption in the CAN-SPAM Act. *See* 15 U.S.C. § 7701(b)(1). Finally, Mummagraphics alleged that the appellees violated the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15, §§ 751 *et seq.*, by violating Oklahoma's commercial e-mail laws. *See id.* § 776.1C. Since we find that Mummagraphics did not raise a cognizable cause of action under Oklahoma's commercial e-mail laws due to federal preemption, the alleged violations cannot give rise to further claims under the Oklahoma Consumer Protection Act.

defined as merely "the character or quality of not conforming to the truth or facts," it also can convey an element of tortiousness or wrongfulness, as in "deceitfulness, untrustworthiness, faithlessness." *Webster's Third New International Dictionary Unabridged* 820 (1971); *see also Oxford English Dictionary* Vol. V 697 (2d ed. 1989) (defining false as "erroneous, wrong," but also as "mendacious, deceitful, treacherous," and "[p]urposely untrue"); *see also Black's Law Dictionary* 635 (8th ed. 2004) (defining "false" as "untrue" but also as "deceitful; lying").

Since the word "falsity" considered in isolation does not unambiguously establish the scope of the preemption clause, we read "falsity" in light of the clause as a whole. Reading "falsity" as referring to traditionally tortious or wrongful conduct is the interpretation most compatible with the maxim of *noscitur a sociis*, that a word is generally known by the company that it keeps. *See, e.g., Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961); *Neal v. Clark*, 95 U.S. 704, 708-09 (1877). The canon applies in the context of disjunctive lists. *See Neal*, 95 U.S. at 706, 709; *Jarecki*, 367 U.S. at 304 n.1, 307. Here, the preemption clause links "falsity" with "deception" — one of the several tort actions based upon misrepresentations. Keeton et al., *Prosser and Keeton on the Law of Torts* § 105, at 726-27 (5th ed. 1984) (defining deceit as species of false-statement tort); *Restatement (Second) of Torts* § 525 (describing elements of deceit). This pairing suggests that Congress was operating in the vein of tort when it drafted the preemption clause's exceptions, and intended falsity to refer to other torts involving misrepresentations, rather than to sweep up errors that do not sound in tort.

Other sections of the CAN-SPAM Act do not support a bare-error reading of "falsity." In the portion of the Act that created a civil cause of action, Congress affixed the title "[p]rohibition of false or misleading transmission information" to a section that prohibits only "header information that is *materially* false or *materially* misleading." 15 U.S.C. § 7704(a)(1) (emphasis added). While "the heading of a section cannot limit the plain meaning of the text," it can "shed light on some ambiguous word or phrase." *Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 529 (1947); *see also Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998). Moreover, the "normal rule of statutory construction" provides that "identical words

OMEGA WORLD TRAVEL V. MUMMAGRAPHICS, INC.    9

used in different parts of the same act are intended to have the same meaning." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (internal quotations omitted). Whether linked with materiality, *see* 15 U.S.C. § 7704(a)(1), or "deception," *see id.* § 7707(b)(1), we can find nowhere in the statute that Congress meant to apply falsity in a mere error sense.

There are good reasons for this. Congress did not intend "falsity" to encompass bare error because such a reading would upset the Act's careful balance between preserving a potentially useful commercial tool and preventing its abuse. The Act's enacted findings make clear that Congress saw commercial e-mail messages as presenting both benefits and burdens. Congress found that "[t]he convenience and efficiency of electronic mail are threatened by the extremely rapid growth in the volume of unsolicited commercial electronic mail," *id.* § 7701(a)(2), but also that e-mail's "low cost and global reach make it extremely convenient and efficient, and offer unique opportunities for the development and growth of frictionless commerce," *id.* § 7701(a)(1). Congress noted that states had sought to regulate commercial e-mails, but it found that the resulting patchwork of liability standards had proven ineffective:

> Many States have enacted legislation intended to regulate or reduce unsolicited commercial electronic mail, but these statutes impose different standards and requirements. As a result, they do not appear to have been successful in addressing the problems associated with unsolicited commercial electronic mail, in part because, since an electronic mail address does not specify a geographic location, it can be extremely difficult for law-abiding businesses to know with which of these disparate statutes they are required to comply.

*Id.* § 7701(a)(11).

