Douglas E. McKinley, Jr.                THE HON. JOHN C. COUGHENOUR
PO Box 202
Richland WA, 99352
(509) 628-0809

iJustice Law, P.C.
Robert J. Siegel
1325 Fourth Ave., Suite 940
Seattle, WA 98101
(206) 304-5400

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON, SEATTLE

| | |
|---|---|
| **JAMES S. GORDON, Jr., a married individual; OMNI INNOVATIONS, LLC., a Washington limited liability company,** | NO. CV06-0204JCC |
| **Plaintiffs,** | |
| v. | **RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **VIRTUMUNDO, INC, a Delaware corporation, d/b/a ADNOWLEDGEMAIL.COM; ADKNOWLEDGE, INC., a Delaware corporation, d/b/a ADKNOWLEDGEMAIL.COM; SCOTT LYNN, an individual; and JOHN DOES, I-X,** | |
| **Defendants.** | |

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
  1

**iJustice Law P.C.**
**1325 Fourth Ave., Suite 940**
**Seattle, WA 98101**
**Phone: 206-304-5400**
**Fax: 206-624-0717**

**Gordon's Motion For Partial Summary Judgment Is Further Buttressed By The Relevant Technical Standards**

The Defendants have used a good portion of their unauthorized over-length brief to improperly re-argue their opposition to Plaintiffs' Motion for Partial Summary Judgment (Dkt. 53-1). Generally, Plaintiffs James S. Gordon, Jr. and Omni Innovations, LLC (hereafter "Gordon") believe that Plaintiffs' Motion For Partial Summary Judgment was sufficiently briefed at the time it was brought. Accordingly, Gordon disputes the Defendants' arguments that simply rehash the issues presented in the Gordon's prior Motion for Partial Summary Judgment. With respect to the issues of whether the Defendants' failure to provide their names in the "from lines" in their spam emails violate CAN SPAM and CEMA, and whether CEMA was pre-empted by CAN SPAM, Gordon relies generally on the arguments and evidence set forth in Gordon's prior Motion for Partial Summary Judgment, and particularly on the brief and accompanying declarations and exhibits (Dkt. 53-66), praecipe (Dkt. 74), reply and accompanying declarations and exhibits (Dkt. 89-90), and surreply (Dkt. 84).

Notwithstanding the forgoing, the Defendants have raised one additional issue related to Gordon's still pending Motion for Partial Summary Judgment that merits additional discussion. Specifically, the Defendants have put forth the declaration of the Defendants' expert Neal Krawetz, together with an "expert report" attached thereto as an exhibit. (Dkt. 99). The "expert report" prepared by Mr. Krawetz consists primarily of legal conclusions and factual assertions about matters which Mr. Krawetz cannot possibly have personal knowledge. Gordon hereby moves to strike Mr. Krawetz's declaration and "expert report" on that basis. The one area where Mr. Krawetz does offer a technical opinion related to his area of technical expertise (rather than

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
2

1   his unsupported legal conclusions) is in reference to the so-called "RFCs," which are the

2   technical standards governing email.  Mr. Krawetz describes the standards as follows:

3       Email is the common name for messages sent using the Simple Mail Transport Protocol
        (SMTP). SMTP is defined by a series of de facto standard documents called the Request For
4       Comments (RFCs). The RFCs are currently maintained by the Internet Engineering Task
        Force (IETF).  (Dkt. 99, p. 10)

5

6       Defendants and Gordon agree that the compliance with the RFCs does not define compliance

7   with the statutory requirements of the CAN SPAM Act.  At the same time, the Internet

8   Engineering Task Force  (IETF) uses the Request For Comments (RFCs) to document how

9   "things are done" to allow people building technical products to design those products to

10  function properly with existing practices.  Accordingly, while the RFCs do not have the force of

11  law, Gordon believes they do provide insight into the accepted norms and practices, and thus the

12  context that existed at the time Congress passed the CAN SPAM Act, to better inform the Court

13  of the Congressional intent.

14      For that reason, Gordon cannot sit idly by without challenging Mr. Krawetz's insinuation that

15  neither RFC 822 and RFC 2822 indicate that the "from line" contains the name of the author of

16  the email.  Mr. Krawetz's statement in his "expert report" that neither RFC822 nor RFC2822

17  "specify the purpose of the string associated with an email address" is flatly wrong.

18      Gordon retained the expert services of Mr. Peter W. Resnick as a rebuttal witness to

19  demonstrate the Mr. Krawetz is mistaken.  Mr. Resnick has vastly more experience than Mr.

20  Krawetz with the IETF and the RFCs.  Unlike Mr. Krawetz, Mr. Resnick has participated in the

21  IETF since 1992.  Further, unlike Mr. Krawetz, Mr. Resnick has authored no fewer that five of

22  the RFCs.  More to the point, Mr. Resnick is in fact the author of RFC 2822.

23

24

25
RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
  3

To cut to the heart of the matter, in the "Declaration Of Peter W. Resnick Responsive To Defendants' Expert And Motion For Summary Judgment" filed concurrently herewith, Mr. Resnick states:

> "There is no doubt whatsoever that the expert testimony of Neal Krawetz is incorrect, and that the intention of both RFC 822 and RFC 2822 was that the textual string before the e-mail address be the name of the author of the e-mail."

