1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

JAMES S. GORDON, Jr., a married individual,
d/b/a 'GORDONWORKS.COM'; OMNI
INNOVATIONS, LLC., a Washington limited
liability company,

11

CASE NO. 06-0204-JCC

12

Plaintiffs,

ORDER

13

v.

14

VIRTUMUNDO, INC., a Delaware Corporation,
d/b/a ADNOWLEDGEMAIL.COM;
ADKNOWLEDGE, INC., a Delaware
Corporation, d/b/a
ADKNOWLEDGEMAIL.COM; SCOTT LYNN,
an individual; and JOHN DOES, 1-X,

15

16

17

18

Defendants.

19

This matter comes before the Court on the following eleven motions:

20

    (1) Defendants' Motion for Summary Judgment (Dkt. No. 98) and the associated motions by

21

Defendants for Leave to File an Overlength Brief (Dkt. No. 97) and by Plaintiffs for Leave to Seal (Dkt.

22

No. 120) the Declaration of Derek Newman (Dkt. No. 101);

23

    (2) Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 53);

24

    (3) Defendants' Motion for Bond for an Undertaking (Dkt. No. 38) and the associated motion by

25

26

ORDER – 1

1  Defendants to Seal their Reply (Dkt. No. 91); and

2      (4) the discovery motions by Defendants to Compel Discovery (Dkt. No. 69), to Compel

3  Segregation of Emails (Dkt. No. 71), to Exclude Testimony from Plaintiffs' lately disclosed witnesses

4  (Dkt. No. 116), and to Compel Further Testimony regarding Prior Settlements (Dkt. No. 87) as well as

5  the associated Motion to Seal (Dkt. No. 86).

6      This Court, having reviewed the materials submitted by the parties, as well as the complete

7  record, and determined that oral argument is not necessary, hereby finds and rules as follows.

8  **I.    BACKGROUND**

9      Plaintiffs James S. Gordon ("Gordon") and Omni Innovations, LLC ("Omni") have brought this

10  action for alleged violations of the Federal CAN-SPAM Act of 2003, 15 U.S.C. §§ 7701–7713 (First

11  Cause of Action); the Washington Commercial Electronic Mail Act ("CEMA"), WASH. REV. CODE §§

12  19.190.010–.110 (Second Cause of Action); the Washington Consumer Protection Act ("CPA"), WASH.

13  REV. CODE §§ 19.86.010–.920 (Third Cause of Action); and the Washington "Prize Statute," WASH.

14  REV. CODE §§ 19.170.010–.900 (Fourth Cause of Action). (Am. Compl. (Dkt. No. 15).)  Gordon is a

15  Washington resident and registrant of the internet domain gordonworks.com ("Gordonworks"). Omni is

16  Gordon's business, which involves (1) software development and other endeavors and (2) a "spam

17  business," which entails "[n]otifying spammers that they're violating the law" and filing lawsuits[1] if they

18  do not stop sending e-mails to the Gordonworks domain. (Defs.' SJ Mot., Newman Decl. Ex. A (Dep. of

19  Gordon) at 117–19.)  Plaintiff Gordon alleges that between August 21, 2003 and February 15, 2006, he

20  received materially false or misleading, unsolicited e-mail advertisements from Defendants that were

21  transmitted through Omni's domain server to his e-mail address "jim@gordonworks.com," as well as to

22

23  ───────────────

24      [1] Omni is a party to ten other similar cases in the Western District of Washington. *See* Case Nos. C06-1118-MJP, C06-1129-JCC, C06-1210-TSZ, C06-1284-TSZ, C06-1348-MJP, C06-1350-JCC, C06-1469-MJP, C06-1537-JCC, C07-222-RSM, and C07-386-MJP.  Only one of these cases is designated

25  "closed."

26  ORDER – 2

1    other individuals using Gordonworks for domain hosting.  (Am. Compl.)  Plaintiffs'[2] most recent estimate

2    of the number of these e-mails is 13,800.  (Pls.' Partial SJ Mot., Gordon Decl. ¶ 26.)

3         Defendants Virtumundo, Inc. ("Virtumundo") and Adknowledge, Inc. ("Adknowledge") are non-

4    Washington resident businesses that provide online marketing services to third-party clients.  Virtumundo

5    is a Delaware corporation with its principal place of business in Kansas.  Adknowledge is also a Delaware

6    corporation with its principal place of business in Missouri.  Virtumundo and Adknowledge market

7    products for their clients by transmitting e-mails to interested consumers.  Defendant Scott Lynn

8    ("Lynn") is a Missouri citizen and serves as Chief Executive Officer of Adknowledge.  He is also the sole

9    shareholder of both companies.[3]

10        On May 24, 2006, this Court denied Defendants' motion to dismiss for lack of personal

11   jurisdiction (Order (Dkt. No. 24)) and on December 8, 2006, this Court granted in part and denied in part

12   Defendants' motion to dismiss various claims for pleading deficiencies (Order (Dkt. No. 51)), granting

13   leave to Plaintiffs to further amend their Amended Complaint to cure the identified defects.  Plaintiffs

14   never did so.  Accordingly, the prior claim dismissals stand, such that no Prize Statute claims remain

15   (entirely eliminating the Fourth Cause of Action) and Plaintiffs' "personally identifying information"

16   CEMA claim, WASH. REV. CODE § 19.190.080, no longer remains (eliminating parts of the Second and

17   Third Causes of Action).  Defendants have now moved for summary judgment on all of Plaintiffs'

18   remaining claims—which include CAN-SPAM claims (First Cause of Action), CEMA claims (Second

19   Cause of Action), and CPA claims (Third Cause of Action) as they relate to surviving CEMA claims (but

20   not to dismissed Prize Statute or CEMA claims).  Because summary judgment on multiple grounds

21

22        [2] Unless otherwise indicated, references to "Plaintiffs" include both Gordon and Omni.

23        [3] Unless otherwise indicated, references to "Defendants" include Adknowledge, Virtumundo, and

24   Lynn.  The Court notes that Defendants prefer to treat Lynn separately, but the outcome of this Order
     renders the distinction irrelevant for the purposes of this discussion, because the analysis herein applies to

25   all of Plaintiffs' claims against all three Defendants.  *See infra* section III.D.

26   ORDER – 3

1  disposes of this case entirely, the Court's analysis is governed by the summary judgment standard, as

2  follows.

3  **II.    LEGAL STANDARD**

4      Rule 56 of the Federal Rules of Civil Procedure governs summary judgment, and provides in

5  relevant part, that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions,

6  answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

7  no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

8  law." FED. R. CIV. P. 56(c).  In determining whether an issue of fact exists, the Court must view all

9  evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that

10 party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84

11 F.3d 1194, 1197 (9th Cir. 1996).  A genuine issue of material fact exists where there is sufficient evidence

12 for a reasonable factfinder to find for the nonmoving party.  *Anderson*, 477 U.S. at 248.  The inquiry is

13 "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is

14 so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.  The moving party bears the

15 burden of showing that there is no evidence which supports an element essential to the nonmovant's

16 claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the movant has met this burden, the

17 nonmoving party then must show that there is in fact a genuine issue for trial.  *Anderson*, 477 U.S. at

18 250.

