# Dckt No. 93 – Declaration of Derek A. Newman in Support of Defendants' Motion for an Undertaking Pursuant to 15 U.S.C. § 7706(g)(4)

Dockets.Justia.com

The Honorable John C. Coughenour

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| JAMES S. GORDON, Jr., a married individual, d/b/a 'GORDONWORKS.COM'; OMNI INNOVATIONS, LLC., a Washington limited liability company,<br><br>          Plaintiffs,<br><br>     v.<br><br>VIRTUMUNDO, INC, a Delaware corporation d/b/a ADNOWLEDGEMAIL.COM; ADKNOWLEDGE, INC., a Delaware corporation, d/b/a ADKNOWLEDGEMAIL.COM; SCOTT LYNN, an individual; and JOHN DOES, 1-X,<br><br>          Defendants. | NO.  CV06-0204JCC<br><br>**DECLARATION OF DEREK A. NEWMAN IN SUPPORT OF DEFENDANTS' MOTION FOR AN UNDERTAKING PURSUANT TO 15 U.S.C. § 7706(g)(4)**<br><br>NOTE ON MOTION CALENDAR: January 12, 2007<br><br>CONFIDENTIAL INFORMATION |

I, Derek A. Newman, declare and testify as follows:

1.      I am over eighteen years of age, counsel for defendants in the above captioned action, competent to testify to the matters stated in this declaration, and make this declaration from personal knowledge of those matters.

2.      On January 9, 2007 and January 10, 2007, Defendants deposed Plaintiff James S. Gordon, Jr. ("Gordon") in the above-captioned lawsuit.  True and correct copies of relevant portions of Gordon's deposition transcript (in rough draft form) are attached

NEWMAN & NEWMAN,
ATTORNEYS AT LAW, LLP

505 Fifth Ave. S., Ste. 610
Seattle, Washington 98104
(206) 274-2800

1    as **Exhibit A** hereto.

2        I certify and declare under the penalty of perjury under the laws of the State of

3    Washington and the United States that to my knowledge the foregoing is true and correct.

4

5        Executed on this 12th day of January, 2007, at Seattle, Washington.

6

7    _____

8    Derek A. Newman

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECL. OF DEREK A. NEWMAN IN SUPP.
OF DEFS.' MOT. FOR AN UNDERTAKING - 2
(CV06-0204JCC)

NEWMAN & NEWMAN,
ATTORNEYS AT LAW, LLP

505 Fifth Ave. S., Ste. 610
Seattle, Washington 98104
(206) 274-2800

Dckt No. 93 – Exhibit A to Declaration of
Derek A. Newman in Support of
Defendants' Motion for an Undertaking
Pursuant to 15 U.S.C. § 7706(g)(4)

# EXHIBIT A
## Deposition Transcript Excerpts

# Transcript of Rough Draft

**Case:**

**Date:** January 9, 2007



Phone: 206.287.9066
Fax: 206.287.9832
e-mail: info@buellrealtime.com
Internet: www.buellrealtime.com

1    cutoff was.

2        Q.    Why did those unemployment compensation payments

3    cease?

4        A.    I don't know.  I have no idea.  Unless -- you know,

5    there's only a certain amount of time that you can qualify, and

6    I'm assuming that was the case.

7        Q.    Were you employed in the year 2004?

8        A.    I had no employer.

9        Q.    Did you own a business in the year 2004?

10       A.    Omni was the only thing that technically was formed.

11   I kept renewing the license for it each year.

12       Q.    Did Omni generate any revenue in 2004?

13       A.    No.  I don't believe -- no.  I don't believe it did.

14       Q.    I just want to clarify.

15             I used the term "revenue."  I suppose a synonym for

16   that would be income, and I just want to make sure you

17   understand that when I ask, I'm inquiring as to whether Omni

18   generated any income whatsoever, gross net, in kind.

19       A.    I would have to double-check because I did ask an

20   accountant for help who actually was one of the professors at

21   city U, so I would have to go back to whatever notes to say --

22   I don't think so, but I'm not absolutely positive.  I don't

23   think at that time it did.

24       Q.    In 2004, did you earn any income other than from

25   unemployment compensation from the State?

1    A.    Did I earn any other income?

2          I held no job during that period of time.

3    Q.    In 2004, did you earn any income other than from

4    unemployment compensation from the State?

5    A.    As I understand that, the answer is no.

6    Q.    In 2005, did Omni generate any revenue or earn any

7    income of any kind?

8    A.    I think -- I think the first revenue for Omni was

9    2006.

10          I lost a lot -- in fact, I lost all of my records due

11    to computer viruses on at least three occasions.  And I've had

12    to, I guess, decentralize recordkeeping.

13    Q.    In 2005, did you earn any income?

14    A.    I'm trying to think if I did any workshops.

15          I don't recall anything at this point for '05?

16    Q.    During these years when you were unemployed, how did

17    you pay your bills?

18    A.    Well, I mentioned that my wife was working.

19          During the course of the last maybe two and a half

20    years, the lawsuits that I have been involved with yielded

21    settlements.

22    Q.    You testified earlier that in 2006, Omni earned its

23    first revenue.

24    A.    Yes.

25    Q.    What from what source did Omni earn its first revenue?

 1    disclose the confidential information.

 2        Q.    Is the amount of e-mails that you received from

 3    **REDACTED**         provided as confidential under an agreement?

 4        A.    I don't know.  I don't know.

 5            I depend on Bob and/or Doug McKinley to interpret that

 6    type of information.  I don't know.

 7            MR. SIEGEL:  To the extent that you want to ask -- I

 8    guess I'll just identify those areas that I think are -- you

 9    know, it's the terms of the settlement agreement, obviously,

10    that are confidential.  So if you want to ask fact-based

11    questions about the claim, that's line.  If you know.

