# Dckt No. 101 – Declaration of Derek A. Newman in Support of Defendants' Motion for Summary Judgment

Dockets.Justia.com

The Honorable John C. Coughenour

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

JAMES S. GORDON, Jr., a married
individual, d/b/a 'GORDONWORKS.COM';
OMNI INNOVATIONS, LLC., a
Washington limited liability company,

        Plaintiffs,

        v.

VIRTUMUNDO, INC, a Delaware
corporation d/b/a
ADNOWLEDGEMAIL.COM;
ADKNOWLEDGE, INC., a Delaware
corporation, d/b/a
ADKNOWLEDGEMAIL.COM; SCOTT
LYNN, an individual; and JOHN DOES,
1-X,

        Defendants.

NO.  CV06-0204JCC

**DECLARATION OF DEREK A.**
**NEWMAN IN SUPPORT OF**
**DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

NOTE ON MOTION CALENDAR:
February 16, 2007

I, Derek A. Newman, swear under penalty of perjury under the laws of the United

States to the following:

1.      I am counsel of record for defendants Virtumundo, Inc. ("Virtumundo") and

Adknowledge, Inc. ("Adknowledge"), am over age 18, and competent to be a witness.  I

am making this Declaration based on facts within my own personal knowledge.

2.      Attached hereto as Exhibit A is a true and accurate copy of the Deposition

of James S. Gordon, Jr.

DECL. OF DEREK NEWMAN
RE: DEFS.' MOT. FOR SUMM. J.
CASE NO. CV06-0204C - 1

NEWMAN & NEWMAN,
ATTORNEYS AT LAW, LLP

505 Fifth Ave. S., Ste. 610
Seattle, Washington 98104
(206) 274-2800

1       I certify and declare under the penalty of perjury under the laws of the State of

2  Washington and the United States that to my knowledge the foregoing is true and correct.

3

4       Executed on this 22nd day of January, 2007, at Seattle, Washington.

5

6

7                  Derek A. Newman

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECL. OF DEREK NEWMAN
RE: DEFS.' MOT. FOR SUMM. J.
CASE NO. CV06-0204C - 2

NEWMAN & NEWMAN,
ATTORNEYS AT LAW, LLP

505 Fifth Ave. S., Ste. 610
Seattle, Washington 98104
(206) 274-2800

# EXHIBIT A

# Transcript of the Deposition of
# James Gordon, Jr., Plaintiff

NEWMAN & NEWMAN,
ATTORNEYS AT LAW, LLP

505 Fifth Ave. S., Ste. 610
Seattle, Washington 98104
(206) 274-2800

# Transcript of James S. Gordon, Jr., Vol. I

**Case:** Gordon v. Virtumundo

**Date:** January 9, 2007



Phone: 206.287.9066
Fax: 206.287.9832
e-mail: info@buellrealtime.com
Internet: www.buellrealtime.com

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

JAMES S. GORDON, JR., a    )
married individual, d/b/a  )
'GORDONWORKS.COM'; OMNI    )
INNOVATIONS, LLC, a        )
Washington limited         )
liability company,         )
                           )
        Plaintiffs,        )
                           )
   vs.                     )    No. CV06-0204JCC
                           )
VIRTUMUNDO, INC., a        )
Delaware corporation       )
d/b/a ADKNOWLEDGEMAIL.COM; )
ADKNOWLEDGE, INC., a       )
Delaware corporation,      )
d/b/a ADKNOWLEDGEMAIL.COM; )
SCOTT LYNN, an individual; )
and JOHN DOES, 1-X,        )
                           )
                           )
        Defendant.         )

---

VIDEO DEPOSITION UPON ORAL EXAMINATION

OF

JAMES S. GORDON, JR. - VOLUME I

---

Taken at 505 Fifth Avenue South

Seattle, Washington

DATE TAKEN:  JANUARY 9, 2007

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 2

```
 1                  A P P E A R A N C E S
 2
     FOR THE PLAINTIFFS:
 3                   ROBERT J. SIEGEL
                     Merkle Siegel & Friedrichsen, P.C.
 4                   1325 Fourth Avenue
                     Suite 940
 5                   Seattle, Washington 98101-2590
 6
 7   FOR THE DEFENDANTS:
                     DEREK A. NEWMAN
 8                   DEREK LINKE
                     Newman & Newman, LLP
 9                   505 Fifth Avenue South
                     Suite 610
10                   Seattle, Washington 98104
11                   MICHAEL R. GEROE
                     General Counsel, Adknowledge
12                   4600 Madison
                     Tenth Floor
13                   Kansas City, Missouri 64112
14
15   THE VIDEOGRAPHER:
                     ALBERT MAIMON, CLVS/CDVS
16                   Buell Realtime Reporting, LLC
                     1411 Fourth Avenue
17                   Suite 820
                     Seattle, Washington 98101
18
19
20
                     *   *   *   *   *
21
22
23
24
25
```

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 3

1          DEPOSITION OF JAMES S. GORDON, JR. - VOLUME I

2                      EXAMINATION INDEX

3

4    EXAMINATION BY                                    PAGE

5

6    Mr. Newman  . . . . . . . . . . . . . . . .        5

7

8                        EXHIBIT INDEX

9

10   EXHIBITS FOR IDENTIFICATION                       PAGE

11

12   10  4/3/06 Letter. . . . . . . . . . . . .         87

13   11  9/24/04 Internetnews.com Article . . . . .    135

14   12  Whois Record for Gordonworks.com . . . . .    142

15   13  9/4/03 E-mail. . . . . . . . . . . . .        163

16   14  1/20/04 E-mail . . . . . . . . . . . .        169

17   15  Declaration of James S. Gordon, Jr. in Support
         of Plaintiff's Motion for Partial Summary
18       Judgement. . . . . . . . . . . . . . . .      195

19

20                   MARKED TESTIMONY INDEX

21

22   REQUESTED BY                                      PAGE

23

24   Mr. Newman . . . . . . . . . . . . . . . .         35

25

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 4

1                    SEATTLE, WASHINGTON; JANUARY 9, 2007

2                              9:23 A.M.

3

4                               -o0o-

5          THE VIDEOGRAPHER:  Good morning.  We are now on the

6    record.  Today is January 9th, 2007.  The time is now 9:23 a.m.

7    This is the videotaped deposition of James S. Gordon, Junior,

8    taken by the defendant in the matter of James S. Gordon,

9    Junior, Gordonworks.com and Omni Innovations, LLC versus

10   Virtumundo, Inc., Adknowledgemail.com, Adknowledge, Inc. and

11   Scott Lynn filed in the district court of the -- United States

12   District Court, Western District of Washington at Seattle,

13   Case No. CV06-0204JCC.

14          This deposition is being held at the offices of

15   Newman & Newman, 505 Fifth Avenue South, Suite 610, Seattle,

16   Washington 98104.

17          My name is Albert Maimon, videographer with the firm

18   of Buell Realtime Reporting located at 1411 Fourth Avenue,

19   Suite 820, Seattle, Washington 98101.  The court reporter today

20   is Christine Hougen, also with the firm of Buell Realtime

21   Reporting.

22          Counsel will now introduce themselves, stating whom

23   they represent, starting with counsel for the defendant,

24   please.

25          MR. NEWMAN:  Good morning.  Derek Newman for the

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 5

1   defendants.

2          MR. SIEGEL:  Good morning.  Robert J. Siegel for

3   Plaintiff Jim Gordon and Omni Innovations.

4          MR. GEROE:  Good morning.  Michael Geroe, general

5   counsel for Defendant Adknowledge, Inc.

6          THE VIDEOGRAPHER:  Will the court reporter please

7   administer the oath and we will continue with the deposition.

8

9                  JAMES S. GORDON, JR.,

10    witness herein, having been first duly sworn on oath,

11    was examined and testified as follows:

12

13                E X A M I N A T I O N

14

15  BY MR. NEWMAN:

16     Q.   Good morning, sir.  My name is Derek Newman.

17     A.   Morning.

18     Q.   I represent Adknowledge, Virtumundo and Scott Lynn in

19  a lawsuit that you have brought.

20          Do you understand that?

21     A.   Yes.

22     Q.   And today we're taking your deposition.

23          Do you understand that?

24     A.   Yes, I do.

25     Q.   Have you ever had your deposition taken before?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 6

1    A.    Yes, I have.

2    Q.    How many times?

3    A.    I'm not sure.  At least once.

4    Q.    Tell me about that time.

5          In other words, what was the lawsuit in which you were

6    deposed; were you a party?

7    A.    That was a lawsuit against Theodore Hansson.

8          The deposition took place in Kennewick, Washington.

9    Q.    Were you a party in that case?

10   A.    Plaintiff.

11   Q.    What were the nature of the claims?

12   A.    This was a spam lawsuit, much like this one.

13   Q.    How did that case resolve, if it did?

14   A.    Well, the judge dismissed it because of improper

15   service or some term like that, and I was proceeding pro se.

16         So I later, within a month or so, hired Doug McKinley

17   to represent me.  And we decided not to at that time pursue

18   Mr. Hansson.  I got a chance to meet him and his wife and we

19   talked about it, and I didn't refile.

20   Q.    I'm going to go over the process for depositions.

21   A.    Okay.

22   Q.    You advised that you have been through it once before,

23   but I think it's appropriate that we all understand what the

24   procedure is going to be.

25   A.    Okay.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

1    Q.    I'm going to ask you a series of questions, and it's

2    your obligation to give to me true, accurate, forthright and

3    honest answers.

4        Not only is it your obligation, but it is your right,

5    and so I'm going to make an effort not to cut you off, I'm

6    going to allow you to always finish your answer so that it can

7    be full and complete, and I ask that you give me that same

8    courtesy.  Please let me finish my question before you begin

9    your answer.

10       There will be times when I ask a question that you may

11   not understand.  And in those circumstances, please ask me to

12   clarify because we want to make sure that the record is clean

13   today.

14   A.    Okay.

15   Q.    Everything that you say is being taken down by this

16   very kind stenographer, and she has a difficult job.  We want

17   to make sure that we speak slowly, clearly and audibly so that

18   she can record everything that you and I say.

19       And similarly, and back to the earlier topic, we don't

20   want to speak over each other because it's really difficult for

21   her to write --

22   A.    Okay.

23   Q.    -- down things that we say simultaneously.

24       So let's keep that in mind.

25   A.    Fair enough.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 8

1    Q.   If at any time, I ask you a question and you don't

2    understand, you can ask me to clarify.  And similarly, if later

3    during the proceeding, you want to amend your answer, feel free

4    to mention that you'd like to change an earlier response or

5    amend an earlier response or add to an earlier response.

6    A.   Okay.

7    Q.   Your lawyer is here, Mr. Siegel --

8    A.   Correct.

9    Q.   -- and he's going to object to some of my questions.

10   That doesn't mean you shouldn't answer them.  You

11   should answer every question that I ask you unless Mr. Siegel

12   instructs you not to answer.

13   And generally, the only reason why he can instruct you

14   not to answer is because I ask a question that would infringe

15   upon a privilege, such as the attorney-client privilege where

16   you're asking him for legal advice or another lawyer for legal

17   advice.  I don't have a right to know what your questions in

18   that regard are or their advice.

19   But other than that, I generally can ask you any

20   questions that are likely to lead to the discovery of

21   admissible evidence --

22   A.   Okay.

23   Q.   -- and I will.

24   And I may ask questions, and through your head, you

25   may not know why it is likely to lead to the discovery of

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 9

1    admissible evidence, but that doesn't mean that I can't ask it.

2    You're required to answer every question that I ask and give me

3    your honest and forthright response.

4          A.    Okay.

5          Q.    This is a deposition, not an interrogation, not an

6    endurance test.  So if at any time you would like to take a

7    break to use the restroom, to get some water, to grab some

8    food, catch some fresh air, please ask, and I'm going to make

9    every effort to accommodate that because I want you to be

10   comfortable.

11         Again, it's important that we have a clear record.

12   It's important that you have a clear mind when you're

13   testifying today, so I don't want to put any undue pressure on

14   he.  Just let me know if you need a break.  The only thing that

15   I request in that regard is that if there is a question

16   pending, please complete your answer before taking your break.

17         A.    Okay.

18         Q.    And if you come back from your break and you change

19   your answer, then I may take that opportunity to inquire as to

20   why the answer was changed.

21         But you have every right to change answers, because,

22   again, what's important that we have true accurate and correct

23   transcript and that we get truthful and forthright answers from

24   you to be used in this proceeding?

25         Do you understand all that?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. I

Page 10

1    A.    Yes.

2    Q.    Do you have any questions in that regard?

3    A.    No.

4    Q.    How old are you?

5    A.    55.

6    Q.    Did you attend college?

7    A.    Yes, I have.

8    Q.    Where?

9    A.    Do you want the whole list of colleges?

10    Q.    I would appreciate that.

11    A.    Okay.

12         Junior college, Oakland, California; that was Merritt

13    Junior College.

14         The University of Wisconsin, Madison, Wisconsin.

15         City University in Richland, Washington.

16         And I'm presently attending Walden University.  It's

17    based in Minneapolis.

18    Q.    Do you have a degree from the University of Wisconsin?

19    A.    A bachelors in science and education.

20    Q.    Do you have a degree from City University?

21    A.    An MBA.

22    Q.    Is Walden University a correspondence course?

23    A.    It's a combination.  Much of it's on-line, but we have

24    certain residence requirements that I've met, and hopefully, by

25    the end of this year, I'll have another degree.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo              James S. Gordon, Jr., Vol. I

Page 11

1    Q.    What are you studying?

2    A.    Business.  It's a self-designed course -- course of

3    study; applied management and decision sciences.

4    Q.    Did you attend the University of Wisconsin immediately

5    after the junior college in Oakland?

6    A.    Yes.

7    Q.    And after you graduated from the University of

8    Wisconsin, did you attend another school or did you take

9    employment?

10    A.    I took employment at the -- Cal Tech's jet propulsion

11    lab in Pasadena, California.

12    Q.    What did you do for Cal Tech?

13    A.    The first three-plus years, I was on a management

14    rotation program.  So everything that you do in a human

15    resource department, I think I did.

16    Q.    How old did you hold that position at Cal Tech?

17    A.    Four years and four months.

18          I did give my resume.  I think.

19          THE WITNESS:  Does the water gurgle when I'm drinking?

20    Will it gurgle in here?  Okay.

21    Q.    Did you take employment at another company after you

22    left Cal Tech?

23    A.    Yes.

24    Q.    Do you know what year you left Cal Tech?

25    A.    It was '78, January '78.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 12

1      Q.    And in 1978, where did you then become employed?

2      A.    The Washington Public Power Supply System.

3      Q.    What was your position there?

4      A.    Training specialist.

5      Q.    What's a specialist?

6      A.    I don't know how to answer that.

7      Q.    You were training them?

8      A.    No.  My position title was a training specialist.

9             I conducted employment training, human resource

10    development.  That's everything from writing courses to

11    supervisory development.

12     Q.    How long did you hold that position?

13     A.    For three years and -- what -- five months or so.

14     Q.    Until approximately 1981 or '82?

15     A.    1981.

16     Q.    And in 1981, did you take employment elsewhere?

17     A.    With -- yes.  With New York Life Insurance Company.

18     Q.    What did you do for them?

19     A.    I was in a training program, again, and became an

20    agent and sold financial service products and did that for

21    maybe two and a half years or so.

