Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 141

1      Q.    Is it always done by telephone?

2      A.    If there's something on our mind, yes, we contact each

3  other by telephone.

4      Q.    Is it done by list serve?

5      A.    No.  There was an attempt, I think -- at one time

6  somebody tried to do that and it lasted maybe a week.  Just

7  people didn't want to use it.  It was that everybody-in-one-

8  place-type thing, we try and avoid.

9      Q.    When you share information in the normal course by

10  telephone, is it done by conference call or by one-on-one

11  communications?

12      A.    Never by conference call.  One-on-one.

13      Q.    And what information -- strike that.

14            Who have you shared information about this lawsuit to?

15      A.    Everybody knows that I filed a lawsuit against your

16  client.  Everybody that I come in contact with, basically.

17            It was, for a time, up on my website.  And there are

18  people that know just to go to the website and look from time

19  to time and see.

20            And other of those people I mentioned in California

21  have their own websites, and we go to each other's websites and

22  see what's current.

23      Q.    Have you encouraged anyone to file a lawsuit against

24  Adknowledge or Virtumundo?

25      A.    No, I haven't done that.

6158c13b-9931-4ad1-a959-e71e19f83129

Dockets.Justia.com

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 142

1    Q.   Has anybody mentioned to you that they might file a
2    lawsuit against Adknowledge or Virtumundo?
3    A.   Not offhand.
4    Q.   What does "not offhand" mean?
5    A.   It means I can't think of anyone that's mentioned
6    that.
7         In fact, I probably am the first one to really
8    understand -- understand -- to acknowledge the fact that these
9    people were spamming me.
10        Other people have other folks that they pursue.
11   Q.   Other than the Informal Coalition of Private Anti-Spam
12   Litigants, are you involved in any formal or informal groups or
13   organizations that serve a function of assisting in the
14   prosecution of anti-spam lawsuits?
15   A.   No, I don't.
16        Unless you want to call my company, Omni; unless you
17   want to call that something else that fits that definition.
18        (Exhibit No. 12 marked.)
19   Q.   Do you recognize Exhibit 12?
20   A.   It's a Whois record.
21   Q.   What is a Whois record?
22   A.   It provides information to the general public as to
23   who owns a particular domain.
24   Q.   Whois is a publicly accessible database, correct?
25   A.   Yes.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 143

1    Q.   And there are several sources on the Internet by which

2    Internet users can access Whois; is that correct?

3    A.   That's correct.

4    Q.   And with respect to .com, .net and .org domain names,

5    the registrant information is available by Whois, right?

6    A.   I believe that to be true.

7    Q.   And it's the registrant of the domain that provides

8    the contact information, correct?

9    A.   Yes.

10   Q.   So the registrant has the ability to enter false

11   information if the registrant so chooses, correct?

12   A.   Yes.

13   Q.   And there's also third-party services that domain

14   registrars offer that allow registrants to register names

15   without disclosing in its database who they are; is that

16   correct?

17   A.   That's true.

18   Q.   Those are sometimes referred to as proxy services?

19   A.   Privacy protection.

20   Q.   The Whois printout for Exhibit No. 12 is for what

21   domain name?

22   A.   I believe it's Gordonworks.com.

23   Q.   And it lists Omni Innovations, LLC as the registrant,

24   correct?

25   A.   Yes.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 144

1   Q.   And it has your address?

2   A.   Yes.

3   Q.   And it has your phone number, correct?

4   A.   That's correct.

5   Q.   And that's publicly available, right?

6   A.   Yes, for Gordonworks.

7   Q.   Can you tell by looking at this where the Whois record

8   obtained is; in other words, which site on the Internet?

9   A.   Where it was obtained?

10       Okay, I don't know if I understand that.

11  Q.   You're looking at a Whois printout that was generated

12  from a website on the Internet.

13  A.   Domain Tools.

14  Q.   Have you ever used Domain Tools?

15  A.   Yes, I do use it.

16  Q.   Do you consider it reputable and reliable?

17  A.   Fairly reliable.

18       Reputable?  I have not done a lot of due diligence in

19  that area, but it's proven fairly reliable.

20  Q.   That's a fair response.

21  A.   Okay.

22  Q.   I suppose asking if something is reputable is a

23  relative question, but you've found it to be reliable, correct?

24  A.   Yes.

25  Q.   Have you ever done a Whois search for any domain names

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 145

1    registered to Adknowledge or Virtumundo?

2        A.    Yes.

3        Q.    And in doing those Whois searches, have you ever found

4    what you believed to be false contact information about

5    Adknowledge or Virtumundo?

6        A.    I can't think of anything offhand.

7        Q.    I've been using the term "registrant."

8              You and I both know what that means, but this record,

9    of course, is intended for the purpose of litigation.

10             So would you explain what your understanding of that

11   term "registrant" is so that I know you and I are both on the

12   same page and the court is not confused.

13       A.    I think that a registrant refers to the individual who

14   is responsible for or will be responsible for that domain in

15   terms of keeping that information up to date.

16       Q.    Sometimes a registrant is referred to as an owner of a

17   domain; is that right?

18       A.    Yes.

19       Q.    When did you first register Gordonworks.com?

20       A.     '98.

21             I think it said May of '98, so that would be a pretty

22   good --

23             I think it was May of '98.

24       Q.    And for what purpose did you register that domain

25   name?

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 146

1      A.    I wanted to get more than the five e-mail addresses

2  that One World Telecommunications limited me to.

3            I wanted to build a website.

4            And I decided that the other was too restrictive, or

5  the cost was more than I wanted to pay under their contract.

6      Q.    Was that the first domain name you ever registered?

7      A.    Yes.

8      Q.    And did you do that through Network Solutions?

9      A.    No, I did it through One World Telecommunications, who

10  likely used Network Solutions.

11     Q.    How do you access the Internet generally?

12     A.    Always on Charter.net.

13     Q.    So you use Charter.net from what location to access

14  the Internet?

15     A.    I use it from my home office.

16     Q.    What type of connection do you have to the Internet

17  from your home office?

18     A.    It's called a broadband connection.

19     Q.    What speed is your broadband connection?

20     A.    Well, I think it's one of the original 3 meg -- what

21  they call 3 meg pipe.

22     Q.    3 megabytes per second?

23     A.    Download speed.

24     Q.    What about upload speed?

25     A.    I don't even pay attention to that.  I have no idea

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

```
                                              Page 147
 1    what the upload speed is.

 2        Q.   Do you know whether it is a digital subscriber line?

 3        A.   No, it's not.

 4        Q.   Do you know whether it is cable modem?

 5        A.   Cable modem.

 6        Q.   It is a cable modem?

 7        A.   Yes.

 8        Q.   Is it your understanding that when you obtain Internet

 9    access through a cable modem that you're sharing the broadband

10    connection with your neighbors?

11        A.   I don't know that.  I don't know that.

12        Q.   You have no knowledge about that one way or the other?

13        A.   I hear stuff about wireless.

14             But for broadband, no, I don't know anything about it.

15        Q.   Have you reviewed your agreement with Charter.net that

16    provides that you may use this 3 megabyte per second Internet

17    access line?

18        A.   I may have when I first got it.  I don't know.

19        Q.   Do you know whether it prohibits you from acting as an

20    Internet service provider?

21        A.   I don't know that.

22        Q.   Have you produced that agreement in connection with

23    this lawsuit?

24        A.   I don't know where it is, so I guess I haven't.

25        Q.   I believe it's responsive to discovery requests.
```

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo       James S. Gordon, Jr., Vol. I

Page 148

1          I would appreciate if you would confer with your

2     lawyer in that regard, and if it's responsive, would you please

3     produce it.

4          A.   I don't know where it is.  I have no idea even if I

5     have it.

6          Q.   Well, you have a duty to obtain it, and I'm sure you

7     could call Charter.net and get it.

8          A.   Okay.  Okay.

9          Q.   Before you used Charter.net, how did you access the

10    Internet?

11         A.   Digital subscriber line through Verizon.

12         Q.   What speed was that Internet connection?

13         A.   I'm not certain.  768 sounds about right.

14         Q.   Up and down?

15         A.   No.  That's probably just downloading.

16         Q.   What about upload?

17         A.   Don't know.

18         Q.   Did you review your agreement with Verizon for the

19    digital subscriber line that provided that you had the right to

20    use it?

21         A.   The right to use it?

22         Q.   You had an agreement with Verizon that provided that

23    you had access to a digital subscriber line, correct?

24         A.   Yes.

25         Q.   Did you review that agreement?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 149

1      A.    I -- I'm pretty sure, initially, I did look it over.

2      Q.    Do you know whether it prohibited you from acting as

3  an Internet service provider?

4      A.    It wouldn't have the right to do that.

5            But, no, I didn't review it for that particular thing.

6      Q.    Do you have a copy of that agreement?

7      A.    No.

8      Q.    Can you make efforts to obtain one?

9      A.    I've not used the service in three or four years.

10           I guess if it's on the record there, it's something --

11  you asked me for two things, and I will probably ask again

12  because I didn't even bring a pen today.

13           So we'll refresh at the end of the meeting today.  And

14  when I get back home, I'll try to get that.

15     Q.    Before using the Verizon DSL line, did you use another

16  carrier for your access to the Internet?

17     A.    The ones that I used -- I think we're mixing up, you

18  know, these various providers.

19           Web hosting is a totally different thing from Verizon,

20  who provided e-mail service.  I didn't get Web hosting through

21  them, so their agreements regarding whether or not I was an

22  Internet access service doesn't mean anything, as far as I know

23  and understand.

24           My Web hosting has been through companies that allow

25  resellers, and there would be no restrictions on me in my

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo            James S. Gordon, Jr., Vol. I

Page 150

1    understanding and belief from Web hosting.

2          So, yes, I used Webmasters, and prior to that,

3    ValueWeb.  I think that was the sequence.

4    Q.   Have you produced your agreement with Godaddy in

5    connection with this lawsuit?

6    A.   I don't know.

7          THE WITNESS:  Bob, can you help me?

8          MR. SIEGEL:  I'm not sure, either.  We could check and

9    see.

10   Q.   Can you check to see that you did?  Because I don't

11   believe that you have.

12   A.   Okay.

13   Q.   And I believe that it's responsive and we're entitled

14   to it.

15   A.   Then I will go back to the ones that you have

16   mentioned.  You mentioned Verizon and you mentioned for

17   Godaddy.

18         Is there any others?

19   Q.   Charter.

20   A.   Charter.  Okay.  Charter.

21         MR. NEWMAN:  Let's take a five-minute break.

22         THE VIDEOGRAPHER:  The time is now 2:45 p.m.  We are

23   off the record.

24         (A recess was taken.)

25         THE VIDEOGRAPHER:  The time is now 3:00 p.m.  We are

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 151

1    on the record.

2        Q.   You're suing Scott Lynn in this lawsuit, correct?

3        A.   I believe he's been named.

4        Q.   Why?

5        A.   That was a decision my attorneys and I came up with.

6        Q.   What basis do you have to file a lawsuit against Scott

7    Lynn?

8        A.   Again, that was the decision that my attorneys and I

9    came up with.

10       Q.   What basis do you have to file a lawsuit against Scott

11   Lynn?

12       A.   I guess you would have to ask Mr. Siegel.

13            I don't understand the legal --

14            MR. SIEGEL:  I'll object to the extent it calls for a

15   legal conclusion.

16            If you have responsive -- something responsive to say

17   in terms of the facts that you are aware of or that you know

18   of, then answer the question on that basis; if you have

19   personal knowledge of some of the facts.

20       A.   Okay.  Then I don't know what else to say about it.

21       Q.   What are you suing Scott Lynn for?

22       A.   I'm not sure how to recall and share what my attorneys

23   and I talked about.  I don't know how to do that.  I don't know

24   how to keep the two things separate.

25       Q.   Well, I don't want to know what advice your lawyers

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 152

1   have given you or what advice you've sought of them, but I do

2   want to know -- and I'm entitled to know -- your firsthand

3   knowledge and any facts that you have that are responsive to my

4   question.

5         And my question is, what are you suing Scott Lynn for?

6   A.   Okay.  I don't have any knowledge that's apart from

7   discussions that led us to the conclusion and my attorneys

8   included Scott Lynn in the lawsuit.

9         So I have nothing beyond that at this point.  Just

10  nothing's fresh in my mind about what other information came to

11  light or anything like that.

12  Q.   It was not your decision to name Scott Lynn?

13  A.   I was not the prime mover, I guess.

14        But I typically agree with my attorneys when a

15  decision is made and they advise me.

16  Q.   What's a "prime mover"?

17  A.   I wasn't the person who initiated, I don't believe.

18  Q.   Do you believe that Scott Lynn violated any laws with

19  respect to you?

20  A.   I believe that he's responsible for his company.

21  Q.   What do you mean, "he's responsible for his company"?

22  A.   He's responsible -- if, in fact, I'm trying to

23  unsubscribe and contact the company, contact the company's

24  legal department and so forth and he ignores it, I think that

25  he's been, I guess, negligent or somehow he hasn't been

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 153

1    diligent in terms of his responsibility as a CEO.

2        Q.   What are his responsibilities as a CEO concerning you?

3            MR. SIEGEL:  Objection.  Calls for a narrative.

4    Speculative.  It's -- it's overly broad.  I don't think this

5    client is qualified to testify to what Scott Lynn's

6    responsibility as a CEO is.  You can ask Scott Lynn that.

7        Q.   Your attorney is going to object from time to time.

8        A.   Okay.  Okay.

9        Q.   But you still have an obligation to answer my

10   question.

