Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 241

1      Q.   Do you believe there's a significance in them sending

2   spam, as you describe it, for Enron as opposed to a company

3   that wasn't involved in the headlines?

4      A.   Let's see.  Enron tanked because of illegal

5   activities, and they're dealing with pornography, and they may,

6   in fact, be implicated in identity theft or facilitating the

7   identity theft.

8           Those are the things that come to mind right now, and

9   I guess if I had all of the e-mail in front of me, I might be

10  able to find something else.

11     Q.   Do you know whether Yahoo, AOL or MSN deal with

12  pornographers?

13     A.   No is the short answer.

14     Q.   Have you done any investigation to verify that?

15     A.   Verify what?

16     Q.   That Yahoo, AOL and MSN do not deal with

17  pornographers?

18     A.   I don't understand, then, what you mean by "deal with

19  pornographers."

20     Q.   Do you believe that Yahoo, AOL or MSN do any business

21  with pornographers?

22     A.   My guess is yes, they probably would.

23     Q.   And upon what information do you base your belief that

24  Virtumundo is involved with pornographers?

25     A.   I just said they had a relationship with

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 242

1    pornographers.

2        Q.    Which pornographers?

3        A.    The IMG National Net IP block.  IP block is shared

4    between the two companies.  Virtumundo sends spam on behalf of

5    IMG.

6              They also spam for Wholesale Internet, who probably is

7    just to directly the pornographer.  Or maybe they have it on

8    their network.  I'm not sure, but pornography comes out over

9    their network, on the IP block they own.

10       Q.    You're saying pornography comes out over Virtumundo's

11   network?

12       A.    I said over Wholesale Internet's.

13       Q.    So it's your testimony that Virtumundo does business

14   with a third party who does business or publishes pornography?

15       A.    I didn't say that.  I didn't mean that if I said it.

16       Q.    I'm trying to understand the link between Virtumundo

17   and the pornographer.

18       A.    Okay.

19       Q.    Can you help me understand that?

20       A.    They have a business link with Wholesale Internet and

21   they have a business link with IMG.

22             I've seen copies of the actual pornography from

23   Wholesale Internet, so they probably do double duty.  They send

24   out stuff that is supposedly benign and then they send out

25   pornography, too.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 243

1          IMG, they have leased a whole net block from one of

2    the biggest pornography companies in the nation, and it's some

3    really vile stuff.

4          They have a relationship with the third one, and

5    again, the name is just not on the tip of my tongue.

6      Q.   So Virtumundo's relationship with the pornography

7    industry is that it has a business link with Wholesale

8    Internet, which has a business link with IMG, which does

9    business with pornographers?

10     A.   I've explained that, so I'm not sure about how -- if I

11   agree with what you've said or not.  Or maybe I don't

12   understand what you said, but I did explain what I thought.

13     Q.   Anything else that is extralegal or illegal that you

14   believe Adknowledge or Virtumundo are engaged in?

15     A.   I guess I'll go back to my drawing board and see if

16   there's anything else.

17          Those are the things that I thought I'd bring up.

18     Q.   Anything other than the alleged identity theft that

19   you believe is predatory about Adknowledge or Virtumundo's

20   business practice?

21     A.   Well, the predatory part primarily was an emotional

22   reaction to the fact that this company or these companies have

23   known for quite sometime that I didn't want any part of their

24   business and yet, even with the advent of a lawsuit, they

25   continue to send e-mail.

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 244

1          They've known about it.  And I'm getting tons of it

2    through September of last year; one or two trickled in in

3    October and November.  But they just -- seven months after the

4    lawsuit is filed, they just continue to send e-mail.

5          Q.   What is a predator?

6          A.   What are you asking for, in terms of definition?

7          Q.   You testified that you believed that Adknowledge and

8    Virtumundo are predators, and I'm asking what you believe a

9    predator is so that I can better understand that testimony.

10         A.   The things that I characterized earlier about what

11   they do.

12         They lie about subscribe and unsubscribe information

13   and they continue to force e-mail into one's box without regard

14   to unsubscribes, without regard to a lawsuit and other types of

15   complaints that I've lodged.

16         And, again, if I go back to the blogs, I find that a

17   lot of other people are complaining the very same thing.

18         Q.   On what information do you base your belief that

19   Virtumundo or Adknowledge lies with subscribe and unsubscribe

20   information?

21         A.   From your documents that you submit to the court.

22   Those are lies, for the most part, when it comes down to the

23   subscribe and unsubscribe information.

24         Q.   Identify any of those lies for me, please.

25         A.   I would have to have something in front of me.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 245

1     Q.    Can you think of a single lie as you sit here?

2     A.    No.  The fact that you have said that I opted in --

3  and there was one point in one of the three CDs that I received

4  where there was some notion -- again, this is a company that

5  used Web bugs, Web beacons to spy on people they send out

6  information to, and it also sends out viruses.

7          And they said that I somehow clicked on or clicked

8  through -- I don't know -- hundreds of times, and I, in fact,

9  did not do that.

10    Q.    Upon what basis -- strike that.

11          What's a Web bug?

12    A.    My understanding of -- it could be a number of things.

13          Web beacon is what I meant to -- it's something that

14  gives out a signal that an e-mail has been opened.  It's some

15  type of applicant [phonetic] software script that retrieves

16  that information.

17    Q.    Is there a problem with Web beacons?

18    A.    It's an intrusion on people's lives and they don't

19  know about it.

20          So, again, that's something I consider predatory.

21    Q.    How is it an intrusion on somebody's life?

22    A.    If a company is spying on -- and that's what it is,

23  spying -- and you don't give them permission to access your

24  computer, then that's spying.  It may, in fact, be illegal.  I

25  don't know.

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 246

1          That's predatory.

2          MR. SIEGEL:  Since you asked.

3     Q.    Upon what information do you base your belief that

4  Adknowledge or Virtumundo transmits viruses?

5     A.    Oh, there's one name for Virtumundo.

6          Adknowledge, I don't have any experience with them

7  actually submitting a virus.

8          I had some viruses.  One time I was receiving 3- or

9  400 a week.  And one that I received, I'm not sure what I did

10 to it, but as the virus breaking up or whatever behavior it

11 had, I saw a few files that said "ogy.cc" and, that's one of

12 the domains that Virtumundo owns or Adknowledge owns.  And.

13         I didn't want to keep that darn thing on my computer,

14 so I ended up doing the Evidence Eliminator-type thing to get

15 my system clear again.

16         But I saw a bunch of little files for that.

17         But it happened more than once.  I'm guessing it

18 happened maybe two or three times that I saw in a virus that

19 came to me the ogy.cc.  Again, the domain of Virtumundo,

20 Adknowledge.

21    Q.    How did the virus manifest itself?

22    A.    I don't recall.  I get anxious when they come in, and

23 the first thing I do is make sure my virus software and adware

24 software is up to snuff, meaning that it's on, and try to do

25 something about it.

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 247

1    Q.   Did your virus software indicate that --

2    A.   Yes.

3    Q.   -- ogy.cc was related to the virus that you just

4    testified about?

5    A.   The virus software did not say it because I did not go

6    in to look at the virus software in terms of where it pointed

7    to on the computer that it may have been lodged.

8         I didn't do that.

9    Q.   Why do you connect ogy.cc with this alleged virus?

10   A.   First of all, I looked up who it is to find out who it

11   belonged to.

12        Simply because of the way the virus was basing -- I

13   don't remember specifically what happened -- it came in on two

14   or three different occasions.

15        ogy.cc was part of the file that maybe was unfolding

16   or something like that and my virus software caught it.

17        So maybe -- there's a couple of possibilities.  Either

18   they directly sent it -- which is predatory.

19        Or the other possibility, quite benign, is that their

20   stuff was infected.

21        So I don't know which one it was; it's just that

22   that's what I saw.

23   Q.   You testified that ogy.cc was part of the file.

24        What part of the file are you referring to?

25   A.   What I think was the virus file.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 248

1      Q.   And why do you believe that the file that you're

2   testifying about was a virus file?

3      A.   Because it kicked -- kicked in my virus alert and pops

4   up and says "virus cleaned" or "you've got a virus" or whatever

5   it was -- whatever it was at that time.

6      Q.   ogy.cc was part of the file name?

7      A.   I believe -- I don't know.  It was just one of the

8   files that I thought was unfolding from the virus.

9           And like I said, if it only happened once, then I'd

10  just leave it at that, but the fact that it happened more than

11  once, I believe that either the system was infected or -- and

12  it happened over more than one day -- or it was deliberately

13  sent.

14     Q.   ogy.cc is a domain name, correct?

15     A.   I think it is.  And I think it belongs to your

16  clients.

17     Q.   It's not a file name, right?

18     A.   No.

19     Q.   So I'm confused how ogy.cc was one of the files, as

20  you testified.

21     A.   I don't understand a lot about viruses, but I've been

22  told by others that they do unpack like a zip file would and

23  start doing things on the computer.  And that's about all that

24  I know.

25          But I know anyone who sends a virus is a predator in

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 249

1    terms of the Internet.

2         Q.    Did you save any data, documents or other information

3    with respect to ogy.cc in connection with a virus?

4         A.    I will check my computer because I thought that I

5    deleted it.  And that was my goal, to delete everything

6    associated with it.  But there may still be something.

7         Q.    Do you believe that because a virus was named

8    Virtumundo that Virtumundo is responsible for it?

9         A.    My best guess, it is.

10        And they admit to the Web beacon technology on the

11   website.  And Web beacon means that they do -- maybe they call

12   them cookies or something like that that they send out,

13   tracking cookies.

14        The other thing is that -- and this is just a

15   different form of logic, I guess -- when you have a virus named

16   for you and you choose not to defend yourself against that

17   claim -- and Virtumundo, from my understanding, is sue happy

18   when it comes to people that encroach on their trademark,

19   business methods and so forth.

20        I saw no litigation anywhere having to do with

21   Virtumundo claiming someone misappropriated their name or they

22   sued anyone, threatened anyone, anything like that.

23        I think that this is something that is, in fact, a way

24   of life, a way of business for that particular client.

25        Q.    And who would they sue?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. I

Page 250

1    A.    Oh, that's not up to me.  It's up to whoever the law

2    firm decided they wanted to sue; internal counsel and so forth.

3    Q.    You testified you believe that if Virtumundo wasn't

4    responsible, they would have sued someone, right?

5    A.    Yeah.  In a blog, someone claiming to be from

6    Virtumundo said, it's not us, it's someone pretending to be us,

7    and there was no litigation subsequent to that.

8    Q.    And who would Virtumundo have sued?

9    A.    Whoever supposedly sent that.

10   Q.    And if they can't be located, would Virtumundo have

11   sued somebody?

12   A.    Well, I saw no disclaimers, no information to say that

13   "that's not us" other than the one blog posting.

14   Q.    So you think Virtumundo's --

15   A.    They're silent on it.

16   Q.    Do you know who named the virus Virtumundo?

17   A.    No, I don't.

18   Q.    Do you believe it was Virtumundo itself?

19   A.    I don't know.

20   Q.    Is there anything in paragraph 20 of Exhibit No. 15

21   that you're unsure about today?

22   A.    No.

23   Q.    Other than the fact that Virtumundo hasn't sued anyone

24   over the Virtumundo virus, do you have any information upon

25   which you base your belief that Virtumundo is responsible for

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 251

1    the Virtumundo virus?

2        A.    What we've been talking about, about the ogy.cc, I

3    don't know, maybe that was a Virtumundo virus that came to me.

4    I don't know that for certain one way or the other.

5        Q.    Is there anything in paragraph 22 that you're unsure

6    about today?

7        A.    No.

8        Q.    Did you ever receive, from Virtumundo or Adknowledge,

9    a response indicating you had unsubscribed or opted out from

10   either?

11       A.    Not from them.

12       Q.    Not from Virtumundo or Adknowledge?

13       A.    Correct.

14       Q.    Is there anything in paragraph 23 that you're unsure

15   of today?

16       A.    Let me retract that.

17             I don't have a record of that.

18       Q.    Did you ever receive from Virtumundo or Adknowledge a

19   response indicating you had unsubscribed or opted out from

20   either?

21       A.    Okay.  I don't have a record of it, though I believe I

22   did it.

23       Q.    So you believe you did it?

24       A.    Well, I know I did it.

25       Q.    Do you believe you received from Virtumundo or

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 252

1    Adknowledge a response indicating that you had opted out?

2        A.    I may have.

3        Q.    But you don't know?

4        A.    No.  I just don't have a record.

5        Q.    Would you have normally kept a record of that?

6        A.    Not at that time, no.

7        Q.    You kept the one for EmailPrize in 2003, right?

8        A.    Yes, I kept it for that one.

9        Q.    Why did you choose to keep that?

10       A.    Because they were a portal or a gateway to many

11   spammers.  And as a result, I thought that if I go back to the

12   source, which was EmailPrize, at Home4FreeStuff and others,

13   that I could stop what it started.

14            The dike had already been opened; it was too late to

15   stop it.

16       Q.    Is there anything in paragraph 23 that you're unsure

17   of today?

18       A.    No, that is fine.

19       Q.    Paragraph 23 talks about records you did not retain.

20            Why did you not retain those records?

21       A.    Didn't see a need at that time.

22            I hadn't sued anyone at that time.  This was

23   October of '03.  The first lawsuit didn't come until two months

24   later.

25            And it wasn't against Virtumundo at that time, either.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo            James S. Gordon, Jr., Vol. I

Page 253

1    Q.   Paragraph 21 talks about Exhibit G being a copy of an
2  article.
3         Paragraph 23 talks about responses similar to that
4  shown in Exhibit G.
5    A.   Okay.
6    Q.   Is an article a response?
7    A.   That must have been -- should have been maybe H. That
8  looks like a mistake.
9         MR. SIEGEL:  It looks like a typo to me.
10        THE WITNESS:  Yeah.
11   Q.   Is there anything else in paragraph 23 that you think
12 might be a typo or that you're unsure of today?
13   A.   That that you point out is the only thing.
14   Q.   Is there anything in paragraph 24 that you're unsure
15 of today?
16   A.   No.
17   Q.   When was the last e-mail you received from Virtumundo
18 or Adknowledge?
19   A.   November 30, Virtumundo.
20   Q.   Did you do anything in response to that e-mail, such
21 as clicking on an unsubscribe link?
22   A.   No, I did not.  I learned my lesson.
23   Q.   What is your lesson?
24   A.   That the defendants are totally unresponsive to any
25 complaints or any opt-out efforts.

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 254

1       Q.   Is there anything in paragraph 25 that you're unsure

2    of today?

3       A.   Without having the information in front of me, I don't

4    know if it's 11 or some higher number or lower.

5            But I'm guessing that's true.  I probably checked.

6            And those are the other addresses I eluded to earlier

7    in your deposition.

8            Abuse, which is one that most domains use.

9            Legal was one that I chose to use.

10           A Postmaster is one.

11           And Webmaster.

12           Those are just common RFC -- at that time -- 822

13   e-mail addresses that virtually everyone that does business on

14   the Internet would have.

15      Q.   RFC stands for requests for comments?

16      A.   And they, of course, were updated with the -- by 2000

17   -- sorry -- 822 and 821 became 2821 and 2822, and there are

18   others.

19      Q.   Did you ever verify that Virtumundo had an

20   abuse@Virtumundo.com?

21      A.   I got no response.

22      Q.   Did you ever verify that Virtumundo had a

23   legal@Virtumundo.com?

24      A.   I got no response.

25      Q.   Did you ever verify that postmaster@Virtumundo.com was

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 255

1    a valid Virtumundo address?

2         A.    I got no response.

3               Let's put it this way.

4               I did, with my Visual Route, a realtime check on

5    whether or not the address was working.  It was working.  And I

6    sent it to the address, and no response.

7         Q.    Do you have any reason to believe that these four

8    e-mail addresses listed in paragraph 25 were monitored by

9    Virtumundo personnel in or around February of 2004?

10        A.    I don't know what goes on there internally.

11        Q.    Did you send similar e-mails to Adknowledge?

12        A.    No.  Not in terms of to those specific -- that I

13   recall.  I don't recall sending to any of those specific types

14   of generic abuse and postmaster, webmasters.

15        Q.    Is there anything in paragraph 26 that you're unsure

16   of today?

17        A.    My answer is the 13,800 -- maybe it's -900 -- I don't

18   know the exact number.