Congress implemented these findings by creating a national standard that would be undermined to the point of near-irrelevancy by Mummagraphics' interpretation of the preemption clause. Rather than banning all commercial e-mails or imposing strict liability for insignificant inaccuracies, Congress targeted only e-mails containing

something more than an isolated error. The CAN-SPAM Act made it a crime to "materially falsif[y] header information in multiple commercial electronic mail messages and intentionally initiate[ ] the transmission of such messages," but it attached no criminal sanction to non-material errors. 18 U.S.C. § 1037(a)(3). The Act created civil causes of action relating to error, but attached requirements beyond simple mistake to each of them. It permitted lawsuits based upon "*materially* false or *materially* misleading" header information. 15 U.S.C. § 7704(a)(1) (emphasis added). The Act made it actionable for a person to "initiate the transmission to a protected computer of a commercial electronic mail message if such person has *actual knowledge, or knowledge fairly implied on the basis of objective circumstances*, that a subject heading of the message would be *likely to mislead a recipient*, acting reasonably under the circumstances, about *a material fact* regarding the contents or subject matter of the message . . . ." *Id.* § 7704(a)(2) (emphasis added). In sum, Congress' enactment governing commercial e-mails reflects a calculus that a national strict liability standard for errors would impede "unique opportunities for the development and growth of frictionless commerce," while more narrowly tailored causes of action could effectively respond to the obstacles to "convenience and efficiency" that unsolicited messages present. *Id.* § 7701(a).

Mummagraphics' reading of the preemption clause would upend this balance and turn an exception to a preemption provision into a loophole so broad that it would virtually swallow the preemption clause itself. While Congress evidently believed that it would be undesirable to make all errors in commercial e-mails actionable, Mummagraphics' interpretation would allow states to bring about something very close to that result.

The ensuing consequences would undermine Congress' plain intent. As we have noted, Congress found that because e-mail addresses do not specify recipients' physical locations, it can be difficult or impossible to identify where recipients live and hence to determine the state laws that apply. *Id.* § 7701(a)(11). Moreover, commercial e-mails are a bulk medium used to target thousands of recipients with a single mouse-click, meaning that the typical message could well be covered by the laws of many jurisdictions. As a result, law-abiding senders would likely have to assume that their messages

OMEGA WORLD TRAVEL v. MUMMAGRAPHICS, INC.    11

were governed by the most stringent state laws in effect. The strict liability standard imposed by a state such as Oklahoma would become a de facto national standard, with all the burdens that imposed, even though the CAN-SPAM Act indicates that Congress believed a less demanding standard would best balance the competing interests at stake. Because Mummagraphics' reading of the "falsity or deception" exception would thus permit an exception to preemption to swallow the rule and undermine the regulatory balance that Congress established, Mummagraphics' reading of the exception is not compatible with the structure of the CAN-SPAM Act as a whole.

C.

By giving the preemption provision its proper scope, we avoid the need to resolve a difficult constitutional question concerning the compatibility of Oklahoma's commercial e-mail provisions with the dormant commerce clause. Congress' power to regulate interstate commerce implicitly prohibits states from passing any law that "discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace.'" *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (alteration in original). Whether a nondiscriminatory law unduly burdens interstate commerce turns upon whether it serves a "legitimate local purpose," and, if so, "the nature of the local interest involved, and . . . whether it could be promoted as well with a lesser impact on interstate activities." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

This is not a simple case because important interests lie on both sides of the *Pike* analysis. We have previously deemed it relevant that one state's Internet laws may impose compliance costs on businesses throughout the country, because it is difficult for businesses to determine where Internet users are located. *See PSINet, Inc. v. Chapman*, 362 F.3d 227, 239-41 (4th Cir. 2004) (relying upon extraterritorial implications in finding statute criminalizing Internet dissemination of material harmful to minors violated dormant commerce clause). Moreover, courts have long recognized that civil liability for false statements can burden even innocent speech. *See, e.g., New York Times Co. v. Sullivan*, 376 U.S. 254, 270-73 (1964). The deterrent effect on commercial speech would be particularly great under a statute that authorizes enormous statutory damages — $25,000 for each

12      OMEGA WORLD TRAVEL v. MUMMAGRAPHICS, INC.

day of violations. Okla. Stat. tit. 15, § 776.2C; Okla. Stat. tit. 15, § 776.7C. On the other hand, false and misleading content on the Internet is a serious problem, *see* 15 U.S.C. § 7701(a), and even innocent inaccuracies can impose costs that states may view as a proper object of redress, *State v. Heckel*, 24 P.3d 404, 409-411 (Wash. 2001). We avoid a difficult balancing analysis by giving Congress' preemption clause its proper scope.[2] *See* Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 Yale L.J. 785, 818-23 (2001) (describing arguments).