In summary, Gordon's Motion For Partial Summary Judgment asserts that the Defendants' spam emails violate the CAN SPAM Act because they do not set forth the name of the author of the email in the textual string before the e-mail address. In Gordon's prior briefing, Gordon has demonstrated that the legislative history of CAN SPAM supports Gordon's position. Gordon has further demonstrated that the plain language of CAN SPAM supports Gordon's position. Gordon has also demonstrated that the FTC's official statement in the Federal Register is directly on point, and supports Gordon's position. To that list, Gordon now adds the relevant technical community, as their opinion is expressed by the relevant de facto standard document RFC 2822, as maintained by the Internet Engineering Task Force (IETF), and as explained by the author of RFC 2822, Mr. Peter W. Resnick.

**The Defendants' Attack On Gordon's Character Does Not Constitute A Defense To Their Violations Of CAN SPAM and CEMA**

The Defendants have used the remainder of their unauthorized over-length brief to attack Gordon's character and motives in bringing this lawsuit. While most, if not all, of the Defendants' characterizations of Gordon and Gordon's motives are inaccurate, they are wholly irrelevant to the issues before the Court. As such, Gordon is not going to dignify the Defendants' slander of Gordon's good name with a detailed, point by point rebuttal of all of the

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
4

1    factual inaccuracies contained in the Defendants' Motion for Summary Judgment. Suffice it to

2    say that, as shown in James S. Gordon, Jr.'s Declaration in Support of Plaintiffs' Response to

3    Defendants' Motion for Summary Judgment filed concurrently herewith (hereafter "Gordon's

4    declaration"), Gordon is a law-abiding, honest, hard-working individual who would have

5    preferred to have never have had any interaction whatsoever with the Defendants.

6        It was only after months of unrelenting assault on Gordon's computers by the Defendants,

7    and a total disregard by the Defendants to Gordon's repeated requests that they leave him alone,

8    (Dkt. 63-1 ¶ 25), that Gordon sought redress in the Courts. Had the Defendants never sent illegal

9    spam to Gordon, or had the Defendants simply stopped sending illegal spam to Gordon after

10   Gordon asked them literally hundreds of times to stop, the Defendants would not find themselves

11   in the position they are in today.   Instead, the Defendants have callously disregarded repeated

12   requests that they stop sending spam, not only by Gordon, but also by numerous other

13   individuals, (See Exhibit A to Robert J. Siegel's Declaration in Support of Plaintiffs' Response

14   to Defendants' Motion for Summary Judgment filed concurrently herewith). These testimonials

15   by scores of other irate recipients of Defendants' spam are offered in stark contradiction to

16   Defendants' position that Gordon somehow failed to properly "unsubscribe" from Defendants'

17   email lists because he failed to use the "unsubscribe" mechanism provided in Defendants' spam

18   emails. As the Court will note for itself, the so-called "mechanism" provided by Defendants is

19   clearly less than reliable. Defendants are apparently confident that neither Gordon, these other

20   individuals, nor this Court, can or will do anything about Defendants' illegal spamming.

21       The Defendants admit that, on or about February 24, 2006, the Defendants received

22   Plaintiffs' First Production, consisting of thousands of spam emails sent by the Defendants and

23   containing the email addresses Gordon wanted Defendants to stop sending spam emails to.

24

25   RESPONSE TO DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT
     GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
      5

iJustice Law P.C.
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-304-5400
Fax: 206-624-0717

1   (Linke Declaration, Dkt. 71)  Subsequent to that production, for a period of some ten months, the

2   Defendants continued to send spam to those same email addresses.  Approximately 1,800 of

3   those spam emails were sent between February 24, 2006 and December of 2006.

4           There is perhaps no better evidence of the Defendants' callous confidence that they will

5   not be held to account, and of the Defendants' utter disregard for Gordon's simple desire to be

6   left alone, than the fact that the Defendants continued sending thousands of spam emails to

7   Gordon until as recently as two months ago.  Defendants' spam emails continued for at least ten

8   months after Gordon had both commenced this lawsuit and delivered to the Defendants' counsel

9   the actual spam containing the actual email addresses Gordon wanted removed from the

10  Defendants' spam lists.

11      Regardless of the foregoing, the character and motives of the parties are simply not relevant

12  to the issues before the Court.  The only facts that are relevant are those that relate to the

13  following questions:

14      1)Whether Gordon is an "Internet access service" (IAS) as defined in 15 USC 7702(11) and

15      47 USC 231(e)(4);

16      2)Whether Gordon is an "Interactive computer service" (ICS) as defined in RCW 19.190.010

17      (8); and

18      3)Whether the Defendants' spam violated the relevant statutes, 15 USC 7701 et seq. and

19      RCW 19.190 et seq.

20          The parties' motives and character simply do not bear on any of these questions.  Quite

21  simply, the Defendants are liable if Gordon's internet service is determined to be an IAS and/or

22  an ICS, and the Defendants are shown to have sent illegal spam to Gordon's internet service.