19 **III.    ANALYSIS**

20      **A.    Federal CAN-SPAM Claims (First Cause of Action)**

21      Because Defendants challenge Plaintiffs' standing to bring a private cause of action under CAN-

22 SPAM, the Court must address this threshold issue prior to reaching the merits of their CAN-SPAM

23 claims.  The CAN-SPAM Act's primary enforcement provisions empower the Federal Trade Commission

24 "FTC" and other federal agencies to pursue violators of the Act.  15 U.S.C. § 7706(a), (b).  State

25 attorneys general may bring civil enforcement actions.  *Id.* § 7706(f).  A limited private right of action

26 ORDER – 4

1   also exists.  The CAN-SPAM Act allows an action by a "provider of Internet access service adversely

2   affected by a violation of" §§ 7704(a)(1), 7704(b), or 7704(d)[4] or "a pattern or practice that violates" §

3   7704(a)(2), (3), (4), or (5).[5]  15 U.S.C. § 7706(g)(1).  "Internet access service" is defined in the CAN-

4   SPAM Act, 15 U.S.C. § 7702(11), by way of reference to another federal statute, which provides as

5   follows:

6         The term "Internet access service" means a service that enables users to access content,
          information, electronic mail, or other services offered over the Internet, and may also
7         include access to proprietary content, information, and other services as part of a package
          of services offered to consumers.  Such term does not include telecommunications
8         services.

9   47 U.S.C. § 231(e)(4).  Defendants argue that Plaintiffs cannot bring a private right of action because (1)

10  they are not "Internet access service" ("IAS") providers as defined by the Act and (2) they have not been

11  "adversely affected" by the violations they have alleged, as required by § 7706(g)(1).

12        The facts relevant to the standing inquiry are as follows.  Plaintiff Gordon, via Plaintiff Omni,

---

14  [4]  Section 7704(a)(1) prohibits "false or misleading transmission information," as follows:

15  It is unlawful for any person to initiate the transmission, to a protected computer, of a commercial
    electronic mail message, or a transactional or relationship message, that contains, or is accompanied by,
16  header information that is materially false or materially misleading.  For purposes of this paragraph—
    (A) header information that is technically accurate but includes an originating electronic mail address,
17  domain name, or Internet Protocol address the access to which for purposes of initiating the message was
    obtained by means of false or fraudulent pretenses or representations shall be considered materially
    misleading;
18  (B) a "from" line (the line identifying or purporting to identify a person initiating the message) that
    accurately identifies any person who initiated the message shall not be considered materially false or
19  materially misleading; and
    (C) header information shall be considered materially misleading if it fails to identify accurately a
20  protected computer used to initiate the message because the person initiating the message knowingly uses
    another protected computer to relay or retransmit the message for purposes of disguising its origin.

21  15 U.S.C. § 7704(a)(1).  Section 7704(b) deals with "aggravated violations" not at issue here, and §
22  7704(d) deals with warning label requirements for "commercial electronic mail containing sexually
    oriented material" not at issue here.

23
24  [5]  A pattern or practice claim under these subsections must allege "deceptive subject headings" (§
    7704(a)(2)), "return address" and unsubscribe option violations (§ 7704(a)(3)), "transmission of
25  commercial electronic mail after objection" allegations (§ 7704(a)(4)), or "identifier, opt-out, and
    physical address" violations (§ 7704(a)(5)).

26  ORDER – 5

1   leases (from "GoDaddy") the server space that hosts the "Gordonworks" domain. (Pls.' Partial SJ Mot.,

2   Gordon Decl. ¶ 6; Defs.' SJ Mot., Newman Decl. Ex. A (Dep. of Gordon) at 115:10.) This is a

3   "dedicated" server (meaning that he does not share his space with other GoDaddy clients), but Plaintiffs

4   do not have physical control over the server "box," do not maintain or configure it, and have, in fact,

5   never seen it. (Defs.' SJ Mot., Newman Decl. Ex. A (Dep. of Gordon) at 111–12.) This server is not

6   backed up. (*Id.* at 110:25–111:1.) However, previously, and when receiving e-mails relevant to this

7   lawsuit, Plaintiffs had a non-dedicated (shared) virtual server that was backed up. (*Id.* at 111:1–13.)

8   Plaintiffs access their server virtually, by going to their "Plesk" interface, available through GoDaddy, to

9   set up new e-mail accounts and new domains, as well as passwords for their clients. (*Id.* at 109:8–24,

10  214:10–19.) Moreover, Plaintiffs could not host their own server even if they chose to do so.

11  Defendants point out that Plaintiffs' service agreement with Verizon, which Plaintiffs use to physically

12  connect to the Internet, prohibits them from using Verizon's Broadband Service "to host any type of

13  server personal or commercial in nature." (Defs.' Mot. for Bond, Townsend Decl. Ex. O (Verizon

14  Agreement ¶ 3.7.5).) Plaintiffs do not address this issue.[6]

15       Plaintiffs operate a website at gordonworks.com, and they provided e-mail accounts to at least six

16  clients "free for the first year, subject to data collection" for Plaintiff Gordon's "research purposes."

17  (Defs.' Mot. for Bond, Townsend Decl. Ex. U (Plaintiffs' Response to Interrogatory No. 22 (identifying

18  e-mail accounts for "Bonnie, Jamila, Jay, Jonathan, and Emily Abbey[,] Griffin Online Domain, and

19  Anthony Potts").) According to Plaintiffs, Gordon began providing e-mail accounts by September 2003,

20  and Gordon believes that his provision of these accounts, "building web sites for others, and maintaining

21  a website that acts as a clearinghouse for job-search information and small business resources on the

22

23  ─────────────────

24       [6] On a final technical note, the parties engage in drawn-out disputes about "root account" access
    and "DNS server" operation. Even taking Plaintiffs' arguments as fact, the Court finds these factors
25  immaterial to the standing analysis. The foregoing description of Plaintiffs' server setup is sufficient to
    assess Plaintiffs' IAS status.

26  ORDER – 6

1   World Wide Web" qualifies him as an IAS under the Act.  (Pls.' Partial SJ Mot., Gordon Decl. ¶¶ 7–8.)

2   Gordon also alleges that the e-mail accounts he had provided to others were "inundated with commercial

3   electronic mail messages, rendering them unusable," and, consequently, he "took over the administration

4   of those e-mail accounts and began directly receiving the e-mail sent thereto." (*Id.* ¶ 9.)  His clients

5   "relinquished control" of their e-mail accounts in 2003.[7]  (Defs.' Reply re Mot. for Bond, Newman Decl.