12            THE WITNESS:  Okay.

13            MR. SIEGEL:  To the extent you know.

14            And I'll also put an objection in based on relevance,

15    not likely to lead to the admissibility of evidence.

16        Q.    I'm going to return to the subject matter we were just

17    discussing later.

18        A.    Okay.

19        Q.    I'm hoping that we will hear from the court and we

20    will receive that guidance that we were discussing.

21            In the year 2006, did you earn any revenue or income

22    that was not as a result of a settlement of a dispute?

23        A.    No.

24        Q.    It is now 2007, and we're only in the -- I believe

25    second week.

1     A.    Yes.

2     Q.    Have you earned any revenue or income this year

3  whatsoever?

4     A.    I think it's your term "earned" that gives me pause.

5           No, is the short answer to that.

6     Q.    Have you generated any income or revenue this year?

7     A.    No.

8     Q.    Did you generate any income or revenue in the year

9  2006 other than from settlements of disputes?

10    A.    No.

11    Q.    You testified that my use of the term "earned" gave

12  you pause.

13    A.    Uh-huh.

14    Q.    I want to make sure my questions are clear.

15          What gave you pause about that term?

16    A.    Well, "earned" is something I associate with a job,

17  where you go in, you get a paycheck or salary and wages.

18    Q.    When I use the term "generate," is that clearer?

19    A.    It's broader.

20    Q.    Have you obtained any income or revenue in the year

21  2006 or 2007 other than from settlements and disputes?

22    A.    No.

23    Q.    You testified in the year 2003, you filed a lawsuit

24  pro se against Mr. Hansson; is that correct?

25    A.    Yes.

1    Q.    Why didn't you contact Virtumundo?

2    A.    Because EmailPrize, I was familiar with.  I wasn't

3    familiar with Virtumundo at that time.

4    Q.    You received a letter from Virtumundo, correct?

5    A.    Yes.

6    Q.    Why didn't you contact Virtumundo in response to the

7    letter?

8    A.    Because they were citing EmailPrize as the gateway or

9    portal to spam.

10          So I wanted to go back to the source, so to speak, and

11   unsubscribe from that source because Virtumundo wasn't the only

12   company that started sending me spam.

13   Q.    You testified that you haven't signed up with

14   Virtumundo or Adknowledge directly.

15   A.    That's correct.

16   Q.    But you may have indirectly.

17   A.    Yes.

18   Q.    What is the difference?

19   A.    Well, these people, like Home4FreeStuff and EmailPrize

20   and those others, they claim that they have affiliatess.  And

21   typically, they don't identify the affiliates, so I don't know

22   who they're signing me up for.

23   Q.    Does indirectly mean that you sign up at one source

24   and inadvertently sign up for a different source?

25   A.    That's not direct -- that's not exactly what I meant.

1     A.    Okay.

2            (Exhibit Nos. 26 & 27 marked.)

3     Q.    Do you recognize Exhibit No. 26?

4     A.    Yes.

5     Q.    That's an e-mail that you contend -- strike that.

6            That's the header of an e-mail that you contend

7     violates the statute and formulates a basis of your claims in

8     this lawsuit, correct?

9     A.    Yes.

10    Q.    And you prepared this using EmailTrackerPro, right?

11    A.    Correct.

12    Q.    Would you please look at Exhibit No. 27 and tell me

13    whether the headers in Exhibit No. 27 are the same as the

14    headers in Exhibit No. 26.

15    A.    Yes, they are.

16    Q.    Do you contend that the "subject" line of this e-mail

17    is false or misleading?

18    A.    Yes.

19    Q.    When you look at the "subject" line, what does it say?

20    A.    Are your closets in order in".

21    Q.    And in the "from" line, what does it say?

22    A.    Closet organizer.

23    Q.    And now that you have the benefit of looking at the

24    "from" line and the "subject" line together, can you tell what

25    the subject matter of the e-mail is?

Page 368

1      A.    It says it's a closet organizer.

2      Q.    Does the "from" line assist you in determining what

3   the e-mail advertises?

4      A.    Well -- it does in that respect, yes.

5      Q.    And when you look at Exhibit No. 27, what does the

6   e-mail advertise?

7      A.    The graphic says, "organize the chaos, closets."

8            MR. NEWMAN:  Let's go off the record.

9            THE WITNESS:  Okay.

10           THE VIDEOGRAPHER:  The time is now 1:53 p.m.  We are

11   off the record.

12                (A recess was taken.)

13           THE VIDEOGRAPHER:  The time is now 1:56 p.m.  We are

14   on the record.

15     Q.    In Exhibit Nos. 22 and 23, can you tell by looking at

16   the headers that it is a commercial e-mail?

17     A.    No, you can't.

18           No, I can't.

19     Q.    You can't?

20     A.    No.

21     Q.    When you received the e-mail that is identified in

22   Exhibit No. 22, did you believe that it was a personal e-mail?

23           MR. SIEGEL:  Objection.  Lacks foundation.

24     A.    I didn't know.

25     Q.    Did you believe it was a commercial e-mail?

1      A.    I didn't know.

2      Q.    Did you open it to determine?

3      A.    No.

4      Q.    Why not?

5      A.    I'm not sure why I didn't do it at that particular

6   time.  I don't know.

7      Q.    In Exhibit No. 24, can you tell by reviewing the

8   header that it was a commercial e-mail?

9            MR. SIEGEL:  24?

10           MR. NEWMAN:  Yes, sir.

11     A.    I'm going to say yes.

12     Q.    What indicates to you it's a commercial e-mail?

13     A.    That's a guess, because it says, "cash flow center."

14           But I read "subject" lines first, and some people read

15   the other "from" lines first.