22     Q.    What did you do after that?

23     A.    I took another position with -- oh, geez.  Now it's

24    kind of foggy.

25            I think I went to IDS/American Express immediately

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 13

1   after that.  Or maybe it was Consolidated Financial.

2            I'm not sure which of the positions I took next.

3            There were a series of two job -- two jobs and my

4   first try at self-employment, and I'm just not sure what the

5   sequence was.  I'd have to go back and look.

6       Q.   Were the jobs in financial services?

7       A.   Yes.  As well as the self-employment.

8       Q.   And when you began self-employment, were you still

9   employed?

10      A.   No.

11      Q.   So you left the firm you were with at the time and

12  started a business?

13      A.   Now that I think about it, it was IDS.

14           It was Consolidated Financial, which was a local

15  company.

16           Then I went to IDS.

17           And then on to self-employment at that time.

18      Q.   What year did you become self-employed?

19      A.   1985.

20      Q.   And what was the nature of the business?

21      A.   Provided information, workshops on financial products.

22           Helped people with credit counseling.

23           Produced a foreclosure newsletter.

24           Those types of things.

25      Q.   You mentioned earlier a lawsuit against Mr. Hansson.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 14

1    A.    Yes.

2    Q.    What year was that lawsuit?

3    A.    I believe it was the end of '03.  I believe it was

4    December of '03.

5          Yes.  And it was dismissed, I think, in April of '04.

6    Q.    You testified that in 1985, you started a business

7    where you provided information and workshops on financial

8    products, you did credit counseling and you had a foreclosure

9    newsletter.

10         What was the name of that business?

11   A.    The Gordon Group, a d/b/a.

12   Q.    When you say it was a d/b/a --

13   A.    Yes?

14   Q.    -- do you mean that it was a sole proprietorship that

15   was called The Gordon Group?

16   A.    Yes.

17   Q.    And how long was The Gordon Group in business?

18   A.    At that time, for maybe two years.

19         It could have been 22 months.  It could have been 25

20   months.  I'm not sure.

21         But, approximately.

22   Q.    What did you do after those approximately 25 months?

23   A.    Well, I was unemployed for a period of time.  One of

24   the reasons for getting my continued education is because I

25   didn't really know what I was doing in terms of the business

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 15

1    aspect.

2          Unemployed for -- I don't know -- maybe six, seven

3    months, and then I went to work for Private Industry Counseling

4    in Kennewick.

5    Q.    And what year was that, 1988?

6    A.    1988, yes.  April of '88.

7    Q.    How long were you employed there?

8    A.    This is one of those complex answers.

9          The contract changed from one group to the next to the

10   next.  So there were at least three, maybe four different

11   groups.  And again, it's a matter of sequencing.

12         At the end of each year, the contract ended.  We were

13   laid off.  Sometimes for 24 hours; other times for a week.

14         It was, all in all, three years or so.

15   Q.    What was the nature of your positions there?

16   A.    I was a training specialist.

17         We did what's called workforce development training.

18   Q.    And did you leave there in approximately 1991?

19   A.    Yes.

20   Q.    What did you do in 1991 for employment?

21   A.    1991, after I was laid off, I was unemployed the rest

22   of the year.  And I had to decide what I wanted to do.

23         So I didn't, and I was unemployed about eight or nine

24   months and tried other things, put together business ideas.

25         And I started another business, The Gordon Group.  I

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 16

1   kind of reinvented that and started, again, I think, in '92.

2       Q.   Why were you laid off?

3       A.   I don't know.  They were running out of money.  This

4   was a local two-person shop.  It was locally-granted dollars

5   for minority economic development, and they simply ran out of

6   money.

7       Q.   In 1991, you testified you started a new business,

8   called it The Gordon Group --

9       A.   I think it was '92.  It could have been the beginning

10  of '93.

11          I was doing a lot of training.  I came here to Seattle

12  with the Pacific Institute, and I thought I was going to do

13  some of their training.

14          I came here for maybe a full year, off and on, taking

15  courses and so forth.

16          So I -- I don't know the exact starting date of The

17  Gordon Group the second time around.

18          The first of '93; it could have been the end of '92.

19      Q.   And that was the nature of the business for that

20  Gordon Group?

21      A.   This time I got back to what I did best, and that was

22  training.

23          And I conducted workshops for the local college,

24  Department of Energy, whoever else locally -- the City and

25  things like that.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 17

1     Q.   How long did you do that for?

2     A.   Up until, I think, 2001.

3     Q.   From approximately 1992 or '93 until 2001 -- I'm

4  clarifying -- you ran a business called The Gordon Group and

5  you were a training specialist, correct?

6     A.   Yes.

7          There's more than that.  I can add to it, if you'd

8  like.

9     Q.   Please.

10    A.   In 1997, I added something to what I was doing.

11         In addition to doing entrepreneur training, things

12 like that, I started a health and nutrition business which was

13 strictly on-line.  That was in '97.  And we sold health and

14 nutrition products in eight or nine, 10 different nations.

15         So that's how I got this on-line presence.

16         So I did the two things simultaneously.

17    Q.   Was the health and nutrition products business under a

18 different name than The Gordon Group?

19    A.   No.  It was the same.

20    Q.   Was it a sole proprietorship?

21    A.   Yes.

22    Q.   How did you come to be involved in the health and

23 nutrition products industry?

24    A.   A life-long allergy, and I found something to relieve

25 the allergy symptoms, both seasonal allergy as well as food

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 18

1    allergy.

2          That something was methyl sulfinyl methane; MSM, they

3    call it.  And as a result of taking that, I had tremendous

4    relief.  Not -- it wasn't gone, but I had relief.

5          And people around me that knew me said, what are you

6    doing, and as a result, I undertook that venture.

7      Q.   Did you have partners in that venture?

8      A.   Not until -- it was either '99 or 2000.  And that

9    partner was Dancing Wolf, Incorporated in -- I guess it was

10   Beaverton, Oregon.

11         And actually, that company absorbed The Gordon Group.

12     Q.   Where were the health and nutrition products sold?

13         And when I say "where," I mean what medium; the

14   Internet, storefront or otherwise.

15     A.   99.9-some percent was sold via the Internet.  Sold in

16   most every state in the nation; Canada, England, Ireland,

17   Italy, Ecuador, Australia.

18         There was a couple of others, but those were some of

19   the places.

20     Q.   Did you have employees in connection with the health

21   and nutrition products company?

22     A.   No.  Occasionally, my son would help me and I paid

23   him.

24     Q.   Did you market on the Internet?

25     A.   Yes.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 19

1    Q.    And who designed the Internet site --

2    A.    I did.

3    Q.    And how did you know how to design an Internet site?

4    A.    I taught myself, HTML.

5    Q.    So you designed the HTML front end for The Gordon

6    Group website that sold health and nutrition products --

7    A.    Yes.

8    Q.    -- is that correct?

9    A.    Yes.

10    Q.    Was there a back-end infrastructure; in other words,

11    code that drove --

12    A.    There were no scripts.

13    Q.    -- the purchases?

14    A.    There were no scripts until toward the end.

15    I apologize for interrupting.  Go ahead.

16    Q.    Thank you.  You're doing great.  It's sometimes

17    difficult when we're speaking back and forth for the court

18    reporter, and I appreciate that.

19    You mentioned a moment ago that there was no scripts

20    until later.

21    How were the products sold if there wasn't any

22    back-end infrastructure and it was just a graphical interface?

23    Do you understand my question?

24    A.    I'm not positive I understand it all.

25    You said, how were they sold?

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 20

1      Q.    You testified that you designed the front end of this

2    website.

3      A.    Yes.

4      Q.    You specifically advised it was through HTML.

5      A.    Yes.

6      Q.    And it's true that HTML is primarily limited to

7    displaying images, right?

8      A.    Yes.

9      Q.    HTML doesn't have an interactive feature that allows

10   purchasers to submit purchase requests and receive receipts and

11   have credit cards billed and the like, correct?

12     A.    That's correct.

13     Q.    So my question is, how were purchasers able to

14   purchase on The Gordon Group website if it was just an HTML

15   interface?

16     A.    Okay.  Toll-free number was one way.  They called a

17   number.

18            We allowed them to do it via fax.

19            Check by phone.

20            And eventually, I learned how to do forms well enough

21   to put forms on the website.  And I don't know at what point we

22   added forms.

23     Q.    When you first started the website in around 1997, did

24   it exist to promote the 800 number; was that the only means by

25   which a consumer could purchase?

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 21

1    A.   I'm not sure.  I'm not sure.

2    Q.   And at some point, consumers could purchase products

3  on the website, correct?

4    A.   At some point, correct.

5    Q.   When do you believe that was?

6    A.   I believe after we had become part of Dancing Wolf.

7         I just -- I'm just not certain right now.

8    Q.   How did you promote the products on the Internet?

9    A.   Okay.  It sounded like I answered that.

10        Let's see.

11        The toll-free number was on there.

12        The fax number was on there for fax orders.  And there

13  was a sheet that said, this is the product number or whatever

14  and the number of products, and they were able to fax it in or

15  call it in.  And most people called it in.

16    Q.   Are you familiar with the term "traffic" as applied to

17  the Internet?

18    A.   I think I am.

19    Q.   What is your understanding of that term?

20    A.   People who access a website -- and I put counters on

21  the website, and that could pull up the amount of people that

22  actually came to the website to look.

23        There are click-throughs where you have some other

24  part of it -- maybe the order forms or something like that --

25  you can -- you can gauge traffic just on -- on hits or you can

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo         James S. Gordon, Jr., Vol. I

Page 22

1    gauge traffic on click-throughs and things like that.

2         And that's my limited understanding of what we're

3    talking about.

4         Q.   Did you make any efforts to generate traffic to The

5    Gordon Group website that sold the health and nutrition

6    products?

7         A.   I'm just trying to remember what things we did do.

8         I'm sure I did.  Just with four hours sleep, maybe

9    it's not coming to my mind right now.

10        If I'm asked that question again, maybe I'll have

11   something.

12        Q.   Would you like some coffee?

13        A.   I don't drink coffee, but thank you.

14        Q.   Did you advertise The Gordon Group website by

15   purchasing key words or other paper-click mechanisms through a

16   search engine?

17        A.   This is a long time ago.

18        I don't know if I purchased -- well...

19        Again, I'm just not certain.

20        I'm not certain.

21        Q.   Did you send out e-mail marketing to promote The

22   Gordon Group website?

23        A.   That's one thing we didn't do.

24        Q.   Never?

25        A.   I have no recollection of ever doing that; not for

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

1    selling health and nutritional products.

2        Q.  Did you pay anybody to market or promote The Gordon

3    Group website?

4        A.   No.

5            Unless I'm misunderstanding your term "marketing," no.

6        Q.   Do you know how consumers that purchased The Gordon

7    Group health and nutritional products found The Gordon Group

8    website?

9        A.   We didn't ask that question until very late in the

10   game, and most people would say that they saw it in a search

11   engine.

12           Now that you mention it, there was an application --

13   you mentioned marketing -- WebPosition, I think it was called,

14   out of Australia, a product that I purchased, and it was

15   supposed to be something to give you better placement in the

16   search engines.

17           I think that's the marketing tool that we used.

18   WebPosition, I think, is the name.

19       Q.   Did you use any other marketing tools?

20       A.   I would have to ask my old partner.  I don't know if

21   we did anything else.

22           I locally told people about it and brought samples.

23   We gave away a lot of samples to people, hundreds of bottles to

24   give them our product.

25           So, word of mouth.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 24

1    Q.    You mentioned a company in response to my question

2    earlier about whether you had a partner.

3          Would you be so kind as to repeat its name?

4    A.    Dancing Wolf, Incorporated.

5    Q.    How did you become introduced to Dancing Wolf,

6    Incorporated?

7    A.    The proprietor called me.  Saw my website.

8    Q.    Did you sell an interest in the health and nutrition

9    product business to Dancing Wolf?

10   A.    Not technically.  We -- because we were both small

11   businesses, we just decided to combine our resources, and we

12   redid our bylaws and things like that.

13   Q.    Did you have a business entity formed for your health

14   and nutrition product business at any time?

15         And when I say "business entity," I'm referring to a

16   corporation, limited liability company or limited liability

17   partnership.

18   A.    I didn't, but she had a corporation, an Oregon-based

19   corporation.

20   Q.    Did she sell you interests or otherwise transfer you

21   interests in the Oregon corporation?

22   A.    No.

23   Q.    Did so you never owned shares in the Oregon

24   corporation?

25   A.    No.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo              James S. Gordon, Jr., Vol. I

1      Q.   In response to my question about Dancing Wolf, you

2  testified that "she" had a corporation.

3           Who is "she"?

4      A.   Her name is Darin E. Tillinghast,

5  T-I-L-L-I-N-G-H-A-S-T.

6      Q.   At some point, Dancing Wolf, Incorporated -- I think

7  you testified -- swallowed up your business?

8      A.   Yes.  That's a way to put it, yes.  Merger.

9      Q.   What was the nature of that transaction?

10     A.   Effectively, it was a merger.

11          When I say we combined resources, that's exactly what

12 we did.  She had a local accountant to do the paperwork and the

13 K-1s and things like that.  And I let her handle that.

14     Q.   Were you paid for the merger?

15     A.   Pardon?

16     Q.   Were you compensated for the merger?

17     A.   Technically, no.

18     Q.   You testified "technically, no," which indicates to me

19 there might be a practically, yes.

20          Is there a practical way that you were compensated,

21 even if technically you were not?

22     A.   Well, other than getting free product, I don't know if

23 there's anything else.

24     Q.   Why did you allow Dancing Wolf, Inc. to swallow up

25 your business?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 26

1       A.    Well, I had done it for maybe three years, and I
2   wanted to do something more.

3           The other part of that is there was a guy in Australia
4   that wanted us to help market our product nationwide there, and
5   he asked us to put together a marketing report.  And I didn't
6   know how to do that.

7           And there was a couple of other requests of that
8   nature, and I wasn't able to fulfill my customers' request, and
9   I decided I needed more education in business.  And that's why
10  I undertook my MBA and, effectively, withdrew from the other.

11          And we had an oral agreement for payment for services
12  and things like that, and I decided I'd go ahead and start
13  school full time.  And that's what I did.

14      Q.    What year was that?

15      A.    2000.

16      Q.    Your business, The Gordon Group, was operating in
17  1999, correct?

18      A.    Up through, I think -- I terminated the business, I
19  think it was 2002.

20          I kept it going.  Just like -- I kept interest going,
21  but I, on a day-to-day basis, did not manage, was not involved
22  in the daily management of the business.

23      Q.    Do you recall the gross revenue you generated in 1999?

24      A.    No.

25          If I guessed, it would be about 100-, 110,000;

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 27

1    something like that.

2        Q.   Do you know what your profit was on that 100-,

3    110,000?

4        A.   No, I don't.

5        Q.   I'm looking for a best estimate because I know that

6    you don't have your financial documents in front of you.