11           I'll repeat it.

12           What are Scott Lynn's responsibilities as a CEO

13   concerning you?

14       A.   Okay.  Well, in terms of his responsibilities, period,

15   I guess I would need a job description or some type of

16   employment contract to know that.

17           But most people who deal with the public have -- I

18   call it a responsibility, a duty -- whatever else we want to

19   call it -- to honor anyone who claims that they don't want

20   contact by the company.  And I think he's responsible for

21   making sure that happens throughout his -- his company.  And he

22   failed.

23       Q.   Do you believe that Scott Lynn did anything else other

24   than what you just testified about that violated your rights?

25       A.   I think that's all it really takes.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 154

1          That is the reason why we're in a lawsuit right now,

2    because he failed at what I consider his duty.

3          Q.   Do you believe that only the CEO has what you consider

4    to be that duty or do you believe other officers of the

5    corporation do as well?

6          A.   They could be delegated.  But ultimately --

7          Q.   Do you know --

8          A.   Pardon.

9               But ultimately, he is responsible.

10         Q.   Do you know whether he's delegated the

11   responsibilities?

12         A.   I don't know that.

13         Q.   Have you ever made any effort to contact Scott Lynn?

14         A.   Not directly.

15         Q.   Have you ever made any effort to contact Scott Lynn

16   indirectly?

17         A.   Well, I didn't know his name until just months ago.

18              All the Whois look-up, I don't remember seeing -- it

19   could have been there.

20              But I looked up e-mail addresses.

21              I just don't recall seeing his name.

22         Q.   Then why was he named?

23         A.   I said before a few months ago.

24         Q.   Had you heard his name before you filed this lawsuit?

25         A.   I may have.  It may have been in something that was

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 155

1    published or something like that.

2        When I started contacting was in '04, and at that

3    time, I didn't know who Scott Lynn was.  So I just sent it to

4    regular departments at Virtumundo.

5        Q.    Do you believe that Scott Lynn initiated the e-mails

6    that you allege Adknowledge and Virtumundo sent to you?

7        A.    I don't know that.

8        Q.    Have you ever made any effort to determine whether he

9    initiated them?

10       A.    The efforts that I made were to get the e-mails

11   stopped, not -- just to get them to stop.

12       Q.    Have you ever made any effort to determine whether

13   Scott Lynn initiated the e-mails that you allege Virtumundo and

14   Adknowledge sent to you?

15       MR. SIEGEL:  Counsel, are you asking him personally or

16   through this lawsuit, through his attorneys?  Could you clarify

17   that?

18       Are you asking him personally?

19       A.    I don't understand.

20       MR. SIEGEL:  Only if you understand the question,

21   answer.

22       A.    I don't.

23       MR. SIEGEL:  Then ask him to clarify.

24       THE WITNESS:  Okay.

25       A.    Then I'd like to get clarification.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 156

1    Q.   You allege that Adknowledge and Virtumundo sent you

2    e-mail, correct?

3    A.   I do.

4    Q.   Do you believe that there was a human being who was

5    responsible for initiating those e-mails?

6    A.   There was.

7    Q.   And do you believe Scott Lynn might be that human

8    being?

9    A.   It's possible.

10   Q.   It's possible that anyone involved in the corporation

11   could be, right?

12   A.   Yes, it's possible.

13   Q.   Do you have any basis to believe Scott Lynn in

14   particular initiated those e-mails?

15   A.   No.

16   Q.   Have you ever made any effort to determine whether or

17   not he initiated those e-mails?

18   A.   Well, I guess, at first blush, I said not him in

19   particular.  Just, again, that notion of him being responsible

20   for what goes on in his company.

21   Q.   It's just a notion?

22   A.   Maybe it's a working premise.

23   Q.   What is a working premise based upon?

24   A.   What information we have at hand.

25   Q.   What information do you have at hand?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 157

1    A.   I have nothing right now.  But there's a lot of stuff

2  that we've shared back and forth, my attorney and I.

3    Q.   Do you believe that Scott Lynn had any knowledge that

4  Adknowledge or Virtumundo sent e-mails to you?

5    A.   Actually, I think he did.

6    Q.   Upon what information do you base that belief?

7    A.   Upon the seven e-mails -- I think it was seven -- that

8  I sent directly to the company, including the legal department.

9    Q.   How do you connect your belief that Scott Lynn knew

10  about the e-mails to the documents that you claim to have sent

11  to the company?

12    A.   If I say it was common sense, it may not be.

13         If someone sent a communication to my legal

14  department, I'm pretty sure I'd know about it.  And I think

15  it's the duty of the attorney to mention it to the principal.

16         So that's the leap that I make.

17    Q.   Do you have a legal department?

18    A.   Not personally.

19         I've got a couple three attorneys working for me,

20  but...

21    Q.   Do you believe that the legal department of

22  Adknowledge advises Scott Lynn of every communication it

23  receives?

24    A.   I don't know that.

25    Q.   Do you know whether the legal department received

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 158

1    communications from you?

2        A.    I believe they did.

3        Q.    Upon what information do you base that belief?

4        A.    The fact that I sent it and it wasn't returned to me.

5        Q.    Did anybody ever acknowledge receipt of what you claim

6    to have sent to Adknowledge?

7        A.    No.  Never.  Nothing that I sent to them was ever

8    acknowledged.

9        Q.    So you really have no evidence that Adknowledge

10   received what you sent, correct?

11       A.    I have evidence.  It may not be something that I can

12   use right now.  The fact that I sent it is evidence.

13             I showed -- I have the actual e-mail letters that were

14   sent.  I have the auto responders and all these things.

15             There's evidence that it was sent.

16             And I have my "sent" log.

17             But in terms of received, without a bounce, the

18   working assumption with most people is that it's been received.

19       Q.    Do you know who the general counsel of Adknowledge is?

20       A.    I didn't know then who it is.

21       Q.    Did you ever make any effort to learn who it is?

22       A.    Not after getting, I guess, the cold shoulder.

23       Q.    Did you ever call Adknowledge?

24       A.    No.

25       Q.    Did you ever call Scott Lynn?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 159

1    A.    No.

2    Q.    I believe you testified a minute or two ago about a

3    "sent" log.

4    A.    As an outgoing mailbox, yes.

5    Q.    Did you produce that "sent" log in connection with

6    this lawsuit?

7    A.    I produced so much.

8         I'm not positive, but I would guess it would be in

9    there, or at least things pertaining to Virtumundo would be in

10   there.

11        E-mail communications to your clients would be in

12   there.

13   Q.    You never received anything from Adknowledge or

14   Virtumundo indicating it had received any of these

15   communications you claim to have sent, right?

16   A.    No, that's not correct.

17        I've said something before like it was a form letter,

18   and I did receive form letters.

19   Q.    What was the nature of the form letter?

20   A.    I don't recall.  I have copies of it, but I don't

21   recall.

22        I've also included that in the production.

23   Q.    Do you believe that Scott Lynn had any involvement in

24   Adknowledge and Virtumundo sending you e-mails?

25        MR. SIEGEL:  Objection.  Asked and answered.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

                                                          Page 160

1       A.    I can go ahead?

2       Q.    Yes.

3             MR. SIEGEL:  You can go ahead.

4       Q.    When your lawyer objects --

5       A.    I follow up?  Okay.

6             I don't know what his role is at the company.  I don't

7    have any way of knowing presently what his role is.

8       Q.    The question was, do you believe that Scott Lynn had

9    any involvement in Adknowledge and Virtumundo sending you

10   e-mails?

11      A.    Again, I don't know what his role is.

12            He can punch every night "send" buttons for millions

13   of e-mails.  I don't know that.

14      Q.    So you have no idea whether or not he had any

15   involvement, correct?

16      A.    No.  I have no idea one way or the other.  He could;

17   he may not have.

18      Q.    Since this lawsuit commenced, have you learned,

19   through the litigation process or otherwise, any information

20   that indicates that Scott Lynn had any involvement in

21   Adknowledge or Virtumundo sending you e-mails?

22            MR. SIEGEL:  Objection.  Asked and answered.  This is

23   the third time.

24            Counsel, this is getting on -- bordering on

25   intimidation and harassment.  You asked this question already.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 161

1        If you want to stand by your prior answers, just say

2   so.

3        A.   I don't know what else to say.  I can create something

4   out of old cloth, if you like.

5        MR. SIEGEL:  No, I don't want you to create anything

6   out of old cloth.  Only answer if you know the answer.

7        THE WITNESS:  Okay.

8        Q.   Since this lawsuit commenced, have you learned,

9   through the litigation process or otherwise, any information

10  that indicates that Scott Lynn had any involvement in

11  Adknowledge or Virtumundo sending you e-mails?

12       A.   And I answered that.

13       Q.   Is the answer no?

14       A.   I have an answer.  I'm not even sure what it was.

15            I do have an answer, though.  I've provided one.

16       Q.   The question calls for a yes or no.

17            I understand if you think the question might be unfair

18  and you want to qualify it, and feel free to qualify, but I'd

19  like the yes or no.

20            And I'll ask the question again.

21            Since this lawsuit commenced, have you learned,

22  through the litigation process or otherwise, any information

23  that indicates that Scott Lynn had any involvement in

24  Adknowledge or Virtumundo sending you e-mails?

25       A.   Okay.  I guess the more I think about that -- his

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 162

1    company is involved in the business of sending e-mail.  I think

2    the figure I saw was one and a half billion per month.

3          He's involved in this in that I would think that he

4    chooses whatever business the company is involved in, and part

5    of it is sending out e-mails.

6          So in that sense, yes.  The business is sending

7    e-mail, and whether or not -- you know, you're talking about me

8    as an individual, me in the collective -- he's involved in that

9    business, sending e-mail to me and everyone else.

10   Q.    What information have you learned that indicates Scott

11   Lynn had any involvement in Adknowledge or Virtumundo sending

12   you e-mails?

13         MR. SIEGEL:  Objection.  Asked and answered.  He just

14   answered that very specifically.

15   A.    The business of Virtumundo is sending e-mail.

16         The business of Adknowledge is sending e-mail.

17         He, as the CEO -- unless he decides to go in a new

18   direction -- and I understand he's thinking about it, or has --

19   he is the prime mover, again, of that momentum to send e-mail.

20   It's his decision to keep you in the business or keep them in

21   the business of sending e-mails.

22   Q.    Upon what basis is it your testimony that it's his

23   decision to keep the company in the business of sending e-mail?

24   A.    Well, there's something that I read -- you all

25   produced a lot of information for me, too.  And I can't put my

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 163

1    finger on it right now.

2           I mentioned about the one and a half billion e-mails

3    per month.

4           But it's something I read over three disks of stuff,

5    and it's -- it's just a conclusion that I drew based on what I

6    read.

7    Q.   What's the conclusion?

8    A.   That he's involved in the business of the company,

9    which is sending e-mail.

10   Q.   And upon what information did you base that

11   conclusion?

12   A.   On what I read, and I don't remember specifically what

13   I read.

14   Q.   Did you read a lot?

15   A.   Pardon?

16   Q.   Did you read a lot?

17   A.   I read hundreds of documents of the probably thousands

18   of documents on three CDs.

19   Q.   Of the hundreds of documents, can you remember

20   anything that indicates it was Scott Lynn's decision to send

21   you e-mail?

22   A.   Not specifically.

23           (Exhibit No. 13 marked.)

24   Q.   You testified that you had received a form letter from

25   Virtumundo.

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 164

1          You've been handed what's been marked Exhibit No. 13.

2     A.    Yes.

3     Q.    Is this the form letter you were referring to?

4     A.    No, it is not.

5     Q.    Do you know whether you produced in the course of this

6     litigation the form letter?

7     A.    Yes, I do.

8          It is dated for late January of '04.  Maybe early

9     February.

10    Q.    Did you receive the document that's marked Exhibit

11    No. 13?

12    A.    Or something similar, yes.

13    Q.    Exhibit No. 13 provides in an e-mail that's apparently

14    addressed to you from Virtumundo, "If you do not wish to

15    receive e-mail offers from Virtumundo Rewards, please click on

16    the following link to unsubscribe from Virtumundo Rewards."

17    And then there's a link.

18         Do you see that?

19    A.    Yes.

20    Q.    Did you ever click on that link?

21    A.    I'm not sure if I did.

22         Again, I was receiving 1500 a day, and this was the

23    time my wife was so ill.

24         And I could have done it; I may not have done it.  I

25    just don't know at this point.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 165

1          I don't know if I received it the same day or a week

2     later.  I have no idea.

3          I didn't get to every e-mail every day, and they

4     accumulated on me.

5          Q.   You object to receiving e-mails from Virtumundo,

6     correct?

7          A.   Yes.

8          I went on the record starting October 1 when I sent

9     this very same company, EmailPrize -- I didn't send it, I went

10    through their links and unsubscribed on-line.

11         Q.   And this e-mail is from Virtumundo to you advising you

12    that it's going to be sending you e-mail solicitations unless

13    you click on that link, right?

14         A.   That's what it says here.

15         Q.   But as you sit here today, you don't know whether you

16    ever clicked on that link?

17         A.   I think I did.  But it just probably wasn't that same

18    day.  It wasn't September 3rd or 4th.

19         Q.   You've testified in declarations that you have

20    received e-mail from Virtumundo very recently; is that right?

21         A.   Yes.

22         Q.   And when you receive those e-mails, did you think to

23    go back to this link and click on it in an effort to cause the

24    e-mails to stop flowing?