19              If I can call it that, it's my fourth production.

20              However, there are many thousands of e-mails from your

21   clients that I have not vetted for duplicates and so forth.  I

22   think it would be 5,000, 10,000 more e-mails, and I don't want

23   to take the time to go through them all.

24        Q.    So you don't know how many e-mails are subject to this

25   lawsuit?

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 256

1      A.   13,800 or -900 are subject to the lawsuit simply

2   because I'm not going back into that bunch of e-mails.

3           If you want them, you can have them.

4      Q.   Why, in paragraph 26, do you apologize to the court?

5      A.   That wasn't my choice of words.

6           Again, this was co-authored.

7      Q.   You didn't write that?

8      A.   That part, I don't believe I wrote.

9      Q.   But you signed it?

10     A.   Oh, yes.

11     Q.   So you apologize to the court?

12     A.   When I get advice from my attorneys, I typically go

13  with that advice.

14     Q.   So you apologize because your lawyers told you to?

15     A.   I go with the advice.

16     Q.   Did you mean the apology?

17     A.   Well, if in fact -- I think you were the first one to

18  bring it up about some misrepresentation.  It was never a

19  misrepresentation to this court.

20          What I brought up was the first set of e-mails, and

21  it's just that we didn't clarify what it is we meant.

22          The first set of e-mails that I submitted to you were

23  mostly -- not all, but mostly from Gordonworks.

24          The second iteration added in a few more from other

25  clients, so we had -- maybe it didn't end right or RCW or Chief

Buell Realtime Reporting, LLC
206-287-9066

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 257

1   Musician or something like that.

2          And the one after that, there were still more coming

3   in from clients.

4          They never told me when they were going to produce --

5   in fact, I talked with Emily earlier today, and she said, Jim,

6   I have another disk with e-mails.  I can get 500 more from

7   Virtumundo on that.

8          So I'll go by before I leave, pick that up, and all of

9   a sudden, maybe we have some more claims.

10          So what I'm saying is, there were iterations of

11   e-mails.  I don't have time to go back and vet each batch from

12   each person.  I dump them into a pile, and later, which was

13   within the past month, go back through and try to finally get

14   all of the duplicates out of that.

15      Q.   Was there a reason to apologize to the court?

16      A.   You would have to ask my attorney.

17      Q.   When you signed this, did you believe there was a

18   reason to apologize to the court?

19      A.   Again, my attorneys helped craft the documents, and I

20   typically do what my attorneys suggest that I do.

21      Q.   When you signed this, did you believe there was a

22   reason to apologize to the court?

23      A.   Okay.  What else are you looking for?

24          I thought I answered it.

25      Q.   Yes or no.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 258

1      A.    I didn't consider that at that time.

2      Q.    You signed this declaration without considering

3  whether the statements in it were true or false?

4      A.    I just said I didn't consider that particular thing.

5            It didn't -- it seemed innocuous enough and it didn't

6  seem like it was an error.  And if it had said here 28,300, I

7  might have asked to change that.

8            So, again, that was my appraisal.

9      Q.    Is there anything in paragraph 27 that you're unsure

10  of today?

11     A.    No.

12     Q.    Have you done anything to verify Virtumundo's annual

13  revenues?

14     A.    I haven't personally, no.

15     Q.    Have anything in paragraph 28 that you're unsure of

16  today?

17     A.    No.

18     Q.    Is there anything in paragraph 29 that you're unsure

19  of today?

20     A.    No.

21     Q.    Is there anything in paragraph 30 that you're unsure

22  of today?

23     A.    Again, some of this was crafted by my attorneys, so --

24            I think J, K, L and M were crafted by my attorneys,

25  even though I did some research and so forth.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 259

1          So I'm going to say no, there's nothing I want to

2    change.

3       Q.   Did you review J, K, L and M?

4       A.   Cursory look over most of the document.

5       Q.   So do you know whether paragraph 30 is true and

6    correct?

7       A.   I've not been misled by my attorneys yet, so...

8          Again, I do some research on my own, I pass it on to

9    them, and I scan over material.  I have done no independent due

10   diligence, verification of this.

11      Q.   Do you know whether paragraph 30 is true and correct?

12         I asked you that earlier, and you testified that your

13   attorneys haven't misled you.

14         But my question is whether you know paragraph 30 is

15   true and correct.

16      A.   The answer to K-N-O-W is, no.

17         MR. NEWMAN:  This will conclude the deposition for

18   today, and I ask that you get a good night's sleep and you have

19   an enjoyable dinner so that we may resume tomorrow.

20         Mr. Siegel, are we doing that at 9:00 a.m.?

21         MR. SIEGEL:  Yes.

22         MR. NEWMAN:  So I will look forward to seeing you at

23   9:00.

24         THE WITNESS:  Thank you.  I appreciate your

25   hospitality.

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. I

Page 260

1          THE VIDEOGRAPHER:    This concludes Tape No. 3 in the

2     deposition of James S. Gordon, Junior.    The time is now 5:46

3     p.m.  We are off the record.

4

5              (The deposition adjourned at

6              5:46 p.m.)

7

8              (By agreement between counsel

9              and the witness, signature was

10             reserved.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6158c13b-9931-4ad1-a959-e71e19f83129

Gordon v. Virtumundo        James S. Gordon, Jr., Vol. I

Page 261

1                    A F F I D A V I T

2

  STATE OF WASHINGTON      )
3                          )  ss
  COUNTY OF KING           )
4
     I have read my within deposition, and the same is true and
5  accurate, save and except for changes and/or corrections, if
   any, as indicated by me on the "CORRECTIONS" flyleaf page
6  hereof.

7

8            JAMES S. GORDON, JR. - VOLUME I

9

10     SUBSCRIBED AND SWORN TO before me this
            day of          , 2006.
11

12            NOTARY PUBLIC in and for the
              State of Washington,
13            residing at                      .

14

15

16

17

18

19

20

21

22

23

24

25

6158c13b-9931-4ad1-a959-e71e19f83129

# Transcript of James S. Gordon, Jr., Vol. II

**Case:** Gordon v. Virtumundo

**Date:** January 10, 2007



Phone: 206.287.9066
Fax: 206.287.9832
e-mail: info@buellrealtime.com
Internet: www.buellrealtime.com

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 262

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

JAMES S. GORDON, JR., a    )
married individual, d/b/a   )
'GORDONWORKS.COM'; OMNI     )
INNOVATIONS, LLC, a         )
Washington limited          )
liability company,          )
                            )
        Plaintiffs,         )
                            )
   vs.                      )      No. CV06-0204JCC
                            )
VIRTUMUNDO, INC., a         )
Delaware corporation        )
d/b/a ADKNOWLEDGEMAIL.COM;  )
ADKNOWLEDGE, INC., a        )
Delaware corporation,       )
d/b/a ADKNOWLEDGEMAIL.COM;  )
SCOTT LYNN, an individual;  )
and JOHN DOES, 1-X,         )
                            )
                            )
        Defendant.          )

_____

VIDEO DEPOSITION UPON ORAL EXAMINATION

OF

JAMES S. GORDON, JR. - VOLUME II

_____

Taken at 505 Fifth Avenue South

Seattle, Washington

DATE TAKEN:  JANUARY 10, 2007

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 263

1

                        A P P E A R A N C E S

2

    FOR THE PLAINTIFFS:
3                           ROBERT J. SIEGEL
                            Merkle Siegel & Friedrichsen, P.C.
4                           1325 Fourth Avenue
                            Suite 940
5                           Seattle, Washington 98101-2590
6

7   FOR THE DEFENDANTS:
                            DEREK A. NEWMAN
8                           ROGER TOWNSEND (as noted)
                            Newman & Newman, LLP
9                           505 Fifth Avenue South
                            Suite 610
10                          Seattle, Washington 98104
11                          MICHAEL R. GEROE
                            General Counsel, Adknowledge
12                          4600 Madison
                            Tenth Floor
13                          Kansas City, Missouri 64112
14

15  THE VIDEOGRAPHER:
                            ALBERT MAIMON, CLVS/CDVS
16                          Buell Realtime Reporting, LLC
                            1411 Fourth Avenue
17                          Suite 820
                            Seattle, Washington 98101
18

19

20
                            *    *    *    *    *
21

22

23

24

25

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 264

1    DEPOSITION OF JAMES S. GORDON, JR. - VOLUME II

2

3                    EXAMINATION INDEX

4

5    EXAMINATION BY                                    PAGE

6

     Mr. Newman    . . . . . . . . . . . . . . . .    266
7    Mr. Siegel    . . . . . . . . . . . . . . . .    455
     Mr. Newman    . . . . . . . . . . . . . . . .    472
8

9                      EXHIBIT INDEX

10

11   EXHIBITS FOR IDENTIFICATION                      PAGE

12

13   16 Defendant Virtumundo, Inc.'s First Set of
        Interrogatories and Requests for Production
        to Plaintiff Gordon . . . . . . . . . . .     274
14
     17 Plaintiff Gordon's Answers and Responses to
15      Defendant Virtumundo's First Interrogatories
        and Requests for Production of Documents to
16      Gordon. . . . . . . . . . . . . . . . . .     274

17   18 "Glamour Shots Offers" E-mail . . . . . . .   288

18   19 "Analysis of five emails" . . . . . . . . .   351

19   20 "Credit Advice Group" E-mail. . . . . . . .   351

20   21 "Normal or Valid 'Transport Path' Protocol   362

21   22 "Analysis". . . . . . . . . . . . . . . . .   366

22   23 "AntiVirus" E-mail. . . . . . . . . . . . .   366

23   24 "Analysis of four emails" . . . . . . . . .   371

24   25 "Cashflow Center" E-mail . . . . . . . . .    371

25

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 265

EXHIBIT INDEX (Cont'd)

EXHIBITS FOR IDENTIFICATION                              PAGE

26 "Analysis of three emails". . . . . . . .    373

27 "Closet Organizer" E-mail . . . . . . . .    373

28 Defendant Virtumundo, Inc.'s First Set of
   Requests for Admission to Plaintiff Omni
   Innovations, LLC. . . . . . . . . . . . .    395

29 Plaintiff Omni's Answers and Responses to
   Defendant Virtumundo's First Requests for
   Admission to Omni . . . . . . . . . . . .    395

30 Declaration of James S. Gordon, Jr. in
   Response and Opposition to Defendants' Motion
   to Compel Segregation of Emails . . . . .    421

31 "Odessa Schmitz" E-mail . . . . . . . . .    429

32 9/13/03 E-mail. . . . . . . . . . . . . .    430

33 8/21/03 E-mail. . . . . . . . . . . . . .    435

34 Adknowledge Unsubscribe Screenshot. . . .    435

35 Virtumundo's Unsubscribe Screenshot . . .    436

36 Declaration of James S. Gordon, Jr. in
   Response and Opposition to Defendants' Motion
   to Compel Discovery Re Lynn Interrogatories   437

37 "First Premier Bank" E-mail . . . . . . .    441


                MARKED TESTIMONY INDEX

REQUESTED BY                                            PAGE

Mr. Newman . . . . . . . . . . . . . . . . .    273

                        -oOo-

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo              James S. Gordon, Jr., Vol. II

Page 266

```
 1                SEATTLE, WASHINGTON; JANUARY 10, 2007

 2                          9:07 A.M.

 3

 4                            -o0o-

 5

 6            THE VIDEOGRAPHER:  This is the beginning of Tape No. 1

 7    of Volume 2 of the videotaped deposition of James S. Gordon,

 8    Junior.  The date is January 10th, 2007.  The time is now

 9    9:07 a.m.  We are on the record.

10

11

12                    E X A M I N A T I O N

13

14    BY MR. NEWMAN:

15         Q.   Good morning, sir.

16         A.   Good morning.

17         Q.   As the videographer just advised, this is Day 2 of an

18    ongoing deposition.

19            Yesterday, before the deposition began, the court

20    reporter swore you in and you gave testimony under oath.

21            You understand that, right?

22         A.   Yes.  And I'm still under oath.

23         Q.   Exactly.

24            My next question was going to be, you understand

25    you're still under oath, and you've just acknowledged that,
```

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 267

1    right?

2        A.   Yes.

3        Q.   Now, after yesterday, you left here, and I assume you

4    conferred with your lawyer, and I'm wondering whether there's

5    any testimony that you wish to change.

6        A.   I believe he will be asking me some questions by the

7    end of the day, and we can do that.  I'd like to proceed.

8        Q.   So, at this point, there's nothing about yesterday's

9    deposition that you wish to clarify or change?

10       A.   Not until he asks me specific questions.

11       Q.   What did you do to prepare for your deposition?

12            And when I say "deposition," I mean both yesterday and

13   today.

14       A.   Nothing.

15       Q.   You didn't meet with your lawyer?

16       A.   No.

17       Q.   Didn't review any documents?

18       A.   No.

19            Let me clarify.  I didn't review any documents with

20   him.  I always look over stuff pertaining to a given case I'm

21   working on.

22       Q.   What documents did you review before this deposition?

23            And when I say "before," I mean within a week or two.

24       A.   Nothing I can think of that's actually on the record.

25            I went back through e-mails, opt-in-type information.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 268

1        I did some research on the CDs provided by defendants.

2        That type of thing.

3        Nothing that I can recall specifically, but just in

4    general, looked over that type of information.

5    Q.   Were there any documents that helped refresh your

6    recollection?

7        MR. SIEGEL:  About what?

8    A.   Okay.  About what?

9        MR. SIEGEL:  Objection.  Vague and ambiguous.

10       How can he answer that?

11   Q.   What are you unclear about, if anything?

12   A.   When you say, are there any documents, are you

13   referring specifically to a given set of documents?  Maybe

14   documents that have been filed?  Documents that are part of the

15   discovery process?

16       I'm -- I'm not certain as to what --

17       MR. SIEGEL:  Jim, you don't need to ask the questions

18   for him.  If you don't understand his question, just ask him to

19   clarify.  You don't need --

20       THE WITNESS:  I did when I said, "About what?"

21   A.   So I repeated what you said because -- I was thinking

22   that, but that's why I took a while to consider it, because I

23   wasn't sure.

24   Q.   Anything further?

25   A.   So I'll ask in the future.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 269

1      Q.   Anything further?

2      A.   I don't fully understand what your request is.

3      Q.   You testified that within the last couple of weeks,

4   you've reviewed documents in connection with this case,

5   correct?

6      A.   I don't know if I said last couple of weeks, did I?

7           I meant prior to the deposition.  So it may have been

8   a few days; could have been a few weeks.

9      Q.   You've reviewed documents in the last couple of weeks?

10     A.   Yes.

11     Q.   Have you reviewed any documents within the last couple

12  of weeks that have helped refresh your recollection?

13     A.   That wasn't the intent.

14          MR. SIEGEL:  Objection.  Vague and ambiguous.

15          Recollection about what?  About his child -- his first

16  child's birth?  This case?

17          MR. NEWMAN:  Speaking objections are inappropriate.

18  Those types of remarks aren't cute or funny.  This is a

19  deposition, it's a formal proceeding, and neither I nor anyone

20  else in connection with it appreciate those remarks.

21     Q.   If you don't understand the question, sir, I'm happy

22  to clarify.

23     A.   Uh-huh.

24          Let's start it again because I've lost that train of

25  thought, please.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 270

1      Q.    Have you reviewed any documents within the last couple

2  of weeks that have refreshed your recollection?

3            MR. SIEGEL:   Same objection.

4      A.    Yeah.   We were working on the Ascentiv case, and I

5  reviewed documents there.

6      Q.    And what did those documents provide that helped

7  refresh your recollection?

8      A.    Well, they were asking about whether or not these

9  particular documents were actually sent by the company

10 Ascentiv, and we provided some evidence that they were.

11     Q.    And do they relate at all to this case?

12     A.    Not directly.

13     Q.    Have you reviewed any documents within the last couple

14 of weeks that helped refresh your recollection about anything

15 that relates to this case?

16     A.    Again, I've looked at e-mails.

17           I looked at the discovery that you, I guess,

18 propounded to us.

19           So those are -- and I have no idea how many documents,

20 what all the documents are because I didn't read every single

21 one of them.

22     Q.    And which documents helped refresh your recollection?

23     A.    Well, the documents that I gazed or just glanced at

24 were internal communications.

25           I saw some complaints.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 271

1          And there was something that reminded me of or made me

2      think of something we talked about yesterday that I was very

3      unclear about, and that was opt-out information.

4          Your discovery contained evidence -- I guess I can

5      call it that because I don't know any better -- evidence that

6      the defendants had opt-out information on me.

7          And of course, it's not your obligation to tell me

8      yesterday.