### III.

We turn next to Mummagraphics' claims that the Cruise.com e-mails violated the CAN-SPAM Act.[3] Mummagraphics first argues that the Cruise.com e-mails violated the Act's requirements concerning the accuracy of header information in commercial e-mails. The Act provides, "It is unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message . . . that contains, or is accompanied by, header information that is materially false or materially misleading." 15 U.S.C. § 7704(a)(1). The Act further explains,

---

[2] Giving the preemption clause its proper scope also allows us to avoid deciding whether such a stringent liability statute exceeds even the states' wide latitude to regulate false or misleading commercial speech. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980) (stating that for commercial speech to be protected under the First Amendment "it at least must . . . not be misleading"); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 (1985) (plurality) (allowing presumed and punitive damages for false and damaging credit report that did not involve matters of public concern and constituted speech "solely in the individual interest of the speaker and its specific business audience").

[3] We shall assume without deciding that Mummagraphics qualifies as an Internet Access Service Provider entitled to bring a claim under the CAN-SPAM Act. *See* 15 U.S.C. § 7706(g) (creating private right of action for providers of Internet access service); 47 U.S.C. § 231(e)(4) ("The term 'Internet access service' means a service that enables users to access content, information, electronic mail, or other services offered over the Internet . . . .").

OMEGA WORLD TRAVEL v. MUMMAGRAPHICS, INC.      13

> the term "materially", when used with respect to false or misleading header information, includes the alteration or concealment of header information in a manner that would impair the ability of an Internet access service processing the message on behalf of a recipient, a person alleging a violation of this section, or a law enforcement agency to identify, locate, or respond to a person who initiated the electronic mail message or to investigate the alleged violation, or the ability of a recipient of the message to respond to a person who initiated the electronic message.

*Id.* § 7704(a)(6).[4] Mummagraphics alleges that the senders of the Cruise.com e-mails violated this provision because the messages' header information incorrectly indicated that the e-mails originated from the server "FL-Broadcast.net," and because the messages' "from" address read cruisedeals@cruise.com, although that e-mail address was apparently non-functional.

We agree with the district court that these inaccuracies do not make the headers "materially false or materially misleading." *Id.* § 7704(a)(1). The e-mails at issue were chock full of methods to "identify, locate, or respond to" the sender or to "investigate [an] alleged violation" of the CAN-SPAM Act. *Id.* § 7704(a)(6). Each message contained a link on which the recipient could click in order to be removed from future mailings, in addition to a separate link to Cruise.com's website. Each message prominently displayed a toll-free number to call, and each also listed a Florida mailing address and local phone number for the company. Several places in each header

---

[4]The statute also provides that particular actions not alleged in this case render a message materially misleading. 15 U.S.C. § 7704(a)(1). There is no evidence that any Cruise.com messages "include[d] an originating electronic mail address, domain name, or Internet Protocol address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations . . . ." *Id.* § 7704(a)(1)(A). Nor is there evidence that any Cruise.com message "fail[ed] to identify accurately a protected computer used to initiate the message because the person initiating the message knowingly use[d] another protected computer to relay or retransmit the message for purposes of disguising its origin." *Id.* § 7704(a)(1)(C).

14       OMEGA WORLD TRAVEL v. MUMMAGRAPHICS, INC.

referred to the Cruise.com domain name, including one line listing Cruise.com as the sending organization.

These references come as little surprise, because the "E-deal" messages were sales pitches intended to induce recipients to contact Cruise.com to book the cruises that the messages advertised. Since the "E-deal" messages and their headers were replete with accurate identifiers of the sender, the alleged inaccuracies in the headers could not have impaired the efforts of any recipient, law enforcement organization, or other party raising a CAN-SPAM claim to find the company. If the alleged inaccuracies in a message containing so many valid identifiers could be described as "materially false or materially misleading," we find it hard to imagine an inaccuracy that would not qualify as "materially false or materially misleading." Congress' materiality requirement would be rendered all but meaningless by such an interpretation.

We also reject Mummagraphics' claim for alleged violations of the CAN-SPAM Act's e-mail removal provisions, because Mummagraphics cannot sustain such a claim without evidence that could establish a "pattern or practice" of violations. The CAN-SPAM Act requires that the commercial e-mails it covers include

> a functioning return electronic mail address or other form of Internet-based mechanism, clearly and conspicuously displayed, that . . . a recipient may use to submit, in a manner specified in the message, a reply electronic mail message or other form of Internet-based communication requesting not to receive future commercial electronic mail messages from that sender at the electronic mail address where the message was received . . . .