23  Even if all the unsupported, factually inaccurate, and scurrilous allegations made by the

24

25

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
6

1   Defendants related to Gordon's conduct and character were true (and they are not), those false

2   allegations simply would not provide a defense to the Defendants' conduct.  Under the statutes

3   that govern the claims at issue, all that is relevant is Gordon's status an IAS/ICS, and whether the

4   Defendants sent illegal spam to Gordon's IAS/ICS.  Once those determinations are made the

5   analysis is over, as neither the CAN SPAM Act nor Washington's Commercial Electronic Mail

6   Act (CEMA) create any affirmative defenses that would otherwise excuse the Defendants'

7   conduct.

8                    **Gordon Has Standing To Bring Gordon's Claims**

9       The following facts related to Gordon's status as an IAS/ICS are not contested by either side:

10  1)Gordon currently leases a dedicated server.

11  2)Gordon currently hosts his own domains, websites, and e-mail accounts on Gordon's

12  dedicated server.

13  3)Gordon also currently hosts domains, websites, and e-mail accounts for numerous third

14  party customers on Gordon's dedicated server.

15  4)Prior to Gordon's leasing a dedicated server, and at all times relevant to this lawsuit during

16  which Gordon did not yet lease a dedicated server, Gordon leased shared server space.  This

17  shared server space hosted the Gordonworks.com domain name, where Gordon placed

18  content accessible to the general public.  This content included job-search information and

19  resources for small business.  Included within this information were reciprocal links from

20  institutions such as colleges and universities, employment related agencies in five different

21  states, and the Federal Small Business Administration.  "Reciprocal" means that not only did

22  Gordon have links to these institutions and agencies, but also that these institutions and

23  agencies had links on their websites to Gordon's website at Gordonworks.com.  As a result

24

25
RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
  7

of these reciprocal links, Gordonworks.com served as a clearinghouse for job-search

information and small business resources on the World Wide Web. (Gordon Declaration,

Dkt. 61-1 ¶ 5)


Defendants claim the following set of contested allegations establish that Gordon is not an

IAS/ICS.  Gordon contests these allegations themselves and the premise that these allegations are

relevant to the determination of whether Gordon is an IAS/ICS,.  There are at lease four

contested allegations addressed individually as follows:

　1)The Defendants falsely claim "Gordon does not have access to the 'root account' on the

　server he leases."

　In his declaration (Dkt. 99), the Defendants' expert Neal Krawetz makes the blanket

recitation that his declaration is "based on facts within my own personal knowledge."  However,

the only basis recited for Mr. Krawetz's claim that "Gordon does not have access to the root

account" is Gordon's deposition testimony.  As a result, it is obvious that Mr. Krawetz has

testified to matters that are not "based on facts within [his] own personal knowledge."  In either

event, Mr. Krawetz is simply wrong.  Gordon does have access to the root account on the

dedicated server Gordon leases.  Giving Mr. Krawetz the benefit of the doubt, and assuming that

Mr. Krawetz's sworn declaration is based on a misunderstanding, rather than a

mischaracterization, of Gordon's deposition testimony, Gordon has corrected the record of his

deposition testimony to ensure no further misunderstandings occur.  These corrections are

attached as exhibit A to Gordon's declaration.  Gordon explains his access to the root account of

Gordon's server in those corrections as follows:

> As a lessee of the dedicated server, I have complete control, including root access, to that
> server.  However, in addition to leasing the server, I have also contracted with GoDaddy
> to provide technical support.  The technical services agreement is separate from the lease

agreement.  Under the terms of the technical services agreement, I have agreed to allow GoDaddy exclusive access to the root, since it would be unduly burdensome for their technical services people to manage the server for me if I were simultaneously changing things at the root.  At the same time, as lessee of the server, I have the power to cancel the technical service agreement at any time.  Canceling the technical services agreement does not cancel the lease to the server.  Thus, in the event that I canceled the technical services agreement, I am automatically responsible for managing root access to the leased server.  Therefore, it is more accurate to say that while I have control over and responsibility for root access to my dedicated server, I have subcontracted out those functions for the time being.

    In addition to Gordon's testimony, attached as exhibits B, C, and D to Gordon's declaration, Gordon has included the User's Manual provided by GoDaddy, entitled "Getting Started With Your Dedicated Server" (exhibit B), a copy of the agreement under which Gordon leases his dedicated server and purchases technical services from GoDaddy (exhibit C), and an email exchange with GoDaddy's technical service personnel (exhibit D).

    A plain reading of both the User's Manual (exhibit B) and the agreement under which Gordon leases his dedicated server and purchases technical services from GoDaddy (exhibit C) corroborate completely that Gordon is responsible for the "root" of Gordon's dedicated server. As explained by GoDaddy's technical service personnel in the email exchange (exhibit D):

> If you remove the assisted plan option, your server and its configuration will remain in tact. We will give you full administrative capabilities to your usernames.

    A plain reading of these documents thus demonstrates conclusively that regardless of any confusion or misunderstandings created by Gordon's deposition testimony, Gordon currently and always has had access to the "root account" of his dedicated server, even if he has outsourced these functions for the time being.

    2) The Defendant falsely claims that Gordon does not host e-mail accounts for others.