6   Ex. A (Draft Transcript of Dep. of Gordon) at 465:6–8.)  At present, the only person other than himself

7   who uses a "Gordonworks" e-mail address is Gordon's wife.  (*Id.* at 465:9–14.)  Nevertheless, Gordon

8   did not disable the relinquished e-mail accounts, instead keeping them active for spam research.  (Defs.'

9   SJ Mot., Newman Decl. Ex. A (Dep. of Gordon) at 197:19–23.)  Gordon testified that the "benefits" of

10  receiving spam can be quantified in terms of his dissertation research, as well as "settlement agreements

11  for people who have said that they wouldn't spam me any longer." (*Id.* at 222.)

12          On its GoDaddy server, Plaintiff Omni (whose first client appeared in May of 2005) hosts

13  domains for its clients, who have e-mail addresses "@" their own domains, *i.e.*, not

14  "@gordonworks.com." (Pls.' Partial SJ Mot., Declarations of Anthony Potts (Dkt. No. 56), Bonnie

15  Gordon (Dkt. No. 57), Emily Abbey (Dkt. No. 58), Jamila Gordon (Dkt. No. 59), Jay Gordon (Dkt. No.

16  60), Jonathan Gordon (Dkt. No. 61), and Russell Flye (Dkt. No. 62).)  Notably, more than half of these

17  Omni clients share the "Gordon" surname.  Each of them has multiple (up to fourteen) e-mail addresses at

18  which they or others allegedly receive illegal spam.  None of these clients has paid Plaintiffs for their

19  services.  All of Plaintiffs' income or revenue for 2006 and 2007 has been from "settlements and

20

21          [7] The effective date of the CAN-SPAM Act is January 1, 2004.  CAN-SPAM Act of 2003, Pub.

22  L. No. 108-187, § 16 (approved Dec. 16, 2003) (note to 15 U.S.C. § 7701).  Thus, Omni's initiation of
    "services" to clients in 2005, described *infra*, appears to be relevant to CAN-SPAM claims as well as

23  Washington state law claims, while the gordonworks.com services described here likely are relevant *only*
    to Plaintiffs' Washington CEMA claims, because CEMA was enacted in 1998 and revised in 1999 (and

24  thus was in effect in 2003).  1998 Wash. Legis. Serv. Ch. 149 (West) (S.H.B. 2752); 1999 Wash. Legis.
    Serv. Ch. 298 (West) (S.H.B. 1037).  Facts regarding gordonworks.com are presented here to

25  demonstrate the historical development of Plaintiffs as entities with potential CAN-SPAM standing.

26  ORDER – 7

1    disputes." (Defs.' Reply re Mot. for Bond, Newman Decl. Ex. A (Draft Transcript of Dep. of Gordon) at

2    46:20–22.)

3          Gordon generally alleges that "[d]ue to the limited technological resources available to me as a

4    small business, the sheer volume of the spam sent by Defendants has made it extremely difficult to

5    manage, and has cost me untold hours of manpower, and substantial resources." (Pls.' Partial SJ Mot.,

6    Gordon Decl. ¶ 26.) However, Gordon has not hired any staff to deal with this administrative situation

7    nor elaborated on the "resources" he has spent. Plaintiffs utilize spam filters, which catch and mark spam

8    before it arrives in Plaintiffs' inboxes. (Defs.' SJ Mot., Newman Decl. Ex. A (Dep. of Gordon) at 81–82;

9    217; 220.) Defendants suggest that Gordon's sorting effort is "exclusively directed toward litigation

10   preparation," and consists of sorting batches of (already-identified) spam e-mails, sent to him by clients

11   "unsorted in lots of 10–50,000" for use in his multiple spam lawsuits. (Defs.' Opp'n to Partial SJ 10

12   (quoting Pls.' Opp'n to Mot. to Compel Segregation of Emails, Gordon Decl. ¶ 3 ("The job of collecting,

13   sorting, and compiling records on this and other defendants is a very time-consuming process.")).)

14          As for technical impact, it is undisputed that Plaintiff Omni's lease provides access to 500

15   gigabytes of data transfer space ("bandwidth") per month through server-host GoDaddy. (Defs.' SJ

16   Mot., Newman Decl. Ex. A (Dep. of Gordon) at 110:16–22.) Gordon acknowledges that he has not

17   "come close" to using all of that bandwidth. (*Id.* at 110:22.) Nor have his server costs gone up due to

18   spam. Gordon has testified that, despite his allegations that Defendants' e-mails are false or misleading,

19   he has not been misled or confused by any "from lines" in Defendants' e-mails. (*Id.* at 394:18–20.)

20          Significantly, Gordon testified that he is not seeking actual damages in the instant litigation

21   (because none exist) and that he is instead seeking solely statutory damages for each e-mail sent. (Defs.'

22   SJ Mot., Newman Decl. Ex. A (Dep. of Gordon) at 319:18–320:22.) For example, in Plaintiffs' motion

23   for partial summary judgment, Plaintiffs seek CAN-SPAM statutory damages for 7,890 allegedly illegal e-

24   mails, pursuant to 15 U.S.C. § 7706(g), of $100 per e-mail, to be tripled for violations committed

25   "willfully and knowingly." (Pls.' Partial SJ Mot. 23–24.) The CAN-SPAM portion of Plaintiffs'

26   ORDER – 8

1   statutory damages request is therefore $2,367,000.[8]  In his final opportunity at dispositive briefing,

2   Gordon again raised no allegation of actual damages, did not dispute the facts described *supra*, and

3   instead asserted that he and his clients having to go through spam e-mails is sufficient "adverse effect" to

4   meet the statutory standing requirement.  (Pls.' Opp'n to SJ 17–18.)

5          The Court now turns to whether Plaintiffs qualify as an IAS that was "adversely affected" by

6   Defendants' alleged CAN-SPAM violations.  Defendants submit that the free e-mail account and domain

7   services and the existence of the Gordonworks domain, along with the structure of Plaintiffs vis-a-vis the

8   Internet and other entities, cannot suffice to make Plaintiffs the type of IAS that Congress intended to

9   have a private right of action.  Defendants further contend that Plaintiffs have realized no adverse effects,

10  even if they are an IAS.  Almost no caselaw exists on the issue of what qualifies an entity as an IAS that

11  is adversely affected, and the statutory language is far less detailed than the facts of this or other cases.

12         Beginning with the definition of an IAS, the plain language of the statute provides:

13     The term "Internet access service" means a service that enables users to access content,
       information, electronic mail, or other services offered over the Internet, and may also
14     include access to proprietary content, information, and other services as part of a package
       of services offered to consumers.  Such term does not include telecommunications
15     services.