16           And by reading "subject" line, because I get so many

17   of them, it's easy for me to read "subject" lines because I can

18   group them together better.

19     Q.    Group them how?

20     A.    I just click on the button that says "subject" lines

21   and I read by "subject" lines.

22     Q.    And can you tell from looking at the "subject" line of

23   Exhibit 24 that it's a commercial e-mail?

24           And the "subject" line I'm referring to is "about

25   selling your stuff, here's how to make it pay."

1    A.    Yeah, that sounds commercial.

2    Q.    In Exhibit No. 26, if you turn your attention to the

3    "from" line, the "from" line reads that it's from Closet

4    Organizer, and then there's brackets, and it says,

5    "GreatClosetOrganizers142442@vmlocal.com

6          Do you see that?

7    A.    I see it now, yes.

8    Q.    Can you tell by reading that "from" line that it is a

9    commercial e-mail?

10   A.    But I didn't read the "from" line, so I would --

11         When I read it now, it appears to be a commercial

12   e-mail.

13         I didn't when I first received it because are your

14   closets in order doesn't make any sense to me, and that's what

15   I read first.

16   Q.    Did you read the "from" line after looking at the

17   subject line?

18   A.    I doubt if I did because I determine whether or not

19   I'm going to keep things.

20   Q.    Did you determine you were going to keep it?

21   A.    I -- I don't know how many I received that payday.    I

22   probably received 2,000.

23         And what I do is I just leave them in boxes and I save

24   every box -- I've had 499, 500 boxes, I've had 200 boxes --

25   I've had a number of boxes.  And I put them in boxes and later

1    will do a search of those boxes.

2        Q.    Did you determine that you were going to keep this

3    message?

4        A.    Well, I kept it because the result of my search said

5    that it was from your client.

6        Q.    Why did you keep this message and not delete it?

7        A.    Because I search messages typically before I delete,

8    with some exceptions.

9        Q.    Did you ever open this message?

10       A.    Yes.   In order to get the e-mail analysis done, I did

11   open it.

12       Q.    Did you review the body of the e-mail?

13       A.    No.

14            In fact, the body may not have been visible.   As I

15   said, I have my graphics turned down -- off at times.

16       Q.    Did you believe that this e-mail was personal in

17   nature?

18       A.    I don't know what I believed at that time.

19       Q.    If you turn your attention to Exhibit No. 22, the

20   "from" line reads "Best Virus Defense," and then there's

21   brackets, "BestVirusDefense199472@vmadmin.com" and the brackets

22   close.

23            Do you see that?

24       A.    Yes, I do.

25       Q.    Can you determine by looking at that "from" line that

1    this is a commercial e-mail?

2        A.    No, I can't.

3        Q.    When you received this e-mail, did you look at the

4    "from" line?

5        A.    I doubt if I did.    That wasn't my custom.

6        Q.    Can you -- strike that question.

7            When you look at the "from" line that I just read, do

8    you believe that it might be a personal message?

9        A.    Like I said, I've got hindsight now.

10           It's --

11           MR. SIEGEL:    Objection.    Calls for speculation.    Lacks

12   foundation.

13       A.    Mr. Newman, would you please ask -- ask that question

14   again.

15       Q.    When you look at the "from" line that I read for

16   Exhibit No. 22, do you believe that it might be a personal

17   message?

18       A.    It could be, yes.

19       Q.    From whom?

20       A.    Any one of my friends that know --

21           MR. SIEGEL:    Objection.    Calls for speculation.    Lacks

22   foundation.

23       A.    Any one of my friends, acquaintances, family because

24   all know that I have virus problems, and they send me

25   information.

1          A friend just sent me something on -- I think it was

2   AVG, and I get information through others as well.

3          So this could have been a personal communication.

4      Q.   And one of those friends, based upon your testimony,

5   you believe might change the "from" line from their personal

6   name to the name Best Virus Defense?

7          MR. SIEGEL:  Objection.  Argumentative.  Lacks

8   foundation.  Calls for speculation.

9      A.   You just talked about the Best Virus Defense, and I'm

10  -- no, I assumed.  I assumed something that you said.

11         I must not have heard it clearly.  I must not have

12  heard the question clearly.

13     Q.   Now that you have heard the question, is there

14  anything about your answer that you'd change?

15     A.   No, I'm saying I don't -- I don't -- or didn't is more

16  correct -- didn't understand the question because I probably --

17  based on what you've fed back to me, I've obviously

18  misunderstood what you asked.

19     Q.   Do you believe, when you look at that "from" line,

20  that it could be a personal message as opposed to a commercial

21  message?

22         MR. SIEGEL:  Objection.  Asked and answered.

23     A.   It doesn't -- the "from" line doesn't look personal.

24         Somehow I thought you said "subject," and that's my

25  error.

1    Q.    Are you familiar with the motion for summary judgment

2    that you filed in this lawsuit?

3    A.    I filed a declaration in support.

4    Q.    Did you read the motion?

5    A.    Yes, I did.

6    Q.    When you review the e-mail that you receive, do you

7    generally look at the "from" lines?

8    A.    No.

9    Q.    Do you ever?

10    A.    Yes.  Ever, yes.

11    Q.    How often?

12    A.    I don't know.

13    Q.    Infrequently?

14    A.    I don't know how -- I don't understand "frequently."

15          So -- I look at e-mail more than most people, that's

16    why I'm saying I don't understand "frequently."

17    Q.    Do you know -- strike that.

18          Did any of the "from" lines in e-mails that Virtumundo

19    or Adknowledge sent you confuse you?

20          MR. SIEGEL:  Objection.  Relevance.  Lacks foundation.

21    A.    We talked about "confusion" yesterday, and that's just

22    not a term that I use.