7        A.   No.  Even so, we were just given K-1s.  And all of the

8    accounting was done with her accountant there in Oregon.

9             So, no, I don't -- even the Quickbooks -- we ran

10   across some problem in transmitting the Quickbooks so that I

11   could keep up to date.  I'm not sure what the problem is right

12   now.

13            So, no, I didn't get a final because I had been

14   involved in my MBA and I also started another job in May of

15   2000 working for City University.

16            So I had so much going on that I really didn't -- I

17   wasn't diligent, vigilant, whatever, in terms of getting

18   through and getting all these weekly updates and biweekly

19   updates and so forth.

20       Q.   Did you report income to the government in 1999?

21       A.   Always.

22       Q.   You don't know how much you reported?

23       A.   No.  I don't even know what I reported last year.

24       Q.   And in the year 2000, did the health and nutrition

25   business generate revenue for you?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 28

1       A.    I -- I'm sure it did.  I just don't know.

2             The last time, though, I got a paycheck from that

3    venture was at the end of '01.

4             So it continued to, you know, provide income, but I

5    just don't know what it was.

6       Q.    What became of the business?

7       A.    I believe it's still going.

8       Q.    But you don't generate revenue from it any longer?

9       A.    I haven't been paid.

10      Q.    Do you have an agreement with Dancing Wolf or

11   Ms. Tillinghast that provides that you should be earning

12   revenue from the health and nutrition business?

13      A.    I have an agreement, but it's more of a nondisclosure,

14   noncircumvention-type of agreement and there was no exit

15   strategy included in that.

16      Q.    Are you entitled to a percentage of the revenue that

17   the company generates?

18      A.    I think so.

19      Q.    Do you know whether you own shares in the company that

20   offers these products?

21      A.    I didn't purchase shares originally.  I think we had a

22   split of 51/49 or 52/48 or something like that.

23            So, that's my best recollection.  It was a pretty

24   narrow split.

25      Q.    You testified that you went back to study for your

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 29

1    MBA.

2         A.   Yes.

3         Q.   And that year was 2000, correct?

4         A.   Yes.

5         Q.   So were you in school full time at that time?

6         A.   The first quarter, no.

7              But the second quarter that I was enrolled, I was full

8    time.

9         Q.   How did you earn a living during that time?

10        A.   Please re- -- I -- I missed something.

11        Q.   Okay.

12             You testified you went back to school, correct, in the

13   year 2000, and you started studying full time, right?

14        A.   Yes.

15        Q.   And school costs money, correct?

16        A.   Yes.

17        Q.   And when you are in school, you are not paid for being

18   in school, correct?

19        A.   Yes, I was.  At City University, that's who provided

20   the education, and that was my employer as well.

21        Q.   So you worked for City University at the time?

22        A.   Correct.  I was an academic advisor.

23        Q.   Thank you for clarifying.

24        A.   Okay.

25        Q.   How long were you an academic advisor?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 30

1    A.    Three years and three months, two months; something
2    like that.

3    Q.    What were your responsibilities as an academic
4    advisor?

5    A.    Market the university, which I did.

6          And all the outlying areas in the Columbia Basin.

7          And to counsel, advise students on options for their
8    academic progress.

9          For new people, just to tell them about the university
10   and to follow up.

11   Q.    You did that until approximately 2003?

12   A.    Until the end of July 2003, yes.

13   Q.    Did you hold other employment positions at that time?

14   A.    Not in '03, no.

15   Q.    Did you own any businesses at that time?

16   A.    I thought I held interest in Dancing Wolf.

17   Q.    Other than Dancing Wolf, did you own any businesses at
18   that time?

19   A.    No, I don't -- I don't think so.

20          Well, I formed Omni with the intention of making that
21   my full-time occupation, but that was 2000, mid-2000.  Maybe it
22   was 2001.

23   Q.    When you refer to Omni --

24   A.    Omni Innovations, LLC.  I apologize.

25   Q.    And we'll just refer to that as Omni because it's

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. I

Page 31

1    probably easier for both of us.

2            But when either of us refer to the entity Omni, we're

3    talking about Omni Innovations, LLC --

4        A.    Yes.

5        Q.    -- is that fair?

6        A.    Yes.

7        Q.    You formed Omni in the year 2000?

8        A.    That's correct.

9        Q.    Why did you form Omni?

10       A.    I'm trying to think of the simplest way.

11            I have intellectual property concepts that I wanted to

12   develop and market.

13       Q.    What were they?

14       A.    What I can tell you is I've developed a proprietary

15   planning system which I will be marketing to K-20 --

16   kindergarten through, really, doctoral level -- a planning

17   program where we're taking my pen and paper process and, with

18   the help of Battelle, turn it into software.

19       Q.    Have you ever generated any revenue from that

20   proprietary planning system?

21       A.    No.  It's not complete.

22       Q.    So it's still in the --

23       A.    Drawing board.

24       Q.    -- research and development phase?

25       A.    Yes.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 32

1      Q.    Did Omni generate any revenue between the year 2000
2  and 2003?
3      A.    No.
4      Q.    Did you personally generate any revenue or income
5  between the year 2000 and 2003, other than from City University
6  or Dancing Wolf?
7      A.    I don't recall any other sources.
8            Other than my wife working.
9      Q.    Why did you leave City University?
10           And when I'm speaking of it, I'm referring to the
11  employment position as opposed to the student position in the
12  year 2003.
13     A.    I was laid off in 2003.
14           And last year -- I'm sorry, 2005, the campus closed in
15  the Tri Cities.
16     Q.    After you were laid off from City University in 2003,
17  what did you do to generate income?
18     A.    Well, I had a lot of time to think about it.
19     Q.    To think about generating income?
20     A.    Well, yeah.  What I attempted to do was to continue
21  work on the software development project.
22           In the meanwhile, the only income that I had was
23  unemployment until sometime in '04.
24     Q.    When you refer to "unemployment," are you speaking of
25  State unemployment insurance?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 33

1      A.    That's correct.  That's correct.

2      Q.    So your only source of income in the year 2003 was

3  from State unemployment payments?

4      A.    Up until my layoff at the end of July, I had a regular

5  salary.

6            And after that -- I don't know -- I had a severance

7  package plus -- oh, geez.  I don't know.

8            It was the equivalent of six or eight weeks of pay

9  after that.  And they threw in my vacation and so forth.

10           So I had almost three months of pay afterwards.

11     Q.    How long were you receiving unemployment compensation

12  payments from the State?

13     A.    It was until maybe mid-'04.  I'm not sure when the

14  cutoff was.

15     Q.    Why did those unemployment compensation payments

16  cease?

17     A.    I don't know.  I have no idea.  Unless -- you know,

18  there's only a certain amount of time that you can qualify, and

19  I'm assuming that was the case.

20     Q.    Were you employed in the year 2004?

21     A.    I had no employer.

22     Q.    Did you own a business in the year 2004?

23     A.    Omni was the only thing that technically was formed.

24  I kept renewing the license for it each year.

25     Q.    Did Omni generate any revenue in 2004?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 34

1      A.    No.  I don't believe -- no.  I don't believe it did.

2      Q.    I just want to clarify.

3            I used the term "revenue."  I suppose a synonym for

4   that would be "income," and I just want to make sure you

5   understand that when I ask, I'm inquiring as to whether Omni

6   generated any income whatsoever, gross net, in kind.

7      A.    I would have to double-check because I did ask an

8   accountant for help, who was actually one of the professors at

9   City U.

10           So I would have to go back to whatever notes to say --

11           I don't think so, but I'm not absolutely positive.  I

12  don't think, at that time, it did.

13     Q.    In 2004, did you earn any income other than from

14  unemployment compensation from the State?

15     A.    Did I earn any other income?

16           I held no job during that period of time.

17     Q.    In 2004, did you earn any income other than from

18  unemployment compensation from the State?

19     A.    As I understand that, the answer is no.

20     Q.    In 2005, did Omni generate any revenue or earn any

21  income of any kind?

22     A.    I think -- I think the first revenue for Omni was

23  2006.

24           I lost a lot -- in fact, I lost all of my records due

25  to computer viruses on at least three occasions.  And I've had

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 35

1    to, I guess, decentralize recordkeeping.

2        Q.   In 2005, did you earn any income?

3        A.   I'm trying to think if I did any workshops.

4             I don't recall anything at this point for '05.

5        Q.   During these years when you were unemployed, how did

6    you pay your bills?

7        A.   Well, I mentioned that my wife was working.

8             During the course of the last maybe two and a half

9    years, the lawsuits that I have been involved with yielded

10   settlements.

11       Q.   You testified earlier that in 2006, Omni earned its

12   first revenue.

13       A.   Yes.

14       Q.   From what source did Omni earn its first revenue?

15       A.   The first revenue came from a settlement.

16       Q.   A settlement of what?

17       A.   A settlement of a lawsuit.

18       Q.   What lawsuit?

19       A.   I -- I think that agreement's confidential.  Best --

20   I'm not supposed to divulge that information.

21       Q.   Are you refusing to answer the question?

22       A.   At this point, yes.

23            MR. NEWMAN:  Would the court reporter be so kind as to

24   mark the record.

25       Q.   You understand that I'm entitled to ask any question

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 36

1    that's likely to lead to the discovery of admissible evidence,

2    correct?

3         A.    Yes.

4         Q.    And here, I'm asking a question that directly relates

5    to this case because it involves another lawsuit you brought.

6         Do you understand that?

7         A.    Yes, I do.

8         Q.    And I believe I have the right to ask this question.

9         Why aren't you answering it?

10        MR. SIEGEL:  Counsel, objection.  To the extent that

11   my client may be bound by confidentiality provisions in a

12   particular settlement agreement, then we would request time and

13   opportunity to consult and review that -- those provisions, and

14   we will answer if we believe that we're obligated to and you're

15   entitled to that information and my client doesn't run afoul of

16   the confidential provisions.

17        MR. NEWMAN:  In this case, we have a protective order,

18   and we agreed to it and the court signed off on it.  We

19   negotiated it.

20        MR. SIEGEL:  That's true.

21        MR. NEWMAN:  And it provides for when in this case the

22   parties should disclose confidential information and how that

23   will be maintained.

24        May I ask this question of this witness pursuant to

25   the protective order and we could ask the court reporter to

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 37

1   maintain the confidentiality of this portion of the record?

2          THE WITNESS:  It's okay?

3          MR. SIEGEL:  I guess so.

4          We do have a protective order.

5          THE WITNESS:  Okay.

6      Q.   I just want to make clear for the record -- and court

7   reporter's doesn't like this very much, but we have a very good

8   one here.

9          At this point, the portion of the record should remain

10  confidential, and then, when we're done with the areas that you

11  would like protected pursuant to the protective order, please

12  let me know so that we can go back on to a regular transcript

13  so as not to inconvenience the stenographer any further.

14     A.   Okay.

15                        [START EXCERPT]

16  /

17  /

18  /

19  /

20  /

21  /

22  /

23                        [END EXCERPT]

24     Q.   What -- from what source did that revenue come that

25  Omni earned in 2006?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 38

1       A.    May I consult with my attorney?

2       Q.    Not unless you believe the question that I'm asking

3   you may infringe upon the attorney-client privilege.

4             MR. SIEGEL:  You can answer the question.

5             THE WITNESS:  This was the REDACTED matter.

6       It's okay?

7             MR. SIEGEL:  Yeah.

8             With that said, we're going to have this portion

9   marked as confidential pursuant to the protective order.

10            MR. NEWMAN:  That's fair.

11            If the court reporter has any questions about the

12  confidentiality, please let us know, because I anticipate we'll

13  be doing this from time to time throughout the day.

14                       [START EXCERPT]

15  /

16  /

17  /

18  /

19  /

20  /

21  /

22  /

23  /

24  /

25  /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 39

```
 1      /
 2      /
 3      /
 4      /
 5      /
 6      /
 7      /
 8      /
 9      /
10      /
11      /
12      /
13      /
14      /
15      /
16      /
17      /
18      /
19      /
20      /
21      /
22      /
23      /
24      /
25      /
```

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 40

```
 1    /
 2    /
 3    /
 4    /
 5    /
 6    /
 7    /
 8    /
 9    /
10    /
11    /
12    /
13    /
14    /
15    /
16    /
17    /
18    /
19    /
20    /
21    /
22    /
23    /
24    /
25    /
```

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 41

1     /

2     /

3     /

4     /

5     /

6     /

7     /

8     /

9     /

10    /

11    /

12    /

13    /

14    /

15    /

16    /

17    /

18    /

19    /

20    /

21    /

22    /

23    /

24    /

25    /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 42

 1      /

 2      /

 3      /

 4      /

 5      /

 6      /

 7      /

 8      /

 9      /

10      /

11      /

12      /

13      /

14      /

15      /

16      /

17      /

18      /

19      /

20      /

21      /

22      /

23      /

24      /

25      /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 43

 1     /

 2     /

 3     /

 4     /

 5     /

 6     /

 7     /

 8     /

 9     /

10     /

11     /

12     /

13     /

14     /

15     /

16     /

17     /

18     /

19     /

20     /

21     /

22     /

23     /

24     /

25     /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 44

 1      /

 2      /

 3      /

 4      /

 5      /

 6      /

 7      /

 8      /

 9      /

10      /

11      /

12      /

13      /

14      /

15      /

16      /

17      /

18      /

19      /

20      /

21      /

22      /

23      /

24      /

25      /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 45

```
 1    /
 2    /
 3    /
 4    /
 5    /
 6    /
 7    /
 8    /
 9    /
10    /
11    /
12    /
13    /
14    /
15    /
16    /
17    /
18    /
19    /
20    /
21    /
22    /
23    /
24    /
25    /
```

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 46

 1        /

 2        /

 3        /

 4        /

 5        /

 6        /

 7        /

 8        /

 9        /

10        /

11        /

12        /

13        /

14        /

15        /

16        /

17        /

18        /

19        /

20        /

21        /

22        /

23        /

24        /

25        /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 47

1    /
2    /
3    /
4    /
5    /
6    /
7    /
8    /
9    /
10   /
11   /
12   /
13   /
14   /
15   /
16   /
17   /
18   /
19   /
20   /
21   /
22   /
23   /
24   /
25   /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 48

1     /

2     /

3     /

4     /

5     /

6     /

7     /

8     /

9     /

10    /

11    /

12    /

13    /

14    /

15    /

16    /

17    /

18    /

19    /

20    /

21    /

22    /

23    /

24    /

25    /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 49

 1    /

 2    /

 3    /

 4    /

 5    /

 6    /

 7    /

 8    /

 9    /

10    /

11    /

12    /

13    /

14    /

15    /

16    /

17    /

18    /

19    /

20    /

21    /

22    /

23    /

24    /

25    /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 50

 1      /

 2      /

 3      /

 4      /

 5      /

 6      /

 7      /

 8      /

 9      /

10      /

11      /

12      /

13      /

14      /

15      /

16      /

17      /

18      /

19      /

20      /

21      /

22      /

23      /

24      /

25      /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 51

```
 1    /
 2    /
 3    /
 4    /
 5    /
 6    /
 7    /
 8    /
 9    /
10    /
11    /
12    /
13    /
14    /
15    /
16    /
17    /
18    /
19    /
20    /
21    /
22    /
23    /
24    /
25    /
```