25         A.   You mean the recent e-mails?  Did it cause me to want

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 166

1    to go back?  No.

2        Q.   Well, here, you see that there's a link --

3        A.   Yes.

4        Q.   -- that, according to the e-mail, would allow you to

5    stop receiving e-mails from Virtumundo, right?

6        A.   Okay.

7        Q.   And since you've received e-mails recently from

8    Virtumundo --

9        A.   Uh-huh.

10       Q.   -- I'm wondering why you wouldn't go back and click

11   on this link so the e-mails might stop.

12       A.   They have, in a serial fashion, failed to honor

13   anything that you have done to unsubscribe.  Not anything;

14   everything that I've done.

15       Q.   Have you done anything to unsubscribe pursuant to

16   instructions from Virtumundo itself?

17       A.   Yes.

18       Q.   What?

19       A.   Initially -- initially, I unsubscribed by whatever

20   means I saw in front of me.  That's the way I started

21   everything.

22            I'd later go through various iterations of complaints,

23   which I explained earlier.

24       Q.   Do you remember unsubscribing to Virtumundo pursuant

25   to a document or website that Virtumundo's responsible for?

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 167

1    A.    Oh, geez.

2          I remember going to the second stage of the process,

3    so -- and I'm assuming I had a first stage when I go to the

4    second stage.  And the second stage is complaining to the ISP

5    or Virtumundo or whatever company it is.

6    Q.    Do you remember unsubscribing to Virtumundo pursuant

7    to a document or website for which Virtumundo was responsible?

8    A.    Maybe I should say the same thing again.

9    Q.    It's a yes or no question.

10         MR. SIEGEL:  If you don't understand --

11   A.    At the moment -- at the moment, I don't recall.

12   Q.    So as you sit here today, you don't know whether you

13   ever unsubscribed pursuant to a method that Virtumundo provided

14   an e-mail or website?

15   A.    I'll repeat, the process that I undertook was to go

16   directly to the company, unsubscribe, and when they didn't

17   honor, to go then to their Internet service providers.  I'd

18   look up Whois information, which I did with Virtumundo.

19   Contacted them directly.

20         That didn't work, and I used my auto responder.  That

21   didn't work.

22         So there was at least four different phases and,

23   eventually, the lawsuit.

24         And the lawsuit didn't work to stop them from sending

25   me e-mail.

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 168

1    Q.   But you never unsubscribed pursuant to the means --

2    A.   That's not true.

3    Q.   -- that Virtumundo provided in its e-mail, correct?

4    A.   Not true.

5    Q.   Do you ever remember doing that?

6    A.   I --

7         MR. SIEGEL:  Objection.  Asked and answered at least

8    three different times.

9    A.   Well, I'm saying, again, that I followed steps and the

10   step was to contact the company directly.

11   Q.   And you contacted the company directly through the

12   means you testified about earlier, right?

13   A.   Yes.  Those steps.

14   Q.   You never called them up?

15   A.   Many -- most --

16        MR. SIEGEL:  Objection.  Asked and answered.

17        Stand by your answers already.

18        THE WITNESS:  Okay.

19   Q.   You never called them up?

20        MR. SIEGEL:  This is bordering on harassment.

21   A.   No, I never called.

22   Q.   And you never sent them a letter by postal mail?

23   A.   No.

24   Q.   And you never sent an e-mail to a specific person as

25   opposed to a general address?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 169

1    A.    I didn't have a specific person's name that I recall.

2    Q.    You never visited their offices?

3    A.    Never been to Kansas City.

4          MR. SIEGEL:  What part of Canned Spam is that in?

5          THE VIDEOGRAPHER:  Counsel?

6          MR. NEWMAN:  The videographer must change a tape, so

7    let's take a break.

8          THE VIDEOGRAPHER:  The time is now 3:25 p.m.  This is

9    the end of Tape No. 2 of the video deposition of James Gordon,

10   Junior.  We are off the record.

11          (A recess was taken.)

12          THE VIDEOGRAPHER:  This is the beginning of Tape No. 3

13   of the video deposition of James S. Gordon, Junior.  The time

14   is now 3:41 p.m.  We are on the record.

15          (Exhibit No. 14 marked.)

16   Q.    Do you recognize Exhibit 14?

17   A.    That looks like something I received, yes.

18   Q.    You testified earlier about a form letter that you

19   received from Virtumundo.

20          Is this that form letter?

21   A.    I think so.

22   Q.    The form letter indicates that it's an automated

23   response.

24          Do you see that?

25   A.    I see that.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 170

1    Q.    It's not from an individual in particular, right?

2    A.    May or may not be.

3    Q.    To your knowledge?

4    A.    I don't know that it's automated, no.

5    Q.    It claims to be automated --

6    A.    It claims to be automated, yes.

7    Q.    But you don't know that because you haven't verified

8    one way or the other?

9    A.    True.

10   Q.    Do you have any reason to believe it's not automated?

11   A.    Yes, because I received a lot of false, demon messages

12   from people who have e-mail addresses they shouldn't have.

13         So, you know, this could be something like that.

14   Q.    Any from Virtumundo or Adknowledge that you're aware

15   of?

16   A.    Not offhand, except -- you know, this could be one.  I

17   just don't know.

18   Q.    Did you reply to this e-mail?

19   A.    I think it says not to.  "Replies will not be read."

20   Q.    Did you reply to the e-mail?

21   A.    I sent other e-mails to different addresses.

22         MR. SIEGEL:  Just answer the question, Jim.

23         THE WITNESS:  Oh, okay.

24         MR. SIEGEL:  I know it's getting later.

25   A.    I don't believe I sent another message to that, no.

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 171

1    Q.   If you look in the first paragraph of Exhibit 14, it

2    provides, "If you would like to unsubscribe from the Virtumundo

3    Rewards mailing list, please use the unsubscribe link in the

4    footer of the original e-mail sent, visit our unsubscribe page

5    here...or reply to this e-mail with 'remove' in the subject

6    line."

7         Do you see that?

8    A.   Yes.

9    Q.   Did you, in response to this, or at any other time,

10   utilize the unsubscribe link in the footer of the original

11   e-mail sent?

12   A.   Yes.

13   Q.   When do you recall doing that?

14   A.   October of '03 is my best recollection.

15   Q.   I believe that I asked you that question earlier and

16   you testified that you didn't, and now you're testifying that

17   you do.

18   A.   I don't recall that.

19        What I have done is -- and I think we can clarify it

20   at this point -- I say that I've gone through a process, and

21   there are certain steps.

22        I went through the first steps, and I have e-mails

23   from October -- let's see -- October, August of 2003, and I

24   think some from another time prior to that, and it shows some

25   of the times that I was in the process of unsubscribing from

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 172

1    just a whole bunch of different things.

2          I also unsubscribed from these folks -- sorry -- from

3    the defendant.  It's just that I didn't keep records of that

4    unsubscribe.

5    Q.    Why?

6    A.    Didn't know that it would be necessary.

7    Q.    But you believe now -- and I'm going to refer to the

8    transcript later because I believe that you testified to the

9    contrary earlier -- that you did utilize the unsubscribe link

10   in the footer of the original e-mail you received from

11   Virtumundo?

12   A.    Please say that again.

13   Q.    You believe now that you did utilize the unsubscribe

14   link in the footer of the original e-mail you received from

15   Virtumundo?

16   A.    Okay.  I think I've said all along that I go through a

17   process, which the first step is to correspond with the company

18   directly.  And that means using whatever unsubscribe is

19   available.  And if I don't see any, I went to a Whois look-up

20   to find something.

21   Q.    And this process you've subscribed is general, right,

22   it's not specific to Virtumundo or Adknowledge?

23   A.    It would be specific to them.

24   Q.    Is it general?

25   A.    It's something I do in each case.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 173

1    Q.    Is there anything with respect to Adknowledge and

2    Virtumundo that you did differently?

3    A.    Yes.

4    Q.    What?

5    A.    I didn't send a certified return receipt letter to

6    them.  That's different.

7    Q.    Other than that, did you do anything differently?

8    A.    I didn't -- well, of course, I don't think I called

9    anyone directly.  I don't believe I called anyone.

10          So I didn't call them directly.

11    Q.    Do you remember, with respect to Virtumundo, using the

12    unsubscribe link in the footer of the original e-mail sent?

13    A.    I've answered that a couple of different ways.

14          The whole point of what I've said is that I use a

15    process, and when I go to step two, I would have only gone to

16    step two if I had done step one.

17          That's why I believe I used their unsubscribe links.

18    Q.    I understand your testimony that you believe you used

19    their unsubscribe link.

20          My question is, do you remember, with respect to

21    Virtumundo --

22          MR. SIEGEL:  Objection.  Asked and answered 15 times.

23    Q.    -- using the unsubscribe link in the footer of the

24    original e-mail sent?

25          MR. SIEGEL:  All right.  This is -- this is badgering,

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

1    as far as I'm concerned.  And let's be clear on the record.

2    This is intended for no other reason but intimidation and

3    harassment.

4         If you believe you've answered the question clearly

5    and you want to rest on your prior answer, then just say so and

6    be on with it.

7    A.    Okay.  I believe I want to rest on it.

8         MR. NEWMAN:  Are you instructing the witness not to

9    answer?

10         MR. SIEGEL:  No, that's not what I said.

11   Q.    Are you refusing to answer the question?

12         MR. SIEGEL:  The record is clear about what I said.

13   A.    No.

14   Q.    Then I'll ask the question again.

15         Do you remember using, with respect to Virtumundo, the

16   unsubscribe link in the footer of the original e-mail sent to

17   you?

18         MR. SIEGEL:  And I'll repeat my objection.  Asked and

19   answered, and it's posed for no other reason but intimidation

20   and harassment.

21         And if you want to rest on your prior answers, if you

22   believe you've answered the question, then do so.

23   A.    And I want to rest on that answer.

24   Q.    What was that answer that you're resting on?

25   A.    I don't know.  We'd have to go back to the court

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 175

1    reporter.

2            We'd need to go back to the court reporter.

3            MR. SIEGEL:  It's all on the record, Counsel.

4    Q.    Well, I don't believe I've received an answer, and

5    it's a yes or no question, which makes it relatively easy to

6    answer.

7            So we could go around and around, I suppose we could

8    look at the transcript --

9    A.    Okay.

10   Q.    -- we could call the court or you could simply

11   answer.  It's a really easy question.

12           And the answer [sic] is, with respect to Virtumundo,

13   do you remember using the unsubscribe link in the footer of the

14   original e-mail sent?

15   A.    I'm going to rest on the answer I've given.

16   Q.    What answer was that?

17   A.    Let's look at the transcript.

18           I don't recall specifically what I said.  I've said a

19   lot of stuff.  So let's go back to the transcript.

20   Q.    So you're refusing to answer the question?

21   A.    No.  I've already answered it.

22           MR. SIEGEL:  He's answered the question, Counsel.

23   You're just harassing him.

24   Q.    What is the answer?

25   A.    It's on the record, so you'll have to refresh me in

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 176

1   terms of what I said.

2          MR. SIEGEL:  That's the answer.  He's answered the

3   question.  That's the answer.  He's already answered the

4   question, is the answer.

5          MR. NEWMAN:  Do you know what the answer to that

6   question was, Mr. Siegel?

7          MR. SIEGEL:  I don't recall, either, because you've

8   asked probably half a dozen times, so it's hard for me to

9   remember, too.

10          It's in the record, though.

11          MR. NEWMAN:  Let's go off the record, and we will ask

12   the court reporter if she would be so kind as to find the

13   question and the answer.

14      A.    Okay.

15          THE VIDEOGRAPHER:  The time is now 3:48 p.m.  We are

16   off the record.

17              (A discussion was held off the record.)

18              (The requested testimony was read.)

19          THE VIDEOGRAPHER:  The time is now 3:51 p.m.  We are

20   on the record.

21      Q.    We went off the record and the court reporter reviewed

22   the transcript, and we determined that you testified that you

23   remember unsubscribing to Virtumundo's Rewards mailing list

24   using the unsubscribe link in the footer of the original e-mail

25   sent.

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 177

1          What do you remember about doing that?

2          MR. SIEGEL:  Is there anything more specific you have

3     to add?  If there is, tell him.  I mean, I want to know, too.

4     A.    I'm sorry, I was just distracted.  I heard some

5     voices.

6          MR. SIEGEL:  Get it all out, if there's anything else.

7     A.    Okay.  I'm trying to refocus on the question -- which

8     just zoomed out.  I need to have that question re-- restated,

9     please.

10              (The requested testimony was read.)

11    A.    Is that specific to Virtumundo?

12    Q.    Yes.

13          MR. SIEGEL:  That's what you said, or indicated.

14    A.    Nothing new comes to mind right now other than what

15    I've already communicated.

16    Q.    Do you remember where you were when you clicked on

17    that unsubscribe link?

18    A.    I'm sure I was at home, if that's what you mean by

19    that question.

20    Q.    Why are you sure?

21    A.    Because I wouldn't take that kind of information out

22    in the public place.

23    Q.    Do you remember being at home at the time?

24    A.    I'm going to say yes because that's the only place

25    that I've connected to the Internet -- Internet using -- in

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 178

1   fact, it was -- yeah, it was the only place I connected using

2   those -- those e-mails, unsubscribes and stuff like that.

3           Yeah, I did it all at home.

4       Q.  Do you remember the time of day it was?

5       A.  No.  Don't.  Sorry.

6       Q.  Do you remember what month or year it was?

7       A.  It was continuous from July and August of '03.  And

8   I'm still doing it.

9       Q.  So you're still clicking on the unsubscribe link in

10  the footer of e-mails that Virtumundo sent?