9          But you have the opt-out information you were trying

10     to get from me, it's just that it wasn't fresh in my mind.

11     Q.    So did that help refresh your recollection?

12     A.    That -- okay.  Yes.

13     Q.    And what did that help refresh your recollection

14     about?

15     A.    The fact that you have opt-out information that you

16     were asking me about.

17         And it also goes to opt-out information that other

18     defendants have which show -- if I were able to -- and I don't

19     know if I can or not -- if I were able to bring in information

20     from other cases, we'd have a much better picture of what I was

21     doing in terms of opt-out.

22         Because, for example, Impulse Marketing Group has

23     information --

24         -- Impulse Marketing Group -- we call it IMG --  of

25     Atlanta, Georgia has information, shows that I opted out from

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 272

1    all the e-mail addresses at the source -- I called it yesterday

2    a portal or gateway -- EmailPrize.com.

3            And I didn't have that information available to give

4    to you because it pertained to another case, and I didn't know

5    -- in fact, I don't think I asked my attorney about it, if I

6    can use information from another case to present.  And I'll

7    revisit that with him later.

8            So I have information for opt-outs for other cases

9    that, if I can introduce them here in this case, would show

10   that I was opting out from all of the sources that I said I was

11   opting out from.

12       Q.   How does that relate to this case?

13       A.   Well, you were asking about opt-out information

14   yesterday, and I'm just further embellishing what I was telling

15   you yesterday, about the fact that I was opting out.

16           And I was opting out in bunches of groups, as I might

17   have called it yesterday, and that included your clients.

18       Q.   Do you recall specifically opting out with Adknowledge

19   or Virtumundo?

20           MR. SIEGEL:  Objection.  Asked and answered.  Many

21   times.

22           THE WITNESS:  So what am I to do if it's asked and

23   answered many times?

24           MR. SIEGEL:  Either answer it again or stand by what

25   you said already.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo               James S. Gordon, Jr., Vol. II

Page 273

1    A.   Well, I would have to be refreshed as to what I said

2    previously.  If we want to take the time to do that, I'll get

3    refreshed.

4    Q.   You don't know the answer unless you look at what you

5    said earlier?

6    A.   Well, I'm taking the advice of my attorney.

7    Q.   Do you fear that if you testifying honestly to my

8    question that it might be inconsistent --

9        MR. SIEGEL:  Objection.

10   Q.    -- with previous questioning?

11       MR. SIEGEL:  Argumentative.  Intended to intimidate

12   and harass.

13       Jim, don't answer that question.

14       MR. NEWMAN:  Counsel, don't --

15       MR. SIEGEL:  I'm instructing you not to answer that

16   question.

17       MR. NEWMAN:  Would the court reporter be so kind as to

18   mark the record.

19   Q.   Are you refusing to answer the question as to whether

20   you remember specifically opting out?

21   A.   No.

22   Q.   Do you remember specifically opting out?

23   A.   I asked to have the court reporter refresh my memory

24   in terms of what I put on the record.

25   Q.   So your answer will be based on what you said earlier

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 274

1    as opposed to your firsthand knowledge as you sit here today?

2        A.   I've answered that.

3        Q.   And the answer is?

4        A.   I told you what --

5            MR. SIEGEL:  Objection.  Asked and answered.

6    Argumentative.

7        A.   I've stated my preference.  If you don't want to honor

8    that, then let's move on.  Plan and simple.

9               (Exhibit Nos. 16 & 17 marked.)

10           MR. SIEGEL:  In what order?

11           MR. NEWMAN:  Exhibit 16 is Defendant Virtumundo,

12   Inc.'s First Set of Interrogatories and Requests for Production

13   to Plaintiff Gordon.

14           Exhibit 17 is Plaintiff Gordon's Answers and Responses

15   to Defendant Virtumundo's First Interrogatories and Requests

16   for Production of Documents to Gordon.

17           MR. SIEGEL:  Thank you.

18       Q.   Sir, would you take a moment to review Exhibits 16 and

19   17 --

20       A.   It will take more than a moment.

21       Q.   And after you've taken more than a moment, will you

22   please testify as to whether you recognize either or both.

23       A.   By way of caption, I recognize it.

24       Q.   What is it?

25       A.   It says, "Defendant Virtumundo's First Set of

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 275

1    Interrogatories and Requests for Production" to me.

2         And I received a document -- I don't know if it was a

3    Word doc or .pdf file -- that had that information.

4         We prepared responses to that.

5    Q.    Were you involved in the preparation of responses to

6    Defendant Virtumundo, Inc.'s First Set of Interrogatories and

7    Requests for Production?

8    A.    "Involved"?  You mean, did I play a role?

9    Q.    Yes.

10   A.    Yes.

11   Q.    What role did you play?

12   A.    I played a role in terms of providing answers to the

13   questions.

14   Q.    Did anyone else provide a role in providing answers to

15   these questions?

16   A.    Okay.  My attorney played a role.

17        And if there's anyone beyond that, I don't know.

18   Q.    I'd like to turn your attention to Interrogatory

19   No. 4.

20        And when I'm stating interrogatory numbers concerning

21   these Exhibits 16 and 17, I'm speaking of the pair.  So when I

22   refer to the numbers, I'd like you to review the question, the

23   interrogatory, and the answer, your response, please --

24   A.    The document -- which document?  So we're going from

25   document 16 over to document 17 or document 17 back to

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 276

1    document 16?

2         Q.    Do you understand that document 17 is your responses

3    to the interrogatories stated in document No. 16?

4         A.    Yes.  I didn't understand the sequence in terms of

5    what you wanted.

6         Q.    I'm asking you to review the Interrogatory No. 4

7    provided in Exhibit 16 and look at your answer provided in

8    Exhibit 17.

9         A.    Okay.

10             (Witness reviews documents.)

11             Okay.  I've read them.

12        Q.    The beginning of your response provides, "Subject

13   matters are not false, only subject lines."

14             What does that mean?

15        A.    Wait a minute.  I thought you said 16.

16        Q.    Would you please review Interrogatory No. 4 in Exhibit

17   No. 16, and then if you'd please --

18        A.    Okay.

19        Q.    -- review the answer to Interrogatory No. 4 in

20   Exhibit 17.

21        A.    I apologize.

22        Q.    And then I'll ask the court reporter to repeat the

23   question so that you can answer it.

24        A.    (Witness reviews documents.)

25             Okay.  I've read it.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 277

1              (The requested testimony was read.)

2      A.   Where -- are we reading from -- where are we reading

3   from?  Where are you reading from?

4      Q.   You have two documents in front of you.

5      A.   Yes.

6      Q.   Exhibit No. 16 and Exhibit No. 17; is that correct?

7      A.   Yes, I have both of those documents.

8      Q.   And Exhibit No. 16 is a set of interrogatories; is

9   that right?

10      A.   As I understand it, yes.

11      Q.   And Exhibit No. 17 is your response to those

12   interrogatories, correct?

13      A.   Yes.

14      Q.   I would like you to review Interrogatory No. 4, which

15   is in Exhibit No. 16.

16      A.   Okay.

17      Q.   I would then like you to review your response to that,

18   which is in Exhibit No. 17, and then I'm going to ask the court

19   reporter to please repeat the question so that you can answer

20   it.

21      A.   Again, I was still reading the wrong one.  I

22   apologize.

23           I didn't get much more sleep last night, so I'm still

24   tired like I was yesterday.  So I read the wrong one again.

25           I've now read No. 4.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 278

1          (The requested testimony was read.)

2      A.   When things are -- for court, for legal purposes, I

3   know everything is not always as simple as it seems, so I will

4   try to explain this.

5          A subject matter could be -- let's see.  It's some of

6   the stuff that your client has sent me.

7          We had one that said "trade in," I think, or

8   "bankruptcy"; one of those subjects.

9          No, that was in the "from" field.

10         A "subject" line can have the capacity to mislead, and

11  because I don't have anything in front of me, nothing comes to

12  mind.  If you shared with me some of the "subject" lines or we

13  saw some of the documents, I could probably expound on that.

14         It's a conceptual thing.  "Subject" lines -- "subject"

15  lines don't have to cohere with subject matter, and in a lot of

16  e-mails, they don't.  They're not necessarily congruent.

17         Again, it's conceptual, and that's -- right now, if

18  you want a specific, I need to see the e-mails, but that's the

19  general concept.

20     Q.   What is a subject matter?

21     A.   It varies.

22         MR. SIEGEL:  Objection.  Lack of foundation.

23         This client has never testified -- this client's

24  answer in his interrogatories only repeats the language that

25  you used in your interrogatory, and so it's not proper to ask

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 279

1   him to define what the meaning of a term that you introduced

2   is.

3              MR. NEWMAN:  Mr. Siegel, stop coaching your witness.

4   Again --

5              MR. SIEGEL:  You've got my objection on the record.

6              MR. NEWMAN:   -- we have a record here, and everything

7   you say is being taken down by this --

8              MR. SIEGEL:  I have no doubt of that.

9              MR. NEWMAN:  -- court reporter.

10             MR. SIEGEL:  This is a very competent video

11  deposition.

12             MR. NEWMAN:  So when I ask your client a question and

13  he parrots your objection, then it's obvious the answer did not

14  come from him and the record shall so reflect.

15             Speaking objections are improper.  There is a court

16  order in this matter on the subject, and you should refrain

17  from them.

18             I'll ask the question again, even though the witness

19  is now tainted by counsel's characterizations.

20     Q.   Do you know what a subject matter is?

21     A.   If that's a legal question, the answer is no.

22     Q.   I'm not asking you a legal question.

23          Have you ever heard that term before?

24     A.   What, "subject matter"?

25     Q.   Yes.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 280

1      A.    I probably have, yes.

2      Q.    And what does it mean?

3      A.    Okay.  I don't remember the genesis.

4            I've read this, "Please identify all e-mails

5      dispatched by Defendant..." right here "...which misrepresented

6      or obscured...contained false or misleading" -- and maybe I

7      shouldn't try to anticipate what it is you're talking about.

8            It's a concept.  Nothing more than that.  Those two

9      things aren't necessarily congruent.  That's all that says.

10     Q.    You testified those two things are not necessarily

11     congruent, which indicates to me that you have some working

12     knowledge of those two things.

13           Are those two things the subject matter, on the one

14     hand, and the "subject" line, on the other?

15           MR. SIEGEL:  Objection.  Lacks foundation.

16     A.    Those are two concepts.

17     Q.    When you testify about two things, what are you

18     referring to?

19     A.    I said those two things.

20           You mentioned two things, and I said those are

21     concepts --

22           Subject matter is a concept.

23           "Subject" line is also a concept.

24     Q.    And those two things are not congruent, right?

25     A.    No, I said they -- they're not necessarily congruent.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 281

1    Q.   And the two things that are not necessarily congruent

2    are subject matter, on the one hand, and "subject" line, on the

3    other, correct?

4    A.   It -- it depends.

5    Q.   Upon what information do you base that testimony?

6    A.   On looking at just so -- so many thousands of e-mails.

7         I mean, unless you gave me a specific e-mail, I

8    couldn't make a further assessment.

9    Q.   That's a fair answer.

10        And when looking at those thousands of e-mails, have

11   you reviewed subject matter?

12   A.   If that question means, did I look at the actual

13   e-mails and -- to determine what the subject matter of the

14   e-mail was, then the answer is yes.

15        If it means something else, then no.

16   Q.   What is subject matter?

17   A.   The general concept -- the --

18        MR. SIEGEL:  Objection.  Lacks foundation.  Calls for

19   a narrative.  Vague.  Ambiguous.  Confusing.

20   A.   Subject matter is a concept, again.

21   Q.   What is the concept?

22   A.   An idea.

23   Q.   So a subject matter is any idea?

24   A.   Not necessarily, but it could be.

25   Q.   Do you stand by your response to Interrogatory No. 4

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

```
                                                    Page 282
 1    as it appears in Exhibit No. 17?

 2         A.   Yes, I do.

 3         Q.   And you do you see "Subject matters are not false,

 4    only subject lines"?

 5         A.   Yes.

 6         Q.   Did you have an understanding of what "subject

 7    matters" meant when you approved the response to Interrogatory

 8    No. 4?

 9         A.   And I still do.

10         Q.   And what is that understanding?

11         A.   I don't, again, remember the genesis of the line of

12    thought that I had at that particular point in time.

13              The representation of subject matter by a "subject"

14    line can be false or true.

15         Q.   So a subject line can be false or true, correct?

16         A.   Yes.

17         Q.   And subject matter?

18         A.   Neither, necessarily.

19         Q.   So what did you mean when you responded to

20    Interrogatory No. 4 and wrote, "Subject matters are not false,

21    only subject lines"?

22         A.   Oh, I see.

23              "In your answer, please specifically identify the

24    subject matters you contend are false."

25              I never said any subject matters were false.
```

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

1      Q.    But "subject" lines were false?

2      A.    Can be.

3      Q.    And do you recall any "subject" lines contained in the

4   e-mails in this case that are false?

5      A.    A lot of them.  It's just I don't recall them.

6            I highlighted them and looked over them.  That's one

7   of the things I refreshed, so to speak, but not a specific one.

8      Q.    Do you believe that most of them are false?

9      A.    No.

10     Q.    Do you believe that 20 percent are false?

11     A.    I don't know a percent.

12           MR. SIEGEL:  Objection.  Calls for speculation.

13           I don't want you to speculate if you don't know.

14     Q.    Do you believe that 20 percent were false?

15     A.    I have no concept as to what percentage would be false

16   or true.

17     Q.    No idea whatsoever?

18     A.    That's my answer.

19     Q.    Have you ever determined whether a "subject" line is

20   false or misleading?

21     A.    I don't understand "determined."

22     Q.    Have you ever evaluated whether a "subject" line is

23   false or misleading?

24     A.    "Evaluated," meaning -- I'm not sure what you mean by

25   that.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 284

1      Q.    Have you ever heard the term "evaluate"?

2      A.    I could lie and say no, I've never heard it.

3            But yes, I have heard the term "evaluate."

4      Q.    What does that mean to you?

5      A.    I want to know what it means to you because I'm to

6      answer your question.

7            So please advise me as what "evaluation" means.

8      Q.    What does the term "evaluate" means to you?

9      A.    It means that we're going to spend a lot of time going

10     back and forth with this.

11           I don't understand what you mean.  Please explain.

12     Q.    What does the term "evaluate" mean to you?

13     A.    I just answered that.  And the only way that I know

14     how to answer it at this point.

15     Q.    And how do you know how to answer it?  What does

16     "evaluate" mean to you?

17           MR. SIEGEL:  Objection.  Asked and answered.

18     A.    I'll stand by that answer.

19     Q.    What does the term "determined" mean to you?

20     A.    And I'll stand by my previous answer.

21           MR. SIEGEL:  Objection.  Irrelevant.  Argumentative.

22     Q.    What is your answer?

23     A.    I stand by my previous answer.

24     Q.    You don't know what "determined" means?

25           MR. SIEGEL:  Objection.  Argumentative.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 285

1          You don't have to answer that.

2          THE VIDEOGRAPHER:  Counsel, the laptop is right --

3          MR. NEWMAN:  I apologize.

4     A.   Oh, get the electronics out of the way.

5          Do we go off the record to clean that up or what?

6          MR. GEROE:  Let's see if smoke starts.  Take your

7     laptop up, based on prior experiences.

8          Your laptop is sitting on wet paper.

9     Q.   Have you ever concluded that a "subject" line is false

10    or misleading?

11         MR. SIEGEL:  Counsel, I think we better take a quick

12    break to clean up the mess, all right?

13    A.   I'd like to take a break, please.

14    Q.   Please give me an answer to the question.

15         MR. SIEGEL:  No.  I'm instructing my client not to

16    answer.  That's intended to intimidate and harass, and I'm

17    telling you now, if you're going to continue on this tact,

18    we're going to be leaving the deposition, if all you want to do

19    today is harass my client.  It's not going to work.

20         And you can file a motion.

21    A.   Pardon me --

22         MR. SIEGEL:  We're taking a break.

23         THE WITNESS:  Are we off the record?

24         MR. SIEGEL:  We are.  Let's go.

25         We're not leaving; just off the record.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 286

1          THE WITNESS:  Oh, okay.

2          MR. NEWMAN:  Can we review the testimony?

3          THE COURT REPORTER:  Can we go off the record now?

4          MR. NEWMAN:  Off the record.

5          THE VIDEOGRAPHER:  The time is now 9:36 a.m.  We are

6     off the record.