*Id.* § 7704(a)(3)(A). Senders must honor requests for removal made using these mechanisms within ten business days. *Id.* § 7704(a)(4)(A). While the Act permits Internet access service providers to bring suit under these provisions, they may do so only for "a pattern or practice" that violates the requirements. *Id.* § 7706(g)(1). In this case, Mummagraphics merely alleged that the appellees failed to remove inbox@webguy.net from the "E-deals" mailing list within ten days of Mark Mumma's call to Omega's general counsel. It does not allege

OMEGA WORLD TRAVEL v. MUMMAGRAPHICS, INC.     15

that the appellees failed to comply with any other removal request. As a result, Mummagraphics has not alleged facts sufficient to survive summary judgment on its opt-out claim. This holding makes it unnecessary to address the district court's ruling that Mummagraphics' evidence did not point to even a single violation of the CAN-SPAM Act's opt-out provisions.

### IV.

Lastly, Mummagraphics claims that Cruise.com's e-mail messages amounted to trespass to chattels under Oklahoma law.[5] While the CAN-SPAM Act does not preempt the application of state tort laws that are not specific to e-mail messages, *id.* § 7707(b)(2)(A), the district court correctly granted summary judgment on this claim because Mummagraphics has not offered evidence that Cruise.com's e-mails caused the company more than nominal damages. Trespass to chattel is a common law tort that "may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." *Woodis v. Okla. Gas & Elec. Co.*, 704 P.2d 483, 485 (Okla. 1985) (quoting *Restatement (Second) of Torts* § 217). However, trespass to chattel claims may be brought against a trespasser only if

> (a) he dispossesses the other of the chattel, or
>
> (b) the chattel is impaired as to its condition, quality or value, or
>
> (c) the possessor is deprived of the use of the chattel for a substantial time, or
>
> (d) bodily harm is caused to the possessor, or harm is caused to some person or thing in which the possessor has a legally protected interest.

---

[5]Mummagraphics cites the law of multiple jurisdictions on this subject but does not contest the appellees' assertion that any trespass to chattels claim arises under the laws of Oklahoma, where Mummagraphics' computers are located.

16     OMEGA WORLD TRAVEL v. MUMMAGRAPHICS, INC.

*Restatement (Second) of Torts* § 218. We proceed with particular caution in this area because Oklahoma courts appear never to have recognized this tort based upon intangible invasions of computer resources. In fact, the *Woodis* court described "intermeddling" with a chattel as meaning "intentionally bringing about a *physical* contact with the chattel." 704 P.2d at 485 (quoting *Restatement (Second) of Torts* § 217 cmt. e (1965)) (emphasis added).

Even if Oklahoma law were to make trespass against chattels available for computer intrusions, Mummagraphics' claim cannot survive summary judgment because the courts that recognize trespass to chattels based upon computer intrusions do not allow "an action for nominal damages for harmless intermeddlings with the chattel." *Intel Corp. v. Hamidi*, 71 P.3d 296, 302 (Cal. 2003) (quoting *Restatement (Second) of Torts* § 218 cmt. e (1965)). Because Mummagraphics failed to submit any evidence that the receipt of eleven commercial e-mail messages placed a meaningful burden on the company's computer systems or even its other resources, summary judgment was appropriate on this counterclaim.

V.

We respect the fact that unsolicited commercial e-mail has created frustration and consternation among innumerable users of the Internet. The proper treatment of mass commercial e-mail has provoked controversy since perhaps the first such message was sent. *See* Adam Hamel, Note, *Will the CAN-SPAM Act of 2003 Finally Put a Lid on Unsolicited E-Mail?*, 39 New Eng. L. Rev. 961, 965 (2005) (dating "spam" to 1994 advertisement sent to approximately 6000 Internet discussion groups, provoking online outcry). Our role is not to determine the best way of regulating such messages, but merely to implement the balance that Congress struck. The CAN-SPAM Act prohibits some material misstatements and imposes opt-out requirements, but it does not make every error or opt-out request into grounds for a lawsuit. The e-mails in this case are not actionable under the Act. Nor can the messages be actionable under Oklahoma's statutes, because allowing a state to attach liability to bare immaterial error in commercial e-mails would be inconsistent with the federal Act's preemption text and structure, and, consequently, with a "fair understanding of congressional purpose." *Medtronic*, 518 U.S. at 486 (emphasis omit-

OMEGA WORLD TRAVEL v. MUMMAGRAPHICS, INC.    17

ted). Since we agree that summary judgment was warranted on Mummagraphics' various claims, the judgment of the district court is

*AFFIRMED.*