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

This allegation is apparently based on yet another misunderstanding of Gordon's deposition testimony.  Specifically, Gordon did not interpret the meaning of the word "provide" in the same way that Defendants' counsel used the term in his question.  Gordon has attempted to eliminate any misunderstanding on this point by augmenting his testimony with the following statement:

> My testimony in this section is inaccurate because I misunderstood the meaning of the word "provide."  In fact, I host domains for clients of my interactive access service on my server.  My clients can then use these domains for e-mail, or to set up e-mail accounts.  Sometimes I assist them in setting up e-mail accounts, sometimes they are able to do it on their own.  All of my client's domains and e-mail accounts, whether set up by them with my assistance or without it, reside on my server.  I have, on occasion, registered domain names for my clients.  On other occasions, they have registered their domain names themselves.  I am not a domain name registrar.  However, I do host my client's domain names, and I also host the e-mail accounts associated with those domains. (Exhibit A, Gordon Declaration)

The Court's attention is further drawn to the sworn declarations filed by Anthony Potts (Dkt. 56), Emily Abbey (Dkt. 58), and Russell Flye (Dkt. 62).  Each of these declarations establish conclusively that each of the respective declarants owns their own domain name, owns one or more e-mail addresses associated with that domain name, and that Gordon and Omni Innovations, LLC host all of those domain names and associated e-mail addresses on Gordon's server.  Accordingly, while Gordon may or may not "provide" e-mail accounts, depending on how one interprets the meaning of the word "provide" in the context of the question asked by Defendants' counsel, there is no doubt that Gordon hosts e-mail accounts and web pages for all of these third parties on his server.

   3) **The Defendants falsely claim that Gordon does not operate Gordon's DNS server.**

Gordon's testimony on this point is equivocal; he stated plainly that he didn't know.  Gordon has since asked his technical service provider and has determined that he does in fact operate his own DNS server.  As explained by the exchange between GoDaddy's technical service personnel

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
  10

and Gordon in exhibit D to the Gordon declaration, Gordon is responsible for setting up the DNS

server:

> If I purchase more IP addresses, will I be responsible for configuring the DNS for new
> domains? Is there anything more needed to operate the DNS feature?
>
> >When you setup a domain in Plesk you can select the IP address you want to use. When
> you receive more IP addresses from us, you will need to add them manually to the Plesk "IP
> Pool" page under "Servers". The "Servers" link is only available to administrative users.
> This would be available if you removed the Assisted Plan.
>
> Do you permit the management of domains from other registrars on this dedicated server?
>
> -> As long as you configure the DNS on the domain to point to your server properly, you
> can register your domains with any registrar.
> (exhibit D to Gordon declaration)

Accordingly, contrary to the Defendants' accusation, as the lessee of a dedicated server

Gordon is in fact responsible for setting up the DNS server, and for configuring the DNS for all

domains on Gordon's server (See exhibit C to the Gordon declaration).

**4) The Defendants falsely claim "GoDaddy only permits the management of domains**

**registered through GoDaddy" and that "this excludes third-party hosting."**

In making this final allegation, the Defendant does not site any evidence on the record at all.

Rather, the Defendant merely cites the URL of a web page located on GoDaddy's website.  This

web page has not been authenticated, and Gordon could move the Court to strike it.  However, if

the Court takes the time to look up the cited web page, the Court will realize that the Defendants

are apparently attempting to mislead the Court.  The web page in question is a help file for

GoDaddy customers seeking to use GoDaddy's domain name registration service.  The page

recites:

> Can a domain registered elsewhere have name servers registered with you?

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
 11

iJustice Law P.C.
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-304-5400
Fax: 206-624-0717

Your domain must be registered through us in order for you to use <u>our</u> system to set up name servers for it. (underline added).

In other words, GoDaddy will not let its domain registration customers use GoDaddy's server to set up name servers for it. But Gordon is not a "domain registration" customer, and Gordon is not using "GoDaddy's" server. Gordon is a *dedicated server customer with his own server*, and Gordon is thus using *Gordon's* system, which consists of a dedicated server leased from GoDaddy. As GoDaddy itself confirms, Gordon can do whatever he wants with his dedicated server, and can register domains with whomever he chooses. GoDaddy's technical service personnel make this point to Gordon explicitly in exhibit D to the Gordon declaration:

> Do you permit the management of domains from other registrars on this dedicated server?

> As long as you configure the DNS on the domain to point to your server properly, you can register your domains with any registrar.

The Defendants have argued to the Court that if someone operates a server leased by a company, and if that person is able to configure the DNS on a domain to point to that server *even if that domain is registered with another company*, then that person is an IAS/ICS. Accordingly, *by the Defendants' own logic*, Defendants have effectively admitted that Gordon is an IAS/ICS because Gordon can host domains registered by anyone, anywhere, on his leased, dedicated server!

Even if the Court were to accept the Defendants' version of all of these contested allegations, none of them have anything whatsoever to do with the determination of whether or not Gordon is an IAS/ICS. Both CAN SPAM and CEMA contain explicit definitions of an IAS and an ICS, and neither of those definitions are remotely concerned with matters such as whether one has access to a "root account" on a server, or whether one "configures their own DNS

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
 12

iJustice Law P.C.
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-304-5400
Fax: 206-624-0717

servers." Instead, both CAN SPAM and CEMA are concerned with the types of services Gordon

provides. Unlike the allegations surrounding whether Gordon has access to a "root account" on

his server, or whether Gordon "configures his own DNS servers," the facts surrounding the types

of services Gordon provides are uncontested, and establish conclusively that Gordon is both an

IAS and an ICS.