16  47 U.S.C. § 231(e)(4).  It is not clear what exactly the exceedingly broad phrase "service that enables

17  users to access" means, and the parties dispute whether this definition incorporates any technical,

18  hardware, or space requirements, and ultimately, whether it includes Plaintiffs.  The Court finds that,

19  although "Internet access service" is defined (by incorporation) in the CAN-SPAM Act, the statutory

20  definition of an IAS is nevertheless ambiguous.  Congress's language is not particularly illuminating

21  except where the definition provides examples ("electronic mail") or exclusions ("telecommunications

22  services").

23

24        [8]  Plaintiffs' partial summary judgment motion requests a total of $10,257,000 in statutory
      damages: $2,367,000 pursuant to CAN-SPAM and $7,890,000 pursuant to CEMA, which allows $1,000
25    per illegal e-mail.  WASH. REV. CODE §§ 19.190.040(2).

26  ORDER – 9

1    In arguing that they are an IAS, Plaintiffs rely on what appears to be one of the *two*[9] cases

2    assessing whether a CAN-SPAM plaintiff has standing.  In this unreported case, *Hypertouch, Inc. v.*

3    *Kennedy-Western Univ.*, No. C04-5203-SI, 2006 WL 648688 (N.D. Cal. Mar. 8, 2006), the district court

4    found that the plaintiff was an IAS because provision of e-mail services alone was sufficient, regardless of

5    whether other services were also provided.  *Id.* at *3.  Because the plaintiff in *Hypertouch*

6    "administer[ed] its own e-mail servers," it was an IAS, "regardless of who is listed as owning the domains

7    associated with those servers."  *Id.*  The *Hypertouch* court also found that the provision of e-mail

8    services at no charge did not change the analysis, because Congress considered free e-mail services when

9    passing the CAN-SPAM Act.  *Id.*  The *Hypertouch* court then found the "adverse effect" element

10   satisfied as well, because the plaintiff had experienced "decreased server response and crashes," "higher

11   bandwidth utilization," and was "forced" to implement "expensive hardware and software upgrades."  *Id.*

12   at *4.  Accordingly, because the *Hypertouch* plaintiff met both prongs, the district court found that it had

13   standing, though it ultimately lost on the merits.  *Id.*

14        While it did not directly so find, the *Hypertouch* court apparently found the foregoing IAS

15   definition ambiguous as well, because it considered "congressional intent" in reaching its conclusion.

16   Courts are entitled to rely on legislative history only after a statute is deemed ambiguous on its face.

17   *United States v. Curtis-Nev. Mines, Inc.*, 611 F.2d 1277, 1280 n.1 (9th Cir. 1980) ("When a statute is

18   ambiguous, reports of committees of the Congress may be used as an aid to ascertaining the purpose of

19   Congress in passing the statute.  Additionally, it is the duty of a court in construing a law to consider the

20   circumstances under which it was passed and the object to be accomplished by it.") (internal citations and

21   quotations omitted).  This Court finds the legislative history particularly instructive to the standing

22

23

24        [9]  The other relevant case is *White Buffalo Ventures v. Univ. of Texas*, 420 F.3d 366 (5th Cir.
     2005).  There, the court found that the University of Texas was an IAS, but did so in the context of a
     preemption analysis.  *Id.* at 372–73.  Accordingly the Fifth Circuit had no occasion to consider the
25   second standing question regarding "adverse effect."

26   ORDER – 10

1  inquiry but comes to a different conclusion than the *Hypertouch* court, because the facts of the instant

2  case are distinguishable.

3      In the Committee Report, under the heading "Costs to ISPs,[10] Consumers, and Businesses," the

4  Senate Committee on Commerce, Science, and Transportation found that "[s]pam imposes significant

5  economic burdens on ISPs, consumers and businesses" because "[m]assive volumes of spam can clog a

6  computer network, slowing Internet service for those who share that network.  ISPs must respond to

7  rising volumes of spam by investing in new equipment to increase capacity and customer service

8  personnel to deal with increased subscriber complaints."  S. REP. NO. 108-102, at 6 (2003) (Comm. Rep.

9  on CAN-SPAM Act of 2003 (S. 877)).  "Dictionary attacks" can hijack a server, slowing it and making it

10  appear that legitimate users are sending spam, and "web bugs" communicate back to the spammer from

11  the recipient's computer.  *Id.* at 3–4.  Increased costs of anti-spam software are "passed on as increased

12  charges to consumers . . . . [and] some observers expect that free e-mail services . . . will be downsized."

13  *Id.* at 6.  The Committee also noted that "[a]lthough Internet access through broadband connections is

14  steadily growing, a dial-up modem continues to be the method by which a vast majority of Americans

15  access the Internet and their e-mail accounts."  *Id.* at 7.  The "per-minute" and long distance charges for

16  Internet connections for many e-mail users were exacerbated by time spent on manual spam filtering,

17  resulting in additional per-customer costs.  *Id.*

18      In subsequently describing the various enforcement provisions in the Act, the Committee

19  discussed the private right of action provision at issue here, which

20      would allow a provider of Internet access service adversely affected by a violation . . . to
        bring a civil action. . . .  This could include a service provider who carried unlawful spam
21      over its facilities or who operated a website or online service from which recipient e-mail
        addresses were harvested in connection with a violation . . . .
22

23  *Id.* at 21.  Moreover, on the House side, Representative John Dingell stated that the standing provision at

---

24      [10]  Congress gave examples of "ISPs" (Internet Service Providers) as being Microsoft's MSN mail
        and Hotmail, as well as Earthlink, in a discussion of the impact of spam on network functioning.  S. REP.
25      NO. 108-102, at 3.

26  ORDER – 11

1  issue here "provides for a *limited* right of action by bona fide Internet service providers."  150 CONG.

2  REC. E72 (January 28, 2004) (emphasis added).  Later, Rep. Dingell stated, "Additionally, we intend that

3  Internet access service providers provide actual Internet access service to customers."  *Id.* at E73.

4          The foregoing legislative history suggests several things with respect to the scope of the private

5  right of action.  First and foremost, the plain statutory language requiring that (1) an IAS (2) suffer

6  "adverse effect" is confirmed.  Specifically, the definition of an IAS ought to be considered in conjunction

7  with the harm caused to IASs (or ISPs as Congress alternately refers to them) when trying to divine

8  Congress's intent.  The most significant harms enumerated by Congress were ISP- or IAS-specific, going

9  well beyond the consumer-specific burden of sorting through an inbox full of spam.  These harms to IASs

10 or ISPs relate to network functioning, bandwidth usage, increased demands for personnel, and new

11 equipment needs, which eventually cost consumers.  S. REP. NO. 108-102, at 6.  Because these harms

12 were defined in terms of Internet access service providers, and because standing was conferred only on

13 IASs (not consumers), it follows that such harms must be (1) possible and (2) actually occur, if a private

14 entity is to have standing under the Act.  *Id.* at 21 (reiterating that the private right of action is for a

15 "*provider of Internet access service adversely affected* by a violation," not individual e-mail users and not

16 IASs experiencing no adverse effects).  Thus, even if an entity could meet the ill-defined and broad

17 definition of an IAS, the "adverse effect" to that entity must be both real and of the type uniquely

18 experienced by IASs for standing to exist.  Any other reading would expand the private right of action

19 beyond what Congress intended.