23    Q.    You know what that term means, though, right?

24    A.    I'm confused about that, too.

25    Q.    You say you're confused about that.

Page 375

1    A.    That was a joke.  I guess I can't joke on the record,

2  so my apologies to everyone.

3    Q.    Do you know what the term "confusion" means?

4    A.    Yes, I do.

5    Q.    And did any of the "from" lines in e-mails you contend

6  Virtumundo or Adknowledge sent to you confuse?

7    A.    Yes.

8    Q.    Which "from" lines do you recall confused you?

9    A.    Don't recall any right now.

10   Q.    Do you recall how you were confused?

11   A.    Yes.  I thought it was from somebody other than who

12  we're now finding out actually sent them.

13   Q.    Do you remember from whom you thought they were from?

14   A.    No.

15   Q.    A friend?

16   A.    I just don't remember.

17   Q.    If you don't remember who you believed they were from,

18  upon what information do you base your testimony that you were

19  confused?

20   A.    Just general recollection since.

21         We can go to the e-mails and we can go one by one, if

22  you'd like, or group by group.

23   Q.    For 9,000 e-mails?

24   A.    If you wish.

25         Group them.  That's how I do it.

1          MR. SIEGEL:  I don't wish.

2          Excuse me.

3     Q.    Did any of the "from" lines in the e-mails that we've

4     reviewed today confuse you?

5     A.    No.  We talked about them.

6          They mislead.  They make me think that it's someone

7     other than who actually sent them.

8          In no place do we see Virtumundo, Adknowledge.

9          We see what's called ad copy -- you all call it a line

10    of business -- I call it a line of bull -- but a line of

11    business in the response that you supplied to the court.

12         First of all, your clients don't have any other

13    business other than sending e-mail, and call it a line of

14    business is disingenuous at best, so --

15         It's misleading.  You can -- we can say confusing

16    because sometimes the effect is the same.

17    Q.    Were you misled by any of the "from" lines in the

18    e-mails that we have reviewed?

19    A.    Yes.

20    Q.    Which "from" line?

21         MR. SIEGEL:  Objection.  Calls for a narrative.

22         Counsel, if you're going to ask him a question, which

23    "from" line in 9,000, put it in front of him.

24         He's already testified he doesn't have specific

25    correction.

Rough Draft

1      A.    Will if you present e-mails I will go back and see if

2    I can refresh myself.

3      Q.    Okay.

4            Let's turn to Exhibit Nos. 22 and 23.

5      A.    22 and 23.

6            Your question?

7      Q.    Did the "from" lines in the Exhibits 22 or 23 mislead

8    you?

9      A.    I didn't read the "from" lines when these came to me.

10            I said I read the "subject" lines.

11      Q.    Let's turn your attention to Exhibits No. 24 and 25.

12            Actually, I should just turn your attention to Exhibit

13    No. 24 because you testified Exhibit No. 25 is different from

14    the it.

15      A.    Okay.

16      Q.    Did the "from" line in Exhibit No. 24 mislead you?

17      A.    I didn't read it when it first came in.  I read the

18    "subject" line.

19      Q.    I'd like to turn your attention to Exhibits No. 22 and

20    23.

21            Did the "from" lines in those e-mails mislead you?

22      A.    I didn't read them when they first came in.

23      Q.    So the answer is no?

24      A.    I didn't read them.

25      Q.    And because you didn't read them, they couldn't have

1  misled you; is that right?

2      A.    Okay.  Yes.

3      Q.    You contend that you were misled by some of the "from"

4  lines that form a basis of your claims in this lawsuit,

5  correct?

6      A.    I claim that they misrepresent who sent them.

7      Q.    But you don't claim that you were misled by any of

8  them; is that right?

9      A.    I don't think that was my language.

10     Q.    Okay.

11         My question was, do you claim that you were misled by

12  some of the "from" lines?

13         Actually, I'll read the question verbatim that I

14  asked.

15     A.    Okay.

16     Q.    I said, you contend that you were misled by some of

17  the "from" lines that form a basis of your claims in this

18  lawsuit, correct?

19         And your answer was, I claim that they misrepresent

20  who sent them.

21     A.    Okay.

22     Q.    Which isn't responsive to the question that I asked.

23     A.    I guess they can do both.  I guess both could be the

24  case sometimes.

25     Q.    Let me ask it this way, then.

1          Do you contend that any of the e-mails that form the

2    basis of your claims in this lawsuit contain "from" line that

3    is misled you?

4          MR. SIEGEL:  Objection to the extent it calls for a

5    legal conclusion.

6      A.   My contention is that it misrepresents the source or

7    sender.

8      Q.   I understand that, and I appreciate you clarifying and

9    explaining that.

10         But I'd appreciate it if you could answer the

11   question, which is, do you contend that any of the e-mails that

12   form a basis of your claims in this lawsuit contain "from"

13   lines that misled you?

14         MR. SIEGEL:  Objection.  Asked and answered.  Vague

15   and ambiguous.  Calls for a legal conclusion.  Lacks

16   foundation.

17     A.   And -- I guess the thing for me to do is to consult

18   with my attorney about this.

19     Q.   I'm asking you facts, and I expect that you're going

20   to testify from your own personal knowledge today, and you

21   shouldn't be testifying based upon what your lawyer tells you.

22     A.   I need explanation of some things, so I'd like to get

23   that from him.

24     Q.   Well, I'm asking you a question and you're refusing to

25   answer; is that right?

1    A.   No.  No.

2         MR. SIEGEL:  Objection.

3    Q.   So you don't know unless you speak with your lawyer

4    whether you contend that any of the "from" lines that form a

5    basis of your claims in this lawsuit misled you; is that right?

6         MR. SIEGEL:  Objection.  Asked and answered.

7    Argumentative.  Borders on harassment.  My client has answered

8    this question already.