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 52

 1      /

 2      /

 3      /

 4      /

 5      /

 6      /

 7      /

 8      /

 9      /

10      /

11      /

12      /

13      /

14      /

15      /

16      /

17      /

18      /

19      /

20      /

21      /

22      /

23      /

24      /

25      /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 53

 1    /
 2    /
 3    /
 4    /
 5    /
 6    /
 7    /
 8    /
 9    /
10    /
11    /
12    /
13    /
14    /
15    /
16    /
17    /
18    /
19    /
20    /
21    /
22    /
23    /
24    /
25    /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 54

 1      /
 2      /
 3      /
 4      /
 5      /
 6      /
 7      /
 8      /
 9      /
10      /
11      /
12      /
13      /
14      /
15      /
16      /
17      /
18      /
19      /
20      /
21      /
22      /
23      /
24      /
25      /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 55

1      /

2      /

3      /

4      /

5      /

6      /

7      /

8      /

9      /

10     /

11     /

12     /

13     /

14     /

15     /

16     /

17     /

18     /

19     /

20     /

21     /

22     /

23     /

24     /

25     /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 56

 1      /

 2      /

 3      /

 4      /

 5      /

 6      /

 7      /

 8      /

 9      /

10      /

11      /

12      /

13      /

14      /

15      /

16      /

17      /

18      /

19      /

20      /

21      /

22      /

23      /

24      /

25      /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 57

 1     /

 2     /

 3     /

 4     /

 5     /

 6     /

 7     /

 8     /

 9     /

10     /

11     /

12     /

13     /

14     /

15     /

16     /

17     /

18     /

19     /

20     /

21     /

22     /

23     /

24     /

25     /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 58

 1    /

 2    /

 3    /

 4    /

 5    /

 6    /

 7    /

 8    /

 9    /

10    /

11    /

12    /

13    /

14    /

15    /

16    /

17    /

18    /

19    /

20    /

21    /

22    /

23    /

24    /

25    /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 59

1  /

2  /

3  /

4  /

5  /

6  /

7  /

8  /

9  /

10  /

11  /

12  /

13  /

14  /

15  /

16  /

17  /

18  /

19  /

20  /

21  /

22  /

23  /

24  /

25  /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 60

1      /

2      /

3      /

4      /

5      /

6      /

7      /

8      /

9      /

10     /

11     /

12     /

13     /

14     /

15     /

16     /

17     /

18     /

19     /

20     /

21     /

22     /

23     /

24     /

25     /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 61

```
 1      /
 2      /
 3      /
 4      /
 5      /
 6      /
 7      /
 8      /
 9      /
10      /
11      /
12      /
13      /
14      /
15      /
16      /
17      /
18      /
19      /
20      /
21      /
22      /
23      /
24      /
25      /
```

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 62

 1    /
 2    /
 3    /
 4    /
 5    /
 6    /
 7    /
 8    /
 9    /
10    /
11    /
12    /
13    /
14    /
15    /
16    /
17    /
18    /
19    /
20    /
21    /
22    /
23    /
24    /
25    /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 63

```
 1        /
 2        /
 3        /
 4        /
 5        /
 6        /
 7        /
 8        /
 9        /
10        /
11        /
12        /
13        /
14        /
15        /
16        /
17        /
18        /
19        /
20        /
21        /
22        /
23        /
24        /
25        /
```

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 64

```
 1      /

 2      /

 3      /

 4      /

 5      /

 6      /

 7      /

 8      /

 9      /

10      /

11      /

12      /

13      /

14      /

15      /

16      /

17      /

18      /

19      /

20      /

21      /

22      /

23      /

24      /

25      /
```

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 65

```
 1    /
 2    /
 3    /
 4    /
 5    /
 6    /
 7    /
 8    /
 9    /
10    /
11    /
12    /
13    /
14    /
15    /
16    /
17    /
18    /
19    /
20    /
21    /
22    /
23    /
24    /
25    /
```

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 66

 1     /

 2     /

 3     /

 4     /

 5     /

 6     /

 7     /

 8     /

 9     /

10     /

11     /

12     /

13     /

14     /

15     /

16     /

17     /

18     /

19     /

20     /

21     /

22     /

23     /

24     /

25     /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 67

 1    /

 2    /

 3    /

 4    /

 5    /

 6    /

 7    /

 8    /

 9    /

10    /

11    /

12    /

13    /

14    /

15    /

16    /

17    /

18    /

19    /

20    /

21    /

22    /

23    /

24    /

25    /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 68

 1      /

 2      /

 3      /

 4      /

 5      /

 6      /

 7      /

 8      /

 9      /

10      /

11      /

12      /

13      /

14      /

15      /

16      /

17      /

18      /

19      /

20      /

21      /

22      /

23      /

24      /

25      /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 69

```
 1      /
 2      /
 3      /
 4      /
 5      /
 6      /
 7      /
 8      /
 9      /
10      /
11      /
12      /
13      /
14      /
15      /
16      /
17      /
18      /
19      /
20      /
21      /
22      /
23      /
24      /
25      /
```

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 70

 1    /

 2    /

 3    /

 4    /

 5    /

 6    /

 7    /

 8    /

 9    /

10    /

11    /

12    /

13    /

14    /

15    /

16    /

17    /

18    /

19    /

20    /

21    /

22    /

23    /

24    /

25    /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 71

 1    /

 2    /

 3    /

 4    /

 5    /

 6    /

 7    /

 8    /

 9    /

10    /

11    /

12    /

13    /

14    /

15    /

16    /

17    /

18    /

19    /

20    /

21    /

22    /

23    /

24    /

25    /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 72

1    /

2    /

3    /

4    /

5    /

6    /

7    /

8    /

9    /

10   /

11   /

12   /

13   /

14   /

15   /

16   /

17   /

18   /

19   /

20   /

21   /

22   /

23   /

24   /

25   /

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 73

```
 1      /
 2      /
 3      /
 4      /
 5      /
 6      /
 7      /
 8      /
 9      /
10      /
11      /
12      /
13      /
14      /
15      /
16      /
17      /
18      /
19      /
20      /
21      /
22      /
23      /
24      /
25      /
```

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 74

```
 1      /
 2      /
 3      /
 4      /
 5      /
 6      /
 7      /
 8      /
 9      /
10      /
11      /
12      /
13      /
14      /
15      /
16      /
17      /
18      /
19      /
20      /
21      /
22      /
23      /
24      /
25      /
```

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo         James S. Gordon, Jr., Vol. I

Page 75

1    /

2    /

3    /

4    /

5    /

6    /

7    /

8    /

9    /

10   /

11   /

12   /

13   /

14   /

15   /

16   /

17   /

18   /

19   /

20   /

21   /

22   /

23                        [END EXCERPT]

24       Q.    You testified earlier that you used an ISP called One

25   World?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 76

1       A.    One World Telecommunications.  OWT for short.

2       Q.    When was OWT your ISP?

3       A.    Pardon me.  I've got something in my throat.

4             I didn't hear the question.

5       Q.    When was OWT your ISP?

6       A.    I believe it was from '95 to 2000 or 2001.

7       Q.    Why did you terminate its services?

8       A.    Too much spam.

9       Q.    What services did you obtain from One World, OWT?

10      A.    The Web hosting and e-mail were the two main ones.

11      Q.    Who provided your bandwidth at the time?

12      A.    I believe the same company, as I understand that.

13      Q.    Did you have your own e-mail server at the time?

14      A.    No.

15      Q.    Did you have any server at all at the time?

16      A.    No.  Just leased space on theirs.

17      Q.    Did you have a website?

18      A.    Oh, yes.  I've had a website since 1996, I think.

19      Q.    How many websites have you had since 1996?

20      A.    Oh.  I -- dozens.  I don't know if it's five dozen,

21   100.

22            I've done dozens of websites for people that I know.

23   For this Woman's Resource Center.  For fraternal organizations.

24   For church organizations.  Friends.  Family.

25            I guess -- "this organization," I should say Columbia

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 77

1    Basin College's Women's Resource Center.

2         Q.   After you terminated One World, do you recall which

3    ISP you engaged next?

4         A.   I think it was Earthlink.  I'm not positive, but I

5    think it was Earthlink next.

6         Q.   What services did Earthlink provide for you?

7         A.   Geez, I'm not sure.

8              I had two ISPs, effectively, for a long period of time

9    -- actually, several years -- so I'm not sure who did what.

10        Q.   What were the two ISPs?

11        A.   Well, at first it was -- at first it was One World.  I

12   had them for five or six years.

13             And then I went to Earthlink.

14             And then, I think, after that, I went to ValueWeb.

15             I'm -- it's not clear, but I had two at the same time

16   for, as I said, maybe two years.

17        Q.   Why did you have two?

18        A.   I wasn't happy with, again, the spam problem.  I had

19   -- trying to check one solution versus others, trying to learn

20   what worked best.

21             That's my best recollection.  I just -- I had spam.  I

22   terminated at least three companies strictly because of spam.

23   Maybe four.

24        Q.   Did Earthlink provide a spam filter?

25        A.   Yes.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

1      Q.   And you utilized it?

2      A.   Yes.  But it was very ineffective.

3           Of course, that may say a lot about my technical

4    expertise, but it was ineffective.

5      Q.   What services did Earthlink provide for you?

6      A.   I'm not certain.  I just don't recall which services.

7      Q.   Spam filtering services?

8           MR. SIEGEL:  Objection.  Asked and answered.

9      A.   What's next?

10     Q.   Spam filtering services?

11          MR. SIEGEL:  Objection.  Asked and answered.  He said

12   he didn't remember, Counsel.

13     Q.   Is that your testimony, that you don't remember?

14     A.   I -- I don't -- the only thing that I recall -- and it

15   must have been e-mail -- that's my summation or my guess there

16   -- there would have been at least e-mail, but I don't remember

17   having an Earthlink e-mail address.

18          So I'm really confused as to what services were

19   provided by whom.

20     Q.   Do you recall what services Webmasters.com provided?

21     A.   The main thing was Web hosting.

22     Q.   Did they provide an e-mail account?

23     A.   Well, with the domain, you can carry as many e-mail

24   addresses as you want with most companies.  Some will have

25   restrictions.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 79

1          I think OWT had five addresses at their domain.

2     Q.   Did Webmasters.com provide e-mail accounts to you?

3     A.   They didn't need to.

4          With my domain, I can establish my own e-mail

5     accounts.

6     Q.   How?

7     A.   You just point it to the e-mail -- the domain to their

8     servers, and be "Jim@" or "James@" or something like that.

9     Q.   Did Webmasters.com operate the mail server through

10    which you received e-mail at that time?

11    A.   I believe that's true.

12         MR. SIEGEL:  What time are we at, just for

13    clarification?

14    Q.   What services did you receive from ValueWeb?

15         MR. SIEGEL:  At what time, Counsel?  Can I get

16    clarification there so we know when we're talking about here?

17         You said, "at that time."

18    A.   Let me go back.

19         ValueWeb was my Internet service provider prior to

20    Webmasters.

21         And all of this took place in the window of 2000 to

22    maybe 2004, but I just don't know with any demarkation when one

23    started and one stopped.

24    Q.   What services did ValueWeb provide for you?

25    A.   Web hosting.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 80

1    Q.   Did ValueWeb provide e-mail accounts to you?

2    A.   That's part of the domain, yes.

3    Q.   Did they provide a spam filter?

4    A.   ValueWeb.

5         I'm almost certain they did because that was, again, a

6    problem that I had with terminating their service.  I continued

7    to get spam.

8    Q.   What services did AOL provide to you?

9    A.   Nothing, really.

10        That -- I had it, at the most, five months.  But I'm

11   thinking it was probably more like three months, and that was

12   early 1995.

13   Q.   What services did AOL provide to you?

14   A.   I'm not sure what services they even had.

15        E-mail, of course, was one that I do recall.  But I

16   didn't have a domain at that time, so I wasn't really

17   interested in anything else beyond e-mail.

18   Q.   We talked earlier about the lawsuit that you have with

19   REDACTED .

20   A.   Yes, we did.

21   Q.   You testified that --

22   A.   I'm sorry, it's not a lawsuit.

23   Q.   Thank you for clarifying.

24        You testified you had a settlement with REDACTED

25   Today.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 81

1      A.    Yes.

2      Q.    What was the nature of the e-mails that you received

3  from them?

4      A.    I think I need a clarification because I'm not sure

5  how to answer that.

6      Q.    Were they advertisements?

7      A.    Oh, yes.  They were all advertisements for their

8      **REDACTED**        .

9      Q.    What did they advertise?

10     A.    Dolls.  Little statuettes, miniatures; things like

11 that.

12     Q.    And you believe they violated statutes, correct?

13     A.    Yes.

14     Q.    Do you remember specifically what about the e-mails

15 violated statutes?

16     A.    Some of it was "subject" line.

17           Relaying of e-mail.

18           That's just off the top of my head.  There may have

19 been other things.

20     Q.    Were there problems with the "subject" lines?

21     A.    Yes.

22     Q.    What were the problems?

23     A.    I don't recall.

24     Q.    What is e-mail relay?

25     A.    Spam filters designates the -- the SpamAssassin spam

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 82

1   filter designates certain e-mail is received via a relay, and

2   they determine relays -- IP addresses, domains that are blocked

3   per Spamhaus, Spam Cop, one of those services, SPEWS and so

4   forth.

5           And they -- whenever an e-mail from one of those

6   domains comes through that, it's flagged, and SpamAssassin

7   apparently somehow gets that information and tags the e-mail.

8       Q.   Do you know whether the statute prohibits e-mail

9   relay?

10      A.   I don't think -- if you have permission, I don't think

11  it's prohibited.  But if you're doing it without permission, I

12  believe it is.

13      Q.   Do you believe **REDACTED**  was doing e-mail

14  relay without permission?

15      A.   If I had to guess, I would say yes.

16      Q.   Do you know whether -- strike that.

17           Are you familiar with the term "opt-out link"?

18      A.   Yes.

19      Q.   What is an opt-out link?

20      A.   Typically, spammers provide that, ostensively, to

21  allow a person to -- it's a scam.

22           But anyway, they say that it's to allow people to opt

23  out of -- or stop receiving communications from that particular

24  spammer.

25      Q.   Do you recall whether  **REDACTED** provided an

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 83

1   opt-out link?

2        A.   They probably did.  I'm guessing they did.

3        Q.   Did you click on it?

4        A.   No.  Not to my --

5        Q.   Have you ever --

6        A.   Many, many times.

7        Q.   I'm going to go back because I think we were talking

8   over each other.

9        A.   I interrupted you.  I apologize.

10       Q.   You testified that you don't recall whether

**REDACTED**

11                       had an opt-out link.

12       A.   That's inaccurate.

13            I wasn't -- I don't know how many of their e-mails had

14   opt-out links, but if I had to guess, it would probably be most

15   of them did.  There may have been some without.

16       Q.   Have you ever clicked on an opt-out link?

17       A.   Hundreds of times.  Maybe thousands of times.

18       Q.   Were there occasions where you clicked on opt-out

19   links and then e-mails stopped in response to clicking on the

20   opt out?