11      A.  I apologize.  I didn't understand you saying that

12  specifically.

13      Q.  Okay.

14          How many times have you clicked on an unsubscribe link

15  in a footer that Virtumundo sent?

16          And when I say footer, I'm referring to a footer in an

17  e-mail.

18      A.  I don't know.

19      Q.  More than once?

20      A.  I'd guess that I did it more than once.

21      Q.  And upon what information do you base that guess?

22      A.  Because with everyone else that I unsubscribed, I did

23  it from each of the e-mail addresses that they would send to.

24          So I would have done it a minimum of maybe six times.

25      Q.  And you're basing that upon your general practice with

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 179

1    respect to other e-mail marketers?

2        A.   Yes.

3        Q.   You don't remember specifically using the unsubscribe

4    link in Virtumundo's e-mail six times, correct?

5        A.   I don't remember specifically, yes.

6        Q.   Exhibit 14 also provides that you could visit

7    Virtumundo's unsubscribe page, and then there's a URL, a

8    uniform resource locator, or a location on the Internet.

9            Did you ever visit that URL?

10       A.   In fact, I've visited in the past year.  I remember

11   going in to see what it looked like.  And I don't know which

12   e-mail address I used.

13           But I need to go in and do -- I guess -- what you call

14   it -- a reconnaissance.  So I need to see what things look

15   like.

16       Q.   Do you know whether you ever accessed the URL that is

17   listed in Exhibit 14?

18       A.   There's two in Exhibit 14.

19           Which one of the two?

20       Q.   The first one is an unsubscribe page, right?

21       A.   Okay.  Yes.

22       Q.   Did you ever visit that one?

23       A.   Yes.

24       Q.   And when you visited that page, what did you view?

25       A.   Don't remember.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 180

1    Q.   You don't remember seeing anything at all?

2    A.   No, I just don't remember what I saw.

3    Q.   Do you remember the nature of the page?

4    A.   Not offhand.

5    Q.   Do you remember whether it had Virtumundo's name on

6   it?

7    A.   I don't remember anything about it other than the fact

8   that I did it because I was doing it for other companies at

9   that time.

10    Q.   Is it possible that you're confusing --

11    A.   No.

12    Q.   -- the other companies with Virtumundo?

13    A.   No.  I -- when we filed a lawsuit, I went back in, and

14   -- as I would do with any lawsuit, and go back and try to

15   refresh my memory with as much information as I could.

16        And part of the reconnaissance, I'm calling it, was to

17   go in and look at this unsubscribe mechanism.

18    Q.   Do you maintain server logs?

19    A.   I don't personally, no.

20    Q.   Do you have any log of the websites that you viewed?

21    A.   Not to my knowledge.

22    Q.   Do you maintain the history in your browser?

23    A.   No.

24    Q.   Do you delete the history in the browser?

25    A.   I do a cleansing of my computer frequently.

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 181

1    Q.    Have you done a cleansing of your computer since you

2    commenced this lawsuit?

3    A.    I cleanse my computer every time I get a virus, I go

4    through and thoroughly -- and I get 10 to 20 to as many as 100,

5    200 viruses a week.

6    Q.    Did you make any efforts to backup or otherwise retain

7    evidence relating to this case when you cleansed your computer?

8    A.    I've presented the evidence or discovery to my

9    attorney, who in turn turned it over to you.

10         But when I have a virus in my system, the first thing

11   I try to do is purge the virus, and I don't even think about

12   backing up anything at that time.

13   Q.    I'd like to turn your attention back to Exhibit

14   No. 10.

15   A.    Yes?

16   Q.    You testified earlier that you received that letter

17   from your lawyer earlier in these proceedings.

18   A.    Yes.

19   Q.    Have you cleansed your computer since you received

20   that letter?

21   A.    I've continually cleansed it, even as recently as last

22   week.

23   Q.    Did you back up or make any efforts to make a record

24   of your browser history?

25   A.    Yes -- no.  Not browser history.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 182

1      Q.   So you have no evidence of visiting the Virtumundo

2   unsubscribe site, correct?

3      A.   No.

4      Q.   Would you agree that at one time, had you ever visited

5   the Virtumundo unsubscribe site, it would be in your history,

6   correct?

7      A.   It should be, yes.

8      Q.   But you cleansed that, so you wouldn't know, right?

9      A.   Yes, is the short answer.

10     Q.   You pointed out that there are two URLs in Exhibit

11  No. 14.  The second one is Virtumundo's privacy policy.

12          Do you see that?

13     A.   Yes.

14     Q.   Do you know whether you ever visited Virtumundo's

15  privacy policy?

16     A.   I'm not sure.

17     Q.   One way or the other?

18     A.   I'm not sure, yes, one way or the other.

19     Q.   Do you know whether you ever used an unsubscribe link

20  in the footer of an e-mail that Adknowledge sent?

21     A.    I don't -- I don't recall for Adknowledge.  I know I

22  did for Virtumundo, but for Adknowledge, I don't recall doing

23  that.

24     Q.   Do you know whether you ever used an unsubscribe page

25  on the Internet for Adknowledge?

Buell Realtime Reporting, LLC
206-287-9066

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 183

1       A.    Okay.  Did you first refer to the e-mail and now the

2   URL; is that the distinction?

3       Q.    Yes.  Thank you for clarifying.

4       A.    Okay.

5             In neither case, I don't believe -- I just -- I

6   shouldn't say I don't believe.

7             I don't recall.  For Adknowledge, I've done the least.

8   I did a lot more in terms -- I've never done the things -- I

9   didn't do the things for Adknowledge that I did do for

10  Virtumundo.  I felt it was fruitless.

11      Q.    Do you know whether you've ever viewed Adknowledge's

12  privacy policy?

13      A.    No, I -- I can't -- I don't recall doing that.

14      Q.    Do you believe that Scott Lynn should be held

15  responsible for the e-mails that Virtumundo sent you?

16      A.    Yes.

17      Q.    And is it for the reasons that you testified about

18  earlier?

19      A.    I don't know what all I said.

20            Unless I'm refreshed at what I said, I -- I don't

21  know.

22      Q.    Well, you testified about how Scott Lynn is the CEO of

23  the company so he should be responsible.

24      A.    That, and I think the statute refers to assisting in

25  the transmission.  And at the very least, he would be someone

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 184

1   who assists or facilitates the transmission of the e-mails.

2       Q.   And upon what basis do you believe that he assisted in

3   the transmission of the e-mails?

4       A.   His position in the company, I think, would lend some

5   credence to the fact that he had a role in what the company

6   does.

7       Q.   Do you know what his position in the Virtumundo

8   company is?

9       A.   I believe at the time he was president, president/CEO

10  of the company.

11          He could have been chairman of the board, but it was

12  in a director, managerial role of the company.

13      Q.   You testified earlier that you utilized the

14  unsubscribe link in the footer of Virtumundo's e-mails.

15          After that time, did you ever opt in to receive

16  Virtumundo's e-mails, directly or indirectly?

17      A.   It's possible that I did it indirectly.

18          And it's also possible, in this role of doing

19  reconnaissance, that I could have inadvertently resubscribed.

20  I don't think I did, but it's possible.

21      Q.   You testified earlier you have customers, correct?

22      A.   Yes, I do.

23      Q.   When did you obtain your first customer?

24      A.   I don't know.  I don't know.

25      Q.   Can you estimate?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo            James S. Gordon, Jr., Vol. I

Page 185

1    A.   In the '90s. I just don't know when.

2    Q.   Who was your first customer?

3    A.   Don't recall who that was, either.

4         God, I've helped people do a lot of things.  Set up

5    multi-level marketing businesses on-line and things like that.

6         I just don't know who was the first customer.

7         MR. SIEGEL:  By "customer," are you referring to Omni,

8    Gordon here when you say "you have customers."

9    Q.   You testified earlier that you act in the capacity as

10   Internet service provider; is that right?

11   A.   Internet access service, is what I called it.

12   Q.   Internet access service?

13   A.   Yes.

14   Q.   And who provides Internet access services; in other

15   words, is it you personally or is it Omni or both?

16   A.   Prior to Omni, I did it as an individual.

17   Q.   When did you do it as an individual?

18   A.   I guess from the time I first set up my family's site

19   back in '96.  That's the first that I recall setting up web

20   pages for anyone.

21   Q.   When did you stop doing it as an individual?

22   A.   I haven't, really, because people ask me from time to

23   time to help them with a web page.

24   Q.   You provided an Internet access services in 1996?

25   A.   Okay.  What do you mean by "Internet access services"?

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 186

1          I just want to make sure I answer appropriately.

2     Q.   I'm following up on your testimony.

3     A.   Okay.

4     Q.   And your testimony is that you act as an Internet

5  access service.

6     A.   Okay.

7     Q.   And I asked whether you do it personally or whether

8  you do it through Omni, and you testified that when you started

9  in 1996, you did it personally, and I'm clarifying that you

10 provided Internet access services in 1996.

11    A.   Yes.

12    Q.   Did you do that on behalf of customers?

13    A.   This was -- the closest term that I can think of is a

14 clearinghouse.

15         I set up websites that reflected job search

16 opportunities, reflected business resources, and other people

17 out on the Internet -- the University of Michigan, Washington

18 State, Oregon, Utah and states like that -- Small Business

19 Administration -- they would link or provide reciprocal links

20 to my website, and there were, at any given time, 2- to 300 of

21 those reciprocal links that other people used my website as a

22 destination for their visitors.

23    Q.   Do you believe that any party that provides a website

24 is an Internet access service?

25    A.   I don't know.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 187

1          In terms of, what, the law or just a personal feeling?
2     What are you asking about?
3          Q.    I'm not asking you about the law.
4          A.    Okay.
5          Q.    I'm asking you about your belief.
6          You testified that you performed Internet access
7     services, that you did it in 1996, and specifically, you set up
8     a website that reflected job searches and other information --
9          A.    Yes.
10         Q.    -- and there were reciprocal links.
11         My question is whether you believe that any party that
12    sets up a website qualifies under your definition as an
13    Internet access service.
14         A.    Not every party.
15         Q.    Does every party that sets up a website with
16    reciprocal links qualify as an Internet access service?
17         A.    I guess I just know my situation.
18         So I don't know for certain.  I just know my
19    situation, and that's the only thing I can speak of with any
20    authority, what I do.  And I can tell you ad nauseam what I do.
21         Q.    What's your definition of an Internet access service?
22         A.    Well, I provide mail services for people, and it's
23    varied over time.  Probably 30 to 40 people, ballpark.
24         Provide Internet web pages for community groups, for
25    personal friends, for family.  Actually, built those web pages

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 188

1    myself and allowed them to host almost like a subdomain on my

2    Gordonworks website so other people could access.

3            For example, in '05 or '04, my fraternal organization

4    wanted to have a campaign spot for our western regional vice

5    president.  So I put up the website, and all of the members

6    here on the West Coast and five or six different states were

7    able to access that site and decided if they were going to vote

8    for this particular candidate or not.

9            We had family, we had bios and resumes and everything

10   on the website for voters to make a determination whether or

11   not they wanted to vote for him.

12       Q.   The website provided information, correct?

13       A.   Yes.

14       Q.   Was it interactive to the extent that users of the

15   website could submit information on the website?

16       A.   Via -- pardon me.

17            Via the e-mail link, yes.

18       Q.   Other than by the e-mail link.

19       A.   Well, I don't know -- there was no blog or anything

20   like that on the website, no chat services.

21       Q.   Was there any other way that the user could submit

22   information other than clicking on an e-mail link?

23       A.   Use the phone number.

24       Q.   Was there any way that a user could submit information

25   other than clicking on an e-mail link or calling on the

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 189

1    telephone?

2        A.    I guess maybe mailing to an address.

3              No, in terms of inner activity, that's all.  The

4    e-mail link was the only activity.

5        Q.    Do you believe that by setting up that web page, you

6    were performing services as an Internet access service?

7        A.    Yes.  That's one of the services.

8              I set up the website for Dancing Wolf as -- also, and

9    they sell products and they have forms on-line to -- to sell to

10   the world, so to speak.

11       Q.    Have you been to the website for my law firm?

12       A.    Been to Dancing Wolf from your law firm?

13       Q.    No.

14             Have you been to the website for my law firm?

15       A.    No, I've not heard of that offhand.

16       Q.    Have you been to the website for Doug McKinley's law

17   firm?

18       A.    I think so.

19       Q.    Do you believe that because he provides that website,

20   he qualifies as an Internet access service?

21       A.    That's an information page.  I think it's only one

22   page, if I recall.

23       Q.    It has an e-mail link, right?

24       A.    I don't recall.  I saw it -- well, three years ago is

25   when I first saw it.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 190

1    Q.   If it has an e-mail link, does it qualify as an
2    Internet access service?

3    A.   In terms of law, I don't know.

4         I think you need to do a little bit more than that.  I
5    don't think he has customers.  And he doesn't provide e-mail
6    services, doesn't provide web pages.

7         So, in my limited definition, it doesn't appear as if
8    he would be an Internet access service.

9    Q.   So providing a web page with information, e-mail links
10   and phone numbers alone is not sufficient to constitute
11   providing Internet access services; is that right?