7               (A discussion was held off the record.)

8               (A recess was taken.)

9          THE VIDEOGRAPHER:  The time is now 9:45 a.m.  We are

10    on the record.

11         MR. NEWMAN:  Would the court reporter be so kind as to

12    repeat the last question that I asked.

13              (The requested testimony was read.)

14     Q.   Are you going to answer the question?

15     A.   Oh, sorry.  I thought that was one of the questions

16    that was dispensed beforehand.

17              I thought that was one that my attorney objected to

18    and was dispensed with.

19              My mistake, then.

20     Q.   I'll ask the question again, and if your attorney

21    objects, then so be it.

22     A.   Okay.

23     Q.   The question is, have you ever concluded that a

24    "subject" line in an e-mail is false or misleading?

25     A.   Yes.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 287

1    Q.    And upon what basis did you come to that conclusion?

2          MR. SIEGEL:  Objection to the extent it calls for a

3    legal conclusion.

4    Q.    When your attorney objects, you still must answer the

5    question.

6    A.    Okay.

7    Q.    Unless he instructs you not to?

8    A.    Aside from the legal part of it, I make a

9    determination based on whether that's an inducement -- like

10   "Your free prize."  That was a misleading "subject" line.

11         So that's the type of thing.

12         And I would highlight in any of the analysis.

13         I've not highlighted every single one, but that's

14   typically what I would do, is highlight the analysis, what I

15   think is misleading.

16   Q.    Do you believe that the "subject" line "Your free

17   prize" is misleading?

18   A.    I believe that it is now, and in retrospect, because

19   there were no free prizes forthcoming from those people who

20   said there were free prizes.

21   Q.    Did you receive an e-mail from Virtumundo or

22   Adknowledge with the subject line "Your free prize"?

23   A.    No.

24   Q.    I believe that you testified that you recall seeing a

25   "subject" line from Virtumundo or Adknowledge that you believed

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 288

1    to be false or misleading; is that right?

2        A.    Oh, there have been a number that I believe still are

3    false and misleading.

4        Q.    Can you remember any --

5        A.    No --

6        Q.    -- as you sit here today?

7        A.    I'm sorry, I interrupted.

8              No, not offhand.

9                (Exhibit No. 18 marked.)

10       Q.    You've been handed what's been marked Exhibit No. 18.

11             Do you recognize it?

12       A.    It says it's from one of my clients.

13             I'm not sure if I've seen this one specifically in

14    that there's so many.

15             So I can't say I recognize it, other than the fact

16    that it appears to be to one of my clients.

17       Q.    Have you reviewed every e-mail that you contend

18    violates the law in this lawsuit?

19       A.    What do you mean by "review"?

20       Q.    Looked at.

21       A.    If it's solely looked --

22             I've looked at the "from" and "subject" lines of

23    e-mails, and I've grouped them by "subject" line or the "from"

24    line, and sometimes by date, and I looked at them as a group.

25             And I can't say for all 13,900 today that I've

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 289

1    actually opened up each one, gone over every detail, gone -- I

2    did them in groups rather than through an individual.

3        Q.   Can you estimate what percentage of the e-mails you

4    contend violated laws in this lawsuit that you opened up?

5        A.   No.

6        Q.   Do you have any idea whatsoever?

7        A.   No.

8        Q.   Do you know whether it's more than one?

9        A.   No.

10       Q.   So it may only be one.

11       A.   No, I'm just saying I have no idea whatsoever.

12       Q.   It may only be one, then, right?

13       A.   No, because I highlighted more than that in the

14   analysis.

15       Q.   Do you believe it's more than 10?

16       A.   I don't know what the number is.

17       Q.   It might be less than 10?

18       A.   I don't know what the number is.

19       Q.   So it might be less than 10, then?

20       A.   I don't --

21           MR. SIEGEL:  Objection.  Argumentative.  Asked and

22   answered.

23           My client said he doesn't know what the number is.

24       Q.   So it might be less than 10?

25           MR. SIEGEL:  Objection.  Asked and answered.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 290

1    Argumentative.

2         A.    I don't know is the only answer that I know when you

3    ask me specific numbers.

4         Q.    I'd like to turn your attention to Exhibit No. 18.

5         A.    Yes.

6         Q.    And since you don't know whether you've seen this

7    document before, please take a moment to review it.

8               Let me know after you've reviewed it so that I can ask

9    you a question.

10        A.    Is there anything in particular I'm to review?  Just

11   give it a once-over?

12        Q.    I appreciate you asking for clarification.

13              I'm going to ask you first about the "subject" line

14   because that's what we were discussing.

15              But I want you to look at the e-mail so that you know

16   it in context so that your answer is accurate and correct.  I

17   don't want to ask an unfair question.  And in order to do that,

18   I think that it's in your best interest to review the whole

19   e-mail.

20        A.    Well, Mr. Newman, what I will do is just pause if I

21   need to refresh by going back to the e-mail.

22              So I would appreciate it if we go ahead with the

23   questions that you have.

24        Q.    Do you believe that the "subject" line of Exhibit

25   No. 18 is false or misleading?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 291

1       MR. SIEGEL:  Objection.  Lacks foundation.

2       My client did not testify that he's ever seen this

3   before.  He knows nothing about it.  No foundation to ask him

4   these questions on.

5       A.   I don't believe this is one of the e-mails that I

6   highlighted as a misleading "subject" line.  I don't -- I don't

7   believe it is.

8       Q.   You don't believe that this is an e-mail you

9   highlighted or you don't believe that the "subject" line is

10  false or misleading?

11      A.   The former.

12      MR. SIEGEL:  Objection.  Lacks foundation.

13      Q.   Do you believe that the "subject" line of this e-mail

14  is false or misleading?

15      MR. SIEGEL:  Objection.  Lacks foundation.  Asked and

16  answered.

17      Q.   When your attorney objects, you still must answer the

18  question unless he instructs you not to.

19      A.   Even though -- I guess my mind races ahead, and even

20  though you've stated it clearly, I stop to listen to what he

21  has to say, and sometimes I --

22      Please repeat it, the question.  I apologize, please

23  repeat the question.

24      (The requested testimony was read.)

25      MR. SIEGEL:  Objection.  Irrelevant.  What my client

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

1    believes is not relevant to the lawsuit.  Asked and answered.

2    Lacks foundation.  And at this point, argumentative as well.

3        A.    This is not something I've had the time to consider.

4              But on the surface -- I just looked at it.

5              If something says it is a $100 portrait coupon from

6    Glamour Shots, I don't have anything to contraindicate that.

7              So it could very well be a $100 coupon from Glamour

8    Shots.

9              This is not one of the exhibits that I prepared in

10   terms of having false "subject" lines.

11       Q.    Do you know where I would find the exhibits that you

12   prepared that you believe have false "subject" lines?

13       A.    It was on, I think, the original -- first or second

14   production.

15             And it would be either "E-mail Analysis, Virtumundo"

16   or "Virtumundo E-mail Analysis," I think, would have been the

17   title.  A Word doc.

18       Q.    Do you know from what source this e-mail came?

19       A.    I don't know.

20             MR. SIEGEL:  Objection.  Lacks foundation.

21       A.    But I don't know.  I don't understand what you mean by

22   "source."

23       Q.    Who did it come from?

24       A.    Who did it come from; meaning an individual, a group?

25             I don't know.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 293

1      Q.   Do you believe this e-mail came from Virtumundo or

2   Adknowledge?

3           MR. SIEGEL:   Objection.   Irrelevant as to my client's

4   belief.

5      A.   I can tell you what I see.   It says, "From," and then

6   I have something here that says, "@vm-mail.com," which is an

7   intellectual property owned by defendants.

8      Q.   And based upon "vm-mail.com," do you conclude that

9   defendants are responsible for sending you this e-mail?

10     A.   Well, I go on to read at the very end that

11  Virtumundo's name and address is at the very bottom of the

12  e-mail.

13          It's always in maybe 6- or 7-point type and not

14  everyone gets to the bottom of the e-mail.

15          But those are a couple of things that helped me to

16  come to that personal conclusion about the e-mail.

17     Q.   Anything else in this e-mail that indicates that

18  either Adknowledge or Virtumundo sent it or is responsible for

19  it?

20     A.   Well, yesterday we used the term "assist."   And I

21  think the statute also used the term "assist" when we were

22  talking about Mr. Lynn, as someone who assists in the

23  transmission.

24          You may not have pushed the "send" button, however,

25  you have a role in the sending of -- well, that's their

Buell Realtime Reporting, LLC
206-287-9066

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 294

1    product.  That's their service.

2         Your clients send e-mail.  So he's an assister at any

3    level, and at all levels, perhaps.

4         Q.   Anything else in this e-mail that indicates that

5    either Adknowledge or Virtumundo sent it or is responsible for

6    it?

7         MR. SIEGEL:  Objection.  Lacks foundation.

8         A.   The only thing that I have been able to glean just in

9    this cursory look is the domain name and the physical address,

10   along with the brand, Virtumundo.

11        Q.   Does the transmission -- strike that.

12        Do you know what a transmission path is?

13        A.   My understanding of a transmission path is the course

14   that a message takes from computer to computer; from yours to

15   mine, mine to yours.  And typically, you'll see headers in

16   that; received lines or received headers.  It can be received

17   one, two, three, four, received eight or 10, even, in a given

18   e-mail.

19        Q.   Does the transmission path for this e-mail appear in

20   Exhibit No. 18?

21        A.   Yes.

22        Q.   Do you believe that anything in this transmission path

23   in Exhibit No. 18 is obfuscated?

24        A.   I have not done an analysis.  I have special tools --

25   forensic tools to an analysis, and I wouldn't want to venture a

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 295

1    guess unless I put it through that forensic analysis.

2        Q.   Did you ever do the forensic analysis on this

3    particular e-mail, to your knowledge?

4        A.   No, I did not.

5        Q.   How many e-mails have you analyzed forensically

6    concerning Adknowledge or Virtumundo?

7        A.   I'm guessing 2,000, maybe 2500.

8        Q.   Did you produce in the course of this litigation the

9    results of that forensic analysis?

10       A.   Yes.

11       Q.   In what form were they produced?

12       A.   Word docs, and I believe also .pdfs.

13       Q.   What do those results look like?

14       A.   A Word doc, is all I -- what more specifically are you

15   asking?

16       Q.   Well, you served -- your lawyers served a large number

17   of documents.

18       A.   Uh-huh.

19       Q.   And I've reviewed them.

20       A.   Okay.

21       Q.   I don't recall what you're referring to, and I'd like

22   to locate them, so I'm asking you what they look like --

23       A.   Okay.

24       Q.   -- to give me a better idea of how to find them.

25       A.   Physically, what you have -- there is a forensic tool

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 296

1    called EmailTrackerPro, and what it will do is it will parse

2    the header -- it will go through the header and it will

3    separate the "received" lines from everything else in the

4    header.  All these "X" headers that you'll see; things that

5    start with an "X."  It will sort those.

6            And it will sometimes do the look-ups on it, Whois

7    look-ups or DNS look-up, whatever you want to call -- name

8    server look-ups.

9            And it will -- most of the headers will be annotated

10   in terms of highlights, and for those that aren't -- if they

11   can see colors, it would be in red and yellow.  I'm not sure if

12   there's a third color, but in red and yellow.

13           Not everything is highlighted simply because it was

14   just too time consuming to do that, so I'd just go through and

15   annotate the respective headers in the e-mails.

16           That's what it looks like.

17      Q.   And you believe that you have done a forensic analysis

18   on 2,000 e-mails?

19      A.   Partially, yes.  As I said, it's not complete, but

20   it's partial.

21      Q.   Do you contend that any e-mails in addition to those

22   2,000 have a transmission path that is obfuscated?

23           And when I'm referring to e-mails, of course I'm

24   referring to the e-mails in this lawsuit, from Adknowledge and

25   Virtumundo.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 297

1      A.    Based on the 2,000 I looked at, of the other 11- to

2    12,000, I would bet most, if not all of them, have problems

3    with the transmission path.

4      Q.    But you haven't done a forensic analysis.

5      A.    Not yet.  Not yet.  Not yet.

6      Q.    Why haven't you done it yet?

7      A.    I haven't completed it.  There have been a lot of

8    other things to do.

9      Q.    How many of the 2,000 e-mails do you estimate have

10   transmission paths that are obfuscated?

11          MR. SIEGEL:  Objection.  Calls for speculation.

12     A.    I'm just going to say most.

13     Q.    And do you recall how any of those e-mails had

14   transmission paths that were obfuscated?

15     A.    One of the problems that I saw with the headers is --

16   there's a hand-off that one -- is it Chris? -- if Chris sends

17   you an e-mail, the server will mark that with certain data, and

18   then -- including usually an i.d.

19          And then it will go to you, and then you pass it on to

20   Mr. Geroe and so on.

21          And each one of you will add your own stuff to that

22   header.

23          So each computer hands off -- and that's what's

24   explained in the legend -- from one to the next.

25          When there's a break in that, then that means that

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 298

1      we've got to determine why there was a break.

2              Not always can you determine exactly why.  The usual

3      suspects include people who are trying to mislead the received

4      -- the recipient of the e-mail.  That's typically the reason.

5              One of the other things that I haven't -- because

6      they're personal -- I've looked at headers -- I don't know how

7      many tens of thousands -- but from police officers, from

8      university professors , I've looked at it from friends and

9      family, and I know what a good header looks like.

10             And as a rule, your clients do not have good headers.

11     They don't have that proper hand-off from one server to the

12     next.  Oftentimes it's broken, there's missing or obfuscated

13     information in most of the headers.

14         Q.   Do you know who's responsible for the hand-off

15     information in the transmission path of an e-mail?

16         A.   Who?  Who do you mean by "who"?

17         Q.   I suppose that question is ambiguous.

18         A.   For me, it is.

19         Q.   There is a sender of an e-mail, right?

20         A.   Yes.

21         Q.   And there's a recipient of an e-mail, right?

22         A.   Yes.

23         Q.   And then there's intermediaries through which the

24     e-mail travels from the sender to the recipient, correct?

25         A.   Do you mean machines when you say "intermediaries" or

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 299

1    other people?

2       Q.   Well, I'm asking you the question.  I'm not making a

3    statement.

4            MR. SIEGEL:  Objection.  Vague.  Ambiguous.

5       A.   I don't understand.

6       Q.   Are there intermediaries through which an e-mail

7    travels from the sender before it arrives to the recipient?

8       A.   I understand the concept "intermediary," and I ask

9    you, do you mean other machines?

10      Q.   I'm asking you whether there are any intermediaries.

11   And if it's a machine, please testify.  If it's a human being,

12   please testify.  If it's a company, please testify.

13           The question is whether there are any intermediaries

14   at all whatsoever.

15      A.   It varies.

16      Q.   So sometimes there are intermediaries and sometimes

17   there are not?

18      A.   My experience has been there are typically

19   intermediaries.

20      Q.   And what are those intermediaries?

21      A.   Other machines, in my experience.

22      Q.   As a general proposition, is the sender or the

23   recipient responsible for the intermediary machines?

24           MR. SIEGEL:  Objection.  Calls for -- it's vague and

25   ambition.  It calls for speculation.  Lacks foundation.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 300

1    A.   I'm not sure if or how to answer that question.

2         MR. SIEGEL:  Calls for a legal conclusion as well.

3    Q.   Why aren't you sure if or how to answer that question?

4    A.   Because of the way it was phrased, probably.

5    Q.   Do you understand the question?

6    A.   I'm going to say I didn't simply because of that

7    response.

8    Q.   Can you identify the intermediaries in the

9    transmission path of Exhibit No. 18?

10   A.   Not without a forensic analysis.

11        MR. SIEGEL:  Objection.  Lacks -- lacks foundation.

12   Q.   From your forensic analysis, can you determine whether

13   the sender is responsible for the intermediaries?

14        MR. SIEGEL:  Objection.  Lacks foundation.  Calls for

15   a legal conclusion.

16   A.   I've not done a forensic analysis on this e-mail.

17   Q.   From your forensic analysis on other e-mails, are you

18   able to ascertain whether the sender is responsible for the

19   intermediaries?

20        MR. SIEGEL:  Same objections.

21   A.   And the only answer that I can think of is they can

22   be.

23   Q.   Can you determine through your forensic analysis

24   whether they are?

25   A.   I think, to some degree, you can.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 301

1          Sometimes we're on the same server.  Spammers will

2    send information from the same spammer -- from the same

3    networks.