### Gordon Is An IAS Because, On The Uncontested Facts, He Meets The Definition In 15 USC 7702(11) And 47 USC 231(E)(4).

15 USC 7702(11) states:

>(11) Internet access service

>The term "Internet access service" has the meaning given that term in section 231 (e)(4) of title 47.

47 USC 231(e)(4) states:

>(4) Internet access service

>The term "Internet access service" means a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers. Such term does not include telecommunications services.

The Defendants blithely allege that language of 47 USC 231(e)(4) is "ambiguous," but

entirely fail to identify which portion of the language contains the alleged ambiguity, or to

provide any explanation whatsoever as to why any portion of the language is ambiguous.

Instead, the Defendants simply invite the Court to ignore the plain language of the statute in

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
 13

iJustice Law P.C.
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-304-5400
Fax: 206-624-0717

1   order to reach a result directly contrary to that same language.  Specifically, the Defendants urge

2   the Court to "exclude all but those who provide access to the Internet (*e.g.*, dial-up, DSL, cable

3   modem, or T1 service providers)" from the statutory definition.  In making this argument, the

4   Defendants are in effect asking the Court to limit the definition of "Internet access service" under

5   47 USC 231(e)(4) to include only those entities that provide a direct, physical connection to the

6   Internet, using "dial-up, DSL, cable modem, or T1 service."  Such a result is directly contrary to

7   the plain statement in 47 USC 231(e)(4) that provides that "such term ("internet access service")

8   does not include telecommunications services."

9       All of the examples offered by the Defendants (dial-up, DSL, cable modem, or T1

10  service) constitute "telecommunications services."  Dial up services are accessed by having a

11  computer literally dial a telephone call to a modem connected to the Internet.  DSL services are

12  provided by telephone companies as an "always on" connection to the internet carried over

13  normal phone lines.  T1 service is a 1.544 Mbps point-to-point dedicated, digital circuit provided

14  by the telephone companies.  While cable modems are typically used to connect a computer to a

15  cable TV service, voice over IP telephony (VOIP) services depend on cable modems and DSL

16  services, as these services provide the "always-on connection" required for VOIP telephone

17  service.

18  While it is obvious that many companies simultaneously provide "Internet access services"

19  and "telecommunications services," Congress explicitly defined "Internet access service" in 47

20  USC 231(e)(4) to <u>exclude</u> a requirement that an "Internet access services" provide

21  "telecommunications services" so that the definition would *not* be limited to only those entities

22  that provided "telecommunications services."  Accordingly, the Defendants' are urging the Court

23  to do the opposite of what is set forth in the plain language of 47 USC 231(e)(4).

24

25
    RESPONSE TO DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT
    GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
     14

iJustice Law P.C.
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-304-5400
Fax: 206-624-0717

1     The Defendants also invite the Court to simply abandon the language contained in 47 USC

2     231(e)(4), and to instead adopt a completely separate definition of "Internet access service"

3     contained in a different section of the bill under which the definition in 47 USC 231(e)(4) was

4     introduced.  Specifically, the Defendants urge the Court to adopt the much narrower definition in

5     subsection 1101(e)(2)(B) of HR 4328 which limits "Internet access services" to "services

6     through which a customer using a computer and a modem or other communications device may

7     obtain access to the Internet,"  that is a physical connection to the internet.

8     The Defendants argument is fatally flawed, however, because the inclusion of this narrower

9     definition in subsection 1101(e)(2)(B) of HR 4328 in fact dictates that the Court apply a broader

10    definition as a matter of law.  "Courts should not rely on inconclusive statutory history as a basis

11    for refusing to give effect to the plain language of an Act of Congress, particularly when the

12    Legislature has specifically defined the controverted term."  *Hubbard v. United States,* 514 U.S.

13    695, 708, 115 S. Ct. 1754, 131 L. Ed. 2d 779 (1995).  "Nor should we infer as much, as it is a

14    general principle of statutory construction that when "'Congress includes particular language in

15    one section of a statute but omits it in another section of the same Act, it is generally presumed

16    that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Russello*

17    v. *United States,* 464 U.S. 16, 23, 78 L. Ed. 2d 17, 104 S. Ct. 296 (1983) (quoting *United States*

18    v. *Wong Kim Bo,* 472 F.2d 720, 722 (CA5 1972)).

19    Plainly, Congress was aware of the narrower definition that required an "Internet access

20    service" to provide a physical connection to the internet, (a "service . . .  using a computer and a

21    modem …[to] obtain access to the Internet").  Equally plain is that Congress deliberately chose

22    the much broader definition, which does *not* require provision of a physical connection, and

23    which instead includes any "service that enables users to access content, information, electronic

24

25

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
 15

**iJustice Law P.C.**
**1325 Fourth Ave., Suite 940**
**Seattle, WA 98101**
**Phone: 206-304-5400**
**Fax: 206-624-0717**

mail, or other services offered over the Internet." Given that Congress provided two separate definitions for the same term in two separate subsections of the legislation, for any Court to impose the narrow definition from one subsection on the provisions of the other subsection, where a different, broader definition was *actually written* into the legislation, would clearly violate the rules of statutory construction and frustrate the intent of the Congress.