20         Defendant repeatedly points out that Plaintiffs have no paying "customers" and their provision of

21 free e-mail precludes status as an IAS.  The Court disagrees with this interpretation, in light of

22 Congress's clear references to free e-mail services and the corrosive effect of spam on free e-mail

23 providers, such as Microsoft and Earthlink.  Rather, in light of the legislative history as it relates to IAS

24 requirements, it is notable that Plaintiffs lease a server housed with GoDaddy which is accessed solely

25 through an interface that GoDaddy provides via Verizon's internet connection.  Congress has not in

26 ORDER – 12

1    specific terms spoken to whether and how Plaintiffs' relationships with GoDaddy or Verizon matter, but

2    because other entities actually house the hardware and bandwidth that could be burdened by spam,

3    Plaintiffs' structural dependence might be quite significant.  Morever, because Plaintiffs' volume is so

4    small, it is unlikely that they alone would realize the ISP- or IAS-specific strains described by Congress

5    before it chose to confer a private right of action only on those entities.  Therefore, Plaintiffs' small scale,

6    when combined with their obvious dependence on other entities, suggests that Plaintiffs' burdens, if any,

7    would be shared and likely borne almost entirely by other entities if they ever were to materialize.  Apart

8    from the question of whether Plaintiffs actually realized any adverse effects, these factors suggest that

9    Plaintiffs might not be an IAS as Congress envisioned one.

10          Nevertheless, it is fairly clear that Plaintiffs are, in the most general terms, a "service that enables

11   users to access" Internet content and e-mail, and accordingly, they qualify as an IAS under the statute's

12   capacious definition.  Regardless, Plaintiffs clearly have not actually borne the ISP- or IAS-specific

13   burdens described by Congress.  Therefore, because they cannot show "adverse effect," which is inherent

14   in the definition of private standing under 15 U.S.C. § 7706(g)(1), it is irrelevant whether Plaintiffs are a

15   true IAS.  For the following reasons, the Court finds that Plaintiffs do not have CAN-SPAM standing

16   regardless of whether they are an IAS.

17          Specifically, Plaintiffs undisputedly have suffered no harm related to bandwidth, hardware,

18   Internet connectivity, network integrity, overhead costs, fees, staffing, or equipment costs, and they have

19   alleged absolutely no financial hardship or expense due to e-mails they received from Defendants.

20   Plaintiffs have spam filters available to them, and such filters continue to become more sophisticated.

21   Nor do Plaintiffs allege that they use "dial-up," the costs associated with which were specifically

22   discussed by Congress (and likely are becoming an obsolete concern as high-speed broadband usage

23   becomes the norm).  Moreover, even if there is some negligible burden to be inferred from the mere fact

24   that unwanted e-mails have come to Plaintiffs' domain, it is clear to the Court that whatever harm might

25   exist due to that inconvenience, it is not enough to establish the "adverse effect" intended by Congress.

26   ORDER – 13

1   Indeed, the only harm Plaintiffs have alleged is the type of harm typically experienced by most e-mail

2   users. The fact that Congress did not confer a private right of action on consumers at large means that

3   "adverse effect" as a *type* of harm must rise beyond the level typically experienced by consumers—*i.e.*,

4   beyond the annoyance of spam.

5       Not only must CAN-SPAM private plaintiffs allege a particular type of harm, the adverse effect

6   they allege must be significant. To hold otherwise would lead to absurd results. For instance, Plaintiffs'

7   client Anthony Potts states that, using the domain Omni established and registered for him, he has

8   provided nine e-mail addresses to Washington residents at the "anthonycentral.com" domain. (Pls.'

9   Partial SJ Mot., Potts Decl. ¶ 4.) Accordingly, Mr. Potts appears as well to be a "service that enables

10  users to access" Internet content and e-mail under the broadest interpretation of what an IAS is. If Mr.

11  Potts is an IAS, is he too an intended holder of a private right of action under CAN-SPAM? Are, in turn,

12  his "clients" (e-mail account holders who might provide "services" to others) also intended plaintiffs? If

13  Congress's "limited" provision of a private right of action is to have any traction at all, the quantum of

14  harm for Plaintiffs or Mr. Potts or any other purported IAS must be *significant*.

15      The necessity of a showing of significant adverse effect is particularly evident in the instant case,

16  where Plaintiffs seek *solely* statutory damages. Indeed, Plaintiffs seek nearly $2.4 million in what amount

17  to punitive fines on Defendants, calculated per e-mail. Because Congress provided a private right of

18  action only to "provider[s] of Internet access service *adversely affected*," 15 U.S.C. § 7706(g)(1)

19  (emphasis added), it must be that Congress intended standing to require a showing of some significant

20  harm to justify such steep statutory damages pursuant to § 7706(g)(3). Statutory damages under CAN-

21  SPAM never would be a function of actual damages. However, "adverse effect" is a textual prerequisite

22  to claiming these damages. Any other construction would impose strict liability on spammers for e-mails

23  received by *any* IAS regardless of adverse impact, thereby rendering the "adversely affected" language of

24  the private right of action provision superfluous. Such is an impermissible result in any statutory

25  construction. Accordingly, substantial actual harm must exist before these exorbitant amounts of

26  ORDER – 14

statutory damages are available to private plaintiffs.  Once a plaintiff shows sufficient harm, it is clear that Congress intended to make a statement by imposing these large per-e-mail fines.  Yet, permitting private parties with *no harm* to invoke CAN-SPAM to collect millions of dollars surely is not what Congress intended when it crafted this "limited" private right of action.  Congress simply did not intend for anyone—IAS or not—to be able to utilize the limited private right of action provided in the Act despite being unable to allege, much less prove, adverse effect.  Without a requirement of significant adverse impact, Congress's "limited" private right of action would become available to almost anyone.

Finally, Congress's reference to "bona fide Internet service providers" merits comment.  Plaintiffs' clients are few, most appearing to be family members.  Plaintiffs also admit to *benefitting* from spam by way of their research endeavors and prolific litigation and settlements.  This belies any suggestion that Plaintiffs are "bona fide Internet service providers" that have been "adversely affected" by spam.  Instead, Plaintiffs' continued use of other people's e-mail addresses to collect spam and their undisputed ability to separate spam from other e-mails for generating lawsuit-fueled revenue directly contradicts any hint of adverse effect that otherwise might exist.  Plaintiffs are not the type of entity that Congress intended to possess the limited private right of action it conferred on adversely affected bona fide Internet access service providers.