9    Q.   I have never asked that question until now.  I'll ask

10   it again.

11        So you don't know unless you speak with your lawyer

12   whether you contend that any of the "from" line that is form a

13   basis of your claims in this lawsuit misled you; is that right?

14        MR. SIEGEL:  Objection.  Mischaracterizes this

15   witness' testimony.  Calls for a legal conclusion.

16   Q.   You still must answer the question.

17   A.   I will.  I just said I want to talk with my attorney.

18   Q.   No, my question is whether you don't know if any of

19   the "from" lines misled you unless you talk to your attorney?

20   A.   I've answered that in a different way earlier.  You

21   said, oh, I appreciate that.

22        So I want to talk with my attorney.

23        And that -- does that mean that you refuse me to allow

24   me to talk with my attorney?

25   Q.   It are you refusing to answer a question?

1    A.    No, I'm not.

2    Q.    Then answer the question.

3    A.    It's a question of timing.

4    Q.    Must you speak with your lawyer --

5    A.    Yes.

6    Q.    -- in order to know whether something misled you?

7    A.    I just want to speak with him first.

8    Q.    Must you speak with your attorney --

9          MR. SIEGEL:  Objection.  Argumentative.

10   Q.    In order to know whether something misled you?

11         MR. SIEGEL:  This is harassment, counsel, and you know

12   it.

13   A.    I have nothing more to say on that.

14   Q.    You're are I fusing to answer the question?

15   A.    No.

16         MR. SIEGEL:  He answered the question.

17   Q.    Then answer the question, please?

18   A.    As soon as I talk with my attorney.

19   Q.    The question is whether you must talk with your

20   attorney in order to know whether something misled you?

21   A.    That wasn't the original question.

22         But I want to talk to my --

23         MR. SIEGEL:  Mischaracterizes testimony.  Harassment.

24   Q.    I'm not characterizing testimony.  I'm asking a

25   question that you haven't answered.

1          Do you refuse to answer the question?

2     A.   The answer still is no.

3     Q.   Then answer the question, please.

4     A.   As soon as I talk with my attorney is the answer to

5     that question.

6     Q.   I'm expecting an answer from you, not your lawyer?

7     A.   Well, you'll get an answer from me.

8     Q.   Do you believe that the question that I'm asking might

9     delve into the attorney-client privilege?

10    A.   That's a brand new question, and I want to talk with

11    my attorney first.

12    Q.   Do you believe it might delve into the attorney-client

13    privilege?

14    A.   We've not even dealt with the previous questions, so I

15    want to talk with my attorney before we go any further.

16    Q.   Well, generally, the only time that you have the right

17    not to answer a question is if it may infringe upon the

18    attorney-client privilege.

19         And when we began this deposition yesterday, we talked

20    about ground rules, and I told you that if you need to take a

21    break, happy to let you do that, but I'd appreciate it if you

22    could answer a question before the break begins.

23         Here you're refusing to answer a question.

24         The reason I gave you that advice is because it's

25    improper for your lawyer to coach you, and it appears that you

1  would like to take a break so that your lawyer can coach you?

2      A.    No, I want to talk with him.

3          MR. SIEGEL:  Objection.  There is no question there

4  you don't have to respond to anything.

5      Q.    So I would like to --

6          MR. SIEGEL:  Move to strike comments of counsel.

7      Q.    I would like to ask my question again, and I'm hoping

8  you'll answer it.

9          And the answer is -- strike that.

10         The question is, did any of the "from" lines in the

11  e-mails that form a basis of your claims in this lawsuit misled

12  you?

13     A.    I'm going to talk with my attorney before I answer.

14     Q.    Then I'll strike that question and ask a new answer.

15     A.    Okay.

16     Q.    Must you speak what your attorney to know whether you

17  were misled by any of the "from" lines in the e-mails that form

18  a basis of your claims in this lawsuit?

19     A.    No, because he couldn't know.

20     Q.    Do you know?

21     A.    I said I'm going to talk with my attorney.

22     Q.    Do you know?

23     A.    I'm going to talk with my attorney first.

24     Q.    I understand you'd like to speak with your lawyer.

25         Do you know whether any of the "from" lines in the

Page 384

1    e-mails that form a basis of your claims in this lawsuit misled

2    you?

3            MR. SIEGEL:  Objection to the extent it calls for a

4    legal conclusion.  Asked and answered.  Argumentative.

5    Harassment.

6        A.    Nothing's changed.

7        Q.    Do you know?

8        A.    We can do this until tomorrow.

9            I'm going to talk with Bob before I answer.

10       Q.    Do you know whether any of the "from" lines in the

11   e-mails that form a basis of your claims in this lawsuit misled

12   you?

13           MR. SIEGEL:  Objection.  Asked and answered.

14       A.    And I'll talk with Bob.

15           MR. SIEGEL:  Argumentative.  Repetitive.

16       Q.    Do you know?

17       A.    Whether you ask it one or a hundred times, my answer

18   is the same.

19       Q.    And what is your answer?

20       A.    I want to talk with Bob first.

21       Q.    So you need to be coached before you can answer the

22   question?

23           MR. SIEGEL:  Objection.  Move to strike -- that's not

24   a question.  Move to strike comments of counsel.  It's

25   harassment.

1    Q.    Why must you speak with your lawyer before you're

2    willing to answer my question?

3    A.    That's for him to know.

4          I won't share that with you.

5          MR. SIEGEL:  Objection.

6    Q.    You need to seek his advice?

7          MR. SIEGEL:  Objection.  Mischaracterizes testimony.

8    This client never said that he must speak with me before he

9    answers.  He said he wants to speak with me.

10   Q.    Are you willing to answer the question without

11   speaking to your lawyer first?