21       A.   There may have been.

22       Q.   Were there occasions when you clicked on an opt-out

23   links, requested to opt out, but e-mails continued?

24       A.   I think that is the -- probably 95 percent of the

25   time, that's the way it works.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 84

1     Q.    Please identify an opt-out link that you clicked on

2    and requested an opt out but continued to receive messages from

3    the provider.

4     A.    I did so with the defendants.

5     Q.    Which defendant?

6     A.    Both.

7           Both.

8     Q.    Adknowledge and Virtumundo?

9     A.    Yes.

10    Q.    You clicked on an opt-out link with Virtumundo; is

11   that right?

12    A.    Well, let me double -- I think I did with Adknowledge.

13          I know I did many, many times with Virtumundo.

14    Q.    When was the first time you clicked on an opt-out link

15   with Virtumundo?

16    A.    Probably early October 2003.

17    Q.    Where was the opt-out link located?

18    A.    Don't recall.

19          I don't recall exactly where it was.

20    Q.    Was it in an e-mail?

21    A.    I -- I would think that it was.  It could have been on

22   their website.  I visited the website.  I've also looked

23   through their e-mails.

24          I just don't recall where it was specifically.  I

25   could have clicked on a link that took me to a website.  I just

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo         James S. Gordon, Jr., Vol. I

1    saw it -- I'm just not certain.

2        Q.   Are you sure that you clicked on an opt-out link

3    through Virtumundo?

4        A.   Oh, yes.

5        Q.   Did you receive any kind of response from Virtumundo

6    after you entered the opt-out information?

7        A.   I don't know right now.  That was at a time where I

8    had opted out of many thousands of offers that had come

9    through.

10           I've kept about 2,000 successful unsubscribe notices

11    that I've received.

12        Q.   From Virtumundo?

13        A.   No.  From -- I guess we're only talking about

14    Virtumundo and Adknowledge.

15           So, no.

16        Q.   Have you ever received an unsubscribe notice from

17    Virtumundo?

18        A.   I don't think I've ever received anything from

19    Virtumundo even though I've tried to contact them many times.

20        Q.   You allege that you, on an Internet site or otherwise,

21    clicked on an opt-out link through Virtumundo, correct?

22        A.   That's my belief.

23        Q.   Do you recall whether, after you clicked on the link

24    or entered in any information, you received confirmation?

25        A.   I don't recall.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 86

1    Q.    How many times did you attempt to opt out through

2    Virtumundo?

3    A.    The reason why I don't recall is because I, as I said,

4    did -- between August of '03 and the end of the year, 10- to

5    12,000 opt-outs and letters, complaint letters.

6        11- to 12,000 is probably a more accurate number.

7        And your clients' e-mails would have been right along

8    with everyone else's.  I have no recollection of any specific

9    ones.  I just have records that I've done it.

10   Q.    You have records of opting out through Virtumundo?

11   A.    Through the opt-in source for Virtumundo, yes.

12   Q.    Do you have records of opting out through Virtumundo?

13   A.    For them directly, no.

14   Q.    Why didn't you maintain any records of opting out

15   through Virtumundo?

16   A.    I didn't know it was going to be necessary.

17   Q.    When was the last time you attempted to opt out

18   through Virtumundo?

19   A.    I don't recall when that was.

20   Q.    Was it during the pendency of this lawsuit?

21   A.    I may have.  I just don't know.

22        MR. NEWMAN:  I'm going to start with Exhibit No. 10.

23   The reason I'm starting with 10 is because I think that in your

24   depositions, you used about 10, and in order to avoid confusion

25   later when we designate exhibits for trial, I think it would be

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 87

1    best if they're sequential.

2              MR. SIEGEL:  That's fine.

3              (Exhibit No. 10 marked.)

4         Q.   The court reporter handed you what's been marked

5    Exhibit No. 10.

6              Have you ever seen this letter before?

7              Take time to read it.

8         A.   Oh, okay.

9              MR. SIEGEL:  Have you got a copy there, Counsel?

10             MR. NEWMAN:  I'm sorry.

11        A.   (Witness reviews document.)

12             Okay.

13             Do you need it back?  Oh.

14        Q.   Throughout this process, you'll be handed exhibits,

15   and they are original documents that will be attached to the

16   transcript.

17        A.   Okay.

18        Q.   You may keep them at your side because we'll refer to

19   them throughout the proceeding.

20             At the end of today, please return those documents to

21   the court reporter and don't take any with you because they're

22   going to be part of the permanent record.

23        A.   Okay.

24        Q.   I've provided your lawyer with a copy of this

25   document, and I will for each exhibit, and so you'll have a

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 88

1    copy for your files.

2        A.    Okay.

3        Q.    Have you ever seen Exhibit No. 10 before?

4        A.    I think I have.  I think I have.

5        Q.    What is it?

6        A.    Just what it says.  "Preservation of evidence."

7        Q.    It's a letter that my law firm sent to your lawyer

8    reminding your lawyer about your duty to preserve evidence,

9    correct?

10       A.    Yes.

11       Q.    And you say you believe you've seen this.

12       A.    Yes, I think I have.

13       Q.    So you're aware of your duty to preserve evidence,

14   correct?

15       A.    Yes.

16       Q.    And what steps have you taken to preserve evidence in

17   this case?

18       A.    I just keep stuff on my computer.  Put it -- try to

19   put it in specific folders.

20       Q.    Have you deleted any files relating to Virtumundo or

21   Adknowledge?

22       A.    Not to my knowledge.

23       Q.    Have you maintained records relating to Virtumundo and

24   Adknowledge to the extent that you have taken any steps with

25   respect to them?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 89

1      A.   Electronic records.

2      Q.   Do you have any electronic records of attempting to

3 opt out with Virtumundo or Adknowledge?

4      A.   Yes, I believe I do.

5      Q.   Have you provided those opt-out records to your lawyer

6 to provide to us in response to discovery responses?

7      A.   Yes.

8      Q.   And do you know whether your lawyer has provided them

9 to us?

10     A.   I don't know.  I think he has.

11     Q.   What forms were the record of the opt-out requests?

12     A.   CDs.

13     Q.   What form were the opt-out requests; in other words,

14 were they e-mails?

15     A.   E-mails.

16          MR. NEWMAN:  The videographer has indicated that he's

17 running out of tape, so let's take a break.

18     A.   Okay.

19          THE VIDEOGRAPHER:  This is the end of Tape No. 1 of

20 the video deposition of James S. Gordon, Junior.  The time is

21 now 11:53 a.m.  We are off the record.

22          (A discussion was held off the record.)

23          THE VIDEOGRAPHER:  This is the beginning of Tape No. 2

24 of the video deposition of James S. Gordon, Junior.  The time

25 is now 11:55 a.m.  We are on the record.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

1      Q.   You testified that you made requests to Virtumundo,

2   what we've discussed were opt-outs, right?

3      A.   That I called opt-outs, yes.

4      Q.   What is an opt-out out with respect to Virtumundo when

5   you use that term?

6      A.   What I attempted to do was to get them to cease

7   sending me e-mails.

8          I did several things.  I contacted them directly at

9   their Whois look-up information that they provide to their

10  registrar in case someone needs to contact them.

11         I directed to their legal.

12         To domain registration.

13         And maybe two for three others -- maybe more than that

14  -- to ask them to stop.

15         I then put my auto responder up.  And the auto

16  responder had a cease and desist notice attached to it for

17  anyone that sent me e-mail.  Even my friends and colleagues

18  were getting this auto response message, and they grew tired of

19  it fast.  But -- to everyone that was sending me e-mail.

20         So that means that they received hundreds of bounces

21  -- not bounces, but hundreds of auto response messages to stop

22  sending me e-mail.  Every e-mail that I received had a

23  corresponding auto responder message sent to them.

24      Q.   You requested that Virtumundo stop sending you e-mail,

25  correct?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 91

1    A.    Yes, I did.

2    Q.    And did you this through e-mail, correct?

3    A.    I did --

4          MR. SIEGEL:  Objection.  Asked and answered.  He just

5    went through the litany of ways that he requested them to stop.

6          MR NEWMAN:  That's not an appropriate objection.

7          If counsel wishes to object to the form of the

8    question, counsel should so do so.  "Asked and answered" is not

9    an appropriate objection, and I would like a clear record here.

10         I also want to make sure the witness understands the

11   subject matter we're discussing.

12   Q.    From time to time, I will repeat a question.  I will

13   attempt not to, and I'm certainly not trying to put you under

14   any pressure or harass you.  I just want to make sure we have a

15   clear record.

16         So I'll ask the question again.

17   A.    Okay.

18   Q.    You asked that Virtumundo stop sending you e-mail,

19   correct?

20   A.    Yes, I did.

21   Q.    And in what form did you make that request?

22   A.    In --

23   Q.    And just to avoid the whole asked and answered issue,

24   you testified you did this through e-mail, right?

25   A.    That's a part of it.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 92

1    Q.   How else did you request that Virtumundo stop sending

2    you e-mail?

3    A.   In '03, it started with trying to opt out through

4    whatever was available.  If it was a link or a web page or

5    whatever, I tried to do it that way.

6         I also went to their upstream providers and sent them

7    complaint letters -- let's say it was Cogent or someone else --

8    and complained to them that I was receiving e-mail.

9         It didn't stop with that.

10        I then resorted to the Whois look-up information to

11   try to get them to stop that way.

12        I then went to auto responders.

13        And it still hadn't stopped.

14        So, eventually, we ended up filing a lawsuit.

15   Q.   You testified that you clicked on a Web link; is that

16   right?

17   A.   That's my belief.

18   Q.   Upon what basis do you have that belief?

19   A.   Well, I received some successful unsubscribes, and I

20   typically did that action in groups.  I would sit down with

21   maybe day one or -- let's say Monday's e-mails and go through

22   them.

23        Then I'd sit down again maybe on Wednesday or Friday

24   or some other date.

25        And I did them in groups.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 93

1    Q.   Did you retain the successful unsubscribes from

2   Virtumundo?

3    A.   No.   I only retained it from EmailPrize and a few

4   others at that date.

5         I didn't retain them again until -- at least, I'm

6   guessing -- until January, February, March; in that time frame.

7    Q.   You testified you sent Virtumundo e-mails, correct?

8    A.   Yes, I did.

9    Q.   And asked them to stop sending you messages?

10   A.   Yes.

11   Q.   Did you retain copies of those e-mails?

12   A.   And I submitted them to you all.

13   Q.   Are there any e-mails that you sent to Virtumundo that

14  you haven't submitted to us in this case?

15   A.   I don't think so.

16   Q.   You testified you clicked on a Web link; is that

17  right?

18   A.   That's my belief.

19   Q.   You responded that it is your belief.

20        Are you not sure whether you clicked on a Web link?

21   A.   I did 10 -- 10-, 12,000 of them.

22        So I just can't be positive right now on who I sent it

23  to.   I only have a few names that I've retained.

24   Q.   Is it possible you did not click on a Web link for

25  Virtumundo?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 94

1    A.   No.  Because I received so much from them that -- the

2    major spammers, I did for sure.

3         And the fact that I also have upstream providers for

4    Virtumundo means that I did first try the opt-out.  That was

5    the sequence.  It was an escalation or acceleration process or

6    whatever you want to call it.  So I went to the next level each

7    time.

8    Q.   So you're confident you clicked on a Web link?

9    A.   No, I'm just confident I contacted them.  And if the

10   Web link was available, I used it.

11   Q.   But you don't know whether you clicked on a Web link?

12   A.   To be absolutely positive, I can't say that I did

13   because I have no evidence that I did.

14   Q.   Did you click on a link in any e-mails you received

15   from Virtumundo requesting that Virtumundo stop sending you

16   messages?

17   A.   Again, that's my belief, that I did that.

18   Q.   How many times?

19   A.   I don't know.

20   Q.   Did you save any evidence or printouts of documents

21   arising out of you clicking on those links?

22   A.   Other than the EmailPrize and maybe one or two of

23   those other gateways or portals.

24        I didn't save records to that degree during '03.

25        I didn't really start saving records until '04.

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 95

1          So I don't have any proof that I opted out at that

2    point specifically to your client.

3          Q.   Did you click on any links in a Virtumundo e-mail

4    requesting not to receive messages after 2004?

5          A.   I may have.  I don't know for sure.

6          Q.   Do you have any records of that in that regard?

7          A.   I would have to check.  Nothing comes to mind.

8          Q.   Have you clicked on any such links in the last year?

9          A.   I don't know.  I may have.

10         Q.   But you have no record of that?

11         A.   I'm not going to say I don't have a record.  I've kept

12    a lot of records.

13         I've got maybe an e-mail repository of 3 or 4 million

14    e-mails and ten of thousands of records.  So it could be in

15    there somewhere.

16         Q.   You understand you have a duty to search those records

17    to determine whether they're responsive to the discovery

18    requests in this lawsuit, correct?

19         A.   No, I don't understand that.

20         Q.   You have that duty.

21         A.   Okay.

22         Q.   But you don't understand you have that duty; is that

23    right?

24         A.   No, I don't understand that.  Or didn't.

25         Q.   Do you understand that now?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. I

Page 96

1       A.    You've explained it, yes.

2       Q.    Are you going to make an effort to go through those

3    e-mails and the other records you just testified about to

4    determine whether there's documents responsive to our discovery

5    requests?

6       A.    Yes, I will do that.

7             I'll likely find more spam.  But, yeah, I will do

8    that.

9       Q.    To whom did you address e-mails at Virtumundo

10   requesting that they stop sending you e-mails?

11      A.    Other than the legal department, there were several

12   others, and I would have to refresh my memory with an actual

13   e-mail, which I've provided to you.

14      Q.    Did you ever receive a response?

15      A.    Yeah, there was something sent back to me.  It was

16   kind of a form letter.

17      Q.    Do you remember the substance of the form letter?

18      A.    Not exactly, no.

19      Q.    Did you produce that form letter in the scope of the

20   discovery in this lawsuit?

21      A.    I believe I did.

22      Q.    Do you remember who signed it?

23      A.    No.

24      Q.    Other than e-mail advertisements, have you received

25   anything from Virtumundo?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 97

1          By way of example, a letter from Virtumundo in

2     response to one of your inquiries or the like.

3          A.    I don't believe so.

4          Q.    Have you ever made any attempt -- strike that.

5                Have you ever requested to Adknowledge that it stop

6     sending you e-mails?

7          A.    Other than the auto responder, I don't believe I have

8     done anything more.

9                I've -- I don't think I've done anything more than

10    that auto responder.

11         Q.    Do you believe that Adknowledge received the messages

12    that the auto responder sent?

13         A.    I would have to double-check.  I think they did.  In

14    fact, I think I even received a few bounces from Adknowledge.

15         Q.    Do you believe that Adknowledge received the messages

16    that the auto responder sent?

17         A.    Yes.

18         Q.    Upon what basis do you base that belief?

19         A.    Because the auto responder is virtually infallible.

20    If you send an e-mail, it will bounce -- send something back to

21    you.

22         Q.    What's the process of the auto responder?

23         A.    Don't know if you're talking about the technical part

24    of it.

25                I just know that if you use it -- and I've tested it.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 98

1    If you use it, it will send an e-mail message.  Any time you

2    send a message, you'll get a message.