12   A.   I'm not --

13        MR. SIEGEL:  Objection.  Mischaracterizes the
14   testimony.

15   A.   I'm not going to try to answer that because I just
16   don't know enough to make that statement.

17        I can just tell you what I do.  And anything else is
18   probably beyond my capacity.

19   Q.   When did you first start providing e-mail services?

20   A.   I don't know specifically.  I'm guessing '97, '98,
21   '99.

22        I'm not sure when exactly it was.

23   Q.   And to whom did you first provide e-mail services?

24   A.   I don't know who initially.

25        Other than family members, I don't know who outside my

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo            James S. Gordon, Jr., Vol. I

Page 191

1   family was first.  They were just people that I knew, but I

2   don't know who was first.

3        Q.   Do you remember who was first outside of your family?

4        A.   No, I don't.

5        Q.   What e-mail services did you provide in 1997 to family

6   members?

7        A.   I set up e-mail addresses at Gordonworks and I set up

8   e-mail addresses at whatever other service -- like OWT,

9   OneWorldTelecommunications.com.  They just abbreviate it

10  OWT.com.

11       So set up those e-mail services initially, and people

12  who I provided web pages to, I provided them their own

13  Gordonworks -- let's say that you had one, Flowers-R-Us, and I

14  would put Flowers-R-Us@Gordonworks or something like that.  If,

15  in fact, that was -- that's kind of a hypothetical.

16       Q.   How did you go about providing e-mail addresses at

17  OWT.com?

18       A.   I must have misspoke.

19            At Gordonworks.

20            But my family, I think, did have OWT -- I better not

21  say that because I'm not sure right now if they had OWT or not.

22            I don't recall.  But I do know I've set people up with

23  Gordonworks.

24       Q.   How did you go about doing that?

25       A.   Just added to our control panel.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 192

1     Q.    The control panel that connects to Godaddy?

2     A.    No.  This was at OWT.

3     Q.    How did you access the control panel?

4     A.    I don't remember what mechanism I used.

5     Q.    Did you lease an e-mail server at the time?

6     A.    I don't know if -- to characterize it like that.  I

7  had a Web hosting service, is what I had with them.  Which

8  means they hosted my domain, which gave me e-mail access.

9     Q.    And it was through that e-mail access that you were

10 able to set up e-mail accounts for your family, correct?

11    A.    Family and friends, yes.

12    Q.    Have you ever been compensated for e-mail services?

13    A.    If we count settlements, yes.

14          But in terms of directly from family members, no, or

15 friends.

16          The settlements are the only remuneration.

17    Q.    Settlements of --

18    A.    Lawsuits.

19    Q.    -- disputes or lawsuits?

20    A.    Yes.

21    Q.    How do the friends and family who use Gordonworks

22 e-mail services today access their e-mail?

23    A.    Okay.  The short answer is they don't at Gordonworks.

24          Because Gordonworks receives so much spam, I informed,

25 advised everyone to get their own private domain, and I believe

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 193

1    everyone did, in fact, do that.

2          And I've been trying to reclaim Gordonworks ever

3    since.

4    Q.    Do you administer those domains?

5    A.    As I understand "administer," yes.

6    Q.    How do you understand "administer"?

7    A.    That means that I still have control of the domains to

8    start, stop, do things like that with them.

9    Q.    Start and stop?

10   A.    Yes.  When I changed from one service provider to

11   another in early 2004, because it was the first time I had ever

12   gone to that type of Web hosting with ValueWeb, I put the

13   filters on so tight that I shut off virtually everything, and I

14   was missing stuff.  So I had to go back in and redo the

15   filters.

16         But it stayed super tight for weeks.  Could have been

17   two weeks; could have been six weeks.

18         And then I had to go back and loosen the filters

19   because too much was being filtered out.  So...

20   Q.    You testified that you advised these people to obtain

21   their own private domains, correct?

22   A.    That's correct.

23   Q.    Did you assist them in obtaining their own private

24   domains?

25   A.    Yes.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 194

1    Q.    What assistance did you provide?

2    A.    It varied depending on who it was.

3    Q.    Did you obtain the domains for them?

4    A.    For some, yes.  Yes, I did.

5    Q.    And how did you do that?

6    A.    Just to go to Godaddy and sign up for a given domain.

7  I'd talk with them, you know, what name do you like and things

8  like that.  And I'd go ahead and, as a gift, start the domain

9  up.

10          For some, they took care of it themselves.

11   Q.    Are you -- strike that.

12          Do you know what a domain name registrar is?

13   A.    Well, Godaddy is a -- a registrar.

14   Q.    Do you know -- what's the definition of a registrar?

15          What is your understanding of a registrar?

16   A.    My understanding?  That there are designated bodies,

17  entities, organizations throughout -- I'll speak to the United

18  States -- that have the capacity to -- I think it's delegated

19  -- to start domains based upon whatever IP block they've been

20  assigned, and they can start domains.

21          So I think they just parcel out, through ARIN and all

22  these other -- RIPE and so forth -- all these blocks, and

23  within that, you have some discretion as to the domains that

24  you start up.

25          Ours is .com, .net and so forth.  Others is .au, .ca;

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 195

1    top level domains there.

2        Q.   Are you a domain name registrar?

3        A.   I don't think I'm considered one.

4        Q.   Do you know what a domain name reseller is?

5        A.   I'm not sure if I do or not.

6             (Exhibit No. 15 marked.)

7        Q.   Do you recognize Exhibit No. 15?

8        A.   I believe this is my declaration.

9        Q.   I'd like to turn your attention to paragraph 9, which

10   is on page 3 and begins at line 8 and a half.

11            Tell me when you're there.

12       A.   Okay.

13       Q.   The paragraph provides that many of the e-mail

14   accounts that you administered were inundated with commercial

15   electronic mail messages rendering them unusable.

16            Do you see that?

17       A.   Yes.

18       Q.   When you administered any of these e-mail accounts,

19   did you use any spam filters?

20       A.   Okay.  It depends on the timing.

21            In '03, what did I have?

22            Yes.

23       Q.   You paused, you thought for a moment, and then you

24   answered.

25            Is that because there was a time when you used filters

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 196

1    and a time when you did not?

2        A.   Well, there was a time where I used my own personal

3    stuff, like MailWasherPro and this other SpamCrime software.

4            And there's a time where I relied wholly on

5    server-based stuff, which is what SpamAssassin and OWT and

6    ValueWeb provided.

7        Q.   And at the time that you provided e-mail addresses as

8    described in paragraph 9 of this declaration, which is

9    Exhibit 15, did you use a server-based spam filter?

10       A.   I'm not sure at that particular point in time whether

11   I was using it or not.

12       Q.   When did you start using the server-based spam filter?

13       A.   With OWT back in the late '90s.

14       Q.   You used it on and off?

15       A.   No.  What I did was experiment with it to see how

16   tight my filter selection should be.  So I made it tight and

17   then loosened it, loosened it, loosened it and tightened it and

18   loosened it.

19           And I did that with each of the companies I was with;

20   experimented.

21       Q.   You don't remember whether the e-mail accounts

22   described in paragraph 9 were on a server that had a

23   server-based spam filter; is that right?

24       A.   I'm not even sure who I was with in 2003.

25       Q.   You're not sure of what?

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 197

1      A.   I'm not sure which service provider I was with at that

2    time.

3      Q.   Paragraph 9 also says, "I took over the administration

4    of those e-mail accounts and began directly receiving the

5    e-mail sent thereto."

6          Do you see that?

7      A.   Yes.

8      Q.   And "I," of course, refers to you, right?

9      A.   Yes.

10     Q.   And do you know when you took over the administration

11   of these e-mail accounts?

12     A.   A more accurate statement is, at the behest of my

13   clients, they threw their hands up and said, we don't want

14   this.  And I -- that's what I mean by I took over.

15     Q.   So the clients stopped using e-mail accounts, right?

16     A.   Yes.

17     Q.   Do those accounts still receive mail?

18     A.   Yes.

19     Q.   If the users don't utilize the accounts, then why

20   don't you disable them?

21     A.   Oh, I do research on the spam that comes through.   I

22   want to compare it to what's coming through on those that I've

23   done the most unsubscribes for.

24          I do research on it.

25     Q.   Why?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 198

1    A.   For my information.

2         I may -- and I haven't decided yet -- but I may do my

3    dissertation on the spam problem that I've had.

4    Q.   Dissertation in what?

5    A.   For my doctorate.

6    Q.   In business?

7    A.   Yes.

8         I've been advised to.

9    Q.   So you use the e-mail accounts described in paragraph

10   9 for the purpose of research that you might use in support of

11   a doctoral dissertation?

12   A.   If I decide -- I have two choices that I like, and I

13   may decide to go with that one.

14   Q.   Do you use the e-mail accounts for any other purpose?

15   A.   They -- that's the prime reason for doing it.

16        And as I said, I compare it to what's coming in the

17   others.  And I do see where some of the spammers cease sending

18   it to certain addresses and things like that and some continue

19   with other addresses.

20        So, again, I've not anything to really be classified

21   as an experiment in terms of scholarly experiments, empirical

22   research in that regard, but I do go back and look at -- do

23   reconnaissance, as I've called it.

24   Q.   Paragraph 10 provides that the first e-mail from

25   defendants was received on or about September 4, 2003.

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 199

1      Do you see that?

2   A.   Yes.

3   Q.   Did you do anything in response to that e-mail?

4   A.   I'm not sure what I did in response to it.

5   Q.   Do you know whether you replied to it?

6   A.   I have no idea right now what I might have done at

7   that time.

8        At 1500 a day, it's hard to say what I did with

9   anything.

10       So, no, I don't -- I don't know.

11       MR. SIEGEL:   Counsel, are you referring to Exhibit

12   No. 13?

13       MR. NEWMAN:   I'm referring to Exhibit No. 15, which is

14   a declaration, and I'm questioning the witness about paragraph

15   10.

16       MR. SIEGEL:   Right.   Is this e-mail in reference -- is

17   the e-mail reference that you're asking about, is that Exhibit

18   No. 13?   It references a September 4th e-mail, and Exhibit

19   No. 13 appears to be a September 4th e-mail.

20       I was just asking so -- because then maybe he could be

21   more specific with his answers if he gets to look at the e-mail

22   that he's already testified about.

23   Q.   Your lawyer will have the opportunity to ask you

24   follow-up questions when I'm finished.

25   A.   Okay.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 200

1      Q.   If there's anything that you don't understand about my

2    questions, of course, please let me know.

3          Do you remember whether you did anything in response

4    to the e-mail you received on or about September 14th?

5      A.   At this moment, no.

6          Okay.   That's not even how I wanted to say it.

7          At this -- at the present time, I don't recall what I

8    did or when I did what I did.

9          And what I eventually did was I started unsubscribing

10   to everything that EmailPrize sent me, and that was in a box

11   over a course of maybe two months, August and September, and I

12   just went through that box and started unsubscribing.

13     Q.   Paragraph 10 says, "The first e-mail from defendants

14   was received on or about September 4," but you just testified

15   about e-mails from EmailPrize.

16     A.   Uh-huh.

17     Q.   Do you believe that EmailPrize is one of the

18   defendants?

19     A.   They may become one.

20         MR. SIEGEL:   Objection.   Mischaracterizes testimony.

21   He stayed he started unsubscribing from EmailPrize.   He didn't

22   say in response to EmailPrize.

23     A.   I missed that.

24         MR. SIEGEL:   So there might be some confusion here.

25     Q.   Paragraph 11 provides, "Subsequently, in September of

Buell Realtime Reporting, LLC
206-287-9066

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 201

1   2003 while researching on-line offers, I entered the e-mail

2   addresses James@Gordonworks.com and Jay@Gordonworks.com at a

3   website found at EmailPrize.com which promised to provide free

4   merchandise."

5           Do you see that?

6       A.   Yes.

7       Q.   The word "subsequently," that means after, correct?

8       A.   Uh-huh.

9       Q.   After what?

10      A.   I don't know what the thought was then.  I have no

11  idea.

12      Q.   This is your testimony, correct?

13      A.   Yes.

14      Q.   And you wrote "subsequently, in September 2003,"

15  right?

16      A.   I don't know if I put the word in or my attorney put

17  it in.

18           But -- I have absolutely no idea what that refers to.

19      Q.   Did you enter the e-mail addresses

20  James@Gordonworks.com and J@Gordonworks.com at a e-mail website

21  found at EmailPrize.com?

22      A.   I believe I did.

23      Q.   Why did you enter both e-mail addresses?

24      A.   Because there was a prize that both of us could use.

25           And I don't recall what the prize was.  But anytime

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 202

1    there was, like I said, makeup or Roomba or something like

2    that, I would -- whoever I thought would be interested, I'd ask

3    them about it and submit their name.

4         Q.   Who is Jay?

5         A.   Jay is my son.

6         Q.   And you asked Jay whether you could enter his

7    e-mail --

8         A.   If he would be interested, is what I asked him, yes.

9         Q.   And he advised he would?

10        A.   Yes.

11        Q.   And he gave you permission to enter his e-mail

12   address?

13        A.   Yes, he did.

14        Q.   And this same paragraph says, "In September of 2003 I

15   also entered the e-mail address Faye@Gordonworks.com,

16   Jamila" --

17        A.   Jamila.

18        Q.    -- "@Gordonworks.com, Jonathan@Gordonworks.com and

19   Emily@Gordonworks.com at a similar website."

20             Do you see that?

21        A.   Yes.

22        Q.   Is that a true statement?

23        A.   Yes.

24        Q.   In September of 2003, who most used the e-mail address

25   Faye@Gordonworks.com?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 203

1      A.    Faye belonged to my wife.  Her name is Bonnie Faye.

2            And she attempted to, but the spam -- she was the

3      first one to get frustrated and say the heck with it.