4          What I have experienced is that a sender will have a

5    computer or computers.  They send it to their network.  Their

6    network sends it to my network.  My network delivers to me.

7          That's the process I understand.

8    Q.   And where in that process is the intermediaries?

9    A.   Well, the networks.

10   Q.   And where does the hand-off occur?

11   A.   Well, from their computer to the network, from the

12   network to the network, from the network to me.

13   Q.   And in the example that you're giving -- and I

14   understand that it's an example --

15   A.   Hypothetical.

16   Q.      -- and you're not testifying about anything real.

17         But in the example you're giving, can the sender

18   control the hand-offs between each of the networks you've

19   testified about?

20   A.   And "control" meaning?  What --

21   Q.   In any respect.

22         MR. SIEGEL:  Objection.  Vague.  Ambiguous.

23   A.   I guess if we had something in front of us --

24         This one, I haven't analyzed, but if we had something

25   specific in front of us, I could probably give you a better

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 302

1    answer.

2           I have a lot of uncertainty regarding that

3    proposition, so I'm -- I'm just not sure.

4        Q.   Do you believe that in some circumstances, the sender

5    can control the intermediary and, in some circumstances, it

6    cannot?

7           MR. SIEGEL:  Objection.  Calls for a narrative.  Vague

8    and ambiguous.  Irrelevant as to my client's belief.

9        A.   Some spammers will quite skillful, and I wouldn't put

10   anything past them in terms of what they're able to accomplish.

11       Q.   Do you believe that in some circumstances, the sender

12   can control the intermediary and, in some circumstances, it

13   cannot?

14          MR. SIEGEL:  Objection.  Asked and answered.

15       A.   Is that different from the previous question?

16       Q.   It's the same question.  Calls for a yes or no.  I've

17   not received one, so I'm asking it again.

18       A.   That wasn't what I answered it varies to?

19          You're asking me, can a spammer control

20   intermediaries, and in a perfect world, the answer is no.

21       Q.   Generally speaking --

22          MR. SIEGEL:  Jim, I don't want you to speculate.

23          Just answer the question.  If you don't understand it,

24   ask for clarification.

25          MR. NEWMAN:  The question is already on the record.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo               James S. Gordon, Jr., Vol. II

Page 303

1          MR. SIEGEL:  Calls for speculation.

2          MR. NEWMAN:  What question calls for speculation?

3          MR. SIEGEL:  The one you just asked.

4          MR. NEWMAN:  The answer is on the record.

5          MR. SIEGEL:  Good, then it's asked and answered.

6          MR. NEWMAN:  And your speaking objections are

7  improper.  Your coaching of the witness is, likewise, improper.

8          MR. SIEGEL:  Objections are noted.

9      Q.  Generally speaking, who in the process of transmitting

10  an e-mail is responsible for the hand-offs?

11          And if there's more than one party, please testify

12  about that.

13          MR. SIEGEL:  Objection.  Lacks foundation.  Calls for

14  speculation.  Calls for a legal conclusion as to who is

15  responsible.

16      A.  I don't -- it's almost -- we're in some type of

17  fantasy hypothetical land.

18          In order to give you something, I think, that is

19  reflective of my experience, I would need to see an e-mail.

20          This generic talk and so forth, we can suppose or make

21  suppositions about all kinds of possibilities.

22          And I am with my attorney that this is just -- I don't

23  know -- seems really far afield to ask how or -- what I believe

24  and things like that.

25      Q.  Do you understand how e-mails are routed on the

Buell Realtime Reporting, LLC
206-287-9066

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 304

1    Internet?

2        A.   I don't know if I do.  I don't understand even what

3    you mean by that.

4        Q.   Do you understand who in the process of routing an

5    e-mail is responsible for a hand-off?

6            MR. SIEGEL:  Objection.  Calls for a narrative.  Calls

7    for speculation.  Calls for a legal conclusion.

8        A.   My only answer would be a speculative one.

9        Q.   What is that answer?

10       A.   I believe my attorney objected to the speculation.

11       Q.   Your attorney is going to object, especially when he's

12   worried about what your testimony might be.

13       A.   Okay.

14       Q.   But that does not mean you shouldn't answer.

15           You should answer every question I ask --

16       A.   Okay.

17       Q.    -- unless your lawyer instructs you not to.

18       A.   Okay.

19       Q.   Simply because your lawyer objected that the question

20   calls for speculation, which it doesn't, does not mean you

21   shouldn't answer it.  Rather, you should.

22       A.   I think it does call for speculation, but let's go

23   ahead and reask it, please.

24           (The requested testimony was read.)

25           MR. SIEGEL:  Same objections.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 305

1       A.    Okay.

2             The problem I have is the "responsible for," and if

3       it's who is responsible for, my answer is I don't know.

4       Q.    Would you please describe the process, as you

5       understand it, of a hand-off.

6       A.    I'm not sure I can do that.

7       Q.    Do you understand the process of a hand-off?

8       A.    My understanding is in the legend, and if you bring me

9       the legend, I will tell you what I understand based on that

10      legend.

11      Q.    Do you understand the process of a hand-off?

12      A.    It's in the legend.

13            That's my answer.

14      Q.    Do you understand the process of a hand-off?

15      A.    I said that's my understanding, which is in the

16      legend.

17            MR. SIEGEL:  Asked and answered.

18      Q.    Do you know whether hand-offs are a process?

19      A.    Okay.  I don't understand those two terms as you asked

20      them.

21      Q.    Do you believe, one way or the other, that a hand-off

22      is a process?

23            MR. SIEGEL:  Objection.  Calls for speculation.  It's

24      irrelevant as to my client's belief.

25      A.    Okay.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 306

1         What I do in my scholarly work is, we define

2    everything before we get started.  And without definitions,

3    it's really hard to expound on anything.

4         Q.   You testified earlier about a hand-off, didn't you?

5         A.   Yes.

6         Q.   What is the definition of a hand-off?

7         A.   One computer sends the e-mail to the next, and it puts

8    on their tag, their information identifying what computer it

9    is.

10        It could be an IP address, and it typically is, which

11   is a quartet of numbers, 123.123.123.123, as a hypothetical

12   example -- and the next one -- and, too, it may also include a

13   host name; like, mydomain.com, yourdomain.com, hisdomain.com,

14   herdomain.com.

15        So it adds, typically, an IP address or -- and/or a

16   domain at each of the stops along the way.

17        Now, in the e-mails that I've received from -- the

18   majority of the e-mails I've received from your clients miss a

19   lot of stops, don't identify what computers are a part of that

20   transmission path.

21        And I contest or contend that that violates the law.

22   It's missing and obfuscated information.

23        The good headers, which I have kept copies of good

24   headers from reputable places -- as I said, law enforcement,

25   universities -- those good headers don't fail to do that.

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 307

1      But the headers in your clients' e-mails do fail to do

2    that.  And we can compare the two, what a good header looks

3    like and what a bad header looks like.

4      Q.   Have the headers in any of Adknowledge's or

5    Virtumundo's e-mails confused you?

6      A.   Confused?  I don't understand.  What do you mean by

7    "confused" me?

8      Q.   Are you familiar with the term "confusion"?

9      A.   Generally.

10      Q.   And based upon your general understanding of the term

11    "confusion," has a header from a Virtumundo or Adknowledge

12    e-mail ever confused you?

13      MR. SIEGEL:  Objection.  Calls for speculation.

14    Irrelevant.

15      A.   I have never thought of that word in relationship to

16    anything -- any analysis I've made of the e-mails.  That word

17    has never crossed my mind.

18      Q.   Well, I'm asking you a question and I'm using the word

19    "confusion," and you've testified that you generally are

20    familiar with that term, "confusion."

21      So I'll ask the question again, and if it's never

22    crossed your mind, it should now because I'm asking you the

23    question.

24      The question is, has a header in an Adknowledge or

25    Virtumundo e-mail ever confused you?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 308

1     A.   I don't recall.

2          MR. SIEGEL:  Objection.  Argumentative.  Calls for

3     speculation.  Irrelevant.

4     A.   I don't recall.

5          MR. SIEGEL:  Lacks foundation.

6     A.   And I don't recall, is my answer.

7     Q.   Has the header in any Adknowledge or Virtumundo e-mail

8     ever misled you?

9          MR. SIEGEL:  Objection.  Irrelevant.

10    A.   Well, I'm not sure if I understand what you mean by

11    "misled."

12    Q.   Do you have an understanding of the term "mislead"?

13    A.   Yes, I do have an understanding generally of what it

14    means.

15    Q.   And what does it mean to you?

16    A.   I didn't ask the question.  You've asked me a

17    question, and I'd like to know what you mean so I can answer

18    your question.

19    Q.   What does the term "mislead" mean to you?

20    A.   You've asked two questions.  I haven't had a chance to

21    answer -- get the first one taken care of.

22         Please tell me what you mean by "mislead" and I will

23    answer it.

24    Q.   What does the term "mislead" mean to you?

25    A.   You asked me, have I been misled, and I wonder what

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 309

1    you mean by that.

2        Q.    What does the term "mislead" mean to you?

3              MR. SIEGEL:   Objection to the extent it calls for a

4    legal conclusion.

5        A.    That's why I'm asking the question.   I think it calls

6    for a legal conclusion.

7        Q.    What does the term "mislead" mean to you?

8              Is your testimony that the term "mislead" is a

9    conclusion of law?

10       A.    No.   My testimony is that I don't understand your

11   first question.

12             And now you're asking a second question, and we

13   haven't dealt with the first question.

14       Q.    I will strike the first question, and I will move on

15   to the second question.

16             What does the term "mislead" mean to you?

17       A.    Well, in the case of your headers, if I have a header

18   that starts out with a given receive line and it goes to the

19   next receive line and there's no hand-off and I'm wondering

20   why.   And sometimes it goes to a third, a fourth, a fifth

21   hand-off and things are missing.

22             One header does not hand off its identity to the next

23   header, so that has the capacity to mislead.   It could possibly

24   be false.

25             And in some cases when they don't match, an IP address

Buell Realtime Reporting, LLC
206-287-9066

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 310

1    and a domain don't match, that could have the capacity to

2    mislead or deceive, those terms.

3            So, that's a general idea.

4        Q.    Have you ever used the term "mislead" without regard

5    to e-mail?

6            MR. SIEGEL:  Objection.  Argumentative.  Irrelevant.

7    Calls for speculation.  Calls for a narrative.

8        A.    If I have, I don't recall anything specific right now.

9        Q.    So "mislead" is not a term you'll use in your regular

10   vocabulary except with respect to e-mail?

11       A.    Not true.

12           MR. SIEGEL:  Objection.  Mischaracterizes testimony.

13   Argumentative.

14       Q.    You do use the term "mislead" in your regular

15   vocabulary?

16       A.    I've used it, I'm sure.

17       Q.    What does it mean to you outside of the e-mail

18   context?

19           MR. SIEGEL:  Objection.  Asked and answered.  He just

20   gave you a lengthy explanation.

21       A.    Okay.  Where are we going?

22           I mean, you've asked me a question.  What does it mean

23   outside of e-mail?

24           This is -- I'm laughing because this -- the deposition

25   -- I didn't know that it sinks to these depths, but...

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 311

1        Mislead, in general -- and I don't know how this

2   comports with Webster's or anything like that -- to me,

3   typically means lead away from, and it could be an artifact

4   that leads you away from, it could be words that lead you away

5   from some other objective, goal, aim, purpose or something like

6   that.

7        Q.    And based upon your definitions of "mislead" has, to

8   the best of your recollection, any Virtumundo or Adknowledge

9   header misled you?

10       A.    Yes.  Many.

11       Q.    How have you been mislead?

12       A.    I would have to have them in front of me.

13       Q.    Do you recall, as you sit here today, how any e-mail

14   has ever misled you from Virtumundo or Adknowledge?

15       A.    I don't have the e-mails.

16            MR. SIEGEL:   Objection.   Vague and ambiguous.   Calls

17   for speculation.   Calls for a legal conclusion.

18       A.    I would have to look at the e-mails.

19       Q.    I'm asking about your recollection.

20            Do you recall, as you sit here today, how many --

21   strike that.

22            Do you recall, as you sit here today, how any e-mail

23   from Virtumundo or Adknowledge has ever misled you?

24       A.    No, not specifically.

25       Q.    When you testify that you would have to look at the

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 312

1    e-mails, what e-mails would you have to look at?

2        A.    The e-mails that are the subject to this lawsuit.

3        Q.    Exhibit No. 18, which is in front of you, is subject

4    to this lawsuit.

5            Does that help refresh your recollection about how

6    Adknowledge or Virtumundo may have misled you in the header?

7        A.    Well, I guess if I were probably more clear, I would

8    have said that I've already analyzed, and this is one I haven't

9    already analyzed.

10       Q.    Do you recall, as you sit here today, an e-mail that

11   you have analyzed?

12       A.    No.

13           That analysis was done the early part of 2006.  That's

14   over six months ago.

15       Q.    Do any of the e-mails upon which you base your claims

16   in this lawsuit fail to contain an unsubscribe link?

17       A.    I don't know.

18       Q.    As you sit here today, do you recall any e-mails upon

19   which you base your claims in this lawsuit failing to contain

20   an unsubscribe link?

21       A.    I've not read every single one in terms of looking --

22   opening every single e-mail, so I don't know.

23       Q.    As you sit here today, do you recall any e-mails that

24   form the basis of your claims to lack a domain name that's

25   registered to Adknowledge or Virtumundo?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 313

1          A.    The one that gave me a problem -- and the reason why

2    I'm explaining is because I'm not certain if I should answer

3    yes or no.

4          Your vm-local.com was one where -- I don't know, maybe

5    it was shut down.

6          I know Cogent shut down Virtumundo last year.  They

7    kicked them off the servers for spamming and abuse.

8          So I don't know if it was vm-local or what, which one,

9    and I got that straight from Cogent.

10         So -- I think I'll stop my answer right now.

11         Q.    Other than vm-local.com, as you sit here today, do you

12   recall any e-mails that form the basis of your claims to lack a

13   domain name that's registered to Adknowledge or Virtumundo?

14         A.    Nothing that I could recall, no.  Nothing else.

15         Q.    As you sit here today, do you recall any e-mail that

16   you allege you received from Adknowledge or Virtumundo that

17   does not have a physical address or telephone number on it?

18         A.    That one's harder in terms of recalling.

19         There have been periods of time where, because of

20   viruses being sent to me, I turned off my graphics in my

21   e-mails.  And one time, believe it or not, I think one of the

22   viruses turned it off for me.  I'm not sure what happened.

23         But I've had months where I received no graphics, and

24   I'm not sure if, during those times, whether or not it showed

25   up or not.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 314

1          So I would have to go back and review those e-mails to

2     determine whether or not there were some that didn't have the

3     return address.

4          And I don't know if all of the return addresses are

5     within or outside of graphics or images and so forth, and that

6     would be what I would have to look at.

7          Q.   As you sit here today, do you recall -- in other

8     words, do you remember -- any e-mail that you allege you

9     received from Adknowledge or Virtumundo that did not have a

10    physical address or telephone number on it?

11         A.   No.

12         Q.   Did you ever make a conscious decision not to write to

13    the physical address listed in an unsolicited commercial e-mail

14    you received from Adknowledge or Virtumundo?

15         MR. SIEGEL:  Objection.  Calls for speculation.  Calls

16    for -- vague and ambiguous.  Lacks foundation.

17         A.   You're asking me, do I recall?  At this point, no.

18         That's not something I've given much thought to.  I

19    don't recall anything presently.

20         Q.   Have you ever written to the physical address listed

21    in any e-mail you received from Adknowledge or Virtumundo?

22         A.   Not to my knowledge, no.

23         Q.   Why not?

24         A.   Because I contacted them through their unsubscribe

25    links and they didn't work, or the process didn't work.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

                                                          Page 315

1          And then I tried by going to their next -- their

2    Internet service providers, and that didn't work.

3          And then I provided through all of the steps I

4    mentioned yesterday.

5          Nothing I've had ever tried with this defendant or

6    these defendants has ever worked in terms of unsubscribing.

7      Q.   So, based upon that testimony, do you agree that you

8    made a conscious decision not to write to the physical address

9    listed in the e-mails that Adknowledge and Virtumundo sent you?

10         MR. SIEGEL:  Objection.  Mischaracterizes testimony.

11   Lacks foundation.  Argumentative.

12     A.   I can't say that to be true.  I just can't.

13     Q.   Why not?

14     A.   I don't -- I don't have a recollection of conscious

15   decisions to do, not to do.