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc.* v. *Dollar Park & Fly, Inc.,* 469 U.S. 189, 194, 83 L. Ed. 2d 582, 105 S. Ct. 658 (1985). The plain language of 47 USC 231(e)(4), provides that the term "Internet access service" means "a service that enables users to access content, information, electronic mail, or other services offered over the Internet." Gordon's dedicated server does exactly that. Through Gordon's dedicated server, Gordon hosts his own domains, websites, and e-mail accounts. Gordon also hosts domains, websites, and e-mail accounts for numerous third party customers. Gordon thereby "enables users to access content, information, electronic mail, or other services offered over the Internet."

The Defendants urge the Court to indulge in the fiction that Gordon is no different that someone who "allows family members use of a computer" or who "inserts a hyperlink into an email." This line of argument insults the Court's intelligence. Perhaps the Defendants cannot distinguish between a company that operates a dedicated server and an individual who writes an email, but if so, they are perhaps the only ones who cannot.

Gordon leased shared server space prior to leasing a dedicated server. This shared server space also unquestionably "enabled users to access content, information, electronic mail, or other services offered over the Internet." Gordon's shared server space hosted the Gordonworks.com

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
  16

**iJustice Law P.C.**
**1325 Fourth Ave., Suite 940**
**Seattle, WA 98101**
**Phone: 206-304-5400**
**Fax: 206-624-0717**

domain name, where Gordon placed "content and information" including job-search information and resources for small business. Users "accessed this content over the internet," as the Gordonworks.com website served as a clearinghouse for job-search information and small business resources on the World Wide Web. Applying the ordinary meaning of the language employed by Congress, Gordon thereby "enabled users to access content, information… or other services … over the Internet." Gordon thereby provided "Internet access service" under 47 USC 231(e)(4) and 15 USC 7702(11) on Gordon's shared server space as well as his dedicated server space.

### Gordon Is An ICS Because He Meets The Definition In RCW 19.190.010 (8)

RCW 19.190.010 (8) states:

> (8) "Interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the internet and such systems operated or services offered by libraries or educational institutions.

Since Gordon operates a computer server connected to the World Wide Web, and since Gordon's server is accessed by thousands of visitors, as well as, Gordon's own customers, Gordon indisputably "enables computer access by multiple users to a computer server." Accordingly, Gordon is also an ICS because he meets the definition in RCW 19.190.010 (8).

### Gordon Has Been Adversely Affected By The Defendants' Illegal Spam

The Defendants argue that Gordon should not be permitted to proceed because he has not been "adversely affected" by a violation of the statute. However, the Defendants do not dispute that Gordon and Gordon's customers have been forced to wade through thousands of e-mails sent by the Defendants to locate legitimate e-mail. The simple fact that the Defendants' have

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
 17

iJustice Law P.C.
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-304-5400
Fax: 206-624-0717

clogged Gordon's ICS with thousands of spam e-mails is more than ample to demonstrate an "adverse affect." Ironically, the Defendants then argue out of the other side of their mouths that Gordon does not have standing because a number of Gordon's customers were forced to abandon their e-mail accounts after they had been overwhelmed by spam. Apparently, it is the Defendants' position that if it can send enough spam to cause all of the customers of an IAS/ICS to abandon that Internet access service, then the Internet access service also loses its standing to bring suit.

The Court should show no patience for such sophistry, and should hold that Gordon is an IAS/ICS, and that Gordon has been adversely affected by the Defendants' violations of the statute.

### Defendants' "Evidence" Is Improper And Inadmissible

Amazingly, the Defendants are asking the Court to rule as a matter of law that thousands of spam e-mails sent by the Defendants do not violate the CAN SPAM Act without ever actually entering the spam e-mails into evidence. Instead, the Defendants have constructed several huge spreadsheets, which they refer to as "logs," where they have selectively cut and pasted what they claim are portions of the relevant spam e-mails. However, the Defendants have not properly authenticated the portions of these spam e-mails in these spreadsheets under Federal Rule of Evidence 901, and even if they had, the Defendants' spreadsheets are still inadmissible under Federal Rule of Evidence 1002.

Federal Rule of Evidence 901 provides that:
The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
  18

1    There are several possible ways to authenticate or identify a document.  The Defendants

2    purport to do so by the sworn declaration of Derek Linke (Dkt. 102).  However, Mr. Linke does

3    not even claim to have first hand knowledge of all of the materials placed in the logs.  Instead,

4    Mr. Linke testifies that others were charged with putting that information in the logs.

5        To evaluate the contents of Plaintiffs' archives, beginning on or about November 16, 2006,
         defendants' counsel engaged a team of seven licensed attorneys to review all of the emails
6        then produced by Plaintiffs including those in: VM1, VM2, VMO, and ADK, a total of
         nearly 19,000 emails.  Under my direction, the contract team reviewed all of the 19,000
7        emails for their compliance with the federal CAN-SPAM Act of 2003, 15 U.S.C. § 7701 et
         seq. ("CAN-SPAM") and the Washington Commercial Electronic Mail Act (RCW 19.190)
8        ("CEMA").  Upon completion of the team's review, I collated and merged all of the contract
         attorneys' work product, reviewed and corrected the work, and assembled the work product
9        into a manageable format consisting of a single log for each of Plaintiffs' archives.  (Linke
         Decl., Dkt. 102, ¶¶ 7, 8, and 11).