Taking the facts as a whole, the Court finds that Plaintiffs lack standing to sue under § 7706(g)(1).  Because Plaintiffs have no standing, their CAN-SPAM claims must be DISMISSED and the Court has no occasion to reach the parties' arguments on the merits of those claims.

### B.    Washington CEMA Claims (Second Cause of Action)

Defendants claim that Plaintiffs' Washington CEMA claims are preempted by the CAN-SPAM Act.  The CAN-SPAM Act contains an expressed preemption clause.  The United States Supreme Court has held that, when evaluating federal statutes that expressly preempt state law, "analysis of the scope" of the preemption clause "must begin with its text."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996).  However, "interpretation of that language does not occur in a contextual vacuum.  Rather, that

ORDER – 15

interpretation is informed by two presumptions about the nature of pre-emption." *Id.* at 485.  First, due

to the presumption that "Congress does not cavalierly pre-empt state-law causes of action," a court must

"start with the assumption that the historic police powers of the States were not to be superseded by the

Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (internal quotations and

citations omitted).  Second, a court must be guided by the principle that "any understanding of the scope

of a pre-emption statute must rest primarily on a fair understanding of *congressional purpose*." *Id.* at

485–86 (emphasis in original) (internal quotations and citations omitted).  This analysis applies to

allegations that an entire state statutory scheme is preempted, as well as to allegations that only particular

claims within that structure are preempted.  *Id.*

The CAN-SPAM Act's preemption clause provides:

> This chapter supersedes any statute, regulation, or rule of a State or political subdivision
> of a State that expressly regulates the use of electronic mail to send commercial messages,
> *except to the extent that any such statute, regulation, or rule prohibits falsity or*
> *deception in any portion of a commercial electronic mail message or information*
> *attached thereto.*

15 U.S.C. § 7707(b)(1) (emphasis added).  Moreover, as part of the CAN-SPAM enactment, Congress

made the following finding:

> Many States have enacted legislation intended to regulate or reduce unsolicited
> commercial electronic mail, but these statutes impose different standards and
> requirements.  As a result, they do not appear to have been successful in addressing the
> problems associated with unsolicited commercial electronic mail, in part because, since an
> electronic mail address does not specify a geographic location, it can be extremely difficult
> for law-abiding businesses to know with which of these disparate statutes they are
> required to comply.

*Id.* § 7701(a)(11).  The question before the Court is whether Plaintiffs' Washington CEMA claims fit into

the § 7707(b)(1) savings clause designated by Congress as the single exception to CAN-SPAM's broad

preemption of state electronic mail legislation.

Plaintiffs' remaining CEMA claims arise under section 19.190.020 of CEMA.[11]  This section

---

[11]  The Court recognizes that Plaintiffs have pled under the Consumer Protection Act
"conspiracy" section of CEMA as well.  WASH. REV. CODE § 19.190.030.  However, it does not differ

ORDER – 16

1    provides:

2         (1) No person may initiate the transmission, conspire with another to initiate the
          transmission, or assist the transmission, of a commercial electronic mail message from a
3         computer located in Washington or to an electronic mail address that the sender knows, or
          has reason to know, is held by a Washington resident that:
4
          (a) Uses a third party's internet domain name without permission of the third party, or
5         *otherwise misrepresents or obscures any information in identifying the point of origin or*
          *the transmission path of a commercial electronic mail message*; or
6
          (b) *Contains false or misleading information in the subject line.*
7
          (2) For purposes of this section, a person knows that the intended recipient of a
8         commercial electronic mail message is a Washington resident if that information is
          available, upon request, from the registrant of the internet domain name contained in the
9         recipient's electronic mail address.

10   WASH. REV. CODE § 19.190.020 (emphasis added).  It is undisputed that the italicized language above

11   forms the basis for Plaintiffs' claims regarding Defendants' e-mails.

12        The precise contours of Plaintiffs' CEMA claims are important to the preemption analysis.  In

13   Plaintiffs' summary judgment motion, as well as in responding to Defendants' summary judgment motion,

14   Plaintiffs' sole focus is on the allegedly misleading "headers" in 7,890 of Defendants' e-mails.  (*See* Pls.'

15   Partial SJ Mot. 2–19; Pls.' Opp'n to SJ *passim*.)  The Court notes that Plaintiffs pled under CEMA for

16   false or misleading subject lines and Defendants moved for summary judgment on these claims.

17   However, Plaintiffs' Opposition brief contains only a single reference to the "subject line" claims, which

18   precedes the conclusory statement that "Gordon contests" Defendants' arguments regarding subject lines.

19   (Pls.' Opp'n to SJ 20.)  Plaintiffs do not allege that any genuine issue of material fact exists as to the

20   subject line claims or offer any evidence going to these claims.  Accordingly, these claims must fail.

21   Plaintiffs' arguments in their Opposition brief regarding the body of the e-mails relate only to CAN-

22   SPAM claims, *see supra* note 5, and are not relevant to the instant discussion of CEMA claims.

23   Therefore, the only substantive CEMA claims relevant to the preemption analysis relate to "from lines" in

24   ─────────────────────

25   from section 19.190.020 in such a way that requires separate analysis.

26   ORDER – 17

1    "headers."

2        Specifically, Plaintiffs allege that Defendants' headers violate both CAN-SPAM and CEMA

3    because the "from line" does not include Defendants' company names or the names of company

4    personnel.  Instead, the "from line" contains a "from name" referencing a topic area or type of

5    advertisement (such as "Criminal Justice") along with a "from address" showing the e-mail address of the

6    sender (such as "CriminalJustice@vm-mail.com").  So, for example, while "vm-mail.com" is one of

7    Defendant Virtumundo's domains, Plaintiffs' claims are that these headers are misleading because they

8    "misrepresent[] or obscure[] . . . information in identifying the point of origin or the transmission path"

9    because the "from name" alone does not identify Defendant Virtumundo.  The Court must determine

10   whether such claims are preempted by CAN-SPAM.