12   A.    No, I'm going to talk with my attorney first.

13   Q.    So you're unwilling to answer the question unless you

14   speak with your lawyer first; is that right?

15   A.    Okay.  Let's go there.

16   Q.    The answer is yes?

17   A.    Let's go there.

18         That's your characterization, so I'm going to agree

19   with that.

20   Q.    Why are you unwilling to answer the question unless

21   you speak with your lawyer first?

22   A.    I could play this game as long as you could can.

23         So, again, I'm going to talk with Bob first, period.

24         MR. SIEGEL:  He's just looking for some clarification,

25   counsel, and you knee it.  You're just harassing the client.

Rough Draft

Page 386

```
 1      Q.   If you would like some clarification, I'm happy to
 2   provide it.
 3           Are you seeking clarification?
 4      A.   Not from you.
 5      Q.   I'm asking the question.  Your lawyer has the right to
 6   follow up later.
 7           Around in fact after you answer my questions you can
 8   speak with your lawyer and later your lawyer can ask you
 9   questions to help clear up the record if you'd like, and if
10   he'd like.
11           So can you answer my question and then later allow
12   your lawyer to follow up?
13           THE WITNESS:  Pardon?
14           MR. SIEGEL:  Do your best.  Answer his question and
15   we'll follow up.  I think that's a good suggestion that counsel
16   had.  I don't see any reason why you can't answer that
17   question.
18           I think you've answered already.  My objection --
19      A.   The answer that I've given hasn't changed.  You've
20   asked me to restate it or do -- ask another question in a
21   different form.
22           I answered "from" fields misrepresent.
23           The "subject" lines are typically -- when we talk
24   about misleading, those are typically what's misleading.
25           I don't read the from fields when e-mails first come
```

Rough Draft

Page 387

1    in.  And I've said that I don't know how many times.

2       Q.    You testified that "from" lines misrepresent.  And you

3    testified that you generally don't read "from" lines.

4       A.    Initially.

5       Q.    But you haven't answered the question that I asked,

6    which is, have any of the "from" lines that form a basis of

7    your claims in this lawsuit misled you?

8             MR. SIEGEL:  Objection.  Same objections to the first

9    time he asked the question.

10      A.    Okay.

11            MR. SIEGEL:  And the second and third.

12      A.    Okay.  Is the question, at any time?  Initially?  Any

13   other parameters?

14      Q.    The question is, have any of the "from" lines that

15   form a basis of your claims in this lawsuit misled you? ?  And

16   if you would like me to limit it by time, I will say at any

17   time.

18      A.    Okay.

19            MR. SIEGEL:  Objection to the extent it calls for a

20   legal conclusion, counsel.

21      A.    Misled and misrepresent can yield the same result at

22   times.

23            So, to that extent, yes, I've been misled.

24      Q.    And do you recall what e-mail misled you?

25      A.    No.

1    Q.   Did any of the "from" lines in the e-mails that we've

2  reviewed today in Exhibits No. 22, 24 or 27 mislead you?

3    A.   I don't recall seeing the "from" lines previously.

4        I may have, but I just don't recall that.

5    Q.   Have you identified in this lawsuit any "from" lines

6  that have misled you?

7    A.   I -- no.

8        My understanding is I -- I identified "from" lines

9  that misrepresent.

10       MR. NEWMAN:  Let's take a five-minute break.

11       THE WITNESS:  Okay.

12       THE VIDEOGRAPHER:  The time is now 2:22 p.m.  We are

13  off the record.

14           (A recess was taken.)

15       THE VIDEOGRAPHER:  The time is now 2:39 p.m.  We are

16  on the record.

17    Q.   Earlier during your testimony, you indicated that you

18  wished to speak with your lawyer before answering any

19  questions.

20       Now that we've taken a break, is there anything about

21  your earlier answers that you wish to clarify?

22    A.   It wasn't about any question.  It was about the

23  specific question.

24       And yes, we did talk.  And he said there's a period at

25  the end of this deposition where he has a chance to -- what --

1   Eudora.

2      Q.    Did you find anything in response to your search that

3   dealt with whether you or Omni may have or may not have opted

4   in to Adknowledge or Virtumundo?

5      A.    I'm really not sure because I sometimes do

6   differences.

7          For example, if I do one unsubscribe, I keep an

8   unsubscribe in a single folder and it's in response to a number

9   of different departments.  So I just go into the unsubscribe

10  successful folder and get that answer.

11         So -- okay.  That's my answer.

12     Q.    Do you generally save unsubscribe confirmations?

13     A.    Generally.

14         Presently, I should say, because initially I did not

15  save them all.  I saved the representative sample which may be

16  one, two, three he -- sometimes more -- of a given unsubscribe

17  run, so to speak.

18     Q.    Just to confirm, you testified you did click on

19  unsubscribe links with both Virtumundo and Adknowledge,

20  correct?

21         MR. SIEGEL:  Objection.  Mischaracterizes his

22  testimony.

23     A.    Please ask again.

24         MR. SIEGEL:  Actually, strike that.  I don't think

25  that does -- strike that.

Page 403

1    A.    Please ask the question again.

2          (The requested testimony was read.)

3    A.    That's my belief, yes.

4    Q.    You didn't, however, retain any evidence of clicking

5    on those links, correct?

6    A.    That's correct.

7    Q.    You don't have any e-mails from Virtumundo or

8    Adknowledge confirming an opt-out, correct?

9    A.    No, I don't.

10   Q.    You don't have any screen shots or .pdf printouts of

11   your computer at the time when you clicked on the links,

12   correct?

13   A.    I answered your question earlier in the sense that I

14   was going to go back and do some checking.

15         There are disks that I've not looked at that may have

16   some backup data on it, and I need to -- to go back and do

17   that.