3         Q.   You believe that you receive messages from Adknowledge

4    and the auto responder sent a message in reply, correct?

5         A.   During certain windows of time, yes, that's true.

6         Q.   Do you know whether the auto responder sent to the

7    "reply to" address or the "from" address or both?

8         A.   I'm not sure.

9         Q.   How do you know Adknowledge received it?

10        A.   It didn't bounce back.

11        Q.   Do you know from what address the auto responder

12   message came?

13        A.   I'm not sure if I understand that.  From --

14        Q.   Well, your e-mail address is James@Gordonworks.com,

15   correct?

16        A.   No, it's Jim@Gordonworks.

17        Q.   And if I send you a message and you hit "reply," it

18   will come from Jim@Gordonworks.com, correct?

19        A.   The recipient.  Okay.

20        Q.   Is that right?

21        A.   Yes, it would.

22        Q.   When the auto responder responds to a message, is that

23   message from Jim@Gordonworks.com or from a different e-mail

24   address?

25        A.   Multiple.  It was from -- I don't know how many.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 99

1    Maybe all.  It could have been as many as the 23, 24 that I had

2    at that time.

3            I believe it was for all of the Gordonworks.

4        Q.    There's only one "from" address in an e-mail, correct?

5        A.    In the course -- normal course of things, yes, that's

6    true.

7        Q.    When the auto responder sent messages, was there only

8    one "from" address?

9        A.    I would have to see.

10            This -- without seeing something, I just -- I don't

11   have any basis to say yes or no.  I'm just not sure.  I would

12   have to see it.

13       Q.    Do you believe that Adknowledge sent e-mails to

14   Jim@Gordonworks.com?

15       A.    I don't know offhand.

16       Q.    If Adknowledge had sent e-mails to

17   Jim@Gordonworks.com, would it have received a message from the

18   auto responder?

19       A.    It depends.  I think in February and/or March of '04,

20   that would have been true.

21            No, that would have been Virtumundo, I think, at that

22   time.

23            Again, without seeing it, I'm not certain.  I would

24   have to see it.

25       Q.    During what period of time was the auto responder

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 100

1    active?

2        A.    Most of 2004.

3        Q.    Do you know when in 2004 you began using the auto

4    responder?

5        A.    I think it was February.

6        Q.    And do you know when in 2004 you stopped using the

7    auto responder?

8        A.    I'm guessing October.

9        Q.    Did you ever call Virtumundo by telephone and request

10   that they stop sending you e-mail?

11       A.    No.

12       Q.    Did you ever called Adknowledge by telephone and

13   request that it stop sending you e-mail?

14       A.    No.

15       Q.    Did you ever send an e-mail to any particular person

16   at Adknowledge requesting that it stop sending you e-mail?

17       A.    They never identified anyone in their e-mails to send

18   it to.

19       Q.    Did you ever send registered mail to Virtumundo or

20   Adknowledge requesting that either stop sending you e-mail?

21       A.    No.

22       Q.    What did you contend were the problems with the

23   messages that Commonwealth Marketing Group sent you?

24       A.    I don't recall specifically.

25       Q.    Do you believe that the messages that you received

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 101

1    from Commonwealth Marketing Group violated a statute?

2         A.   That probably was my belief at the time.

3         Q.   But you don't remember how they violated the statute?

4         A.   Not offhand.

5         Q.   How many lawsuits did you file in 2003?

6         A.   Three, because that was the first time.

7         Q.   And we discussed each of those lawsuits, correct?

8         A.   I think so.

9         Q.   Did you file lawsuits in 2004?

10        A.   I just don't recall who I filed them -- I don't know

11   the sequence.  I know that I filed 15 to 20 lawsuits.  I just

12   don't know when they were filed.

13        Q.   15 to 20 lawsuits over what period of time?

14        A.   Since December of '03.  I think that's the ballpark

15   figure.

16        Q.   To the present?

17        A.   Yes.

18        Q.   How many of those lawsuits have settled?

19        A.   Probably less than -- well, less than half.

20             I guess maybe seven, eight, six.  I'm not sure.

21        Q.   Was money paid to you in each of those six to eight

22   settlements?

23        A.   There's one that I can't talk about.

24             But as a rule, that is the case.

25        Q.   Have you ever dismissed a lawsuit, other than the one

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 102

1    against Mr. Hansson, for any reason other than an agreement

2    with the other party to settle?

3         A.    There's one I can't talk about.

4               But, again, as a rule, that was the case.

5         Q.    There's one you can't talk about?

6         A.    Uh-huh.

7         Q.    Why can't you talk about it?

8         A.    Confidentiality.

9         Q.    You dismissed it, but it wasn't dismissed pursuant to

10   an agreement; is that right?

11        A.    I'm not going to talk about it.

12        Q.    You testified that you have filed 15 to 20 lawsuits

13   since December of 2003.

14              Did they all allege violations of laws governing

15   e-mail?

16        A.    Yes.

17        Q.    Have you ever been to trial on any of these cases?

18        A.    Not yet.

19              Something to look forward to, though.

20        Q.    Has a court ever dismissed any of the cases upon a

21   motion?

22        A.    Hansson, I think, is the only case that I know of.

23        Q.    How many lawsuits do you have pending?

24        A.    I don't know.

25        Q.    Have you ever been sued?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 103

1      A.   Yeah.   Impulse Marketing Group just sued us, I think,
2  in '05.  '04, '05.

3      Q.   Is that lawsuit in the nature of a counterclaim --

4      A.   Yes.

5      Q.    -- or third-party complaint or is it a separate
6  lawsuit?

7      A.   My understanding is that it's a countersuit.

8      Q.   It's part of the same case as one that you brought
9  against Impulse Marketing, correct?

10     A.   I don't understand it from a legal term.

11          But I'm just guessing that they're all, part and
12  parcel, the same.

13     Q.   Fair response.

14          Is it the same judge as the case --

15     A.   Yes.

16     Q.    -- you brought against Impulse Marketing Group?

17     A.   Yes.

18     Q.   You're married?

19     A.   Yes, I am.

20     Q.   How long have you been married for?

21     A.   30 years.

22     Q.   Congratulations.  That's awesome.

23     A.   Hard work.

24     Q.   Have you ever been convicted of a crime?

25     A.   Never.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 104

1            I guess I should ask, what's a crime?

2            But in my -- to my knowledge, I have no criminal

3    record as a juvenile or as an adult.  Misdemeanor nor felony.

4        Q.    And when you're asking for clarification, other than a

5    traffic incident, speeding or the like --

6        A.    Okay.

7        Q.    -- has there been any type of --

8        A.    No.  No.

9        Q.    Other than Impulse Marketing Group filing a

10   counterclaim, have you ever been sued?

11       A.    Okay.  This is one -- I'm not certain how to answer

12   that.

13           When there is a case of a suit and a countersuit,

14   that's where, I guess, I'm getting hung up.

15       Q.    Okay.  I'm not trying to trick you.

16       A.    I'm trying to understand.

17       Q.    You are the plaintiff in the Impulse Marketing Group

18   lawsuit, correct?

19       A.    Yes.

20       Q.    And they have a claim against you, which I'm calling a

21   counterclaim, and you're not sure if that's what it is.

22           But there is a claim in that lawsuit that they're

23   bringing against you, correct?

24       A.    Yes.

25       Q.    Is there any lawsuit that you can remember where you

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 105

1    were named as the defendant and you weren't the plaintiff?

2           And my question is in all of time.  It's not just

3    limited to the past few years.  If you can remember.

4        A.   I -- I know I've been involved in legal squabbles

5    about a couple of things.  But I think it's as a plaintiff, if

6    I recall.

7           I'm not sure, is the answer.  I'm sure it's part of

8    the record.  If we have to do some research, I could find that.

9           As a plaintiff, I can think of other things, but as a

10   defendant, nothing comes to mind right now.

11       Q.   As a plaintiff, have you ever been involved in a

12   lawsuit that didn't deal in e-mail marketing law violations or

13   the like?

14       A.   Yes.

15       Q.   When?

16           THE WITNESS:  Bob, how far back do we have to go with

17   this?

18           MR. SIEGEL:  As long as you can remember.

19       A.   Oh, geez.  I think it was 1992 or '3, I had dispute

20   with a company I worked with about wages.  And I went pro se,

21   lost that case, and they got attorneys' fees.

22           That comes to mind.

23       Q.   That was in 1992?

24       A.   Oh, I don't know for sure.  I'm just guessing.  That's

25   about the time.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 106

1          It was early '90s. Could have been '91, '2 or '3.

2     Q.   What was the name of that employer?

3     A.   Columbia Basin Minority Economic Development

4   Association.

5     Q.   Any others in which you were a plaintiff?

6     A.   There were two as The Gordon Group, small claims, and

7   I just don't know the details right now.  One for me and one

8   against me, in terms of the judge ruling.

9     Q.   Let's start with the first one for you.

10    A.   I don't -- I don't remember which was which.

11    Q.   Who was the defendant?

12    A.   Don't know.

13         I don't know either of them right now.  This is 20

14   years ago.

15    Q.   What were the nature of the disputes?

16    A.   Just small claims matters.

17    Q.   Claims for what?

18    A.   Without looking at it -- it has been out of my mind

19   since whenever it was.  1985, '6 or '7; something like that.

20    Q.   Any other lawsuits that you can recall?

21    A.   No, there were probably -- that's all that comes to

22   mind right now.  If I took time to be refreshed, I probably

23   could --

24         Oh, an employment discrimination complaint.  1981, I

25   think it was.  1980.  Could have been '79.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 107

1    Q.    What was the nature of the claim there?

2    A.    Employment discrimination.

3    Q.    You alleged that you were discriminated against?

4    A.    Yes.

5                    [START EXCERPT]

6    /

7    /

8    /

9    /

10   /

11                  [END EXCERPT]

12   Q.    I'm going to suggest that we take a lunch break.

13   A.    Okay.

14   Q.    And we'll return after and continue questioning.

15   A.    Okay.

16         MR. NEWMAN:  So we're off the record.

17         THE VIDEOGRAPHER:  The time is now 12:21 p.m.  We are

18   off the record.

19         (A lunch recess was taken.)

20         THE VIDEOGRAPHER:  The time is now 1:38 p.m.  We are

21   on the record.

22

23              E X A M I N A T I O N (Cont'd)

24   BY MR. NEWMAN:

25   Q.    Godaddy currently provides you services, correct?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 108

1    A.    That's correct.

2    Q.    That are their services?

3    A.    They provide a dedicated server for me.

4          And on the dedicated server, I can put all kinds of

5    software on it.  There's mail, Web hosting available, for

6    starters.

7    Q.    What else?

8    A.    Just other things.

9          If I -- I've added SiteBuilder, which is an

10   opportunity for all my clients to build their own websites.  Or

11   other people that I know, if they want to practice building

12   websites, they can use that.

13   Q.    The SiteBuilder service is offered by Godaddy,

14   correct?

15   A.    No, it's offered by SWSoft.

16   Q.    What's SWSoft?

17   A.    A company that builds SiteBuilder and other

18   applications.

19         The two companies coordinate the offering, though,

20   because SWSoft has an administrative control panel that Godaddy

21   offers to its clients.

22   Q.    How much do you pay Godaddy each month?

23   A.    It's done automatically and we just upped it.

24         I don't know.  It's about $200 a month.

25   Q.    For the $200, do you receive any services in addition

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 109

1    to the dedicated server?

2        A.    Yes.    There is one other.    It's a technical assistance

3    program where they go in and actually do the behind the scenes

4    work on the server with the server.

5        Q.    Who owns the server?

6        A.    I guess they own it.

7              I believe my relationship is a lease.

8        Q.    How do you access the server?

9        A.    I go to my interface, the Plesk, P-L-E-S-K, and put in

10   my password and user i.d. and can work with the administrative

11   control panel to do what I need to do.

12       Q.    What type of tasks do you perform via the Plesk

13   interface?

14       A.    Set up new e-mail accounts.

15             Set up new domains.

16             I don't really configure SiteBuilder, but I can

17   practice sites and things like that as well.

18             But most of it's, you know, keeping control of -- of

19   statistics, make sure people don't go over their limits and

20   things like that.

21       Q.    Go over what limits?

22       A.    Their monthly limits in terms of bandwidth, how much

23   bandwidth they can use and how much space they can occupy on

24   the physical space on the server.

25       Q.    Who is "they"?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 110

1    A.    My clients.

2    Q.    What are the monthly limits?

3    A.    I think it's 600 megabytes for bandwidth, and there's

4    250 megabytes for disk space.

5    Q.    How much disk space is on the server in aggregate?

6    A.    I think it's 120 gigabytes.

7    Q.    How much bandwidth can you access through Godaddy for

8    that server per month?

9    A.    Currently, 500 gigabytes, I think, is my monthly

10   limit.

11   Q.    500 gigabytes of what?

12   A.    Of bandwidth, of traffic that they'll allow on the

13   server.

14   Q.    What's your limit at a single time?

15   A.    I don't know.

16   Q.    You believe that you have access to 500 gigabytes of

17   data transfer per month --

18   A.    Yes.

19   Q.    -- through your server?

20   A.    Yes.

21   Q.    Have you ever used 500 gigabytes?

22   A.    No.  I haven't come close.

23   Q.    Do you know the most you've ever used?

24   A.    No, I don't.

25   Q.    Is the server that you lease from Godaddy backed up?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 111

1      A.    Currently, no.

2            When I had the virtual dedicated server, that was, I

3      believe.

4      Q.    You don't have the virtual dedicated server now?

5      A.    No, I don't.

6      Q.    What is a virtual dedicated server?

7      A.    Where I share a server with -- I don't know how many

8      other people.

9      Q.    The reason you're using the virtual dedicated server

10     now is because you have simply a dedicated server, right?

11     A.    That's right.

12     Q.    One box that's reserved for you?

13     A.    That's correct.

14     Q.    Have you ever seen the box?

15     A.    No, I haven't.

16     Q.    Do you know what kind of computer it is?

17     A.    They had that information.  I mean, it's in my Plesk

18     interface.  I would have to go on there to actually see what

19     type of --

20           It's, likely, probably a Pentium box that runs Apache

21     or something on there.

22           It's a Uni- -- not a Unix -- Lenox box.  Lenox

23     software running on Microsoft -- not Microsoft, but a regular

24     PC.

25     Q.    Was it your decision that that computer should run

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 112

1     Lenox?

2          A.    No.

3          Q.    Whose decision was it?

4          A.    I assume it was Godaddy.

5          Q.    If you wanted the box to run Windows, could you?

6          A.    I haven't asked that question.

7          Q.    Do you know who makes the Lenox product that's on that

8     box?

9          A.    No, I don't.

10         Q.    Do you have root access to the box?

11         A.    Not for -- I'm sorry, I interrupted you.

12               Not for the dedicated server.

13         Q.    The manner in which you answered that question

14    indicates you might have root access for something else.

15         A.    Prior to having the dedicated server, I had the

16    virtual dedicated server up until November of last year, and

17    that did have a provision for root access, which I never used.

18         Q.    But not root access for the whole server, right?

19         A.    I wouldn't think so.

20               No, I don't think it would be.

21         Q.    Because other people shared that server?

22         A.    That's correct.

23         Q.    Have you asked Godaddy for root access to the server

24    that you lease?