4      Q.    Did she authorize you to enter her e-mail address in a

5      similar website offering free merchandise in September of 2003?

6      A.    If I did -- okay.  Let's see.  Did she authorize?

7            I'm not sure what you mean by "authorize."  There was

8      no written document.  We'd typically talk, and I mentioned

9      something, and she would probably say something like, oh, that

10     sounds like it might be nice.

11     Q.    So you remember her telling you that you had

12     permission or should enter her name in?

13     A.    That was -- the answer to your question is no, but I

14     wouldn't have done it without permission.

15     Q.    Who is Jamila?

16     A.    Jamila is my daughter.

17     Q.    And you entered Jamila@Gordonworks.com into the

18     website offering free merchandise?

19     A.    Yes.

20     Q.    Did Jamila ask you to do that?

21     A.    I probably went to her and told her what we were doing

22     and trying to see if these people would provide the prizes.

23           And I have no idea what we said, but I felt that I had

24     her okay, permission, whatever we can call it, to proceed.

25     Q.    Why didn't Jamila enter the e-mail address in herself,

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 204

1    if you know?

2        A.    I don't.

3        Q.    Do you know why Faye didn't?

4        A.    I don't.

5        Q.    And Jonathan is your son, right?

6        A.    Yes.

7        Q.    And you entered Jonathan@Gordonworks.com in as well,

8    correct?

9        A.    Yes, I did.

10       Q.    Do you know why Jonathan didn't enter the e-mail

11   address in himself?

12       A.    I can't say that I know.

13       Q.    Is Emily your daughter?

14       A.    No.   Emily is a friend.

15       Q.    And did Emily, your friend, use this e-mail account,

16   Emily@Gordonworks.com?

17       A.    I don't remember for sure, other than I think this is

18   one of the accounts -- it may not have been Emily, it could

19   have been another.  She and I used Gordonworks solely for

20   communications with one another, and I don't remember the name

21   of it.  It may not have been Emily, though.

22       Q.    So you don't know whether you entered

23   Emily@Gordonworks.com in a similar website offering free

24   merchandise?

25       A.    It's likely that I did.

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 205

1      Q.    Here you testified under the penalty of perjury that

2   you did.

3            Is that how you understand it?

4      A.    It depends on what offer.  I don't recall which offers

5   were in which order.

6            But if I had permission to do it once, I had

7   permission -- I would get permission to do it a subsequent

8   time.

9            So if there was makeup, Emily, Jamila and Faye would

10  get that.

11           If there was something else in a different

12  household -- if my son lived with me, he wouldn't get the same

13  one that my wife or I got.  If there were a Roomba.

14           And if it was another household, we'd tell them about

15  it.

16     Q.    So you don't remember whether you entered

17  Emily@Gordonworks.com at the same website offering free

18  merchandise?

19     A.    No, I've done it.  I just don't know which ones.

20     Q.    You don't remember whether it occurred in September

21  '03?

22     A.    It could have been October.  But I'm guessing it was

23  September.

24     Q.    Is there anything else in this declaration, which is

25  marked as Exhibit No. 15 to the deposition, that you're just

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 206

1    guessing about?

2        A.    A lot of stuff I'm thinking about right now.

3              Unless you ask for specifics, I can't say yes or no.

4        Q.    But it is your testimony that there's a lot in this

5    declaration that you're just guessing about, right?

6              MR. SIEGEL:  Objection.  That mischaracterizes

7    testimony.

8        A.    Please ask me a specific question and I'll try to

9    answer it.

10       Q.    I asked, is there anything else in the declaration,

11   which is marked as Exhibit No. 15 to the deposition, that

12   you're just guessing about, and you responded, "A lot of stuff

13   I'm thinking about right now."

14             I then asked you another question and your lawyer

15   objected that I'm mischaracterizing your testimony.  I don't

16   think I am, but if you do, help me clarify.

17             And that is, I'm asking whether it's your testimony

18   that there is a lot in this declaration that you're just

19   guessing about.

20       A.    That's not what I intended.

21             When you asked the question about -- I think it was

22   No. 11, I was thinking that some of these people that I've

23   identified actually use the domains to handle offers that they

24   saw, and I don't know which ones they used as opposed to which

25   ones I used.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

1        So we could have both actually signed up for the same

2    website.

3        So I have no idea or control over it whether or not

4    and to what degree that happened.

5        Q.   Did you sign this declaration?

6        A.   Yes, I signed it.

7        Q.   Did you read the declaration before you signed it?

8        A.   I read a draft of it.  I didn't read the final, I

9    don't believe.

10       Q.   Why didn't you specify in this declaration what

11   specifically you were guessing to and what specifically you

12   know?

13       MR. SIEGEL:  Objection.  Mischaracterizes testimony.

14   Calls for speculation.  Vague.  Ambiguous.

15       A.   I looked for guidance from my attorneys when it comes

16   down to putting together declarations.  This is not my area of

17   expertise.

18       Q.   So your lawyers wrote this?

19       MR. SIEGEL:  Objection.  Mischaracterizes testimony.

20       Don't let him put words in your mouth, Jim.  Just take

21   your time and think about it.  He's just harassing you right

22   now.

23       Don't let him put things in your mouth.  It's

24   improper.

25       THE WITNESS:  Okay.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 208

1    MR. SIEGEL:  He knows -- he knows how the declaration
2 drafting process goes.  He does it every day.
3    A.   Most -- most documents are co-authored, and I don't
4 know who inputted what.
5    Q.   So this document was co-authored by you and your
6 lawyers?
7    A.   I'm -- I believe that's true.
8    Q.   Is it your testimony?
9    A.   My testimony is I believe that's a true statement.
10    Q.   Do you consider the words stated in this declaration
11 to be your testimony?
12    A.   Testimony is a legal concept.
13         This is my declaration.  I signed the declaration.
14    Q.   Do you swear under the penalty of perjury that
15 everything stated in this declaration is true?
16    A.   It's probably more than likely -- there's some things
17 that are approximate, but it's true to the best of my ability
18 in terms of approximating things that took place years before.
19    Q.   Is there anything in the declaration that's
20 approximate that is not noted as such in the declaration?
21    A.   Do you want me to read this thing again?
22    Q.   Yes.
23         MR. SIEGEL:  Yes, I do.  I want you to take your time
24 and answer to every paragraph, if that's where he's going with
25 that.

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 209

1        So make sure you're being accurate here.

2    A.   No. 1, "I the plaintiff"...

3        No. 2, okay.

4        Because it's not fresh in my mind, in No. 3, I'm not

5    sure if it was both the administrative and registrant or one or

6    the other.

7    Q.   Was it fresh in your mind at the time you signed this

8    declaration?

9    A.   There are some changes made here, I recall, because

10   something else was in here and I had to put in One World

11   Telecommunications, and that's where I concentrated my efforts,

12   so...

13   Q.   Was it fresh in your mind at the time you signed the

14   declaration?

15   A.   Well, what was fresh in my mind was that the answer

16   that was in here before it was a mistake, so I corrected the

17   mistake.

18       MR. SIEGEL:  I'm going to object.  You know, this

19   document speaks for itself.

20       So Jim, if you want to rest on what you declared in

21   this declaration, then you can just -- you can just do that

22   because it already is -- you already testified to it, so it's

23   asked and answered.

24       MR. NEWMAN:  Mr. Siegel, your client has testified

25   that there's certain things he was guessing to here.  I have a

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 210

1    right to know what they were considering that he filed this in

2    support of a motion and that that motion is based on this

3    testimony.

4          And you're now coaching him not to answer my question.

5          MR. SIEGEL:  Jim, if there's anything that you can

6    identify as having guessed to in this declaration --

7          THE WITNESS:  Okay.

8          MR. SIEGEL:  -- then go ahead and tell counsel.

9    A.    Then on No. 3 --

10   Q.    Well, yeah.  Let's go back to No. 3.

11         You were just testifying that you don't know because

12   your memory is not fresh now whether you were both

13   administrative contact and registrant.

14   A.    That was not my area of focus.

15         The focus was on correcting mistakes when I did my

16   drafts.  This could have been draft three, five, seven; I don't

17   know.

18         But I corrected the error in it and sent it back.

19         So that one, I could -- it could be true that I was

20   both the administrative and registrant, and I haven't checked

21   this in months, so -- and the reason why I checked a few months

22   ago was because we had some changes and I had to go back to my

23   Who Is information and change that.

24         So I don't know how long ago -- two months, four

25   months ago -- that I made the change.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 211

1    Q.   So you really don't know if you were the

2    administrative contact and registrant, right?

3    A.   That typically is what happens when you get registered

4    by someone else.  You get -- sign up -- not only that, but

5    sometimes technical contact as well.

6         So you get three or four different titles or contacts

7    in the Who Is look-up.

8    Q.   But you're guessing?

9    A.   Well, it's a guess based on some experience --

10        MR. SIEGEL:  Objection.  Mischaracterizes testimony.

11   A.   If it's a guess, it's on experience.

12   Q.   You said -- okay.  Strike that.

13        Is there anything else in paragraph 3 that you're

14   uncertain about?

15        MR. SIEGEL:  Objection.  Mischaracterizes testimony.

16   A.   The One World Telecommunications was the only thing I

17   thought to change at the time.

18   Q.   Is there anything in paragraph 4 that you're uncertain

19   about?

20   A.   No.

21   Q.   What about paragraph 5?

22   A.   No.

23   Q.   Paragraph 6?

24   A.   No.

25   Q.   Paragraph 7?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 212

1    A.    No.

2    Q.    Paragraph 7 provides that all of the e-mail accounts

3  that you provided could be accessed using the World Wide Web.

4          Do you see that?

5    A.    Yes.

6    Q.    Do you know how they could be accessed using the World

7  Wide Web?

8    A.    I don't understand that.

9    Q.    Users access e-mail accounts, correct?

10   A.    Yes.

11   Q.    And you've provided e-mail accounts to users, right?

12   A.    Yes.

13   Q.    And those users access them through the World Wide

14  Web, correct?

15   A.    That's my understanding.

16   Q.    By what means do they access them through the World

17  Wide Web?

18   A.    That's the part I don't understand.

19         What do you mean by "what means"?

20   Q.    Did they use an e-mail client software?  Did they use

21  a Web browser?  Was it Mail, WebMail, IMac, POP?

22         How did they access the e-mail that you provided to

23  them?

24   A.    Okay, if you mean -- they all had POP accounts -- no,

25  that's not true.

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 213

1      Some had POP accounts.

2      I should say I don't know what all of them had, but

3   they were able to access the Web and get their e-mail.

4      Q.   POP e-mail protocol isn't done through the World Wide

5   Web, though, is it?

6      A.   Well, right now, I'm tired and this is all running

7   together.

8      I indicate here all of these e-mail accounts could be

9   accessed by individuals.

10      I did not put the World Wide Web there, but --

11      Q.   Who put the World Wide Web there?

12      A.   I don't know.

13      Q.   You don't know how it got there?

14      A.   I'm not sure.

15      Q.   But you signed it?

16      A.   Yes.

17      Q.   And a moment ago you testified that everything in

18   paragraph 7 is true?

19      A.   It's true.  I thought they did access it by using the

20   World Wide Web.  And now you've started questioning me about it

21   and I want to know -- I want to know.

22      You said it's not done by the World Wide Web.  Okay.

23   Then that's news to me.

24      Q.   What's not done by the World Wide Web?

25      A.   You just said that they didn't access e-mail by way --

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 214

1    it's not accessed by the World Wide Web.

2          So that's news to me.

3    Q.    Did you provide Web mail to these users?

4    A.    Web mail, meaning?

5    Q.    The ability to log on to an Internet website and

6    access mail --

7    A.    Provided.

8    Q.    -- through an HTML-based site?

9    A.    Provided by whoever the Web hosting company was.

10   Q.    So a Web hosting company provided Web mail to these

11   users?

12   A.    Yes.

13   Q.    But you didn't?

14   A.    Well, I was the interface that helped them in terms of

15   setting up passwords and user names and so forth.

16   Q.    What do you mean by "interface"?

17   A.    I use a control panel that allows me to set up the

18   domains and e-mail addresses within the domains, set up auto

19   responders; that type of thing.

20   Q.    Is there anything in paragraph 8 that you're not sure

21   about?

22   A.    No.

23   Q.    Is there anything in paragraph 9 that you're unsure

24   about?

25   A.    No.  We've talked about that.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 215

1      Q.   Is there anything in paragraph 10 that you're unsure

2   about?

3      A.   Well, I think about that.  And there was an e-mail or

4   two prior to that date.

5          However, my attorneys and I did not include it in the

6   litigation from Virtumundo.

7      Q.   Why didn't you include it in the litigation?

8      A.   Because it was totally different from all the others,

9   that the only references to Virtumundo were in the source code.

10         And I don't know anything -- remember anything beyond

11  that, but we just decided not to include them at that point.

12     Q.   Do you know whether that e-mail you just testified

13  about came from Virtumundo?

14     A.   According to source code, that's where the hyperlink

15  was to Virtumundo.

16     Q.   Is there anything in paragraph 11, other than what

17  you've already testified about, that you're unsure of?

18     A.   No, that's fine.

19     Q.   Is there anything in paragraph 12 that you're unsure

20  of?

21     A.   No.

22     Q.   Are you sure that you never agreed to receive e-mail

23  or opt in to any e-mail lists using any other e-mail addresses

24  at the Gordonworks.com domain other than the ones listed in

25  paragraph 11?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo         James S. Gordon, Jr., Vol. I

Page 216

1    A.   I don't recall any others.

2         Now that I think about it, it's possible there could

3    have been others, but those are the only ones that I remember

4    at this time.