16         I'm not sure -- I don't know.  I'm trying to think

17   what it is -- and maybe I'm thinking ahead of you, but --

18         Why not?  That doesn't make sense to me.  I either did

19   or didn't, is all I can think of.

20     Q.   Why don't I ask the question a different way.

21     A.   Okay.

22     Q.   And I'll simply strike that adjective "conscious."

23         And I'll ask the question again without that adjective

24   because perhaps that's confusing you.

25         Did you make a decision not to write to the physical

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

1   address listed in the e-mails that Adknowledge and Virtumundo

2   sent to you?

3       A.   Okay.  I didn't write to them, so -- I'm assuming,

4   just that fact means that a decision -- I must have made a

5   decision at some point.

6            I tried to do all things that I thought we were to do

7   on-line, and that was to go through.  And I tried all the

8   things that people typically do to get someone to stop sending

9   them spam, and again, none of them worked.

10      Q.   And you made a decision not to write to the physical

11  address listed in the e-mails that Adknowledge and Virtumundo

12  sent to you, correct?

13           MR. SIEGEL:  Objection.  Mischaracterizes testimony.

14  Argumentative.

15           MR. NEWMAN:  The speaking objections --

16           MR. SIEGEL:  Lacks foundation.

17           MR. NEWMAN:  The speaking objections are improper.

18  I'm not characterizing testimony.  I'm asking a question.

19      Q.   And my question is --

20           MR. SIEGEL:  Objection noted.

21      A.   Geez.  You actually -- you could do both at the same

22  time.

23           Good God.  This is funny.

24      Q.   My question is, isn't it true that you made a decision

25  not to write to the physical address listed in the e-mails that

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 317

1      Adknowledge and Virtumundo sent to you?

2              MR. SIEGEL:  Same objections.  And I add relevance.

3      A.    I don't believe so.

4              I'm going to answer it that way this time.

5      Q.    Never made a decision --

6      A.    I don't believe so.

7              That will be my answer for now.

8      Q.    So did you make a decision to write to them?

9              MR. SIEGEL:  Objection.  Argumentative.

10     A.    I'm really amused by this.

11             I didn't write to them.  One can only conclude that I
12     perhaps decided not to.

13             One could conclude that it was a conscious decision
14     where I considered everything.

15             I have no idea how to answer that particular question.

16     Q.    I would like you to answer it truthfully and honestly,
17     which --

18     A.    I don't recall.  I don't know.

19     Q.    -- you have the obligation to do.

20     A.    That's my answer.  That's what I've been trying to get
21     across to you.

22             I don't know.  I don't recall.  And you're trying to
23     get me to remember something I don't remember.

24             I don't recall.

25     Q.    Do you agree that you made the decision not to call

Buell Realtime Reporting, LLC
206-287-9066

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 318

1     the phone numbers listed in the Adknowledge and Virtumundo

2     e-mails?

3          A.    My answer is the same.  I don't recall.

4          Q.    You don't recall a decision one way or the other?

5          A.    I don't recall a decision one way or the other.

6               MR. SIEGEL:  Counsel, can we take five minutes?

7               MR. NEWMAN:  Yes.

8               THE VIDEOGRAPHER:  The time is now 10:29 a.m.  We are

9     off the record.

10               (A recess was taken.)

11               THE VIDEOGRAPHER:  The time is now 11:02 a.m.  We are

12     on the record.

13          Q.    I'd like to turn your attention back to Exhibits No.

14     16 and 17.

15          A.    Okay.

16          Q.    Specifically, Interrogatory No. 12, which is on page

17     -- I apologize, there's not page numbers -- of the Exhibit

18     No. 16.

19               But if you could turn your attention to Interrogatory

20     No. 12, which is at the top of a page, if that helps you find

21     it quicker.

22          A.    Okay.  I see Interrogatory No. 12.

23          Q.    And if you could review that and your response, which

24     is contained in Exhibit No. 17.

25          A.    Okay.  I've read both.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 319

1      Q.   Interrogatory No. 12 states:  "Please identify all

2  damages you claim to have actually suffered from your receipt

3  of the allegedly offending e-mails."

4           Do you see that?

5      A.   Yes, I do.

6      Q.   And it says in your answer, "include the nature,

7  extent and monetary value of those alleged damages."

8           Do you see that?

9      A.   I'm sorry, I didn't follow.

10     Q.   Would you please Interrogatory No. 12 into the record.

11     A.   Interrogatory No. 12:  "Please identify all damages

12  you claim to have actually suffered from your receipt of the

13  allegedly offending messages.  In your answer, include the

14  nature, extent and monetary value of those alleged damages."

15     Q.   And your answer to Interrogatory No. 12 is contained

16  in Exhibit No. 17, right?

17     A.   Yes, it is.

18     Q.   And specifically, it's on page 3, and in it, you

19  state:  "I'm not asking for actual damages, only statutory

20  damages as set forth in my complaint and provided for by

21  statute."

22     A.   Yes.

23     Q.   Did you suffer any actual damages?

24     A.   I -- my answer is that I will stick by what I said in

25  No. 12.  "I am not asking for actual damages, only statutory

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 320

1    damages as settle forth in my complaint and provided for by

2    statute."

3             I stand by that.

4    Q.    The response that you just read provides you're not

5    asking for actual damages.

6             My question wasn't what you're asking for.

7             My question is whether you suffered actual damages.

8    A.    That's not a part of our lawsuit, actual damages.

9    Q.    My question is whether you suffered actual damages.

10   A.    Okay.  Well, let's stalk about actual damages, even

11   though they're not a part of it.

12            The actual damages -- and I don't know what the legal

13   term for it is, but my personal term for it is --

14            Oh, let's see.  Where do we start?

15   Q.    Why don't we start with this.

16            I am assuming from your answer -- strike that.

17            I am assuming from the testimony you just gave that

18   your answer to my question is yes, you suffered actual damages;

19   is that right?

20   A.    No, that's not true.  Because we're not going there.

21            I told you, I stand by my answer, and you're asking

22   me, again, to elaborate on something.

23            MR. SIEGEL:  Objection.  Calls for a legal conclusion.

24   Q.    The answer in your interrogatory state s you're not

25   asking for actual damages, and you just confirmed that, and I

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 321

1    appreciate it.

2              But my question isn't about what you're asking for.

3              My question is whether you suffered actual damages.

4              Did you?

5    A.    We've not enumerated any actual damages.

6              MR. SIEGEL:   Objection on relevance as well.

7    Q.    I appreciate you testifying that you haven't

8    enumerated it, but, again, that's not what I'm asking.

9              My question is whether you suffered any actual

10   damages.

11   A.    Okay.  My only answer is I'll stand by No. 12.

12   Q.    No. 12 doesn't answer my question.

13             My question calls for a yes or no.

14             And the question is, did you suffer any actual

15   damages?

16             MR. SIEGEL:   If you have anything to add responsive to

17   his question, go ahead and answer.

18   A.    I don't have anything to add.

19   Q.    Did you suffer any actual damages?

20   A.    I don't have anything to add.

21   Q.    It's a yes or no question.

22   A.    I don't have anything to add, is my answer, though.

23   Q.    I'm not asking whether you have anything to add.  I'm

24   asking whether you suffered any actual damages.

25   A.    And my answer is, or was, I'm standing by what I said

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 322

1    in No. 12.

2         Q.    No. 12 doesn't ask whether you suffered any actual

3    damages.

4              MR. SIEGEL:  Objection.  Asked and answered.

5         Q.    But I am now.

6              Have you suffered any actual damages?

7              MR. SIEGEL:  Objection.  Argumentative.  Asked and

8    answered.  Irrelevant.

9         A.    I have nothing to add to my answer.

10        Q.    You're refusing to the answer the question?

11        A.    I have nothing to add.

12        Q.    So you're refusing to answer the question?

13             MR. SIEGEL:  Objection.  Argumentative.  He's not

14   refusing to answer.  He answered.

15        Q.    If you refuse to answer the question, I will move on,

16   and I may make a motion to compel your testimony.

17             If you're not refusing to answer the question, then

18   I'm going to keep asking it.

19        A.    Okay.

20        Q.    So I'll ask it again, and if you refuse to answer it,

21   we'll move on, and if not, I'd appreciate an answer, because I

22   have asked it, but I haven't received an answer.

23             And the answer -- strike that.

24             The question is, have you suffered actual damages?

25             MR. SIEGEL:  Derek, I can help you out here if we go

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 323

1   off the record a second.

2          MR. NEWMAN:  Let's go off the record.

3          THE VIDEOGRAPHER:  The time is now 11:09 a.m.  We are

4   off the record.

5              (A discussion was held off the record.)

6          THE VIDEOGRAPHER:  The time is now is 11:10 a.m.  We

7   are on the record.

8      Q.   Mr. Gordon, we went off the record.

9      A.   Yes.

10     Q.   And your lawyer, in the presence of all of us, told

11  you that you had suffered actual damages and that you had

12  reported this in discovery responses and now you should testify

13  about it.

14         So I'm going to ask the question again --

15     A.   Okay.

16     Q.   -- because perhaps that helped refresh your

17  recollection.

18         MR. SIEGEL:  Objection.

19     Q.   Have you suffered actual damages?

20     A.   I --

21         MR. SIEGEL:  Objection.  Hold on a minute.

22         Mischaracterizes off-the-record statements by counsel.

23  Irrelevant.  Asked and answered.

24         With that said, go ahead and answer the question.

25         THE WITNESS:  Please read back what he said.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 324

1          (The requested testimony was read.)

2     Q.   Would you like me to ask the question again to

3  alleviate any confusion?

4     A.   We have a video record, too.  You said something prior

5  to the question that sent me in another direction, so I just

6  wanted to hear what that was.

7     Q.   I don't want to send you in another direction, so I'm

8  going to strike whatever that was.

9     A.   Okay.

10    Q.   And I'm going to --

11    A.   Start again.

12    Q.   -- ask the question that I was intending to ask --

13    A.   Okay.

14    Q.   -- which is, have you suffered any actual damages?

15    A.   In terms of the legal answer, again, I'm not sure.

16         But in terms of what's going on in my life, I can

17  testify about that.

18         I think the most -- one of the most important things

19  to me is that -- the impingement on time.  I started a doctoral

20  program that was to last three years, and I'm not going to

21  finish until my fifth year.

22         So the misdirection of a lot of energy and time has

23  cost me a lot of money.  It cost me $4,000 a quarter to be in

24  the doctoral program, and it's extended by two years, so you do

25  the math there.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 325

1           The other thing is in terms of personal resources.

2           My server cost has tripled as a result of fighting

3    spam.

4           I have had to spend inordinate amounts of time, six

5    and seven days a week, working on projects, lawsuits trying to

6    get my domain back.  That's all I'm trying to do.

7           When I contacted your client and asked them to cease

8    and desist, I was trying to reclaim my domain name.  That's my

9    personal property, my intellectual property, and your client

10   won't give me back my property.

11          So I continued to contact, contact, contact.  Lawsuits

12   won't stop them from misappropriating my domain name.

13          My clients are also -- I spend a lot of time with my

14   clients.  My clients are also getting this spam.  It's

15   unwanted, undesirable and so forth.  And I'm spending time with

16   them -- going too fast -- spending time with them trying to

17   help them reclaim their domains, so it's caused an inordinate

18   amount of time wasted.

19          It's cost me financial in terms of my server cost s

20   going up.

21          I've had to be on a learning curve just to -- to learn

22   how to manage my server.  Something I've never had to do

23   before.

24          So those costs are a part of it, and if I sat and

25   thought about it more, I could probably think of other things.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

1        Doing the investigation and so forth, I've had to get

2    additional software tools to do that.

3        So it's -- it's that type of thing.

4    Q.    Other than the time that you have spent preparing for

5    and working on this litigation, how much time has Adknowledge

6    or Virtumundo cost you?

7    A.    I've not kept a record.

8    Q.    Do you have any idea how much time Adknowledge or

9    Virtumundo has cost you other than in your time preparing for

10   and prosecuting this lawsuit?

11   A.    I choose not to speculate on that.

12   Q.    My question wasn't asking you to speculate.

13       My question was whether you have any idea how much

14   time.

15   A.    To me, that's speculation.

16   Q.    Do you have any idea?

17   A.    I would have to speculate, and I choose not to

18   speculate.

19   Q.    Do you have any idea?

20   A.    I'll stand by the fact I choose not to speculate.

21   Q.    Can you estimate?

22   A.    I choose not to speculate.

23   Q.    Do you have any documents that provide for the amount

24   of time you spent dealing with Virtumundo or Adknowledge

25   e-mails except for preparing for and prosecuting this

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 327

1   litigation?

2        A.   I answered that a few minutes ago.

3        Q.   Is the answer no?

4        A.   If we read it back, I think it will reflect my answer.

5        Q.   Is the answer no?

6        A.   Let's read it back, please.

7             (The requested testimony was read.)

8        A.   I have no records and I choose not to speculate.

9        Q.   When you testify that you have no records, do you mean

10   that you have no documents?

11           MR. SIEGEL:   Objection.  Asked and answered.  Calls

12   for speculation.

13       A.   I have no records.

14       Q.   Including documents, correct?

15       A.   I think documents are records.

16       Q.   Thank you.

17           Do you have information other than documents about how

18   much time you spent dealing with Adknowledge or Virtumundo

19   e-mails outside of preparing for or prosecuting this lawsuit?

20       A.   No.

21       Q.   I asked you earlier whether you can estimate, and you

22   indicated you cannot.

23           Is there a document that would help refresh your

24   recollection to help you estimate that amount of time?

25       A.   I don't recall any type of document or record.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 328

1      Q.    You testified earlier your server costs triple and

2  those were actual damages, correct?

3      A.    I believe so.

4      Q.    How much of the server cost tripling is attributable

5  to Adknowledge or Virtumundo?

6      A.    I don't know the answer.

7      Q.    Do you know whether it's any?

8      A.    I don't know.

9      Q.    When your server costs tripled, how much was the

10 original cost and what was the cost after it tripled?

11     A.    I'm guessing it's approximately -- I paid for a year

12 in advance, so I got a discount.  So I don't remember what the

13 actual --

14         I'm guessing it was about $60 a month at that time.

15         And it's about $200 a month presently.

16     Q.    Do you receive any additional services for the $200 a

17 month cost --

18     A.    Yes.

19     Q.    -- as opposed to the $60 a month cost?

20     A.    Yes.

21     Q.    And what are those services?

22     A.    I've not availed myself of everything, but the

23 services that I currently have -- I have a fully dedicated

24 server and I have prepaid technical support to help me do

25 everything that I need to do with the server.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 329

1          So those are the two major things.

2     Q.   And how do those two major things help you in dealing

3     with spam in a manner that you were unable to before tripling

4     the cost of your server?

5          And --

6     A.   Capacity.  Capacity is a major thing.

7     Q.   What is capacity?

8     A.   I'm sorry, I was looking at your water.

9          Capacity means that I have more disk space, bandwidth,

10    and it means that I have professional, technical help with

11    things that I want to do.

12         For example, I mentioned yesterday I've installed --

13    oh.

14         I've had SWSoft install the SiteBuilder so my clients

15    can build their own sites, people who are prospective clients

16    can play around with and build test sites and things of that

17    nature.

18         So those are the reasons why I went to a

19    fully-dedicated server, plus there were times where we've had

20    to reboot the server, and I don't know if it was someone else's

21    fault or something happened that I did.

22         So I thought it was a better solution.

23    Q.   Do you no longer have to reboot the server with the

24    new service whereas you had to reboot the server with the old

25    service?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 330

1      A.   I haven't presently.  I haven't had to reboot the new

2   server.  I don't know if it's because they're doing it for me

3   or what the answer is to that.

4      Q.   Do you know whether the servers were rebooted due to

5   spam?

6      A.   I don't know that.

7      Q.   Have you ever asked anybody?

8      A.   Never.

9           I shouldn't say never.

10          I've not asked anyone with Godaddy that I can recall.

11     Q.   Have you ever asked anybody with another service

12   provider?

13     A.   Oh, I've talked with them about spam at length, and

14   solutions and tried to get new filters and things like that.

15          And again, those services failed to stop most of the

16   spam.

17     Q.   You testified that your new service allows your

18   clients to build websites, correct?

19     A.   SiteBuilder, the application, allows them to do that.

20     Q.   And does SiteBuilder help alleviate the flow of spam?

21     A.   That's not its purpose, no.

22     Q.   You testified that's not its purpose.

23          My question is whether it does it in any respect,

24   whether it's its purpose or not.