10    Mr. Linke's own testimony thus indicates that the "team of seven licensed attorneys" was the

11    only group with the first-hand knowledge to properly authenticate the portions of the spam e-

12    mails that were purportedly put into the logs, because they "reviewed all of the emails."

13    Accordingly, the Defendants' have failed to properly authenticate the materials placed in the logs

14    because the "team of seven licensed attorneys" has never testified.

15

16    Federal Rule of Evidence 1002. "Requirement of Original" requires:

17

18        To prove the content of a writing, recording, or photograph, the original writing, recording,
         or photograph is required, except as otherwise provided in these rules or by Act of Congress.

19

20    Even if the Court is willing to overlook the Defendants' failure to properly authenticate the

21    logs under Federal Rule of Evidence 901, Federal Rule of Evidence 1002 still requires that the

22    Defendants put the actual, original emails into evidence.  The Defendants' have not done so.  At

23    best, they have put a compilation of selected portions of the emails into evidence.  Accordingly,

24

25    RESPONSE TO DEFENDANTS' MOTION FOR
      SUMMARY JUDGMENT
      GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
       19

1  Gordon hereby moves the Court to strike the logs referenced in the Linke Declaration (Dkt. 102)

2  from the record.

3  **Gordon Contests The Defendants' Claims Regarding The Content Of The Defendants'**

4  **Spam**

5

6      The Defendants had very self-serving reason not to put the actual e-mails into evidence,

7  as the actual e-mails contradict the Defendants' arguments.  For example, the Defendants claim

8  that the body of all of the spam e-mails in question contain a working unsubscribe link or other

9  opt out mechanism.  However, there is an enormous volume of correspondence sent to the

10  Defendants from various individuals who were unable to opt out using the mechanisms allegedly

11  provided by the Defendant for that purpose.  (See Exhibit A to Robert J. Siegel's Declaration in

12  Support of Plaintiffs' Response to Defendants' Motion for Summary Judgment filed

13  concurrently herewith).  This alone correspondence creates an issue of material fact as to

14  whether Defendants provided a working mechanism allowing recipients to opt out of further

15  spam emails.

16      The Defendants further claim that the body of all of the spam e-mails in question contain

17  a postal address and that the subject lines of their spam e-mails are not misleading when read in

18  the context of the advertisement contained in the body of the e-mail.  Gordon contests these

19  claims.

20      For thousands of the Defendants' spam e-mails, Gordon contends that no usable

21  information appears in the body of the e-mail.  Instead, what the Defendant has done has been to

22  place HTML code in the body of their e-mail messages.  This HTML code is intended to retrieve

23  graphics from a remote server.  It is these graphics that presumably contain the postal address

24

25

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
 20

**iJustice Law P.C.**
**1325 Fourth Ave., Suite 940**
**Seattle, WA 98101**
**Phone: 206-304-5400**
**Fax: 206-624-0717**

1  and other information that the Defendants' claim render their spam e-mails CAN SPAM

2  compliant.

3        If a recipient of the spam e-mail has configured their computer so that these graphics are

4  not displayed, as is the case with Gordon, none of the information in these graphics is ever

5  transmitted to the spam e-mail recipient, as it is not actually contained within the text of the spam

6  e-mail message itself.  As described in Gordon's Motion for Partial Summary Judgment, a

7  prudent computer user has very good reason to turn off the features in an e-mail client that allow

8  the e-mail client to display graphics, since viruses and other malicious software can be

9  introduced to a user's system by exploiting those graphics.  The technical advisory issued by the

10  Microsoft Corporation, and attached as exhibit F (Dkt. 63-2) to Gordon's Declaration In Support

11  of Partial Summary Judgment, (Dkt. 63-1, ¶ 20), warns of exactly this vulnerability, and advises

12  users to turn the graphics display feature off in their e-mail clients.  Accordingly, there exists a

13  question of material fact as to whether the bodies of thousands of the Defendants' spam e-mail

14  messages contain any information at all, except for HTML code.

15

16        **Gordon Contests The Defendants' Claims That Gordon Failed To "Opt-Out"**

17        There also exists an issue of material fact as to whether Gordon opted out of receiving e-

18  mail from the Defendants.  Gordon's declarations and sworn testimony plainly indicates that he

19  did.  The Defendants dispute those sworn statements and testimony, claiming that Gordon failed

20  to "unsubscribe" properly, using the mechanism provided in Defendants' emails.  However, as

21  the Court can see from the evidence presented with the Declaration of Robert J. Siegel, the use of

22  Defendants' "mechanism" is anything but an effective means to "opt-out".  Thus, any rational

23  person would conclude that the Defendants were on notice that Gordon did not want to receive

24

25

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
 21

**iJustice Law P.C.**
**1325 Fourth Ave., Suite 940**
**Seattle, WA 98101**
**Phone: 206-304-5400**
**Fax: 206-624-0717**

the Defendants' spam e-mails at the very latest when Gordon filed this lawsuit in Federal Court.