11       In a case analyzing an Oklahoma law, *Omega World Travel v. Mummagraphics, Inc.*, 469 F.3d

12   348, 353 (5th Cir. 2006), the Fifth Circuit analyzed a statute prohibiting a sender of e-mail from

13   "misrepresent[ing] any information in identifying the point of origin or the transmission path of the

14   electronic mail message" or sending a message that lacks "information identifying the point of origin or th

15   transmission path" or "[c]ontains false, malicious, or misleading information which purposely or

16   negligently injuries a person."  There, in comparing the plaintiffs' claims to the statutes in question, the

17   *Omega* court first affirmed the district court's finding that the plaintiffs' claims were for "immaterial

18   errors" or misrepresentations in the e-mails at issue.  *Id.* at 353.  For example, the plaintiffs had claimed

19   that the messages (1) stated that the recipients had signed up for the mailing list when they actually had

20   not, (2) contained header information, and in particular a "from address" that was not linked to the actual

21   sender, and (3) contained "from addresses" that the sender had stopped using.  *Id.* at 351.  The *Omega*

22   court then turned to the text of § 7707(b)(1), scrutinizing the terms "falsity or deception" and concluding

23   that they are linked contextually, such that the statute's savings clause was not meant to "sweep up" mere

24   errors.  *Id.* at 354.  Rather, the *Omega* court found that because only "materially false or materially

25   misleading" header information was actionable under CAN-SPAM, Congress could not have intended, by

26   ORDER – 18

1    way of the savings clause, to allow states to undermine that choice by imposing "strict liability for

2    insignificant inaccuracies." *Id.* at 355.  The *Omega* court found that the plaintiffs' reading of the savings

3    clause within the preemption clause would create "a loophole so broad that it would virtually swallow the

4    preemption clause itself." *Id.*

5          The CAN-SPAM legislative history underscores that the *Omega* court's holding is correct.  In

6    discussing the preemption clause and its savings clause, the Committee explained that only statutes that

7    "target fraud or deception" would be saved.  S. REP. NO. 108-102, at 21.  Indeed, a "State law requiring

8    some or all commercial e-mail to carry specific types of labels, or to follow a certain format or contain

9    specified content, would be preempted.  By contrast, a State law prohibiting fraudulent or deceptive

10   headers, subject lines, or content in commercial e-mail would not be preempted." *Id.*  In light of the

11   impossibility of a sender knowing to which state an e-mail would be sent and the resultant inability to

12   know with which laws to comply, the Committee believed strongly in the necessity of "one national

13   standard" except where e-mails were fraudulent or deceptive. *Id.* at 21–22.

14          This Court agrees with the *Omega* court's assessment of congressional purpose as well as its

15   preemption holding.  Applying the *Omega* analysis here, the Court finds the following.  Plaintiffs'

16   allegations here are that "from addresses" ending, for example, with "vm-mail.com" do not suffice to

17   make the header not false or misleading because they require one to figure out to whom or what "vm-

18   mail.com" refers—*i.e.*, the message is not obviously from "Virtumundo."  The parties agree that

19   identification can be achieved by reverse-look-up using, for example, the "WHOIS" database, which "is

20   an Internet program that allows users to query a database of people and other Internet entities, such as

21   domains, networks, and hosts."  Definitions, Implementation, and Reporting Requirements Under the

22   CAN-SPAM Act; Proposed Rule, 70 Fed. Reg. 25,426, 25,446 n.233 (May 12, 2005).  The WHOIS

23   database is maintained by domain registrars and "includes the registrant's company name, address, phone

24   number, and e-mail address." *Id.*  Plaintiffs do not dispute that WHOIS data can identify Defendants, and

25   they have pointed to no e-mails that fail to provide information useful to a correct WHOIS look-up.

26   ORDER – 19

1    Plaintiffs instead contend that this extra step should not be required of consumers.  Regardless of the

2    merits of that argument, the Court cannot find that "from addresses" ending with a domain that facilitates

3    an accurate identification of Defendants could in any sense be found "false" or "deceptive."  Accordingly,

4    while claims actually alleging falsity or deception under CEMA would not be preempted, Plaintiffs'

5    claims here—for, at best, "incomplete" or less than comprehensive information—are for immaterial errors

6    that may not be litigated under state law.  Plaintiffs have not raised any issues of material fact that could

7    prove Defendants' e-mails materially "false or deceptive" as those terms are used in the CAN-SPAM Act.

8    Accordingly, Plaintiffs' CEMA claims are preempted by CAN-SPAM.

9        In arguing against such a result, Plaintiffs cite to another of their cases, *Gordon v. Impulse*

10   *Marketing Group, Inc.*, 375 F. Supp. 2d 1040, 1044–46 (E.D. Wash. 2005), wherein the district court

11   found Gordon's claims were not preempted.  Plaintiffs argue that this preemption holding compels the

12   same result here.  However, that ruling was on an early Rule 12(b)(6) motion and the contours of

13   Gordon's claims were not discussed in the opinion.  This Court does not disagree with the general

14   proposition that some CEMA claims are not preempted.  Indeed, as noted above, CEMA claims that

15   allege "false or deceptive" e-mail headers would fit into Congress's savings clause.  However, in the

16   instant case, the Court has the benefit of extensive summary judgment briefing and a record that clarifies

17   the nature of Plaintiffs' claims.  The claims in the instant case are not for "falsity or deception," and

18   therefore they are preempted and must be DISMISSED.

19       **C.    Washington CPA Claims (Third Cause of Action)**

20       In its December 8, 2006 Order (Dkt. No. 51), this Court discussed the five elements to a CPA

21   claim:  (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that impacts the public

22   interest, (4) which causes injury to the party in his business or property, and (5) the injury must be

23   causally linked to the unfair or deceptive act.  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins.*

24   *Co.*, 719 P.2d 531, 535–37 (Wash. 1986).  A violation of CEMA satisfies the first three *Hangman Ridge*

25   elements.  Because Plaintiffs' preempted CEMA claims are the basis for their CPA claims, the CPA

26   ORDER – 20

claims too must fail.  Moreover, while an allegation of damage or harm was sufficient to survive a prior Rule 12(b)(6) motion in the instant case, the record has now been developed and it is undisputed that Plaintiffs have suffered no actual harm and are instead seeking only statutory damages.  Accordingly, there is no genuine issue of material fact as to the injury element of Plaintiffs' CPA claim.  For the foregoing reasons, Plaintiffs' CPA claims must be DISMISSED.

### D.     Request to Separately Dismiss Defendant Scott Lynn

Defendants' motion for summary judgment to dismiss Scott Lynn is MOOT because the legal analysis of both federal and state claims disposed of all claims against all Defendants without need to reach the merits of any claims against Mr. Lynn in particular.

### E.     Miscellaneous Motions to Seal, Strike, and File Overlength Briefing

**(1)**     Defendants' reasonable request (Dkt. No. 97) to file an overlength summary judgment motion is GRANTED.

**(2)**     Plaintiffs' motion to seal (Dkt. No. 120) the declaration of Derek Newman (Dkt. No. 101) filed in support of Defendants' summary judgment motion is DENIED.  Plaintiffs argue that the entire 489-page Gordon deposition exhibit should be sealed because four pages therein were designated "confidential" pursuant to the parties' protective order in this case.  Under Local Civil Rule CR 5(g)(1), there is a "strong presumption of public access to the court's files and records which may be overcome only on a compelling showing that the public's right of access is outweighed by the interests of the public and the parties in protecting files, records, or documents from public review."  Simply because portions of the deposition were designated as "confidential" during discovery does not justify sealing them from public view when filed on the Court's docket.  Nor do the oblique references to settlements therein constitute a "compelling showing" that this significant amount of material should be sealed.  Accordingly, the motion is DENIED.