18         I just have so many -- just hundreds of disks, and I

19   don't even know where to start because they weren't dated.   I

20   just put "backup" on it.

21   Q.    You're going to go back and look at each and everyone

22   of those disks, right?

23   A.    I'm going to look at everything for Virtumundo and

24   Adknowledge.

25   Q.    Why didn't you do that for today?

Page 404

1      A.    I did look for everything on my computer.

2            I did not go back -- because I have no clue as to

3      where it is, and that just -- it could have taken a week or two

4      to find more.

5      Q.    Then why didn't you take that week or two?

6      A.    Because I have other things to do.

7      Q.    You understand you have obligations in this lawsuit,

8      including responding --

9      A.    Uh-huh.

10     Q.    -- fully to discovery requests?

11     A.    Uh-huh.

12     Q.    But you didn't take the time to do so because you have

13     other things to do; is that right?

14     A.    That's not true.

15     Q.    Well, why didn't you take the week or two to search

16     for the documents in response to the discovery requests?

17     A.    I did search.

18     Q.    You just testified that you could do additional

19     searching, which would take a week or two, and you just

20     committed that you would do it but hadn't in the past.

21     A.    It would yield nothing, possibly, and it would waste a

22     week or two.

23           I have no knowledge that anything regarding

24     Adknowledge or Virtumundo is on those disks.

25     Q.    You don't know until you search them, right?

Page 405

1       A.    I don't know until I search them, yes.

2       Q.    And why didn't you search them when you were

3   responding to discovery requests in this lawsuit?

4       A.    Because I didn't believe at that time that there was

5   anything on it because it says "backup."  And that doesn't -- I

6   have no idea what "backup" is.

7       Q.    It's possible, is it not, that in that backup, you'll

8   find e-mails from Virtumundo and Adknowledge confirming that

9   you actually did subscribe to the lists, right?

10      A.    That is -- I don't believe that to be true.

11            There might be other information that I kept about the

12  company.  It could have been an article I read.

13            But most of my e-mail-related stuff I keep in my

14  e-mail folder in terms of e-mails.

15            I keep my unsubscribe folder in terms of unsubscribe,

16  successful.  I have maybe 2,000 of those.

17            So I don't have a clue as to what's on it.

18            It could have been just more duplicate, and I think

19  they are.

20      Q.    You really don't know until you search, though,

21  correct?

22      A.    Except for those few that have stickies on them that

23  say what the content is.

24            There may be some of those still.  My clients give

25  them to me from time to time.

1    e-mails, I don't recall seeing the words "advertisement" -- it

2    says "advertise" here.

3        I don't recall seeing that.  It could be there, but I

4    just don't recall.

5    Q.    Have you made any efforts to block receipt of e-mail

6    from Virtumundo and Adknowledge?

7        MR. SIEGEL:  Objection.  Asked and answered.

8    A.    I've made no attempts to block any specific spammer.

9    Q.    Did you make any attempt to block the e-mails that

10   form a basis of your claims in this lawsuit?

11       MR. SIEGEL:  Objection.  Asked and answered.

12   A.    Did I make any attempts to block any e-mails that are

13   a part of this lawsuit; is that what you're asking?

14   Q.    Yes.

15   A.    If it's the word "block," then the answer is no.

16   Q.    Are you familiar with the term "blacklisting?

17   A.    It's used in so many different ways.

18       If you specifically give me an application, I'll tell

19   you.

20   Q.    Sure.

21       It's possible, with respect to e-mail, to blacklist a

22   domain name at the server level, which would cause your server

23   to reject any e-mails that purport to come from that domain

24   name, correct.

25   A.    Yes.

1    Q.    It's possible with your server to blacklist domain

2    names that are listed to Virtumundo and Adknowledge, correct?

3    A.    That's true.

4    Q.    And if you were to blacklist those domains, you would

5    block e-mail from Adknowledge and Virtumundo, correct?

6    A.    That I believe to be true.

7    Q.    But you've never undertaken to use the blacklist

8    function and block e-mails from Adknowledge and Virtumundo,

9    correct?

10    A.    Or anyone else, yes.

11    Q.    The videographer has indicated that we're running out

12    of tape and he'd like to change it, so let's take a short

13    break.

14          THE VIDEOGRAPHER:    This is the end of Tape No. 2,

15    Volume 2 of the deposition of James S. Gordon, Junior.    The

16    time is now 3:52 p.m.    We are off the record.

17          (A recess was taken.)

18          THE VIDEOGRAPHER:    This is the beginning of Tape

19    No. 3, Volume 2 of the video deposition of James S. Gordon,

20    Junior.    The time is now 4:07 p.m.    We are on the record.

21          (Exhibit No. 30 marked.)

22    Q.    Do you recognize Exhibit No. 30?

23    A.    Yes, that's my declaration.

24    Q.    Is that your signature on page 4 of the declaration?

25    A.    Yes.

1      A.    In person.

2      Q.    So do you believe that it violates law on the Internet

3   but not in person to solicit that type of information?

4      A.    Yes, if the information is not going to a lending

5   company.  It's going to private parties.

6      Q.    Do you have any information upon which you can

7   conclude that First Premiere Bank violated any laws?

8      A.    I didn't say First Premiere Bank.

9            I'm saying parties other than First Premiere Bank,

10  they -- in my estimation -- it's not a legal conclusion, but

11  it's the way I look at things -- they're negligent in that they

12  allow this to continue.

13     Q.    Do you believe that the "subject" line of the e-mail

14  in Exhibit No. 37 is false or misleading?

15     A.    No.  It mentions First Premiere Bank in the "subject"

16  line.  It mentions that.

17     Q.    Do you believe that the "from" line of Exhibit No. 37

18  is false or misleading?