25         A.    No, I haven't, because I had the technical assistance

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 113

1    program.  They'll do all the work.

2        Q.   How many domain names do you register?

3        A.   Me personally?

4        Q.   You personally.

5        A.   Okay.

6        Q.   Or Omni or Gordonworks.

7        A.   I have three or four that I own.

8             And I have set up just two recently that I just

9    advanced my brother and another friend the fee for setup, and

10   at some point -- I'll probably end up just making it again.

11            But I just set up two new ones and it's currently in

12   my name, but we'll transfer it to the them in the near future.

13       Q.   Is Godaddy the domain name registrant?

14       A.   Yes.  Yes.

15       Q.   Godaddy provides a DNS for your domain names?

16       A.   Yes.  My belief, that's true.

17       Q.   You don't operate your own DNS servers, correct?

18       A.   My understanding is that it's all managed by their

19   technical assistance group because I have -- I've had basically

20   no duties to do anything with that server other than to set up

21   the software to serve the clients.

22       Q.   You don't operate your own DNS server, correct?

23       A.   My understanding is no, I don't.

24            But who knows?  That's my understanding.

25       Q.   Do you know what an IP address is?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 114

1     A.    Internet protocol address?

2           I have one.  I've had three.

3     Q.    When you say you have one and you've had three, what

4  do you mean?

5     A.    I'm still harking back to the virtual dedicated

6  server.  I had three assigned to me.

7           With this, I have one, but I understand that they're

8  assigning another to an FTP service that I'm interested in, and

9  I can get a third as well.

10    Q.    Are you familiar with ARIN, the American Registry for

11 Internet Numbers?

12    A.    That depends on what "familiar" is.

13          I can look up who domains belong to.

14    Q.    Can you look up who Internet protocol addresses belong

15 to?

16    A.    I don't use ARIN.  I just use other applications to do

17 look-ups.

18    Q.    What applications?

19    A.    I started with Sam Spade.

20          I've done dnstools.com.

21          SmartWhois.

22          CompleteWhois.

23          AllWhois.

24          And there are probably others that I've used.

25    Q.    And on any of those websites that you just mentioned,

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 115

1    can you find out to whom an IP address is registered?

2        A.    Usually, they -- let's see.   How do I answer that?

3              Yes, but I believe you typically get blocks of IPs.

4    That's my recollection, that you get blocks, who the blocks

5    belong to.

6        Q.    And the IP address that you testified is assigned to

7    your server, who is that IP address registered to?

8        A.    I'm guessing Omni.

9        Q.    And upon what information do you base that belief?

10       A.    Well, Omni is the one that leases, owns the server.

11             I guess "leases" is a more proper term.

12       Q.    Have you ever done a search on any of the tools you've

13   testified about earlier regarding the IP address that you

14   believe is registered to Omni?

15       A.    I don't recall anything right now.   I could have done

16   it sometime, but nothing comes to mind.

17       Q.    Do you have any information other than your guess that

18   the IP address assigned to that server is registered to Omni?

19       A.    Please repeat that.

20             (The requested testimony was read.)

21       A.    Somehow I'm not understanding that.

22       Q.    I'll rephrase in an attempt to make it easier for you.

23       A.    Okay.   Okay.

24       Q.    You testified earlier that there is an IP address

25   assigned to the server that you lease from Godaddy, correct?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 116

1      A.    Yes.

2      Q.    And you testified that you believe that the IP address

3    assigned to that server is registered to Omni, correct?

4      A.    Right now -- I'm not sure.  I'm just guessing.  That's

5    just my best guess.

6      Q.    You don't know?

7      A.    I don't know.

8      Q.    Have you paid any fees for an IP address with Godaddy?

9      A.    Other than my monthly fee, I don't know if I have.

10           I can't think of anything else.

11     Q.    Do you have FTP access to the server that you lease

12   from Godaddy?

13     A.    I don't quite understand what you mean.

14           I can FTP files to Gordonworks if I chose to because

15   I've set that up.

16           But in terms of having an FTP site, where can go in

17   and get a 450 megabyte file.  That I haven't formally set up.

18           I tried to do that maybe -- about the time we filed a

19   summary judgment motion, there was some files that I wanted to

20   put on the Internet, and I talked with them about it.

21     Q.    If you wished to have a copy of the hard drive in that

22   server, could you obtain one?

23     A.    I don't know.  I've never asked.

24     Q.    Do you have a computer that you own?

25     A.    Yes, I do.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 117

1    Q.   How many?

2    A.   I have three that I use; two for business and one for

3    my studies.

4    Q.   What kind of computers?

5    A.   I built them myself.  So they're no brand, I guess.

6    Q.   Where did you learn to build computers?

7    A.   From my 14-year-old son.

8    Q.   You testified you use two computers for business.

9    A.   Yes.

10   Q.   What business is that?

11   A.   For my Omni business.

12        And I use -- let's see.

13        The Omni business.  Occasionally, I'll do my studies

14   on that depending on -- my laptop was unavailable to me for

15   several months.  So I've done my studies as well as my business

16   on there.

17        And I see it as two businesses.  I see the spam

18   business, if I can call it that, and there's also the business

19   of Omni, which is the software development, proprietary stuff

20   that I was mentioning earlier.

21   Q.   What is the "spam business"?

22   A.   The spam business involves reclaiming my domain name

23   from spammers.

24   Q.   How does that business operate?

25   A.   Basically, I notify -- first, I've done a little bit

Buell Realtime Reporting, LLC
206-287-9066

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 118

1    of research, and of course, I've retained attorneys.

2          Notifying spammers that they're violating the law, ask

3    them to stop, ask them to not use my Gordonworks domain, and

4    those that refuse to after as many attempts to do the things I

5    mentioned earlier, they don't, some of them, we file lawsuits

6    against.

7        Q.    Does the spam business have any customers?

8        A.    I think both of us have something in our mind when we

9    say "customers."

10         I don't understand what you mean by it, but if I can

11   just give you what I understand by that, my clients, in a

12   manner of speaking, are customers because they have a spam

13   problem as well.

14         I talk to university groups and so forth about spam.

15   So, theoretically, some of those people could be customers in

16   that sometimes I follow up with them and so forth.

17         So as far as -- that's the extent of what I'm

18   referring to as customers.

19       Q.    Do your customers compensate you for the spam

20   business?

21       A.    The agreement that I had with my customers is that the

22   first two years of running their business, that there would be

23   no monthly charge -- and the monthly charge in our area is

24   about $45 to $50 a month for the same set of services -- until

25   they got their websites up and running.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. I

Page 119

1           So, two years.

2      Q.   What set of services are you referring to?

3      A.   Well, it's strictly e-mail presently.  And sometimes

4  when there are viruses and things like that, I'll help them if

5  they need their hard drive reformatted or something like that.

6           And then there are other people I can refer them to,

7  folks that I know that are network administrators or do have

8  specialized expertise.

9      Q.   Did you testify that you believe e-mail services

10 require a $40 a month charge as a market rate?

11     A.   No.  What requires that amount is the services,

12 meaning the Web building, the Web hosting, the 250 megabytes of

13 disk space and so forth.

14          I do a lot of work for them, including some of the

15 troubleshooting that I can do with their computers.

16     Q.   Do you believe Web building, hosting and 250 megabytes

17 of disk space has a market rate of $40 per month?

18     A.   In our area, yes.

19     Q.   What is your area?

20     A.   Tri Cities.

21     Q.   Do you perform those services for free?

22     A.   I said for the first two years, I would provide the

23 services.

24     Q.   Have you ever received any payment for those services?

25     A.   We haven't gotten to the two years yet.

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 120

1    Q.    Why are you doing it for free for two years?

2    A.    That's just a choice I made.

3    Q.    How many customers do you have?

4    A.    12, 15; something like that.

5    Q.    How did you obtain those customers?

6    A.    Technically, that answer isn't wholly correct.

7          There's another group that I set up the domain for,

8    and that's a group of about 110 or -20 people that are related

9    to GreatNorthwest-Alpha.org.  That I just haven't started doing

10   the work on.  I've set up the e-mail address for anyone that

11   wants to start, but we've not gone into actual setup of all of

12   the --

13         So, presently, there are active 12 to 15 people, and

14   those that are prospective, sometime this year, another 110 or

15   -20 people.

16   Q.    Will any of them pay you money for services?

17   A.    They will offset -- yes.  Yeah, they'll offset costs.

18   Q.    How much?

19   A.    We haven't determined that yet.

20   Q.    And upon what information do you base your belief that

21   they will pay you anything at all?

22   A.    First of all, they said they would.

23         And they know that there is a cost involved in doing

24   this.  And that would --

25   Q.    Doing what?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 121

1      A.    Setting up all of the e-mail addresses and having a
2    monthly contract with Godaddy to provide Web hosting.
3      Q.    Have you ever suggested that these people sign up with
4    Godaddy directly?
5      A.    Some of them did.
6      Q.    Do you know why these people would turn to you for
7    these services as opposed to Godaddy when these types of
8    services are generally $7 a month or so?
9      A.    Well, the fact that Godaddy didn't offer them two full
10   free years of service might have been a reason.
11     Q.    You testified that you have two lines of business; one
12   you referred to as the spam business and the other is software
13   development.
14     A.    Yes.
15     Q.    What's the nature of the software development
16   business?
17     A.    It is software development.  It takes pen and paper
18   product that I have and turns it into a Web-based application.
19     Q.    Who is writing that Web-based application?
20     A.    Well, we started with Meiers, Incorporated in
21   Kennewick, M-E-I-E-R. They were helping with the demo portion
22   of the software.
23           And Battelle is providing what's called a technical
24   assistance program grant to do a lot of the work in terms of
25   helping me learn about the documentation process, software

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

                                                           Page 122

1    development cycle and all those kinds of things.  So they're

2    providing a lot of administrative support.

3           However, I'm considering going to them to do the whole

4    job.  The price would go up two to three times, but I think I

5    can get the job done faster.

6       Q.   What's the nature of the software?

7       A.   It entails something I call vision mapping; helping to

8    take ideas from something ethereal to a finished product.

9           I think there is a track that all ideas run on and I

10   think I've identified that track.

11      Q.   Do you pay Meiers and Battelle?

12      A.   I have, yes.  Just Meiers.

13          I haven't paid Battelle.  It's a grant that I received

14   through DOE, Department of Energy.

15      Q.   Do you ever order products or services on-line?

16      A.   All the time.

17      Q.   What types of?

18      A.   Mostly software, but I've ordered lots of things.

19          The software comes to mind immediately.  10, 12 times

20   a year, if not more.

21      Q.   From whom do you purchase that software or have you

22   purchased the software?

23      A.   The most recent, Visualware, which is a company that

24   markets EmailTrackerPro.  They market Visual Route.  Visual

25   IPTrace, it's called.  Visual IPTrace.  SmartWhois.  Commview.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 123

1    MailWasherPro.

2           I've ordered things like Adobe Acrobat Pro on-line

3    through one of the academic resellers.

4           I order health and nutrition products all the time via

5    the Internet.

6    Q.   When you order these products, do you submit your

7    e-mail address?

8    A.   I submit -- yes, Jim@Gordonworks.

9    Q.   And in connection with that submission, do you

10   generally read terms and conditions?

11   A.   Not generally.

12   Q.   Are there terms and conditions at these websites where

13   you submit your e-mail address?

14   A.   I guess.  I guess most of them would have it nowadays.

15   Q.   But you've never read them?

16   A.   Seldom.  I can't even tell you which ones I've read.

17   Q.   Why?

18   A.   I just don't waste time doing that.

19          And I only submit the Jim@Gordonworks.

20   Q.   When you submit your e-mail address and purchase

21   software, do you ever click on a button that says "I agree" or

22   "I accept" or the like?

23   A.   I typically decline to receive anything from

24   third-party marketers.

25          I only agree to updates.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 124

1    Q.   When you submit your e-mail address and purchase

2    software, do you ever click on a button that says "I agree" or

3    "I accept" or the like?

4    A.   I don't click on it.

5         If it's already defaulted there, I probably don't

6    change it most of the time.

7    Q.   Have any of the companies from which you have

8    purchased software marketed to you by e-mail?

9    A.   No one comes to mind.

10        I typically go out and search for what I need, so I

11   can't think of one offhand.  Unless, again, one of those boxes

12   was checked.

13        And there is one company, now that you mention that,

14   Zone Alarm.  And apparently, it has an agreement with a lot of

15   people to send related software to me.

16        That's the only one that comes to mind right now.

17   Q.   You testified you purchased Acrobat Pro, correct?

18   A.   Yes.

19   Q.   Did you purchase that from Adobe?

20   A.   No, from an academic reseller.

21   Q.   Has the academic reseller ever sent you e-mails

22   marketing or promoting its services?

23   A.   I would have to check my e-mail.

24        They may have.  I get so many e-mails, I'm just not

25   sure right now.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 125

1     Q.    From whom did you purchase MailWasherPro on-line?

2     A.    I don't recall.  It could have been from Tamosoft,

3    T-A-M-O soft.

4          It could have been directly from Visualware.

5          I'm not sure who I purchased it from.

6     Q.    Has Tamosoft or Visualware ever sent an advertisement,

7    marketing or promotion to you by e-mail?

8     A.    Updates, they do.  Typically it's in their software.

9    It says "time" or "an update" type stuff.

10     Q.    You testified earlier about your definition of spam,

11    and I believe part of that definition included the word

12    "unwanted" or an adjective similar to that.

13     A.    Okay.

14     Q.    Do you believe that there are legitimate e-mail

15    marketing pieces?  In other words -- I'm going to strike that

16    question.

17     A.    Okay.

18     Q.    Do you object to the receipt of any e-mail promotions

19    or marketing or only certain e-mail promotions and marketing?

20     A.    When there is a relationship, no, I don't object to

21    that.

22          When there's no relationship, there may have been an

23    exception or two.  I just can't recall anything right now.

24          But as a rule, I do object when it's unsolicited.

25     Q.    You object to all unsolicited commercial e-mail,

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 126

1    correct?

2        A.    I'm not going to say 100 percent, because I'm sure

3    there's something at some time that I may have responded to.

4              I just don't recall anything right now.

5        Q.    So you believe that at some point, you received an

6    unsolicited commercial e-mail to which you responded?

7        A.    It's very likely that I have.

8        Q.    Were you grateful to have received it?

9        A.    I don't recall the emotion, but maybe I was.  If I

10   responded, there had to be some level of gratitude.

11       Q.    You testified that you don't object to commercial

12   e-mail when "there is a relationship."

13       A.    That's true.

14       Q.    What did you mean by that?

15       A.    Well, with Tamosoft and Visualware, they have related

16   products that developers and unaffiliated companies sell, and

17   they want to send notices.  And I've received those notices

18   from those allied companies.

19       Q.    You're familiar with the term "opt-in"?

20       A.    Pardon me?

21             Yes.

22       Q.    What does that term mean to you?

23       A.    Typically, when you take an affirmative step by saying

24   yes to -- whether it's by way of e-mail or assent to it in

25   terms of conversation -- when you say, I agree to receive what

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 127

1    it is that you have.