5         There were so many created, and I didn't keep records

6    of what was created, so I'm just not absolutely positive there

7    was never anything else.

8    Q.   Is there anything in paragraph 14 you're unsure of?

9    A.   For 13 and for 14 --

10   Q.   You already testified you never received any

11   merchandise in response to EmailPrize, right?

12   A.   I thought we were going to in sequence.

13   Q.   Did you ever receive any merchandise in response to

14   the EmailPrize offers?

15   A.   No, I did not.

16   Q.   Is there anything in paragraph 14 that you're unsure

17   about as you sit here today?

18   A.   I guess my choice of words today may have been -- I

19   contacted these websites and I guess what I did was contact

20   e-mail addresses.  Technically, I don't contact the website.

21        So I used e-mail addresses to try to get removed.

22        I don't understand exactly what I made contact with on

23   these websites.  The only contact was the unsubscribe link.

24        So, technically -- they didn't work, so I don't know

25   if that's a contact or not.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 217

1        Q.   By what means did you contact these websites to

2   request that they remove the e-mail addresses from their lists?

3            MR. SIEGEL:  Objection.  Asked and answered.  He just

4   answered that question.  He just said the only -- well, you can

5   read it back.

6        A.   Okay.  One other thought came to mind.

7            Those that had opt-in links, I used them.

8            Those that did not -- and this is not 100 percent --

9   but those that did not, I looked up Whois information to find

10  the e-mail address.

11           MR. SIEGEL:  Did you say "opt-in" or "opt-out" link?

12           THE WITNESS:  I should have said "opt-out."

13           MR. SIEGEL:  I think you said "opt-in."

14       A.   Opt-out links.

15       Q.   Is there anything in paragraph 15 that you're unsure

16  of today?

17       A.   No, that's fine.

18       Q.   You included as part of Exhibit A to this declaration

19  e-mails that include a marking that indicates they are spam

20  which came from the SpamAssassin filter, correct?

21       A.   Yes.

22       Q.   The SpamAssassin filter has the ability to exclude

23  those e-mails so you never see them; isn't that right?

24       A.   I don't know.

25       Q.   You have no idea whether you can configure

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 218

1    SpamAssassin to exclude the e-mails marked as spam?

2        A.    No -- I said I don't know to the first question that
3    you answered [sic].

4              I've never used it in that manner, if in fact it has
5    that capability.

6        Q.    So you receive every e-mail marked spam?

7        A.    It comes to my mailbox, yes.

8        Q.    And you have no idea whether you have the ability to
9    configure SpamAssassin such that you don't receive the e-mails
10   in your mailbox, right?

11       A.    SpamAssassin is server-side, and all we have an option
12   to do is turn it on or turn it off.

13       Q.    You use your door, right?

14       A.    That's -- I've used virtually all of the e-mail
15   clients, but that's primarily the one that I used.

16       Q.    Are you familiar with the term "filter" as applied to
17   an e-mail software application?

18       A.    Spam filter, yes.

19       Q.    Are you familiar with filter in an e-mail application
20   that allows you to specify how certain e-mails shall be routed?

21       A.    I don't know if I am or not.  I don't know.

22       Q.    Are you familiar with the term "rules"?

23       A.    Yes.  That concept, yes.

24       Q.    What is rules?

25       A.    With Webmaster, I believe it was, we could set up

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 219

1    rules to white list people.  We could set up rules to not

2    accept anything that was a foreign alphabet or something like

3    that.

4              So those were some of the rules.

5        Q.   Do you know whether you can set up rules in the Eudora

6    e-mail client that would cause the client to automatically

7    delete e-mails that are marked as spam so that you would never

8    see them?

9        A.   I've not read that in years.

10             With some of the new software, they probably do have

11   some of those rules.

12       Q.   Have you ever looked into it?

13       A.   No.

14       Q.   If you found out that Eudora had that function, would

15   you use it?

16       A.   It does now have a spam filter.  It was in an ad that

17   -- when I updated my Eudora, it mentioned it had a spam filter.

18       Q.   Do you use that spam filter?

19       A.   No, I purchase separate spam filters.

20       Q.   If you found out that Eudora had the ability to

21   discard all messages marked as spam by SpamAssassin, would you

22   utilize that function?

23       A.   I haven't -- no, is the short answer.

24             I'd prefer to use the server-based options as well as

25   my other software.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 220

1       Eudora has had some problems, and I've contacted

2   QUALCOMM about them, and they've yet to fix those problems.

3       So I'm starting to use more Outlook presently because

4   of the problems that Eudora has.

5       Q.   If you learned that SpamAssassin had the ability to

6   exclude the messages that it marks spam so that you would never

7   receive them, would you use that function?

8       MR. SIEGEL:   Objection.   Irrelevant.   Calls for

9   speculation.

10      A.   I'm starting to read about SpamAssassin a little bit

11  more, and maybe I'm still intimidated a little bit about the

12  particular product.

13      I just, again, use the other, the MailWasher and

14  SpamCrime, as my spam filters after talking with the tech

15  support at the companies and asking them to help me set up spam

16  filters because I messed up my own MailWasherPro because,

17  apparently, I didn't do the rules right or there were

18  contradictions in the rules.

19      So I ask for help when it comes to those kind of

20  things.

21      Q.   If you learned that SpamAssassin had the ability to

22  exclude the messages that it marks spam so that you would never

23  receive them, would you use that function?

24      A.   I don't know.

25      MR. SIEGEL:   Objection.   Calls for speculation.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 221

1    Irrelevant.

2        A.    The "I don't know" comes because, again, I'm doing

3    research on the spam that I receive, and there is a benefit in

4    receiving spam because of that.

5        Q.    What's that benefit?

6        A.    The fact that it would contribute to the research.

7        Q.    So you believe it's a positive thing that you receive

8    the spam?

9        A.    Well, in that one regard, it is.

10            The fact that I have so much of it, my advisor told me

11    that 3 or 4 million e-mails is more than I'd ever need for a

12    dissertation.

13            So I've got to somehow, you know, trim that down and

14    develop a research question based on some much smaller corpus

15    of e-mails.  So I don't know what that's going to finally look

16    like.

17        Q.    The receipt of spam benefits you, correct?

18            MR. SIEGEL:  Objection.  Mischaracterizes testimony.

19    He told you exactly --

20            MR. NEWMAN:  I didn't quote his testimony.  You're

21    coaching your witness.  If you want to object to the form of

22    the question, you should.

23            MR. SIEGEL:  It's a leading question.

24            MR. NEWMAN:  But a speaking objection is improper and

25    coaching the witness is improper.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 222

1    MR. SIEGEL:  A leading question is improper.  That's

2  not what he testified to.

3    MR. NEWMAN:  A leading question is not improper.  I'm

4  cross-examining this witness.  In fact, a leading objection is

5  the most proper question that one can ask on cross-examination.

6    I'm going to ask the question again.  I would

7  appreciate it if you do not coach the witness.  We have a

8  record here.

9    MR. SIEGEL:  That's fine.

10    Don't let him put words in your mouth, Jim.

11    THE WITNESS:  Okay.

12    MR. NEWMAN:  Would the court reporter be so kind as to

13  repeat the question.

14    (The requested testimony was read.)

15    A.   I answered slightly different.

16    Yes, insofar as research, and yes, insofar as there

17  have been settlement agreements for people who have said that

18  they wouldn't spam me any longer.

19    Q.   Is there anything in paragraph 16 of Exhibit 15 that

20  you're unsure of today?

21    A.   We'll leave it as is.

22    Q.   The answer is no?

23    A.   Yes.

24    Wait a minute.

25    There's nothing.  So, no.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 223

1    Q.   Exhibit 15, paragraph 16 talks about the proper use of

2    "from" names in the "from" line.

3         Do you see that?

4    A.   Oh, I thought we were on 17.  Let me go back.

5         Okay.  Yes, I see it.

6    Q.   What is the proper use of "from" names in the "from"

7    line?

8    A.   Identify the sender.

9    Q.   And upon what information do you base the testimony

10   that that's the proper use of the "from" name?

11   A.   Federal Trade Commission and Canned Spam, in my

12   estimation, as a layman, both say that that's the proper use.

13   Q.   Any other source?

14   A.   I may have read other things.

15   Q.   What has the Federal Trade Commission said about the

16   proper use of a "from" name in the "from" line?

17   A.   I don't recall.  I don't have any of that in front of

18   me.

19   Q.   You testified that you based our testimony upon

20   information that you received or reviewed from the Federal

21   Trade Commission.

22        What did you receive or review from the Federal Trade

23   Commission?

24   A.   I went to their website.

25   Q.   And is that website publicly available?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 224

1      A.    Oh, God.

2            Okay.  Now, my attorney gave me something as well.

3            I think I went to the website.

4            MR. SIEGEL:  Jim, I don't want you to speculate.

5      Answer the question if you know the answer.  If you have

6      personal knowledge of what he's asking you, answer it.  If not,

7      say so and we'll move on.

8      A.    Okay.  Let's move on.

9            MR. SIEGEL:  I don't want you to make up answers.

10           THE WITNESS:  Okay.

11     Q.    Is the website at which you reviewed or received

12     information from the Federal Trade Commission public?

13     A.    And I'm saying I may have gotten it from my attorney

14     now that I think about it.

15     Q.    And do you remember the content of that information?

16     A.    Not offhand.  It's not fresh in my head.

17     Q.    Did you produce in the course of this litigation the

18     documents that you reviewed or received from the Federal Trade

19     Commission that discusses the proper use of the "from" names in

20     the "from" line?

21     A.    Okay.  Do you mean, did I submit as part of the

22     discovery?

23     Q.    Yes.

24     A.    I don't know if it's in there or not.  There's so much

25     information.  I don't know if it's in there.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 225

1        And it's probably something that was just discovered

2  here in the past -- I don't know -- since the summary judgment

3  or right -- maybe a week before that.  So it wouldn't have been

4  in any of the previous productions.

5        Q.    Do you know how it was discovered?

6        A.    It's not -- I don't recall specifically how it was

7  discovered.

8              I don't even know if I was the one to discover it.

9        Q.    Paragraph 16 provides that an e-mail that you see from

10  Virtumundo shows that they are well aware of and capable of

11  properly using the "from" name information.

12             Do you see that?

13       A.    Yes.

14       Q.    Upon what information do you base your belief that

15  they're well aware of properly using the "from" name?

16       A.    I read dozens, if not hundreds, of the e-mails that

17  were from one named individual to another named individual, and

18  if it were -- I don't know if Lynn was in there -- whoever the

19  people are, it was from one person to another person, and you

20  could identify them because their name was there.

21       Q.    Upon what information do you base your belief that the

22  defendants know that that is proper?

23       A.    Oh, that's a different question.

24             Because that's how e-mail is sent and received over

25  the Internet with everyone I do business with, everyone that I

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 226

1    correspond with.

2          So in terms of common practice, in terms of e-mail

3    marketing pieces that we quoted in our summary judgment motion,

4    that's just the way things are done.  And they are doing it

5    internally the way things are generally done.  But through

6    marketing materials or ad copy, they fudge, they don't identify

7    who they are.

8          Q.   Is there anything in paragraph 17 that you're unsure

9    of?

10         A.   I have to see the screenshots again, but I think this

11   refers to like 270 pages of e-mail box -- inboxes or outboxes

12   or whatever it was.

13         So I -- let's leave that one as is.  I don't think

14   there's anything that needs to be changed.

15         Q.   Is there anything in paragraph 18 that you're unsure

16   of?

17         A.   Huh.  I see one thing was added back in in terms of a

18   draft, which is a mistake.

19         Google Gmail, I erased it from one of my drafts, and

20   somehow it got back in.  So that's a mistake because I'm not

21   familiar with Gmail.

22         Q.   Are you familiar with Microsoft Outlook?

23         A.   Yes.  I used it for the three years that I was with

24   City University.

25         Q.   And Hotmail?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 227

1    A.   Yes, I've used that before.

2    Q.   And Yahoo mail?

3    A.   Yes.  I currently use that.

4    Q.   Have you ever used Thunderbird?

5    A.   I tried using it for a short period of time, probably

6    less than two months, and I didn't like it, so I've stopped.

7    Q.   Is there anything in paragraph 19 that you're unsure

8    of?

9    A.   No, there's nothing I'm unsure of.

10   Q.   What is EmailLabs?

11   A.   I looked up a bunch -- talked with my attorney, and he

12   asked me to do some research, and I looked bunches of sources

13   up and I wasn't aware of which ones he selected for inclusion

14   until after I saw the draft.

15        So it's not fresh in my mind as what all they do, but

16   I looked up -- probably gave them 20 or 30 different

17   references, and he just selected which -- apparently selected

18   the ones he thought would be most appropriate.

19   Q.   What is EmailLabs?

20   A.   I don't know specifically.  I would have to go look up

21   whatever information I passed on.

22   Q.   Why did you attach as Exhibit D to your declaration an

23   e-mail from -- an article from EmailLabs?

24   A.   Again, I have to go back to refresh my memory as to

25   what specifically it contained.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 228

1    Q.   Had you ever heard of EmailLabs before this

2    litigation?

3    A.   I don't -- I don't know.  I don't think so.  It's not

4    fresh in my mind that I had.

5    Q.   What is Constant Contact?

6    A.   That was one of the sources that I passed on to my

7    attorney.