25     A.   Not to my knowledge.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 331

1    Q.   You testified that you have had to delay working on

2    your doctoral program as a result of receiving e-mails from

3    Adknowledge and Virtumundo.

4         I don't understand the connection between the two.

5         Would you please explain it.

6    A.   If I said that, I misspoke.

7         I meant collectively spam, not just from a single

8    defendant.

9    Q.   Do you know what percentage of the spam you receive

10   you attribute to Adknowledge and Virtumundo?

11   A.   No, I don't.

12   Q.   Can you estimate?

13   A.   I don't want to speculate.

14   Q.   Can you estimate?

15   A.   That's speculation, is it not?

16        MR. SIEGEL:  Calls for speculation.   Objection.

17   Q.   Yesterday we discussed estimations, and I gave you an

18   example to help explain it.   It's an example I've just heard

19   recently from a colleague of mine, and I like it a lot, and

20   I'll explain it to you again.

21   A.   Okay.

22   Q.   If I ask you how much money is in your bank account,

23   you probably don't know as you sit here, but you could likely

24   estimate because it's your bank account and you access it from

25   time to time.

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 332

1          If I ask you how much money is in my bank account,

2     well, there, you have no idea.

3          Asking you how much is in my bank account would be

4     pure speculation, you can't estimate.

5          Asking you how much is in your own bank account, well,

6     you have a basis for a conclusion and you could estimate.

7     A.    Okay.

8     Q.    With respect to the amount of e-mails you receive, you

9     have reviewed them.

10          In fact, you testified that you've filed a lot of

11    lawsuits and you review the e-mails and you do forensic

12    analysis, and because of that, I believe that you have a basis

13    for an estimate, which is why I asked you for the estimate.

14          I'm not asking for pure speculation.  I'm asking for a

15    simple estimate.

16    A.    You asked me about things that I reviewed and I don't

17    review all of my e-mails.

18    Q.    Do you have any basis upon which you could make an

19    estimate as to how many e-mail Virtumundo and Adknowledge have

20    sent you in relation to all of the spam you've received?

21    A.    I can't think of anything.

22    Q.    In testifying about the actual damages you claim to

23    have suffered, you used the term "personal resources."

24          What "personal resources" were you referring to?

25    A.    I don't think I said that.  I didn't know I said that.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 333

1      Q.   So if you said that -- I don't want to misquote you --
2   do you rescind that testimony?

3      A.   And I just said -- I was talking that I don't recall
4   saying that specific term.

5           Coming over here for a deposition involves personal
6   resources.

7      Q.   Any other personal resources?

8      A.   Oh.  Printing documents.

9           Buying the paper.

10          Laser cartridges.

11          Things like that.

12          And that was specifically for printing the documents
13  for this case.

14     Q.   Any other personal resources?

15     A.   I'd probably have to think about that.

16          No, nothing else comes to mind presently.

17     Q.   You testified that you had to undertake a learning
18  curve to manage your server.

19     A.   I'm still on that.

20     Q.   How does that learn curve relate to Virtumundo or
21  Adknowledge, or does it not?

22     A.   I don't see a present connection.

23     Q.   I'd like to turn your attention back to Exhibits No.
24  16 and 17, and specifically, the Interrogatory No. 17 and your
25  response thereto.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 334

1          Interrogatory No. 17 says -- please correct me if I

2    misread it -- "Please describe the manner in which you were

3    adversely affected by the allegedly offending messages," and in

4    your response, No. 17, you write, "unwanted and offending

5    e-mails use up my bandwidth on my server," and then it

6    continues, but I just want to ask you about that portion at

7    this time.

8          Is that fair?

9    A.    Let's see.

10         Okay, the question is?

11         I've read that.

12   Q.    Okay.

13         Do you see in your response to Interrogatory No. 17

14   that you wrote, "Unwanted and offending e-mails use up my

15   bandwidth on my server?

16   A.    Yes.

17   Q.    What server are you referring to?

18   A.    The server that I lease from Godaddy.

19   Q.    You pay for a certain amount of bandwidth each month

20   with that server; is that correct?

21   A.    Yes, I do.

22   Q.    And that amount you pay for that server doesn't go up

23   or down based on e-mails that Adknowledge or Virtumundo sends

24   you, correct?

25   A.    I don't know that to be true.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                  James S. Gordon, Jr., Vol. II

Page 335

1    Q.   How much do you pay per month for bandwidth?

2    A.   I don't know how it's broken out, but there's a just a

3    flat fee that I pay.

4    Q.   Has that flat fee ever gone up or down based upon the

5    amount of e-mails you've received?

6    A.   I don't recall that it's changed.

7    Q.   Can you attribute any amount of that bandwidth to

8    Adknowledge or Virtumundo in particular?

9    A.   I've not done an analysis of that.

10   Q.   The question is, can you?

11   A.   I don't know.

12   Q.   One way or the other?

13   A.   I don't know.

14   Q.   Your response to Interrogatory No. 17 continues, and

15   you write that the allegedly offending e-mails -- I'm

16   paraphrasing that; now I'm quoting -- "interfere with my

17   interactive service business."

18        Do you see that?

19   A.   Yes.

20   Q.   How has Adknowledge and Virtumundo's e-mails

21   interfered with your interactive service business?

22   A.   It's clogged up my clients' e-mail boxes, too, and

23   they're unhappy with it.

24   Q.   How has that interfered with your business?

25   A.   Well, I've got to go and help them develop solutions

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 336

1    for that problem.

2          Q.   What service -- strike that.

3               What solutions have you helped them develop?

4          A.   I'm just saying that I have to go with them -- go to

5    them and help them to develop solutions.

6               I can't think of anything offhand.

7          Q.   Are you compensated for that?

8          A.   No.  Not at present.

9          Q.   Do your clients receive unwanted e-mail from anybody

10   other than Adknowledge or Virtumundo?

11         A.   Yes.

12         Q.   And do you know what percentage of e-mails your

13   clients receive that are unwanted that are attributed to

14   Adknowledge or Virtumundo?

15         A.   I don't know.

16         Q.   Your answer to Interrogatory No. 17 continues and you

17   write, "clog my computer."

18              What did you mean by that?

19         A.   I think this refers to the virus we were talking about

20   yesterday, if anything.

21              I've received maybe -- I don't know -- 15-, it could

22   be 20,000 e-mails.

23              I just received the disk last night from a client who

24   says, this is my update.  And I go over that; that may be more.

25              But I think it was the virus that I was referring to

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 337

1    when I wrote that.  I just -- I'm just not sure of the fact

2    that it was the virus.

3           It could have been just the volume, so -- and it's

4    just -- I guess -- I don't want to say just an expression,

5    but...

6           I consider it clogging when my e-mail box is full.

7    When I go back to my office, my box will be -- will have

8    somewhere between 12- and 20,000 e-mails in it.  To me, that's

9    clogging my e-mail box.

10       Q.   How many of those between 12- and 20,000 e-mails are

11   attributable to Virtumundo or Adknowledge?

12       A.   I haven't looked at them yet.

13       Q.   Did you receive between 12- and 20,000 e-mails

14   yesterday?

15       A.   I have no idea.  I didn't look at it yesterday.

16       Q.   When is the last time you looked at your e-mails?

17       A.   Monday morning.

18       Q.   And did you receive between 12- and 20,000 e-mails on

19   Monday morning?

20       A.   That's a cumulative figure.

21           It's 5- to 8,000 a day.

22       Q.   Did you receive between 5- and 8,000 on Monday?

23       A.   I wasn't there all day.  I was only there for a few

24   hours on Monday.

25       Q.   When you checked your e-mail on Monday morning, were

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 338

1    there between 5- and 8,000 new e-mails?

2        A.   I didn't check all of my e-mail accounts.

3        Q.   How many did you check?

4        A.   I checked the e-mail account that my attorney sends

5    e-mail to, which is not part of this lawsuit.

6             And hightailed it out of there.

7        Q.   Was there any spam, as you defined it yesterday, in

8    the e-mail box to which your attorney sends e-mail?

9        A.   I don't recall.  I do receive spam at that e-mail

10   address, but I don't recall.  I wasn't looking for that.  I was

11   looking specifically for any communications.

12       Q.   Do you have a spam filter on that e-mail address?

13       A.   I -- I don't know.

14            Charter -- I don't know if I do or not.

15       Q.   No. 17 in Exhibit 17 continues, "require wasted time

16   to deal with."

17            Earlier, we talked about time you spent.

18            Is there anything in addition to what you already

19   testified about that falls in the category of "require wasted

20   time to deal with"?

21       A.   Nothing comes to mind.

22       Q.   The next line says, "unlawful."

23            What did you mean by that?

24       A.   I believe that it violates the statutes, CEMA as well

25   as Canned Spam.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 339

1     Q.    In any way in addition to what you've alleged in your
2   pleadings of this lawsuit?
3     A.    Gosh, I don't have a full comprehension of every --
4   all of that right now.
5           I don't know if it's any other way or not, but that's
6   just my summation at that particular point in time.
7     Q.    You write further that it violates your "right to
8   privacy and the sanctity" of your personal space.
9           Do you see that?
10    A.    Yes.
11    Q.    How has Adknowledge or Virtumundo violated your "right
12   to privacy and the sanctity" of your personal space?
13    A.    Again, this is the predatory behavior I was talking
14   about yesterday.
15          This company continued to send e-mail to me after
16   being asked not to and is doing the same thing to my clients, I
17   believe, and according to Internet chatter, it does it to other
18   people on the Internet.
19    Q.    What "right to privacy" are you referring to?
20    A.    I purchased a domain name, and it's personal property,
21   if not intellectual property.
22          And I believe I have a right to have whoever I choose
23   to communicate with use that particular e-mail address, and
24   those that I don't want to use it, I don't believe they have a
25   right to use it.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 340

1          And I believe that in my layman's understanding,

2    they've misappropriated, they've misused my domain name by

3    continuing to use it when I've told them not to.

4          Q.   What is the "sanctity" of your personal space?

5          A.   Rhetoric, phraseology.

6          It's the personal property that I just mentioned a

7    couple of minutes ago that I'd like to keep pure from

8    infringement by miscreants, predators.

9          And again, I've characterized the behavior of your

10   clients as predatory, and they do infringe upon my right to

11   privacy, peace of mind.

12         Q.   I'd like to turn your attention to Interrogatory

13   No. 24.

14         MR. NEWMAN:  Where are the exhibits from yesterday?

15         Q.   In Exhibit No. 16, Interrogatory No. 24, do you see it

16   says, "Explain in detail all steps you have undertaken to

17   preserve your electronic correspondence and data since the

18   filing of this lawsuit"?

19         A.   Yes, I see that interrogatory.

20         Q.   And in Exhibit No. 17, do you see your response at the

21   top of page 5?

22         A.   I'm reading that presently.

23         Q.   Okay.

24         A.   Okay.  And I see my answer.

25         Q.   And in this answer, you write that you routine ly

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 341

1    clean your hard drive, run virus checks, remove malware,

2    defragment and other maintenance due to attacks by spammers?

3        A.    Correct.

4        Q.    And thousands of e-mails and files are routinely

5    scrubbed from your computer.

6              Do you see that?

7        A.    Yes, I do.

8        Q.    I'd like to turn your attention back to Exhibit

9    No. 10, which is the letter you testified about earlier, which

10   deals with preservation of evidence.

11       A.    Yes.

12       Q.    Since you received a copy of that letter for the first

13   time, have you scrubbed anything from your computer without

14   maintaining a backup of it?

15       A.    Scrubbed anything from my computer without making a

16   backup.

17             Yes.

18       Q.    How many times have you done it?

19       A.    I don't know.

20       Q.    Can you estimate?

21       A.    I have no idea how many times.

22             I do it regularly.  I just don't know if it was once a

23   month, four times a month.  I just -- I don't keep --

24             The -- part of the reason why I don't know is because

25   intermittently, viruses adhere to my system, so there may be

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 342

1  some weeks where I do it five or six times just to purge my

2  system of the viruses.

3       And so I just -- I cannot come up with a number of how

4  many times I've had to do that.

5     Q.   Do you agree that you have failed to maintain and

6  preserve electronic evidence?

7     A.   No.

8          MR. SIEGEL:  Objection.  Calls for speculation.  Calls

9  for a legal conclusion.  Is argumentative.

10    A.   And no was my answer.

11    Q.   Do you agree that in scrubbing your computer, you

12  destroy electronic evidence?

13    A.   No.

14    Q.   Have you made any efforts to preserve electronic

15  evidence in the process of scrubbing your computer?

16    A.   Okay, I don't know the legal definition.  I don't know

17  anything about the rules of evidence and so forth.

18         I maintain my computer in the best manner that I know

19  how, and when I get a virus -- I told you yesterday that I

20  think I received viruses from your client, and the first thing

21  I do is try to stop those viruses.  And if I don't clean my

22  computer, it slows down to where it's almost unusable.

23         So, I've maintained evidence -- and you've got -- in

24  fact, you've been complaining about the production I produced,

25  so -- it's something where you --

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

                                                              Page 343

1          I mean, I can give you more.  There's a lot more to

2    give you.

3          Q.   What else is there to give me?

4          A.   I've got over 3 million e-mails you can have.

5          Q.   Do they relate to this lawsuit?

6          A.   Possibly.

7          Q.   Are they responsive to discovery requests?

8          A.   I don't know.

9          Q.   Do you understand that you have a duty to review those

10   e-mails to determine whether they're responsive to discovery

11   requests, and if they are, you're obligated to produce them,

12   and if they're not, you shouldn't?

13         A.   It's -- I don't know how long -- it would probably

14   take me to this time this year -- next year to go over the 3 --

15   could be 4 million e-mails.

16              So that's -- I guess, in total, is my answer.

17         Q.   Are you going to go over those 4 million e-mails?

18         A.   Yesterday, I said that I would go back and look for a

19   couple of things.  I didn't write those down, so I'm trusting

20   the transcript to provide exactly what I said.

21              I will continue to look.  And I do, from time to time,

22   look for information, and that's why we have supplemental

23   discovery, I guess.

24         Q.   Are you going to go through the 4 million e-mails?

25         A.   To the extent possible.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 344

1    Q.   We served discovery requests on you.

2    A.   Uh-huh.

3    Q.   And you have an obligation to search for responsive

4    documents.

5    A.   Uh-huh.

6    Q.   Will you search through those 4 million e-mails for

7    documents responsive to our discovery requests?

8    A.   First of all, I think that I've delivered.

9         However, there are other theories that are developing.

10   I mentioned some yesterday.

11        The identity theft.  Identity theft, though, is

12   responsive to other -- other defendants as well.

13        The pornography that I talked about, that's in other

14   prospective defendants and current defendants.

15        IMG, I mentioned yesterday.  If you go to McAfee's

16   site advisor, they say that IMG is involved with -- some of the

17   people that are part of IMG -- with child pornography, fraud

18   and a bunch of other things.

19        So if, in fact, you all have a business relationship

20   with fraudsters, identity theft -- or thieves, predators -- be

21   they child pornographers or pornographers -- then I will go

22   back through those to see if, in fact, there are IPs that are

23   identical from one spammer or defendant to the next.

24        If you'd like me to do that, I will.

25   Q.   Yes.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 345

1      A.    Okay.

2      Q.    I would like you to search for documents responsive to

3   our discovery requests and then produce them --

4      A.    If I find anything.

5      Q.    -- pursuant to your obligations under the federal

6   rules.

7      A.    Okay.

8      Q.    Will you do that?

9      A.    If I can find anything, I will bring in it in and turn

10   it over to authorities.

11      Q.    You use a product called Evidence Eliminator, correct?

12      A.    That's correct.

13      Q.    Do you wish to eliminate evidence?

14      A.    My --

15          MR. SIEGEL:  Objection.  Argumentative.  Ambiguous.

16   Lacks foundation.

17      A.    On the recommendation of Detective Jason Sprowl of the

18   Kennewick Police Department, he says because people send child

19   pornography and other things on the Internet, that I should

20   wipe my computer very frequently.  And he said once a week is

21   not a bad idea.

22          So on his personal recommendation, I proceeded to

23   clean my computer every week.  And there were times where I

24   didn't; there were times where I did it many times a week.

25          So it was on the detective's recommendation and I was

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 346

1    brand new to the game.  So I followed his direction, and still

2    do.