Since spam e-mail violates the CAN SPAM Act if it is sent to a person after they have asked the

sender to stop, at a minimum, the issue of whether Gordon opted out of receiving the

Defendants' spam is in dispute, by Defendants' admission is "material", and can only be resolved

by submitting it to a trier of fact, thereby defeating Defenants' Motion.

**There Is Direct And Substantial Evidence That Scot Lynn Is Responsible For The Spam E-Mails At Issue In This Lawsuit.**

The Defendants assert that there is "no evidence" indicating that defendant Scott Lynn is

in any way responsible for the spam e-mails at issue.  Accordingly, the Court's attention is

respectfully drawn to exhibit E of the Gordon declaration filed concurrently herewith.  As the

Court will note, exhibit E is the "Who is" record of the registration of both the "vmlocal.com"

and "vtarget.com" domain names.  As shown in the record, the e-mail address of the

administrative contact listed for both of these domain names is "slynn@virtumundo.com."  This

is Scott Lynn's email address.

Exhibit B (Dkt. 63-2) to Gordon's Declaration In Support of Partial Summary Judgment

(Dkt. 63-1) shows internal emails produced by the Defendants.  These emails plainly show that

Scott Lynn's email address is "slynn@virtumundo.com" because, unlike the spam emails the

Defendants send to others, in their internal email Virtumundo lists the actual person's name in

the "from name" portion of the "from line" of the header.  As shown in the exhibit, the "from

name" associated with the email address "slynn@virtumundo.com" is Scott Lynn.

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
 22

iJustice Law P.C.
1325 Fourth Ave., Suite 940
Seattle, WA 98101
Phone: 206-304-5400
Fax: 206-624-0717

The Defendants' entire argument is built upon the proposition that their spam e-mails comply with the relevant statutes, not because the e-mails themselves actually identify the sender, but because a person may look up the Defendants' identity in the "Who is" database using the sender's domain name from the spam e-mail.  When Gordon took the exact actions suggested by the Defendants, and looked up the registration in the "Whois" database, Gordon found that Scott Lynn's e-mail address was listed as the administrative contact for both the "vmlocal.com" and "vtarget.com" domain names.  The "vmlocal.com" and "vtarget.com" domain names are used in the "from lines" of thousands of e-mails that form the basis of this action.  Accordingly, by the Defendants' own logic, Defendants have effectively admitted that Scott Lynn is inexorably bound to responsibility for the spam e-mails from both the "vmlocal.com" and "vtarget.com" domain names.  This is true even if one ignores the obvious inferences that may be drawn from the fact that Scott Lynn founded Virtumundo, owns 100% of Virtumundo, and is personally entitled to 100% of the profits generated by Virtumundo.  The Court should not dismiss Scott Lynn from this action, as the facts before the Court indicate that Mr. Lynn was deeply involved with, and therefore has direct and personal responsibility for spam e-mails sent from the "vmlocal.com" and "vtarget.com" domain names.

### Conclusion

For the forgoing reasons, the Plaintiffs James S. Gordon, Jr. and Omni Innovations, LLC respectfully request Court  deny the Defendants' Motion For Summary Judgment, strike the declaration and "expert report" of Neil Krawetz (Dkt. 99), strike the logs attached as exhibits A-E to the Linke declaration (Dkt. 102), and decline to dismiss Scot Lynn from the case.

RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
GORDON v. VIRTUMUNDO GROUP, INC., ET AL.
 23

1

2   **RESPECTFULLY SUBMITTED** this 12th day of February, 2007.

3   DOUGLAS E. MCKINLEY, JR                iJustice Law, P.C.

4   /S/ Douglas E. McKinley, Jr.           /S/ Robert J. Siegel
    Douglas E. McKinley, Jr., WSBA #20806  Robert J. Siegel, WSBA #17312
5   Attorney for Plaintiffs                Attorney for Plaintiffs

6

7

8                       **CERTIFICATE OF SERVICE**

9
    I hereby certify that on this 12th day of February, 2007, I electronically filed RESPONSE TO
10  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using
    the CM/ECF System which will send notification of such filing to the following:
11
12  Attorneys for Defendants:  Derek A. Newman, Newman & Newman .

13                              Robert J. Siegel, WSBA
                                WSBA #17312
14                              ATTORNEY FOR PLAINTIFFS
                                iJustice Law P.C.
15                              1325 Fourth Ave., Suite 940
                                Seattle, WA 98101
16                              bob@ijusticelaw.com
                                Phone: 206-304-5400
17                              Fax: 206-624-0717

18

19

20

21

22

23

24

25
    RESPONSE TO DEFENDANTS' MOTION FOR          **iJustice Law P.C.**
    SUMMARY JUDGMENT                            **1325 Fourth Ave., Suite 940**
    GORDON v. VIRTUMUNDO GROUP, INC., ET AL.    **Seattle, WA 98101**
     24                                         **Phone: 206-304-5400**
                                                **Fax: 206-624-0717**