**(3)**     Defendants move to seal (Dkt. No. 91) their entire Reply (Dkt. Nos. 92 and 93) filed in support of their motion for bond because it contains, as an exhibit, Gordon deposition testimony that was

ORDER – 21

1    designated "confidential" pursuant to the parties' protective order.  However, Defendants do not believe

2    the material is confidential.  Plaintiffs have not commented with respect to this particular motion.  As with

3    the deposition exhibit described *supra*, Local Rule 5(g)(1) requires more than a "confidential" designation

4    and an unspecific sweeping request to seal an entire brief and all of its exhibits.  Accordingly, the motion

5    is DENIED and the Clerk is DIRECTED to UNSEAL the Reply and accompanying materials (Dkt. Nos.

6    92 and 93).

7         **(4)**    Defendants' motion to seal (Dkt. No. 86) their motion to compel further testimony (Dkt.

8    No. 87) again seeks to seal deposition testimony that does not actually disclose the sensitive material that

9    is the subject of the motion to compel.  The motion to compel merely relies on Gordon deposition

10   testimony that is not properly sealed under the standard of Rule 5(g)(1).  Accordingly this motion is

11   DENIED and the Clerk is DIRECTED to UNSEAL the motion and accompanying materials (Dkt. Nos.

12   87 and 88).

13        **(5)**    In their Surreply (Dkt. No. 94) to Defendants' motion for bond, Plaintiffs move to strike

14   the Draft transcript of Gordon's deposition testimony as incomplete.  This request is DENIED as MOOT

15   because the entire transcript was available to this Court in ruling on the instant motions and any excerpts

16   from the draft were considered in context.  Likewise, Plaintiffs' motions to strike argument from

17   Defendants' pleadings on the motion for bond are DENIED as MOOT because there is no need to rule

18   on the motion for bond in light of the dispositive holdings in this Order.  The Court GRANTS Plaintiffs'

19   request that their motion for partial summary judgment be considered a "Response" to Defendants'

20   motion for bond.

21        **(6)**    In their Opposition (Dkt. No. 82) to Plaintiffs' partial summary judgment motion,

22   Defendants move to strike much of Plaintiffs' argument and evidence as inadmissible hearsay or

23   speculation lacking foundation.  The Court has considered these objections and DENIES Defendants'

24   motion to strike this evidence because the Court did not consider inadmissible evidence or speculation in

25   ruling on the instant motions, and, as the prevailing parties, Defendants were not prejudiced by Plaintiffs'

26   ORDER – 22

1   submittal in any event.

2       **(7)**     In their Opposition (Dkt. No. 104) to Defendants' summary judgment motion, Plaintiffs

3   move to strike the Declaration of Mr. Krawetz and his expert report submitted with Defendants' motion

4   materials.  However, the Court DENIES this motion because there was no need to consider Mr.

5   Krawetz's declaration or expert report in ruling on the instant motions.  Rather, the content of those

6   materials went either to the merits of CAN-SPAM claims for which Plaintiff has no standing or to the

7   immaterial errors alleged in preempted CEMA claims.  Plaintiffs also move to strike Defendants'

8   spreadsheets submitted as exhibits to the Declaration of Derek Linke (Dkt. No. 102).  Again, the Court

9   DENIES this motion because these exhibits are relevant to the merits of claims never reached, and, in any

10  event, such summaries would be admissible under Federal Rule of Evidence 1006.

11      **(8)**     In their Reply (Dkt. No. 108) in support of their summary judgment motion, Defendants

12  move to strike portions of Plaintiffs' Opposition brief and the Gordon Declaration (Dkt. No. 107) to the

13  extent that they contradict Gordon's prior deposition testimony.  Indeed, "[t]he general rule in the Ninth

14  Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition

15  testimony."  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  The same rule applies

16  to interrogatory responses.  *School Dist. No. 1J v. AcandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993).  To

17  the extent that Plaintiff Gordon's Declaration attempts to contradict his earlier deposition testimony

18  about Omni being in the "spam business," it is STRICKEN.  Gordon was deposed in detail on this issue.

19  However, the Court notes that this testimony was not by any stretch dispositive in considering the instant

20  motions, and accordingly, undue weight should not be placed on this issue one way or the other.  All

21  other requests to strike improper self-impeachment are DENIED because they go to merits of claims not

22  reached herein.

23      **(9)**     Also in their Reply (Dkt. No. 108), Defendants move to strike the "Microsoft Bulletin"

24  (Dkt. No. 63-11) submitted in support of Plaintiffs' partial summary judgment motion and the

25  "unsubscribe" e-mails sent to Defendants regarding e-mails not at issue in this lawsuit, submitted as

26  ORDER – 23

Exhibit A to the Declaration of Robert Siegel (Dkt. No. 106). The motion regarding the "Microsoft Bulletin" is DENIED because that exhibit goes to merits not reached. The motion regarding the "unsubscribe e-mails" is GRANTED, because while it goes to merits not reached, such e-mails are wholly irrelevant to this case as well as improper hearsay and inadmissible character evidence.

## IV.    CONCLUSION

For the foregoing reasons,

(1) Defendants' Motion for Summary Judgment (Dkt. No. 98) and the associated motion by Defendants for Leave to File an Overlength Brief (Dkt. No. 97) are GRANTED and Plaintiffs' Motion for Leave to Seal (Dkt. No. 120) the Declaration of Derek Newman (Dkt. No. 101) is DENIED;

(2) Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 53) is DENIED because Plaintiffs have no standing to bring CAN-SPAM claims;

(3) Defendants' Motion for Bond for an Undertaking (Dkt. No. 38) is STRICKEN as MOOT; Defendants may move for attorneys' fees in light of this Order; and the associated motion by Defendants to Seal their Reply (Dkt. No. 91) is DENIED and the Clerk is DIRECTED to UNSEAL the Reply and accompanying materials (Dkt. Nos. 92 and 93);

(4) the discovery motions by Defendants to Compel Discovery (Dkt. No. 69), to Compel Segregation of Emails (Dkt. No. 71), to Compel Further Testimony regarding Prior Settlements (Dkt. No. 87), and to Exclude Testimony from Plaintiffs' lately disclosed witnesses (Dkt. No. 116) are all STRICKEN as MOOT. The Motion to Seal (Dkt. No. 86) associated with the Motion to Compel Further Testimony is DENIED and the Clerk is DIRECTED to UNSEAL the motion and accompanying materials (Dkt. Nos. 87 and 88); and

(5) The June 18, 2007 trial date and all associated deadlines are hereby STRICKEN.

As the prevailing parties, Defendants may file a motion for attorneys fees pursuant to 15 U.S.C. § 7706(g)(4) and for entry of final judgment in this matter. Defendants are hereby DIRECTED to confer with opposing counsel and advise the Court of a proposed schedule for briefing these remaining issues.

ORDER – 24

SO ORDERED this 15th day of May, 2007.


John C. Coughenour
United States District Judge

ORDER – 25