19     A.    It mentions First Premiere Bank, an entity, that you

20  -- sorry -- your client spams for.

21     Q.    Do you believe that the "from" line is false or

22  misleading?

23     A.    No.  It identifies accurately, I guess, a sender or

24  someone who's on behalf an e-mail was sent.

25     Q.    Do you believe that this e-mail violates the law in

1    A.    Never.

2    Q.    Okay.

3          Does that include directly?

4    A.    I mean never directly.

5    Q.    And does it include indirectly?

6    A.    Indirectly, I never intended to be a subscribe -- or

7    subscriber, I should say -- of anything related to the company.

8    Never intended to do that.

9    Q.    Okay.

10         Now, because -- and the reason I'm asking these is

11   yesterday, I believe when you were asked by counsel if you ever

12   opt -- in opted in again to Virtumundo -- and I believe that

13   the word "again" was used -- I want some clarification, you

14   testified that it's possible that I inadvertently resubscribed

15   when doing reconnaissance for this lawsuit.

16         Can you explain what you meant by that?

17   A.    I, first of all, will restate that I never intended at

18   any point in time to ever subscribe to any of their offerings.

19         When I wanted to go in last year after the lawsuit was

20   filed -- maybe it was even before -- I don't rightly know now

21   -- the thing that I tried to do was get more information about

22   the company, information about affiliate marketing that they

23   do.

24         I may have looked at a legal document of one sort or

25   another, and I don't know which ones, if there were more than

Page 455

1    one.

2           So I just did a general -- what I call reconnaissance

3    to see what that site entailed.

4        Q.    Okay.

5           And by your testimony, you believe that in doing that,

6    you may have inadvertently resubscribed or subscribed?

7        A.    I don't know if I did or not.  I have no way of

8    knowing that at this point.

9           If the -- if there was a requirement to put an e-mail

10   address in, it's likely I did that.

11          If that means that I subscribed to something again,

12   then, you know, that's the case.

13       Q.    And why would you have put your e-mail address in at

14   that point?

15       A.    The only access I would have to the site to get the

16   information that I could share with my attorneys was to do that

17   reconnaissance and put my name in a block to get that

18   information.

19       Q.    Okay.

20          Yesterday when you were requested regarding your

21   declaration in support of the motion for summary judgment now

22   pending -- I believe it was Exhibit No. 15, but I'm not going

23   to ask you -- this is more of a general question -- you

24   testified that it was -- and I "co- authored by me and my

25   attorneys," could you elaborate on that a little more?  Could

Rough Draft

Page 465

1      A.   No.  I don't recall ever knowing about them.

2      Q.   If Virtumundo had used the name Virtumundo instead of

3  vmadmin.com when it first sent you e-mail, would that have

4  meant anything to you?

5      A.   No.

6      Q.   When did your clients relinquish control of their

7  e-mail accounts?

8      A.   In '03.  2003.

9      Q.   Does anybody currently, other than yourself, regularly

10  use e-mail accounts that you provide?

11      A.   At Gordonworks; is that what you're asking?

12      Q.   Okay.  Gordonworks.

13      A.   My wife is the only other person that uses a

14  Gordonworks address presently.

15           We created a brand new one that's not a part of any of

16  this litigation.

17      Q.   What about at other domains?

18      A.   Okay.  I know you piggybacked there, but please ask me

19  a complete question.

20      Q.   Sure.

21           Does anybody currently, other than yourself, regularly

22  use e-mail accounts at any domain that you provide?

23      A.   Okay, the problem I'm having that the distinction of

24  what Omni provides as opposed to what Godaddy provides, and

25  that's not clear in my mind when you're asking about provides.

1    Q.    Do you know the distinction between what Omni provides
2    and what Godaddy provides?
3    A.    A lot of it's blurred.
4    Q.    Do you believe that anybody currently, other than
5    yourself, uses an e-mail account that Omni or you provide
6    personally provide?
7    A.    I'm still confused.
8          If it's an Omni-owned one, it's one answer.
9          If you're talking about other -- personal ones, it's
10   another answer.
11         So I guess I'm trying to -- I don't know how to answer
12   it because I'm just not sure how to -- which way to go.
13   Q.    Do you believe that anybody currently, other than
14   yourself, uses an e-mail account that Omni or you provide?
15   A.    I still don't understand.
16   Q.    Do you provide e-mail accounts?
17   A.    "Provide" means what?  Let's get that clear because
18   I'm having a problem trying to understand what you're saying.
19   Q.    Are you an Internet access service?
20   A.    Internet access service.  Yes.
21   Q.    And in connection with your role as an Internet access
22   service, do you provide e-mail accounts?
23   A.    Okay.
24         Domain names -- the answer about e-mail accounts, as I
25   understand your question, is no, I don't provide e-mail

Rough Draft

Page 467

1    accounts.

2         Domain names are not provided by me.  I'm not their

3    registrar of domain names.

4         Q.   As an Internet access service, does Omni or you

5    personally currently provide service?

6         A.   You're being to that word "provide" again.

7              I'm not certain of the answer.

8         Q.   Do you currently provide Internet access service for

9    anybody other than yourself and your wife?

10        A.   Since we haven't defined it, I'm still having a

11   problem.

12        Q.   Since we haven't defined what?

13        A.   "Provide."

14             And I asked you, was it meaning ownership, was one of

15   the clarifications I asked about.

16        Q.   Services, by definition, are provided, are they not?

17        A.   Okay.

18        Q.   Do you agree that services, by definition, are

19   provided?

20        A.   Okay.  Yes.

21        Q.   Do you provide any services as an Internet access

22   provider?

23        A.   Yes.

24        Q.   Do you provide any services as an Internet access

25   provider currently for anybody other than to yourself or your