2        Q.   Are you familiar with the term "subscribe" as applied

3    to e-mail?

4        A.   I think I am.

5        Q.   What is your understanding of that term?

6        A.   Sometimes it's the same thing.

7        Q.   Have you ever opted in or subscribed to receive

8    e-mail?

9        A.   Yes.

10       Q.   How many times?

11       A.   I don't know.  I think virtually all of them were in

12   2003.

13            Could have been 100, 150 times all told.

14            But it wasn't me directly.  It was me on behalf of

15   people.

16            For my own account, so to speak, I'm not sure how

17   many, but it's much fewer.  Maybe you can count it on a hand or

18   two.  It's fewer times.

19       Q.   What do you mean when you testify that it wasn't you

20   directly, it was on behalf of people?

21       A.   No, what I meant was it was not for my own account.  I

22   asked my wife, I said, this is something out there, would you

23   like it, because there's something you've already won or a

24   prize you already supposedly are being offered.

25            And I've asked my son, I've asked a friend, and they

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 128

1    say yes.  That's what we did back in '03.

2        Q.   Why were you asking your wife and son and friend?

3        A.   Free makeup, $125 worth.  As much as she buys?  I

4    figure, hey, if she's already won it, why not try to get the

5    offer.

6        Q.   So you opted in 100 to 150 times on behalf of yourself

7    and others, correct?

8        A.   Do we have to wait?  Oh, I apologize.

9             Probably, yeah.

10            I don't have a record as to how many times, so I'm

11   guessing.

12       Q.   Did you ever opt in or subscribe to Virtumundo?

13       A.   Not directly.

14       Q.   Have you ever subscribed or opted in to Adknowledge?

15       A.   Not directly.

16       Q.   Did you ever opt in or subscribe indirectly to

17   Virtumundo?

18       A.   Well, I found out later that I was subscribed to it.

19       Q.   Do you know whether you ever opted in or subscribed

20   indirectly to Virtumundo?

21       A.   Indirectly, it's possible.  But not directly.

22       Q.   Do you know whether you opted in or subscribed

23   indirectly to Adknowledge?

24       A.   I'm trying to figure out how that's different from

25   what you asked me.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 129

1    Q.   I asked about Virtumundo.  Now I'm asking about

2  Adknowledge.

3    A.   Oh.  Okay.  Wait a minute.

4         Virtumundo was the byproduct of signing up at

5  EmailPrize, and they sent me a letter within 10 days that I had

6  signed up at that particular website.  Never heard of the

7  company directly and never had a relationship with them until I

8  got that letter saying that I had a relationship.

9         However, within three weeks, maybe four, I rescinded

10  it by going back to EmailPrize and said -- basically, I opted

11  out.  I took the unsubscribe, kept a copy of that and said I

12  didn't want what Virtumundo and all of the other spammers were

13  sending.

14    Q.   Who sent the letter?

15    A.   I did the opt-out on their website.  They had a link

16  to the EmailPrize, but Virtumundo sent the e-mail

17  acknowledgment that I was now a subscriber.

18    Q.   When you testified "they sent me a letter," is "they"

19  Virtumundo?

20    A.   Yes.

21    Q.   And after you received that letter, you contacted

22  EmailPrize; is that right?

23    A.   That was who I was pointed to in the e-mail.

24    Q.   Why didn't you contact Virtumundo?

25    A.   Because EmailPrize, I was familiar with.  I wasn't

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 130

1    familiar with Virtumundo at that time.

2        Q.    You received a letter from Virtumundo, correct?

3        A.    Yes.

4        Q.    Why didn't you contact Virtumundo in response to the

5    letter?

6        A.    Because they were citing EmailPrize as the gateway or

7    portal to spam.

8            So I wanted to go back to the source, so to speak, and

9    unsubscribe from that source because Virtumundo wasn't the only

10   company that started sending me spam.

11       Q.    You testified that you haven't signed up with

12   Virtumundo or Adknowledge directly.

13       A.    That's correct.

14       Q.    But you may have indirectly.

15       A.    Yes.

16       Q.    What is the difference?

17       A.    Well, these people, like Home4FreeStuff and EmailPrize

18   and those others, they claim that they have affiliates.  And

19   typically, they don't identify the affiliates, so I don't know

20   who they're signing me up for.

21       Q.    Does "indirectly" mean that you sign up at one source

22   and inadvertently sign up for a different source?

23       A.    That's not direct -- that's not exactly what I meant.

24            I'm just saying that these people claim alliances with

25   all types of marketers out there, and I don't know at that

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 131

1    given point who those marketers are.  And that list over time

2    migrates, changes, and all of a sudden, there are new

3    affiliates that we're not sure about.

4          But I do know and do have that record that I had

5    unsubscribed from EmailPrize, along with those others that

6    claim that they now have the right to give my name to others.

7          So I unsubscribed.

8    Q.   We talked earlier about what the word "spam" means.

9          Do you believe that the term "spam" can be applied to

10   both solicited and unsolicited e-mail or does it only apply to

11   the unsolicited kind?

12         MR. SIEGEL:  Objection to the extent this calls for a

13   legal conclusion.

14         You can answer it from your understanding.

15   Q.   You can answer.

16   A.   Well, when you first asked the question, I was trying

17   to paraphrase what Spamhaus -- which has, in my opinion, the

18   best definition of spam -- trying to paraphrase what they said.

19         I don't have a separate, distinct definition of it.  I

20   know what I don't like, and I don't like to receive e-mail

21   after I ask people to stop.  I basically consider everything

22   after that point spam.

23   Q.   Do you believe that all spam, as that term is defined

24   by Spamhaus, is unlawful?

25   A.   No.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

```
                                                         Page 132
 1        Q.   Do you have an understanding as to what kind of spam
 2   is lawful and what kind of spam is unlawful?
 3        A.   I have a layman's understanding, yes.
 4        Q.   What is your layman's understanding?
 5        A.   There are statutes that restrict practices such as
 6   obscuring parts of the headers, "subject" lines that have the
 7   capacity to see and things of that nature.  Those are
 8   restrictions upon mailers in terms of what they can't do, is my
 9   understanding.
10        Q.   Can a marketer send spam lawfully?
11        A.   It appears so.
12        Q.   And what is your layman's understanding about how a
13   marketer could send spam lawfully?
14        A.   To comply with the statutes in terms of not obscuring
15   their identity and not munding, M-U-N-D-I-N-G, the headers.
16        Q.   You allege in this lawsuit that you received e-mail
17   from Adknowledge and Virtumundo, correct?
18        A.   Yes.
19        Q.   Did Adknowledge or Virtumundo obscure its identity?
20        A.   Yes, I believe so.
21             Part of that belief is, I guess, demonstrated by way
22   of our summary judgment motion.
23             And the other things, we've not -- I guess theories,
24   if you will, of the case, we've not divulged them entirely.
25             There's been some response to your motion to compel
```

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 133

1  which further delineates some of those theories or our ideas

2  about the theories that we have.

3      Q.   You believe that the basis for your claim that

4  Adknowledge and Virtumundo obscured its identify is disclosed

5  in the summary judgment motion, right?

6      A.   No, that's just one point.

7      Q.   What are some other points?

8      A.   They were, I guess, elucidated in that letter.

9          Gosh.

10     Q.   What letter?

11     A.   Sorry.  The response to the motion to compel that

12  Mr. Siegel responded to.

13          I have a little cheat sheet which I didn't bring which

14  talks about the various things.  We could actually look at some

15  of the e-mails and we can start going through and pointing out

16  things, if you'd like.

17     Q.   Are you familiar with the Informal Coalition of

18  Private Anti-Spam Litigants?

19     A.   Yes.

20     Q.   What is the Informal Coalition of Private Anti-Spam

21  Litigants?

22     A.   In the simplest form, it's just people that sue

23  spammers.

24     Q.   Are you the founder of that organization?

25     A.   What I did was -- when you say "founder," I wasn't the

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 134

1    first to start doing this.  I was Johnny-come-lately, so to

2    speak.

3           However, I made a lot of the networking calls and

4    contacts, and in that place, I guess you can say it's a

5    founding role.

6    Q.    Who's the founder -- strike that.

7          Do you know who the founder of that organization is?

8    A.    No.  Not in terms of the initial person to start these

9    lawsuits.

10   Q.    Do you know how many members the Informal Coalition of

11   Private Anti-Spam Litigants has?

12   A.    There are no members, as such.

13   Q.    How is the coalition comprised?  And I should clarify

14   because I know that's an awkward question.

15          But if there's not members, who comprises the

16   coalition?

17   A.    Okay.  Those words weren't mine.  I didn't call it

18   ICPAL.  That was someone else's doing.

19          Just people who talked to one another.

20   Q.    Whose doing was it, calling it ICPAL?

21   A.    It was more my attorney's doing than mine.

22   Q.    Which attorney?

23   A.    Doug McKinley.

24          Actually, the naming is --

25   Q.    Excuse me?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 135

1       A.    The naming of the organization was more his doing.

2   I'm not sure what name I had had before, and he asked me to

3   change it.

4               (Exhibit No. 11 marked.)

5       Q.    Have you ever seen Exhibit No. 11 before?

6       A.    Yes, I have.

7       Q.    What is it?

8       A.    An article from Internetnews.com.

9       Q.    And it's about the Informal Coalition of Private

10  Anti-Spam Litigants, right?

11      A.    Yes.

12      Q.    And in this article, the writer states that you're the

13  founder of ICPAL.

14            But that's not correct?

15      A.    It's not correct in that these people were doing this

16  long before me.

17      Q.    And the article also advises that you rejected a

18  $40,000 settlement from Commonwealth Marketing Group.

19            Is that true?

20            I'm looking at page 2.

21      A.    Yes, I see that page there.

22            THE WITNESS:  Bob, is this still protected, the

23  conversation part here?

24            MR. SIEGEL:  Well, he's just asking you to comment on

25  the statement in this article, not on --

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 136

1    A.    That's then -- that's what Susan Kuchinskas said.

2    Q.    Susan Kuchinskas, the author of the article?

3    A.    Yes.

4    Q.    My question is whether you rejected a $40,000

5    settlement from Commonwealth Marketing Group.

6    A.    And that's what I was asking Mr. Siegel.

7          THE WITNESS:  Are we still under that protective

8    thing?

9          MR. SIEGEL:  Well, I don't think that would be

10   protected, Jim.

11         THE WITNESS:  Okay.

12         MR. SIEGEL:  If you recall and you can say --

13   A.    The answer is yes, then.

14   Q.    At some point, you settled the Commonwealth Marketing

15   Group lawsuit, right?

16   A.    I'm not going to talk about that.

17   Q.    You can't tell me whether or not you settled it?

18   A.    I can't tell you that.

19   Q.    What did you tell the author of this article that's

20   contained in Exhibit No. 11 about the Commonwealth Marketing

21   Group lawsuit?

22   A.    I don't recall what I told her.

23   Q.    Do you know why you told her anything?

24   A.    I'm rereading some of this.

25         I do recall saying that I received that amount of

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 137

1   e-mails, 1500 a day, and it went up to 2,000, and then on up

2   from that.

3          Do I recall -- I'm not sure what the catalyst was for

4   this particular article.  It could have been some of the

5   California folks or it could have been some of the Western

6   Washington folks.

7          Somehow our names all came up in the course of

8   conversations.

9          Again, I don't know the genesis of it.

10   Q.    Who are the California folks?

11   A.    The people named here, I think, are Joe Wagner, Dan

12   Balsam.

13          And I don't know if Bill is mentioned or not here.

14          Those are two of the names that I just saw.

15          Bill Silverstein is another person in California.  And

16   I don't think he's mentioned.  Of course, I'm not reading it

17   carefully.

18          And then there's some Western Washingtonians also

19   mentioned.

20   Q.    Does the Informal Coalition of Private Anti-Spam

21   Litigants have meetings?

22          And when I use the word "meeting," I mean it in the

23   broadest sense; conference calls, Web exchange, list serves,

24   actual inperson meetings.

25   A.    No.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 138

1      Q.    What has your participation in the Informal Coalition

2   of Private Anti-Spam Litigants been?

3      A.    That name was probably more for the benefit of the

4   press than anything else.

5            We just talk to one another from time to time.  There

6   are no formal meetings, and we did that by design.  We just

7   chose not to.

8      Q.    Why did you choose not to?

9      A.    It's an easier target.

10     Q.    Target for what?

11     A.    People like IMG that want to countersue and do

12  scorched-earth-type stuff.

13     Q.    IMG is Impulse Marketing Group?

14     A.    I apologize.  It is Impulse Marketing Group of

15  Atlanta, Georgia.

16     Q.    The article provides -- and I think you just confirmed

17  that you stated to the reporter that you received roughly 1500

18  e-mails every single day; is that right?

19     A.    That varies, though, over time.

20     Q.    Plus or minus?

21     A.    Plus or minus many thousands.

22           When I had my auto responder, I got up to 8,000 all by

23  myself on a daily basis.

24     Q.    And what have you done to stop that?

25     A.    I stopped using my auto responder.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 139

1        That was part of it.  But the SpamAssassin filter is

2    one of the things.

3        And I continue to contact network service providers

4    who use protection services and so forth.  ICANN, which is the

5    registrar, the rural registrar, if you will, of domains.

6        And I've done all the little things that I know of,

7    contact state Attorney Generals to try to stop it.

8        Q.   Internet corporation for assigned names and number,

9    right?

10       A.   That's true.

11       Q.   Who at ICANN did you contact?

12       A.   It was by e-mail.  I don't remember an individual.

13       Q.   Did you receive a response?

14       A.   Yes, there was some responses.

15       Q.   But you don't remember from whom?

16       A.   No, I don't remember a name.

17       Q.   What did the response provide?

18       A.   An opportunity to say whether or not the problem that

19   I referred to them had been corrected, and I told them no, and

20   I told them why and set a follow-up.

21       Q.   When did you exchange e-mails with ICANN?

22       A.   In the last three to five months.

23       Q.   Is that exchange ongoing or has it concluded?

24       A.   There's been a silence for about two months now, so it

25   may be concluded.

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

1      I've not done any additional work.  There are other

2  people who I could turn in, so to speak, but I've not done

3  anything recently.

4      Q.   What do you hope to accomplish with ICANN?

5      A.   According to what I understand is their charter, there

6  are certain things they can do for people such as myself when

7  it comes to misrepresentations.

8      There are a lot of companies who will -- I'm not

9  alleging it for the defendants -- but who will falsely register

10  domains, and that was what I was reporting to ICANN.

11      Q.   Do you believe that Adknowledge or Virtumundo falsely

12  registered domains?

13      A.   They didn't, in my opinion.

14      Q.   Have you shared any information about this lawsuit

15  with other persons who participate in the Informal Coalition of

16  Private Anti-Spam Litigants, other than your attorneys?

17      A.   When you say "share," we talk and they know because

18  there are a lot of -- there are individuals who will go to

19  Pacer and look up stuff and they know that I'm involved in

20  various litigation.

21      So share information -- they know that we're suing.

22  They know that we had a summary judgment motion because those

23  are things that we talk about in the normal course.

24      Q.   What is the normal course?

25      A.   From time to time, we call each other.