8    Q.   Had you ever heard about it before this litigation?

9    A.   I don't think so.

10    Q.   In paragraph 19, you testify that it's a "leading

11    e-mail marketing industry publication."

12         Do you see that?

13    A.   Okay.

14    Q.   Do you stand by that testimony?

15    A.   I guess I'm going to have to be more careful about the

16    words left in the draft there.

17         If I were to change that, it would just be an "e-mail

18    marketing industry publication."

19         I don't remember adding the word "leading" to it.  I

20    could have done it, but I don't recall doing that.

21    Q.   Is there anything else about paragraph 19 that you're

22    unsure of?

23    A.   No.

24    Q.   Upon what information do you base your belief that

25    Constant Contact is an e-mail marketing industry publication?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 229

1    A.   It was whatever was contained in the research that I

2    had done.

3    Q.   Did you verify it?

4    A.   Verify --

5    Q.   Did you verify that Constant Contact is an e-mail

6    marketing industry publication?

7    A.   From the content, that was fairly clear.

8    Q.   So you're basing your testimony that it's an e-mail

9    marketing industry publication based on the content of what you

10   saw on the Internet, right?

11   A.   Yes.

12   Q.   Do you know of any e-mail marketing industry companies

13   that receive Constant Contact?

14   A.   No, I don't offhand.

15   Q.   Have you ever spoken with an e-mail marketing industry

16   executive or employee about Constant Contact?

17   A.   No.

18   Q.   Do you know whether any e-mail marketing industry

19   business people receive Constant Contact?

20   A.   No, I don't know that.

21   Q.   The next sentence in paragraph 19 provides that the

22   Constant Contact publication indicates the importance of the

23   information placed in the "from" line.

24        Do you see that?

25   A.   The next sentence?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 230

1      Q.   I'm sorry, I was unclear.  I'm looking at paragraph

2   19.

3      A.   Okay.

4      Q.   And it's actually part of the same sentence I was just

5   referring to, which might have been part of the confusion.

6      A.   Okay.

7      Q.   But it does say that Constant Contact article

8   indicates the importance of the information placed in the from

9   line in e-mail user's determination whether or not to delete or

10  open an e-mail?

11          Do you see that?

12     A.   Yes.

13     Q.   Why do you believe that this article indicates the

14  importance of that information?

15     A.   I believe that's what I read.

16     Q.   So you believe it simply because the article says it?

17     A.   That's not the only thing I've ever read.  But I

18  believe that that is true based on my own personal experience,

19  and I've seen millions of e-mails.

20          And I base my decisions -- I think initially, it was

21  all on the "from" field, but more so on subjects.

22          But those are the two pieces of information I base my

23  decisions on whether or not to delete it and whether or not to

24  open it and so forth.

25     Q.   Is there anything else that you know of that indicates

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 231

1   the importance of the information placed in the "from" line in

2   an e-mail user's determination of whether or not to delete or

3   open an e-mail?

4       A.   I've seen other -- what they call affiliate marketer

5   firms out there, read blogs and things like that, where people

6   refer to different companies.

7            And I draw conclusions based on the information that I

8   find.

9       Q.   What are they?

10      A.   What are?

11      Q.   I asked whether there's anything in addition to these

12  -- strike that.

13           I asked whether there's anything in addition to this

14  article, and you testified that you have reviewed blogs.

15      A.   Yes.

16      Q.   And their affiliate marketer firms.

17           And I'm asking, what are those blogs for those

18  marketing affiliate firms?

19           MR. SIEGEL:  He's also testified he was familiar with

20  the FTC and Canned Spam as that regards the "from" line.

21           MR. NEWMAN:  Mr. Siegel, you have no right to coach

22  your witness.  If you object to the form of the question, state

23  your objection, but do not feed this witness with answers.

24           MR. SIEGEL:  I object.

25           MR. NEWMAN:  I'm entitled to seek discovery.  I'm

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 232

1    asking fair questions.  I'm entitled to fair answers from the

2    witness and not from you.

3              MR. SIEGEL:  Okay.  Object.  Asked and answered.  This

4    client's already testified about how he has knowledge about the

5    proper use of "from" lines.

6              MR. NEWMAN:  Would you please repeat the question.

7              (The requested testimony was read.)

8    Q.   I'm going to strike that question and ask it again.

9    A.   Okay.

10   Q.   Do you know what the blogs and affiliate marketer

11   firms are that you testified about?

12   A.   I may still have the list.  I don't know them offhand.

13   Q.   As you sit here today, can you name one?

14   A.   No, can't name the first.

15   Q.   So is there anything else that you can think of that

16   indicates the importance of the information placed in the

17   "from" line in an e-mail user's determination of whether or not

18   to delete or open an e-mail other than the Constant Contact

19   article?

20   A.   No.  I just said there were others because I submitted

21   the research to my attorney.

22        The statutes refer to -- I've already mentioned Canned

23   Spam refers to the "from" line as identifying a sender -- I

24   guess, technically, it would be an organization that's the

25   sender.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 233

1          I mentioned the FTC.

2          Washington state CEMA refers to the headers.

3          So I guess a collective of information which I've been

4    reading since '03, I come to that conclusion.

5       Q.   Have you submitted any of the information that you've

6    collected since '03 in response to the discovery requests in

7    this lawsuit?

8       A.   Some.  Again, I can't tell you specifically what I've

9    submitted.  It's on the disks.

10      Q.   Can you remember any of it?

11      A.   Letters regarding the communications to Virtumundo,

12   Whois look-up information, complaints, auto response messages

13   and things like that, those are the kinds of things I've

14   submitted as well as an analysis of some of the e-mails, or

15   partial analysis.

16      Q.   Any of the blogs or e-mail marketing firm documents

17   that you testified about earlier?

18      A.   The blogs are very unkind to the defendants.  Most

19   talk about them as pariah.

20          These are people who are predators on the Internet

21   and, in a manner of speaking, that may very well be true.

22          So they're very unkind to the defendants.

23      Q.   So you're basing your opinion -- strike that.

24          You believe that an indication of the importance of

25   the information placed in the "from" line in an e-mail user's

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 234

1    determination of whether or not to delete or open an e-mail is

2    blogs that are unkind about the defendants?

3         A.    Personal experience is my basis.

4               But there's corroboration in terms of the other things

5    I read out in cyberspace.

6         Q.    Corroboration for what?

7         A.    Some of the conclusions that I've reached.

8               I believe that your client is, in fact, an Internet

9    predator.

10              I believe that your client is involved in things that

11   are extralegal or perhaps illegal.

12              I find corroboration in the things I read out on the

13   Internet.

14        Q.    Which client of mine do you believe is involved in

15   things that are extralegal or perhaps illegal?

16        A.    Both, but perhaps more so, Virtumundo.

17        Q.    What do you think Virtumundo is extralegal or perhaps

18   illegal?

19        A.    They perhaps facilitate identity theft.

20              They are affiliated with pornographers.

21              There may be some other things that I'm not certain of

22   right now.

23        Q.    Upon what information do you base your belief that

24   Virtumundo is involved in identity theft?

25        A.    The relationship they had with First -- First and

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 235

1   whatever it is.  First Premiere Bank.

2        Q.    What is that relationship?

3        A.    They do spam or e-mail ad campaigns for them.

4              They request information such as Social Security

5   number and date of birth, and it's not information that is

6   requested by the actual institution, the lending institution.

7   It's requested by the domain owners.

8              So they're data brokers in that sense.  And data

9   brokers have no reason to know or need to know that

10  information.  It's information that should be vested in a

11  lending institution.

12             So that's sold by maybe this client over here and

13  resold and sold again, and Washington state law -- I don't

14  think it's the 080 provision of CEMA -- strictly prohibits

15  that.

16       Q.    Do you believe that Virtumundo or Adknowledge is

17  selling Social Security numbers or other private information?

18       A.    I believe they may be, yes.

19       Q.    And upon what information do you base that belief?

20       A.    The fact that they collect it.  They don't collect it

21  as a business for no reason at all.

22       Q.    On what information do you base your belief that

23  Virtumundo or Adknowledge collects it?

24       A.    Because of the websites they point to and redirect it

25  to.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 236

1    Q.    What are those websites?

2    A.    Don't know offhand.

3    Q.    Do you know whether they're Adknowledge or Virtumundo

4    websites?

5    A.    I said I don't know offhand.

6    Q.    Upon what information do you base your belief that

7    Virtumundo is involved with pornographers?

8    A.    I don't know what you mean by "involved," but an

9    entire IP block of Impulse Marketing Group is housed on

10   National Net.  National Net is probably one of the largest

11   pornographers in America.  They're based in the southeast, and

12   they occupy that block.

13        Right there in Kansas City, Wholesale Internet is

14   another company that promotes, sends out pornography, and they

15   have a relationship with -- with -- I believe it's -- no,

16   Virtumundo.

17        And there's one other company.  Never mind who that

18   is.

19        But there are at least two companies that they have

20   e-mails that they do business with, and these companies also

21   are pornographers.

22   Q.    Why do you believe Virtumundo is involved with the

23   pornographers?

24   A.    Well, they have a business relationship with

25   pornographers.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. I

                                                              Page 237

1        Q.   How do you know?

2        A.   Well, I don't have the information in front of me.

3   But to look at the e-mail, to check the IP blogs, to check the

4   Whois information and the fact that they are actually selling

5   products.  For example, they sell or market IMG products.

6             IMG -- Spamhaus called them a criminal spam gang, and

7   they are, in fact, a spam gang.  And they may be involved in --

8   and again, I'm a layperson -- RICO activities and so forth.

9             It's a deep pit in terms of the kinds of criminality

10  they are involved in.

11            And your clients affiliate with Impulse Marketing

12  Group.

13       Q.   How is our client affiliated with Impulse Marketing

14  Group?

15       A.   They market their products that they're licensed to

16  provide.

17       Q.   Upon what information do you base that belief?

18       A.   I have a contract -- copy of the contract that IMG has

19  with their principal, and these are -- this is an exclusive

20  contract, and the only one technically that is licensed to do

21  that -- unless they're, again, a layperson, they're violating

22  copyright laws -- Virtumundo, if they are violating copyright

23  laws, then of course they're doing it without the permission of

24  the principal.

25            But it's a paper trail.  All the paperwork I gave you

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 238

1    illustrates.  Let's pull it out and I'll show you.

2         Q.   Do you believe the paper trail shows a connection

3    between IMG and Virtumundo?

4         A.   Absolutely.

5         Q.   And can you explain that paper trail?

6         A.   I could show you if you gave me the documents.

7         Q.   What documents?

8         A.   The e-mails.  The e-mails.

9         Q.   What e-mails?

10        A.   There are e-mails that market typically credit cards

11   and credit offers.

12        Q.   And how is there a connection between IMG and

13   Virtumundo?

14        A.   That's something, again, I need to show you.

15        Q.   You can't explain it?

16        A.   I'm a visual person.  That's my learning style that

17   predominates.  And some of the times when you and I are talking

18   and I ask you to repeat things, there's things that make life

19   easy for me, and that's seeing things.  That's my style.

20        Q.   Mr. Gordon, can you help me understand which e-mails

21   to which you are referring?

22             Because I would like to show you those e-mails so that

23   you could establish for me the link between Virtumundo and the

24   unlawful activity.

25        A.   Okay.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 239

1    Q.   So can you explain to me what the e-mails are so that
2    I can locate them?

3    A.   Let's just look under First Premiere Bank.  And if you
4    have an Internet connection, we may be able to see links to
5    some of those websites that are still up.  They go up and they
6    go down all the time, so I don't know if they're still up or
7    not.

8         So just click on any of the -- not any.  The First
9    Premiere Bank would be the principal whose product is being
10   advertised.

11        If we find those under Virtumundo, I think we'll begin
12   finding what I'm referring to.

13        MR. SIEGEL:  Counsel?

14        MR. NEWMAN:  Sir?

15        MR. SIEGEL:  Just a time check.  Just wondering how
16   long you want to go.

17        THE WITNESS:  I'm doing fine.

18        MR. NEWMAN:  The witness is doing fine.

19        MR. SIEGEL:  I heard that.

20        MR. NEWMAN:  Considering that we're going to return
21   tomorrow, are you suggesting that we finish this evening?

22        MR. SIEGEL:  I'm good for a while longer, but if there
23   is a line of questioning you want to finish, then -- I just
24   want to see the light at the end of the tunnel.

25        MR. NEWMAN:  Let me give you a light for today.

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 240

1        I'm questioning this witness about Exhibit No. 15, and
2    when I finish with Exhibit No. 15 and any related questions and
3    response to his answers, I will most likely terminate for
4    today.
5        A.    We're on 15?
6        Q.    We're on Exhibit No. 15.
7        A.    I apologize.  Okay.
8        Q.    Is there anything else other than what you've
9    testified about that indicates that Virtumundo or Adknowledge
10   are engaged in any extralegal or illegal activity?
11       A.    The two things I've mentioned; the identity theft and
12   pornography affiliation.
13        They had an affiliation with Enron that people talked
14   about on the Internet.  Whether they occupied the Enron net
15   block or what the details were, I'm not clear at this moment.
16        I don't know.  It just seems like they affiliate with
17   unsavory people.
18       Q.    And if they had a business relationship with Enron,
19   you believe that indicates they were engaged in extralegal or
20   illegal activity?
21       A.    Well, no.  The fact that they were sending spam from
22   or sending spam on behalf of Enron from the servers, from their
23   servers.
24        It's all over the Internet.  You can probably Google
25   that information.