3        Q.   How do you spell the detective's last name?

4        A.   Sprowl, S-P-R-O-W-L.

5             He's a former detective.  He's in private consulting

6    presently.

7        Q.   Do you wish to eliminate evidence?

8             MR. SIEGEL:  Objection.  Calls for a legal conclusion.

9    Speculative.  Vague and ambiguous.  Argumentative.

10       A.   I've eliminated no evidence related to this case.

11       Q.   How do you know when you scrubbed your computer that

12   you didn't eliminate any electronic evidence that is responsive

13   to the discovery requests that we served on you?

14       A.   In an absolute sense, I don't.  And if I did, it's

15   inadvertent.

16            And I do know that the computer viruses that wiped out

17   my hard drive destroyed everything, including all of my

18   business records at that time.  And it's done that on three

19   different occasions.  My business computers, I had to replace

20   in 2005 simply because the other ones were destroyed.

21       Q.   When you received Exhibit No. 10 for the first time --

22       A.   Uh-huh.

23       Q.   -- did you take steps to back up your computer

24   systems?

25       A.   Yes.  Yes, I did.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 347

1      Q.    What steps did you take?

2      A.    Well, the product that I purchased in '05 was Norton

3   Ghost, and it backs up a hard drive.

4            And I tried backing it up that way, and one of my

5   friends who -- actually, two friends -- mentioned that one of

6   the problems is, Jim, if you get viruses, they can replicate on

7   that backup drive.  So that spooked me out of continuing to do

8   that on a regular basis.

9            So I've tried disks, which is probably the only safe

10  way, to put it on CDs and DVDs.

11     Q.    Do you have any backups of the hard drives that you

12  have scrubbed?

13     A.    My hard drive is too large to put backups on DVDs.  I

14  wouldn't even attempt to do that.

15     Q.    Do you have any backups of the hard drives that you

16  have scrubbed?

17     A.    I think I have one.  I think I do.  I'm not positive.

18  I'll double-check.

19     Q.    When was that backup created?

20     A.    I don't know.

21     Q.    Do you know whether it was created in the last six

22  months?

23     A.    I just don't know.

24     Q.    You can't estimate?

25     A.    I don't know if that's an estimate.  I just don't know

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                     James S. Gordon, Jr., Vol. II

Page 348

1    when I did it.

2        Q.   Have you searched that backup for documents responsive

3    to the discovery requests in this lawsuit?

4        A.   I've never looked at the backups.

5            MR. NEWMAN:  The videographer has indicated that we're

6    running out of tape, so let's take a break.

7            THE WITNESS:  Okay.

8            THE VIDEOGRAPHER:  This is the end of Tape No. 1,

9    Volume 2 in the deposition of James S. Gordon, Junior.  The

10   time is now 11:44 a.m.  We are off the record.

11               (A recess was taken.)

12           THE VIDEOGRAPHER:  This is the beginning of Tape No.

13   2, Volume 2 of the deposition of James S. Gordon, Junior.  The

14   time is now 11:53 a.m.  We are on the record.

15       Q.   How did you come to meet Jason Sprowl?

16       A.   Someone recommended that I see him.  I believe it was

17   someone at the Attorney General's office in Kennewick,

18   Washington.  I believe that's how I got the referral.

19       Q.   For what purpose?

20       A.   Because there was child pornography being sent and I

21   tried to complain there, and they said, no, he helps with the

22   forensic investigation of the e-mails.

23           And I went to him seeking help, and then later to

24   Officer Lou Reed of the Richland Police Department.

25           I've also consulted with the F.B.I. in Seattle,

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 349

1    MissingKids.org -- or.com -- whatever the -- trying to figure

2    out how these folks are sending -- and why they are sending

3    that type of thing to me.

4         Q.    Have you engaged Jason Sprowl for expert witness

5    services?

6         A.    I don't think we have.  I don't think so.

7         Q.    Have you ever paid Jason Sprowl for any services?

8         A.    No, he's on the City's payroll.  He wouldn't accept

9    anything like that.

10        Q.    And the advice that he has given to you, has that been

11   formal or informal?

12        A.    Formal.  I went to him to file a complaint, or

13   complaints.

14        Q.    Are there documents that summarize the complaints and

15   his advice?

16        A.    The documents are forwards of e-mails that I included

17   in the production.

18        Q.    You testified that he advised you should use Evidence

19   Eliminator; is that right?

20        A.    That was his recommendation.

21        Q.    And do you have a document reflecting that advice?

22        A.    It may have been over the phone.  I don't recall.

23        Q.    You testified he's a City employee; is that right?

24        A.    Police detective.  He was.

25        Q.    But he's not a police detective now, right?

Gordon v. Virtumundo              James S. Gordon, Jr., Vol. II

Page 350

1     A.    No.

2     Q.    So why would it be improper for you to pay him money

3   for services?

4     A.    No, he was a police detective during the time that I

5   was complaining and sending forwards of e-mails there.

6     Q.    Have you spoken with him since he left the police

7   force?

8     A.    When he was in the process of leaving, he told me to

9   forward the e-mails, and I don't know if he was still on the

10   pay- -- he must have been still on the payroll, because it was

11   at his original number -- forward them on to MissingKids.

12     Q.    Do you know what business Mr. Sprowl is engaged in

13   now?

14     A.    No.

15     Q.    When was the last time you conferred with him?

16     A.    I don't know.  I don't recall, I guess I should say.

17     Q.    Do you believe it was within the last six months?

18     A.    I don't recall.

19     Q.    Have you ever conferred with him about Adknowledge or

20   Virtumundo?

21     A.    I don't know or don't recall.

22           The primary purpose was, I believe, just the child

23   pornography.

24           I did ask him about software that he uses, and he

25   mentioned that he uses -- or also uses EmailTrackerPro and

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 351

1    Visual Route.

2              So I'm trying to think about that time.

3              No, this was IMG that I consulted with police

4    detectives about.

5              (Exhibit Nos. 19 & 20 marked.)

6        Q.   Sir, the court reporter has handed you Exhibits 19 and

7    20.

8        A.   Correct.

9        Q.   I'd like to turn your attention first to Exhibit

10   No. 19.

11             Do you recognize it?

12       A.   Yes.

13       Q.   What is it?

14       A.   It's an e-mail that I believe came from your clients,

15   and it's been annotated with -- well, markings.

16       Q.   Who annotated it?

17       A.   I did.

18       Q.   What do the markings indicate?

19       A.   Where specifically do you want me to start?

20       Q.   Would you please tell me generally what they indicate,

21   and then we'll get into specifics.

22       A.   Under received headers from you to the sender, these

23   are markings, annotations which --

24       Q.   Sir, I don't mean to cut you off, and I apologize.

25             I'd like to strike the question, if that's okay.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo            James S. Gordon, Jr., Vol. II

Page 352

1      A.    Okay.

2      Q.    And I'll ask you, do the markings indicate sections of

3  this e-mail that you believe might violate law?

4      A.    Yes.

5      Q.    If you turn your attention to Exhibit No. 20, is

6  Exhibit No. 20 the same e-mail as Exhibit 19, but it does not

7  include the markings?

8      A.    Yes, it looks like it is the same.

9      Q.    And do you believe that this e-mail violates law?

10     A.    I didn't say the e-mail.

11           You said this e-mail.  You're talking about No. 20?

12     Q.    I'm referring to the e-mail that's contained in

13  Exhibits 19 and 20, which I believe you testified is the same

14  e-mail.

15     A.    My answer to the previous question was the annotations

16  represent my thinking in terms of alleged -- I guess I'll use

17  that term -- alleged violations of the statutes.

18     Q.    Do you believe that the subject line of the e-mail is

19  false or misleading?

20           MR. SIEGEL:  Objection to the extent it calls for a

21  legal conclusion.

22     A.    I can't say it's false.

23           Misleading -- just looking at it, it -- "Try Privacy

24  Plus for 30 days" -- it doesn't lead me to any conclusion.

25     Q.    Do you see the little "R" in the circle next to

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 353

1    "Privacy Plus" in the subject line?

2        A.    Yes, I do.

3        Q.    Do you know what that indicates?

4        A.    If it were the little small "R" and a circle, I would

5    guess it means something is registered.

6              But it's not, and I didn't know what it meant.

7        Q.    If you turn your attention to Exhibit No. 20, can you

8    identify in the body of the e-mail the name of the product

9    that's being offered?

10       A.    It says, "Privacy Plus."

11       Q.    And the subject line is "Try Privacy Plus," correct?

12       A.    Yes, that's what it says.

13       Q.    Do you believe that the "subject" line accurately

14   identifies what the body of the e-mail is about?

15       A.    I didn't have the advantage of seeing the body of the

16   e-mail.  I just used the headers.

17       Q.    Now that you have the advantage of seeing the body of

18   the e-mail, do you believe that the "subject" line accurately

19   identifies what the body of the e-mail is about?

20       A.    Okay.

21             Yeah, after looking at the e-mail, it looks like the

22   subject refers to something in the e-mail.

23       Q.    I'd like to turn your attention to the "from" line.

24             Do you see that?

25       A.    Yes.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 354

1      Q.    In the "from" line, do you see any domain name that

2  you believe is registered or owned by Virtumundo or

3  Adknowledge?

4      A.    Yes.

5      Q.    And what is that domain name?

6      A.    vm-admin.com.

7      Q.    And do you know that to be a domain name that's

8  registered or owned by Virtumundo?

9      A.    I now know that, yes.

10     Q.    How do you know that?

11     A.    I've looked it up.

12     Q.    Where did you look it up?

13     A.    I'm not sure which Whois database.

14     Q.    A Who Is database?

15     A.    Yeah.

16     Q.    And we talked about Whois databases yesterday,

17 correct?

18     A.    Yes, we did.

19     Q.    And when you're referring to the Whois database today,

20 it's --

21     A.    One of those.

22     Q.    Do you believe that the transmission path of this

23 e-mail is obfuscated?

24     A.    Yes.

25     Q.    Would you please explain why you believe that.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 355

1      A.    This, again, is a problem with the hand-offs.

2            Your "from" tokens correspond with the "by" tokens in

3      the header above it, and when they don't, I believe that shows

4      an obfuscation or trying to mislead the person.

5            And because 99. -- percent of the e-mails have some

6      problem like this, I just have a general conclusion that they

7      misrepresent the -- the transmission paths is misrepresented,

8      obfuscated.  There is no clear hand-off from one clear header

9      to the next.

10           And in good headers, which I eluded to earlier, you

11     have clear hand-off from a "from" token to a "by" token.

12     Reputable firms do that.

13     Q.    Does this e-mail indicate that there wasn't a clear

14     hand-off between a "from" token to a "by" token?

15     A.    Yeah, there's a break.

16     Q.    Where?

17     A.    The "from" token in R3, which according to Internet

18     protocol, is the sender.  The lowest one -- lowest meaning

19     vertically -- is the sender, and that "from" token should

20     correspond to the next highlighted R2 and it doesn't.

21     Q.    Do you know what a private IP address is?

22     A.    I'm not sure what you mean.

23     Q.    So is your answer you don't know what a private IP

24     address is?

25     A.    I said I'm not sure.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 356

1    Q.   Have you ever heard the term?

2    A.   I'm not sure what you mean, is my answer.

3    Q.   I'm asking about your understanding.

4    A.   Okay.

5    Q.   And I don't mean anything other than what I ask, which

6  is, have you heard the term "private IP address" before?

7    A.   I may have.

8    Q.   But you don't know as you sit here today?

9    A.   I'm not sure.

10   Q.   When you look at R3, which is highlighted, next to it

11 is an IP address, correct?

12   A.   Yes.

13   Q.   And that IP address is 192.168.3.11, right?

14   A.   Yes.

15   Q.   By looking at that IP address, can you tell what it's

16 intended for use of?

17   A.   You mentioned private IPs.  I'm thinking about that.

18        There are blocks.  Routers will have blocks, firewalls

19 and so forth, and -- so there are blocks that, I guess, are

20 denoted in a trace route as private.

21   Q.   And the IP address that's highlighted next to R3 in

22 Exhibit 19 is a private IP address, right?

23   A.   Yes, it is.  Or it appears to be.

24   Q.   So it appears to be Virtumundo's internal IP address,

25 right?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 357

1      A.    I would guess that.

2      Q.    Do you believe that's where the e-mail originated

3   internally?

4          MR. SIEGEL:    Objection as to relevance as to what my

5   client's belief is.

6      A.    My belief is that the lowest header in an e-mail

7   header is the point of origin.

8      Q.    And do you see any problem with the lowest header

9   identified in Exhibit 19?

10     A.    The problem is in the "from" token, I have mentioned.

11     Q.    What's the problem?

12     A.    The problem is that there is no clear hand-off to the

13  "by" token above it.

14     Q.    And the "by" token above it, it's R2, correct?

15     A.    Yes.

16     Q.    And have you looked up to see to which entity the IP

17  address -- that would be Internet protocol address -- in R2 is

18  registered?

19     A.    I'm only referring to what I've highlighted.    That's

20  what I've done research on.

21     Q.    Does that mean the answer to my question is no?

22     A.    Okay.    Let me hear your question again.

23     Q.    Have you looked up to see to which entity the Internet

24  protocol address in R2 is registered?

25     A.    I'm not sure if I have or not.    I may have done that.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 358

1              Because this isn't the only e-mail from your client

2       that I looked at.  So maybe in another e-mail, I did do that.

3       I don't know.

4            Q.    In R2, you have highlighted "by ams.ftl.affinity.com."

5                  Why is that highlighted?

6            A.    Because it does not link to the "from" token below it.

7            Q.    In R2, you have "0500" highlighted.

8                  Do you know what "0500" indicates?

9            A.    Greenwich Mean Time, and that's the distance -- or the

10      time behind it because there is a minus sign.  If it were a

11      plus sign, it would be the time ahead of Greenwich Mean Time.

12           Q.    And that time is based upon a time that's entered into

13      a computer, right?

14           A.    Okay.  Yes.

15           Q.    And does that indicate the time -- strike that.

16                 Next to the "0500," do you see "16:43:55"?

17           A.    "16:46."

18           Q.    I'm sorry, you're right.  "16:46:55."

19           A.    Yes.

20           Q.    Does that indicate 4:46 and 55 seconds in the

21      afternoon?

22           A.    It looks like that, yes.

23           Q.    And is that the time that the e-mail passed through

24      the server that's identified in R2?

25           A.    That's my guess, yes.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 359

1      Q.   Why did you highlight "0500"?

2      A.   The point of -- of the highlighting was to remind me

3    -- more than anything else -- remind me of what I saw was

4    problematic.

5           And what's problematic is that I went to a trace route

6    and looked at the trace route and compared it to the e-mail,

7    and they didn't coincide in terms of where those possible

8    servers were.  Geographically, where they were.

9      Q.   Could you explain further?

10          I don't know that I understand.

11          If your testimony is complete, that's fine.  But I

12   don't really understand why you highlighted "0500."

13     A.   A trace route will delineate each computer that a

14   message -- I should say a ping signal will access on their way

15   to a given IP address.  216, as an example.

16          And there may be 10 -- I've seen 60 or 70 computers

17   that intervened, or intermediary computers.

18          So each one has -- each computer, each IP address has

19   a geographic location, and it's my testimony that my

20   recollection is that that didn't match the trace route in terms

21   of the geographic location.

22          That's my testimony.

23     Q.   What's the geographic location?

24     A.   This is in the Pacific Time Zone.

25     Q.   And you know that because of the 0500, correct?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 360

1      A.   And -- I know that because it's Standard Time during

2    December of any year, Pacific Time Zone.

3      Q.   And do you know what computer is responsible for

4    marking the "0500" and the time --

5      A.   No.

6      Q.   -- in this e-mail?

7      A.   I made a mistake.  I'm sorry.

8           Not Pacific Time Zone.  Standard Time for Eastern

9    Time.

10     Q.   And do you know what computer is responsible for

11   marking the time identified in R2 of this header?

12     A.   I don't know what computer and what header.  There are

13   three headers.

14     Q.   R2.

15     A.   R2?

16          I don't know what computer.

17     Q.   You highlighted in R1 "unknown."

18          Why did you highlight it?

19     A.   Because my IP address is not unknown.  And --

20     Q.   Do you know what computer is responsible for marking

21   the "unknown" in R1?

22     A.   I -- I don't know if I want to consider it a computer.

23          A spammer could have taken the information that I said

24   was problematic in R2 and just put information in it that the

25   receiving computer couldn't process.

f14872fb-74cf-41dd-967d-534cf51d2fc8