Gordon v. Virtumundo        James S. Gordon, Jr., Vol. II

Page 361

1     Q.   Have you made any efforts to determine how the

2   "unknown" that appears in R1 was generated?

3     A.   Yes.

4     Q.   What were those efforts?

5     A.   I've talked with network administrators, people who

6   have held positions as network administrator.

7        I've talked with a professional out at Washington

8   State University, Tri Cities.

9        I've read things on the Internet.

10       And they talk about configurations of computers, and

11   some computers are configured to -- in such a way that that

12   information is obscured.

13       The computers that I typically deal with from

14   reputable sources will put a number in there, an IP address,

15   which is the IP address that accesses my computer.

16       And sometimes the unknowns are in other headers. I

17   mean, the second header, the third header, the fourth header.

18   And sometimes there are multiple unknowns.

19       MR. NEWMAN: Can we take a break?

20       THE WITNESS: Okay.

21       MR. SIEGEL: Is this going to be more --

22       MR. NEWMAN: Let's take a break.

23       THE VIDEOGRAPHER: The time is now 12:15 p.m. We are

24   now off the record.

25       (A lunch recess was taken.)

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 362

1            (Mr. Townsend did not return.)

2            THE VIDEOGRAPHER:  The time is now 1:28 p.m.  We are

3       on the record.

4

5                    E X A M I N A T I O N  (Cont'd)

6

7       BY MR. NEWMAN:

8            Q.   Mr. Gordon, in Exhibit 19 and Exhibit No. 20, both of

9       which contain an identical e-mail, you testified that you

10      believe the transmission path is obfuscated, right?

11           A.   Yes, I did.

12           Q.   Is there anything that we have not discussed that

13      leads you to believe that the transmission path is obfuscated?

14           A.   I'm sure there is.

15                The way that -- let's say that at trial, what I would

16      do is sit in front of my actual laptop or computer and I would

17      send it through the analysis that I did.

18                I don't have the advantage of my legend.

19                I don't have the advantage of the documentation that

20      I've already done the Visual Routes -- trace routes, I should

21      say.

22                And I would do all that, I guess, realtime, and it

23      would highlight things, it would jog my memory on other things.

24                So there may be things I'm not thinking of right now.

25           Q.   You testified that your legend would help refresh your

Buell Realtime Reporting, LLC
206-287-9066

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 363

1   recollection as to how the transmission path is obfuscated; is

2   that correct?

3        A.   Not quite.

4             What I intended was that it may help me see if there

5   are other things that I might have overlooked.

6                  (Exhibit No. 21 marked.)

7        Q.   Do you recognize Exhibit No. 21?

8        A.   It appears to be -- yes.

9        Q.   Is Exhibit No. 21 that legend?

10       A.   It's one of my legends, yes.

11       Q.   How many of them are there?

12       A.   Oh.  Five, six, seven.  I'm not sure.

13            Probably less than 10, with their number.

14       Q.   Do you know how the legends differ?

15       A.   Occasionally, there will be new e-mails in it, and I

16   think some are five pages, some are seven pages.

17            And I can't tell you right now what the difference is

18   in terms of the sixth and seventh page.

19       Q.   Would you please review this legend and, after you

20   review, testify whether there's anything further in Exhibits 19

21   and 20 that indicate to you the transmission path is

22   obfuscated.

23       A.   (Witness reviews document.)

24            At present, I see nothing else.

25       Q.   Do you contend that any of the e-mails that form the

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 364

1  basis of your claims in this lawsuit were sent by Adknowledge

2  or Virtumundo through use of a domain that either did not have

3  the right to use?

4      A.   Did you say "either did not have"?

5      Q.   Either Adknowledge or Virtumundo.

6      A.   Oh.

7           Yes, when I testified about relays.  And I don't see

8  that information in front of me.

9      Q.   You believe that Virtumundo and Adknowledge used a

10 domain name without permission?

11     A.   Yes.

12          Or an IP address, which reflects typically a host, or

13 two or three.

14     Q.   Do you believe that Adknowledge and Virtumundo used a

15 domain name without permission concerning the e-mail contained

16 in Exhibits 19 and 20?

17     A.   It doesn't appear so.  I don't see the Spam Assassin

18 annotation here.

19     Q.   If there is a Spam Assassin annotation, would that

20 indicate that it did?

21     A.   No, it's a specific annotation within Spam Assassin,

22 and it says, "Received via a relay."

23          And it tells which block list it refers to.

24     Q.   You testified earlier about viruses.

25     A.   Yes.

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 365

1      Q.   Do you believe that in using anti-virus software, you

2  help to keep your computer well?

3      A.   I'm going to say --

4           MR. SIEGEL:  Objection.  Vague and ambiguous as to

5  what "well" means.

6      A.   No and yes.

7           No is my first answer, but yes is also, in part, true.

8      Q.   Can you explain them, please.

9      A.   When I set -- and I've used both Norton and McAfee --

10 in fact, depending upon which computer you're talking about,

11 I'll have one on one and one on the other.

12          I've used them both, and there have been failures on

13 the part of both anti-virus applications to withstand the

14 onslaught of viruses that have gone up to as many as 600 in a

15 week.

16     Q.   Does anti-virus software help to keep your computer

17 well?

18     A.   It is an aide.

19          THE WITNESS:  Bless you.

20          Does that go on the record?  Sorry.  That's just

21 automatic.

22          MR. NEWMAN:  Let the record reflect that Mike Geroe

23 sneezed and Mr. Gordon was kind enough to issue a "bless you,"

24 which shouldn't be construed as testimony in response to

25 questions.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo              James S. Gordon, Jr., Vol. II

Page 366

1          THE WITNESS:  Thank you.

2              (Exhibit Nos. 22 & 23 marked.)

3     Q.   Do you recognize Exhibit No. 22?

4     A.   Yes.

5     Q.   What is it?

6     A.   It is an e-mail that has undergone the EmailTrackerPro

7  formatting.

8     Q.   Who prepared the EmailTrackingPro [sic] formatting?

9     A.   I did, I believe.

10     Q.   Would you please review Exhibit No. 23 and testify

11  whether Exhibit No. 23 is the same e-mail as that analyzed in

12  Exhibit No. 22.

13     A.   (Witness reviews documents.)

14          Okay.  It's trivial, hypertechnical.

15          The Exhibit 22 is not an e-mail; it's a header from an

16  e-mail.

17          And Exhibit 23 is, in fact, an e-mail.

18          That's the distinction I have in my own head.

19     Q.   I appreciate you clarifying.

20     A.   Okay.

21          And I've not seen Exhibit 23 directly.

22     Q.   Ever?

23     A.   In terms -- in terms of the e-mail.

24          I see the headers, but I don't see the e-mails.

25     Q.   Have you ever seen the e-mail in Exhibit 23?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 367

1      A.   No, I don't recall seeing the e-mail.  And when I

2  refer to the e-mail, I mean the graphic.

3      Q.   Is the header in Exhibit No. 22 the same as the header

4  in Exhibit No. 23?

5      A.   Yes.

6      Q.   Do you contend that the "subject" line contained in

7  this e-mail is false or misleading?

8      A.   Yes.

9      Q.   What is the "subject" line?

10     A.   "Keep your computer well."

11     Q.   What do you believe is false or misleading about that?

12          MR. SIEGEL:  I'm going to object to the extent it

13  calls for a legal conclusion and relevance.

14     A.   "Keep your computer well" is just a generic statement.

15  It points to absolutely nothing.

16          And in order to find out what that means, one has to

17  open the e-mail, and as I said, I'd never opened this e-mail

18  other than to get the header.

19     Q.   Do you see what the "from" line says in it?

20     A.   Yes.

21     Q.   What does that say?

22     A.   "Best virus defense."

23     Q.   And when you look at the "Best virus defense" that you

24  just read together with "Keep your computer well," can you,

25  without opening the e-mail, determine what the e-mail

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 368

1    advertises?

2        A.    If I -- your question doesn't characterize what I do.

3              I look at one or the other.  I don't look at both

4    until such time I've actually opened the e-mail to analyze it.

5        Q.    Now that you have it in front of you, you have the

6    fortune of looking at them together, can you tell by looking at

7    that "subject" line, "Keep your computer well," and what's in

8    the "from" line, "Best virus defense," and anticipate what the

9    subject matter of the e-mail is?

10       A.    Yes.  When you put it that way, yes.

11       Q.    Do you believe that either Virtumundo or Adknowledge

12   used a domain name without permission in sending the e-mail

13   that's represented in Exhibits No. 22 and 23?

14       A.    No, it's without the annotation.

15       Q.    Do you see a domain name in Exhibit Nos. 22 and 23

16   that you believe is owned by or registered to Adknowledge or

17   Virtumundo?

18       A.    I see one that is; vm-admin.com.

19       Q.    And you know that to be registered to Virtumundo,

20   correct?

21       A.    Yes, I know that now.

22             Again, when this came to me back in -- when these

23   e-mails started coming to me back in '03, I had no clue.  I had

24   never heard of Virtumundo.

25             And I looked up the e-mails -- they came in -- the

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 369

1    domains came in iterations, starting with whatever came in '03,

2    and then there were new ones and new ones and new ones

3    throughout our three- or four-year history.

4            So -- and when they first came to me, I didn't know

5    who they were from.  It meant absolutely nothing to me.

6        Q.    We discussed earlier Exhibits No. 20 and 21 and you

7    testified about why you believed the headers in those exhibits

8    are obfuscated.

9            You have in front of you now Exhibits No. 22 and 23.

10           Is there anything in the headers in Exhibits No. 22

11   and 23 that indicates to you that those headers are obfuscated

12   that is inconsistent or in addition to what you testified about

13   Exhibits No. 20 and 21?

14       A.    They're just very similar.

15       Q.    In the analysis portion of Exhibit No. 22, there's a

16   highlight of "Location:   'Chicago, Illinois, U.S.A.'"

17           Do you see that?

18       A.    Yes, I do.

19       Q.    Why is that highlighted?

20       A.    Because Chicago, Illinois would have a specific

21   geographic location.

22           The highlighted portions of the GMT either correspond

23   or doesn't correspond to the highlights.

24           And in many cases, they don't correspond.

25           I shouldn't say in many cases.  In this case, since

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 370

1    that's all we're talking about, it didn't correspond.

2        Q.    What doesn't correspond?

3        A.    The location, Chicago, Illinois, to that particular

4    GMT, they don't correspond.

5        Q.    Is the GMT 0500?

6        A.    Yes, it is.

7        Q.    Does Chicago, Illinois correspond to the GMT 0600?

8        A.    It would in Standard Time.

9        Q.    Is Chicago, Illinois where the e-mail purports to come

10   from?

11       A.    No.

12             I'm sorry, yes.  Yes, it does.

13       Q.    And if you look at R3 in the transmission path, is

14   that where the e-mail purports to come from?

15             MR. SIEGEL:  Objection.  Vague and ambiguous as to the

16   term -- as to the term "come from."

17       A.    R2 is the header that EmailTrackerPro selected as the

18   source, not R3.

19       Q.    Is there something on this e-mail that indicates that

20   EmailTrackerPro identified R2 and not R3 as the source?

21       A.    Yes.

22             It says, "From IP address 216.64.222.133" in the

23   analysis.

24             And then, below that, in R2, it has the very same IP

25   address.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 371

1              (Exhibit Nos. 24 & 25 marked.)

2      Q.    Do you recognize Exhibit No. 24?

3      A.    Yes, it's another one of my analyses.

4      Q.    You prepared it using EmailTrackerPro?

5      A.    That's correct.

6      Q.    And you contend -- strike that.

7            And this is a copy of the headers of an e-mail,

8  correct?

9      A.    Yes.

10     Q.    An e-mail that you contend violated your rights and

11 form the basis of your claims in this lawsuit, correct?

12     A.    Yes.

13     Q.    Would you take look at Exhibit No. 25 and testify

14 whether the headers in Exhibit No. 25 are the same as the

15 headers in Exhibit No. 24?

16     A.    They're not.

17     Q.    Can you explain how you come to the conclusion that

18 they're not?

19     A.    Well, in the "received" header, you have two different

20 i.d. numbers.

21           One is 315.313-2361.

22           The other is -- in Exhibit 25, it is 321.944-2361.

23           They're not the same.

24     Q.    Have you ever seen the e-mail contained in Exhibit

25 No. 25?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 372

1    A.    I don't recall.

2    Q.    Do you know whether you -- strike that.

3          As you sit here today -- I understand you've never

4    seen this e-mail before, so you may not be able to answer this

5    question -- do you believe the "subject" line of Exhibit No. 25

6    is false or misleading?

7          MR. SIEGEL:  Objection.  Lacks foundation.  And

8    relevance as to my client's belief.

9          MR. NEWMAN:  Mr. Siegel, speaking --

10         MR. SIEGEL:  And calls for a conclusion of law.

11         MR. NEWMAN:  Mr. Siegel, the speaking objections are

12   improper.

13         Relevancy is not an objection in a deposition.

14         I'm asking questions of this witness, and if he

15   doesn't understand them, he should tell me.  And if you object

16   to the form, that should be your objection, but not relevance.

17   A.    Yes, is the answer.

18   Q.    Why do you believe the "subject" line is false or

19   misleading?

20   A.    I can't -- I don't know what it's about by reading the

21   subject.  It's just some off-the-wall statement about selling

22   your stuff.  Here's how to make it pay.

23         Are they talking about -- well, it says "eBay" right

24   here.

25         It could be talking about any number of things, and I

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 373

1    have no clue as to what it directs me to unless, of course, I

2    open the e-mail. And I didn't open the e-mail, as I recall.

3        Q.    And when you --

4        A.    That's fine. I've finished.

5        Q.    And when you look at the e-mail that's depicted in

6    Exhibit No. 25, it is about selling stuff and how to make it

7    pay, right?

8        A.    That's what it appears to be about, yes.

9              By the way, the two e-mails were addressed to two

10   different people that you shared with me, 24 and 25.

11       Q.    Thank you for pointing that out.

12       A.    Okay.

13             (Exhibit Nos. 26 & 27 marked.)

14       Q.    Do you recognize Exhibit No. 26?

15       A.    Yes.

16       Q.    That's an e-mail that you contend -- strike that.

17             That's the header of an e-mail that you contend

18   violates the statute and formulates a basis of your claims in

19   this lawsuit, correct?

20       A.    Yes.

21       Q.    And you prepared this using EmailTrackerPro, right?

22       A.    Correct.

23       Q.    Would you please look at Exhibit No. 27 and tell me

24   whether the headers in Exhibit No. 27 are the same as the

25   headers in Exhibit No. 26.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 374

1       A.   Yes, they are.

2       Q.   Do you contend that the "subject" line of this e-mail

3  is false or misleading?

4       A.   Yes.

5       Q.   When you look at the "subject" line, what does it say?

6       A.   "Are your closets in order?"

7       Q.   And in the "from" line, what does it say?

8       A.   "Closet Organizer."

9       Q.   And now that you have the benefit of looking at the

10 "from" line and the "subject" line together, can you tell what

11 the subject matter of the e-mail is?

12      A.   It says it's a closet organizer.

13      Q.   Does the "from" line assist you in determining what

14 the e-mail advertises?

15      A.   Well -- it does in that respect, yes.

16      Q.   And when you look at Exhibit No. 27, what does the

17 e-mail advertise?

18      A.   The graphic says, "Organize the chaos, closets."

19           MR. NEWMAN:  Let's go off the record.

20           THE WITNESS:  Okay.

21           THE VIDEOGRAPHER:  The time is now 1:53 p.m.  We are

22 off the record.

23           (A recess was taken.)

24           THE VIDEOGRAPHER:  The time is now 1:56 p.m.  We are

25 on the record.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 375

1      Q.   In Exhibit Nos. 22 and 23, can you tell by looking at

2  the headers that it is a commercial e-mail?

3      A.   No, you can't.

4           No, I can't.

5      Q.   You can't?

6      A.   No.

7      Q.   When you received the e-mail that is identified in

8  Exhibit No. 22, did you believe that it was a personal e-mail?

9           MR. SIEGEL:   Objection.   Lacks foundation.

10     A.   I didn't know.

11     Q.   Did you believe it was a commercial e-mail?

12     A.   I didn't know.

13     Q.   Did you open it to determine?

14     A.   No.

15     Q.   Why not?

16     A.   I'm not sure why I didn't do it at that particular

17  time.  I don't know.

18     Q.   In Exhibit No. 24, can you tell by reviewing the

19  header that it was a commercial e-mail?

20          MR. SIEGEL:   24?

21          MR. NEWMAN:   Yes, sir.

22     A.   I'm going to say yes.

23     Q.   What indicates to you it's a commercial e-mail?

24     A.   That's a guess.  Because it says, "Cashflow Center."

25          But I read "subject" lines first, and some people read

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 376

1    the other "from" lines first.

2            And by reading "subject" lines -- because I get so

3    many of them, it's easy for me to read "subject" lines because

4    I can group them together better.

5        Q.   Group them how?

6        A.   I just click on the button that says "subject" lines

7    and I read by "subject" lines.

8        Q.   And can you tell from looking at the "subject" line of

9    Exhibit 24 that it's a commercial e-mail?

10           And the "subject" line I'm referring to is "About

11   selling your stuff...here's how to make it pay."

12       A.   Yeah, that sounds commercial.

13       Q.   In Exhibit No. 26, if you turn your attention to the

14   "from" line, the "from" line reads that it's from Closet

15   Organizer, and then there's brackets, and it says,

16   "GreatClosetOrganizers142441@vm-local.com."

17           Do you see that?

18       A.   I see it now, yes.

19       Q.   Can you tell by reading that "from" line that it is a

20   commercial e-mail?

21       A.   But I didn't read the "from" line, so I would --

22           When I read it now, it appears to be a commercial

23   e-mail.

24           I didn't when I first received it because "Are your

25   closets in order" doesn't make any sense to me, and that's what

Buell Realtime Reporting, LLC
206-287-9066

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo              James S. Gordon, Jr., Vol. II

Page 377

1    I read first.

2         Q.   Did you read the "from" line after looking at the

3    "subject" line?

4         A.   I doubt if I did because I determine whether or not

5    I'm going to keep things.

6         Q.   Did you determine you were going to keep it?

7         A.   I -- I don't know how many I received that day.  I

8    probably received 2,000.

9              And what I do is I just leave them in boxes and I save

10   every box -- I've had 499, 500 boxes, I've had 200 boxes --

11   I've had a number of different boxes.  And I put them in boxes

12   and later will do a search of those boxes.

13        Q.   Did you determine that you were going to keep this

14   message?

15        A.   Well, I kept it because the result of my search said

16   that it was from your client.

17        Q.   Why did you keep this message and not delete it?

18        A.   Because I do search messages typically before I

19   delete, with some exceptions.

20        Q.   Did you ever open this message?

21        A.   Yes.  In order to get the e-mail analysis done, I did

22   open it.

23        Q.   Did you review the body of the e-mail?

24        A.   No.

25             In fact, the body may not have been visible.  As I

Buell Realtime Reporting, LLC
206-287-9066

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 378

1    said, I have my graphics turned down -- off at times.

2        Q.  Did you believe that this e-mail was personal in

3    nature?

4        A.   I don't know what I believed at that time.

5        Q.   If you turn your attention to Exhibit No. 22, the

6    "from" line reads "Best Virus Defense," and then there's

7    brackets, "BestVirusDefense199472@vm-admin.com" and the

8    brackets close.

9            Do you see that?

10       A.   Yes, I do.

11       Q.   Can you determine by looking at that "from" line that

12   this is a commercial e-mail?

13       A.   No, I can't.

14       Q.   When you received this e-mail, did you look at the

15   "from" line?

16       A.   I doubt if I did.  That wasn't my custom.

17       Q.   Can you -- strike that question.

18           When you look at the "from" line that I just read, do

19   you believe that it might be a personal message?

20       A.   Like I said, I've got hindsight now.

21           It's --

22           MR. SIEGEL:  Objection.  Calls for speculation.  Lacks

23   foundation.

24       A.   Mr. Newman, would you please ask -- ask that question

25   again.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 379

1    Q.   When you look at the "from" line that I read for

2    Exhibit No. 22, do you believe that it might be a personal

3    message?

4    A.   It could be, yes.

5    Q.   From whom?

6    A.   Any one of my friends that --

7    MR. SIEGEL:  Objection.  Calls for speculation.  Lacks

8    foundation.

9    A.   Any one of my friends, acquaintances, family because

10   all know that I have virus problems, and they send me

11   information.

12   A friend just sent me something on -- I think it was

13   AVG, and I get information through others as well.

14   So this could have been a personal communication.

15   Q.   And one of those friends, based upon your testimony,

16   you believe might change the "from" line from their personal

17   name to the name Best Virus Defense?

18   MR. SIEGEL:  Objection.  Argumentative.  Lacks

19   foundation.  Calls for speculation.

20   A.   You just talked about the Best Virus Defense, and I'm

21   -- no, I assumed.  I assumed something that you said.

22   I must not have heard it clearly.  I must not have

23   heard the question clearly.

24   Q.   Now that you have heard the question, is there

25   anything about your answer that you'd change?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 380

1    A.   No, I'm saying I don't -- I don't -- or didn't is more

2  correct -- didn't understand the question because I probably --

3  based on what you've fed back to me, I've obviously

4  misunderstood what you asked.

5    Q.   Do you believe, when you look at that "from" line,

6  that it could be a personal message as opposed to a commercial

7  message?

8         MR. SIEGEL:  Objection.  Asked and answered.

9    A.   It doesn't -- the "from" line doesn't look personal.

10        Somehow I thought you said "subject," and that's my

11  error.

12   Q.   Are you familiar with the motion for summary judgment

13  that you filed in this lawsuit?

14   A.   I filed a declaration in support.

15   Q.   Did you read the motion?

16   A.   Yes, I did.

17   Q.   When you review the e-mail that you receive, do you

18  generally look at the "from" lines?

19   A.   No.

20   Q.   Do you ever?

21   A.   Yes.  Ever, yes.

22   Q.   How often?

23   A.   I don't know.

24   Q.   Infrequently?

25   A.   I don't know how -- I don't understand "frequently."

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 381

1          So -- I look at e-mail more than most people.  That's

2     why I'm saying I don't understand "frequently."

3          Q.   Do you know -- strike that.

4          Did any of the "from" lines in e-mails that Virtumundo

5     or Adknowledge sent you confuse you?

6          MR. SIEGEL:  Objection.  Relevance.  Lacks foundation.

7          A.   We talked about "confusion" yesterday, and that's just

8     not a term that I use.

9          Q.   You know what that term means, though, right?

10         A.   I'm confused about that, too.

11         Q.   You say you're confused about that --

12         A.   That was a joke.  I guess I can't joke on the record,

13     so my apologies to everyone.

14         Q.   Do you know what the term "confusion" means?

15         A.   Yes, I do.

16         Q.   And did any of the "from" lines in e-mails you contend

17     Virtumundo or Adknowledge sent to you confuse you?

18         A.   Yes.

19         Q.   Which "from" lines do you recall confused you?

20         A.   Don't recall any right now.

21         Q.   Do you recall how you were confused?

22         A.   Yes.  I thought it was from somebody other than who

23     we're now finding out actually sent them.

24         Q.   Do you remember from whom you thought they were from?

25         A.   No.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 382

1       Q.   A friend?

2       A.   I just don't remember.

3       Q.   If you don't remember who you believed they were from,

4    upon what information do you base your testimony that you were

5    confused?

6       A.   Just general recollection since.

7            We can go to the e-mails and we can go one by one, if

8    you'd like, or group by group.

9       Q.   For 9,000 e-mails?

10      A.   If you wish.

11           Group them.  That's how I do it.

12           MR. SIEGEL:  I don't wish.

13           Excuse me.

14      Q.   Did any of the "from" lines in the e-mails that we've

15   reviewed today confuse you?

16      A.   No.  We talked about them.

17           They mislead.  They make me think that it's someone

18   other than who actually sent them.

19           In no place do we see Virtumundo, Adknowledge.

20           We see what's called ad copy -- you all called it a

21   line of business -- I call it a line of bull -- but a line of

22   business in the response that you supplied to the court.

23           First of all, your clients don't have any other

24   business other than sending e-mail, and to call it a line of

25   business is disingenuous at best, so --

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 383

1       It's misleading.  You can -- we can say confusing.

2  Because sometimes the effect is the same.

3       Q.   Were you misled by any of the "from" lines in the

4  e-mails that we have reviewed?

5       A.   Yes.

6       Q.   Which "from" lines?

7            MR. SIEGEL:  Objection.  Calls for a narrative.

8            Counsel, if you're going to ask him a question, which

9  "from" line in 9,000, put it in front of him.

10           He's already testified he doesn't have specific

11 recollection.

12      A.   If you present the e-mails, I will go back and see if

13 I can refresh myself.

14      Q.   Okay.

15           Let's turn to Exhibit Nos. 22 and 23.

16      A.   22 and 23.

17           Your question?

18      Q.   Did the "from" lines in the Exhibits 22 or 23 mislead

19 you?

20      A.   I didn't read the "from" lines when these came to me.

21           I said I read the "subject" lines.

22      Q.   Let's turn your attention to Exhibits No. 24 and 25.

23           Actually, I should just turn your attention to Exhibit

24 No. 24 because you testified Exhibit No. 25 is different from

25 it.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 384

1      A.   Okay.

2      Q.   Did the "from" line in Exhibit No. 24 mislead you?

3      A.   I didn't read it when it first came in.  I read the

4    "subject" line.

5      Q.   I'd like to turn your attention to Exhibits No. 22 and

6    23.

7           Did the "from" lines in those e-mails mislead you?

8      A.   I didn't read them when they first came in.

9      Q.   So the answer is no?

10      A.   I didn't read them.

11      Q.   And because you didn't read them, they couldn't have

12    misled you; is that right?

13      A.   Okay.  Yes.

14      Q.   You contend that you were misled by some of the "from"

15    lines that form a basis of your claims in this lawsuit,

16    correct?

17      A.   I claim that they misrepresent who sent them.

18      Q.   But you don't claim that you were misled by any of

19    them; is that right?

20      A.   I don't think that was my language.

21      Q.   Okay.

22           My question was, do you claim that you were misled by

23    some of the "from" lines?

24           Actually, I'll read the question verbatim that I

25    asked.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 385

1      A.    Okay.

2      Q.    I said, you contend that you were misled by some of

3  the "from" lines that form a basis of your claims in this

4  lawsuit, correct?

5            And your answer was, "I claim that they misrepresent

6  who sent them."

7      A.    Okay.

8      Q.    Which isn't responsive to the question that I asked.

9      A.    I guess they can do both.  I guess both could be the

10 case sometimes.

11     Q.    Let me ask it this way, then.

12           Do you contend that any of the e-mails that form a

13 basis of your claims in this lawsuit contain "from" lines that

14 misled you?

15           MR. SIEGEL:  Objection to the extent it calls for a

16 legal conclusion.

17     A.    My contention is that it misrepresents the source or

18 sender.

19     Q.    I understand that, and I appreciate you clarifying and

20 explaining that.

21           But I'd appreciate it if you could answer the

22 question, which is, do you contend that any of the e-mails that

23 form a basis of your claims in this lawsuit contain "from"

24 lines that misled you?

25           MR. SIEGEL:  Objection.  Asked and answered.  Vague

Buell Realtime Reporting, LLC
206-287-9066

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 386

1   and ambiguous.  Calls for a legal conclusion.  Lacks

2   foundation.

3       A.   And -- I guess the thing for me to do is to consult

4   with my attorney about this.

5       Q.   I'm asking you facts, and I expect that you're going

6   to testify from your own personal knowledge today, and you

7   shouldn't be testifying based upon what your lawyer tells you.

8       A.   I need explanation of some things, so I'd like to get

9   that from him.

10      Q.   Well, I'm asking you a question and you're refusing to

11  answer; is that right?

12      A.   No.  No.

13          MR. SIEGEL:  Objection.

14      Q.   So you don't know unless you speak with your lawyer

15  whether you contend that any of the "from" lines that form a

16  basis of your claims in this lawsuit misled you; is that right?

17          MR. SIEGEL:  Objection.  Asked and answered.

18  Argumentative.  Borders on harassment.  My client has answered

19  this question already.

20          MR. NEWMAN:  I have never asked that question until

21  now.  I'll ask it again.

22      Q.   So you don't know unless you speak with your lawyer

23  whether you contend that any of the "from" lines that form a

24  basis of your claims in this lawsuit misled you; is that right?

25          MR. SIEGEL:  Objection.  Mischaracterizes this

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 387

1    witness' testimony.  Calls for a legal conclusion.

2        Q.   You still must answer the question.

3        A.   I will.  I just said I want to talk with my attorney.

4        Q.   No, my question is whether -- you don't know if any of

5    the "from" lines misled you unless you talk to your attorney?

6        A.   I've answered that in a different way earlier.  You

7    said, oh, I appreciate that.

8             So I want to talk with my attorney.

9             And is that -- does that mean that you refuse me to

10   allow me to talk with my attorney?

11       Q.   Are you refusing to answer a question?

12       A.   No, I'm not.

13       Q.   Then answer the question.

14       A.   It's a question of timing.

15       Q.   Must you speak with your lawyer --

16       A.   Yes.

17       Q.   -- in order to know whether something misled you?

18       A.   I just want to speak with him first.

19       Q.   Must you speak with your attorney --

20            MR. SIEGEL:  Objection.  Argumentative.

21       Q.   -- in order to know whether something misled you?

22            MR. SIEGEL:  This is harassment, Counsel, and you know

23   it.

24       A.   I have nothing more to say on that.

25       Q.   You're refusing to answer the question?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 388

1    A.    No.

2          MR. SIEGEL:  He answered the question.

3    Q.    Then answer the question, please.

4    A.    As soon as I talk with my attorney.

5    Q.    The question is whether you must talk with your

6    attorney in order to know whether something misled you.

7    A.    That wasn't the original question.

8          But I want to talk to my --

9          MR. SIEGEL:  Mischaracterizes testimony.  Harassment.

10   Q.    I'm not characterizing testimony.  I'm asking a

11   question that you haven't answered.

12         Do you refuse to answer the question?

13   A.    The answer still is no.

14   Q.    Then answer the question, please.

15   A.    As soon as I talk with my attorney, is the answer to

16   that question.

17   Q.    I'm expecting an answer from you, not your lawyer.

18   A.    Well, you'll get an answer from me.

19   Q.    Do you believe that the question that I'm asking might

20   delve into the attorney-client privilege?

21   A.    That's a brand new question, and I want to talk with

22   my attorney first.

23   Q.    Do you believe it might delve into the attorney-client

24   privilege?

25   A.    We've not even dealt with the previous couple of

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 389

1    questions, so I want to talk with my attorney before we go any

2    further.

3        Q.   Well, generally, the only time that you have the right

4    not to answer a question is if it may infringe upon the

5    attorney-client privilege.

6            And when we began this deposition yesterday, we talked

7    about ground rules, and I told you that if you need to take a

8    break, happy to let you do that, but I'd appreciate it if you

9    could answer a question before the break begins.

10           Here you're refusing to answer a question.

11           The reason I gave you that advice is because it's

12   improper for your lawyer to coach you, and it appears that you

13   would like to take a break so that your lawyer can coach you.

14       A.   No, I want to talk with him.

15           MR. SIEGEL:   Objection.   There is no question there.

16   You don't have to respond to anything.

17       Q.   So I would like to ask --

18           MR. SIEGEL:   Move to strike comments of counsel.

19       Q.   I would like to ask my question again, and I'm hoping

20   you'll answer it.

21           And the answer is -- strike that.

22           The question is, did any of the "from" lines in the

23   e-mails that form a basis of your claims in this lawsuit

24   mislead you?

25       A.   I'm going to talk with my attorney before I answer.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 390

1    Q.   Then I'll strike that question and ask a new answer.

2    A.   Okay.

3    Q.   Must you speak what your attorney to know whether you

4    were misled by any of the "from" lines in the e-mails that form

5    a basis of your claims in this lawsuit?

6    A.   No, because he couldn't know.

7    Q.   Do you know?

8    A.   I said I want to talk with my attorney.

9    Q.   Do you know?

10   A.   I'm going to talk with my attorney first.

11   Q.   I understand you'd like to speak with your lawyer.

12        Do you know whether any of the "from" lines in the

13   e-mails that form a basis of your claims in this lawsuit misled

14   you?

15        MR. SIEGEL:  Objection to the extent it calls for a

16   legal conclusion.  Asked and answered.  Argumentative.

17   Harassment.

18   A.   Nothing's changed.

19   Q.   Do you know?

20   A.   We can do this until tomorrow.

21        I'm going to talk with Bob before I answer.

22   Q.   Do you know whether any of the "from" lines in the

23   e-mails that form a basis of your claims in this lawsuit misled

24   you?

25        MR. SIEGEL:  Objection.  Asked and answered.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 391

1      A.    And I'll talk with Bob.

2            MR. SIEGEL:  Argumentative.  Repetitive.

3      Q.    Do you know?

4      A.    Whether you ask it one or a hundred times, my answer

5  is the same.

6      Q.    And what is your answer?

7      A.    I want to talk with Bob first.

8      Q.    So you need to be coached before you can answer the

9  question?

10           MR. SIEGEL:  Objection.  Move to strike -- that's not

11 a question.  Move to strike comments of counsel.  It's

12 harassment.

13     Q.    Why must you speak with your lawyer before you're

14 willing to answer my question?

15     A.    That's for him to know.

16           I won't share that with you.

17           MR. SIEGEL:  Objection.

18     Q.    You need to seek his advice?

19           MR. SIEGEL:  Objection.  Mischaracterizes testimony.

20 This client never said that he must speak with me before he

21 answers.  He said he wants to speak with me.

22     Q.    Are you willing to answer the question without

23 speaking to your lawyer first?

24     A.    No, I'm going to talk with my attorney first.

25     Q.    So you're unwilling to answer the question unless you

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 392

1    speak with your lawyer first; is that right?

2        A.   Okay.  Let's go there.

3        Q.   The answer is yes?

4        A.   Let's go there.

5             That's your characterization, so I'm going to agree

6    with that.

7        Q.   Why are you unwilling to answer the question unless

8    you speak with your lawyer first?

9        A.   I could play this game as long as you can.

10            So, again, I'm going to talk with Bob first, period.

11            MR. SIEGEL:  He's just looking for some clarification,

12   Counsel, and you know it.  You're just harassing the client.

13       Q.   If you would like some clarification, I'm happy to

14   provide it.

15            Are you seeking clarification?

16       A.   Not from you.

17       Q.   I'm asking the questions.  Your lawyer has the right

18   to follow up later.

19            And in fact, after you answer my questions, you can

20   speak with your lawyer, and later your lawyer can ask you

21   questions to help clear up the record if you'd like, and if

22   he'd like.

23            So can you answer my question --

24            MR. SIEGEL:  Just --

25       Q.   -- and then later allow your lawyer to follow up?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 393

1          THE WITNESS:  Pardon?

2          MR. SIEGEL:  Do your best.  Answer his question and

3     we'll follow up.  I think that's a good suggestion that counsel

4     had.  I don't see any reason why you can't answer that

5     question.

6          I think you've answered already.  My objection --

7     A.    The answer that I've given hasn't changed.  You've

8     asked me to restate it or do -- ask another question in a

9     different form.

10         I answered "from" fields misrepresent.

11         The "subject" lines are typically -- when we talk

12    about misleading, those are typically what's misleading.

13         I don't read the "from" fields when e-mails first come

14    in.  And I've said that I don't know how many times.

15    Q.    You testified that "from" lines misrepresent, and you

16    testified that you generally don't read "from" lines.

17    A.    Initially.

18    Q.    But you haven't answered the question that I asked,

19    which is, have any of the "from" lines that form a basis of

20    your claims in this lawsuit misled you?

21         MR. SIEGEL:  Objection.  Same objections to the first

22    time he asked the question.

23    A.    Okay.

24         MR. SIEGEL:  And the second and third.

25    A.    Okay.  Is the question, at any time?  Initially?  Any

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 394

1    other parameters?

2        Q.    The question is, have any of the "from" lines that

3    form a basis of your claims in this lawsuit misled you?

4            And if you would like me to limit it by time, I will

5    say at any time.

6        A.    Okay.

7            MR. SIEGEL:  Objection to the extent it calls for a

8    legal conclusion, Counsel.

9        A.    Misled and misrepresent can yield the same result at

10   times.

11           So, to that extent, yes, I've been misled.

12       Q.    And do you recall what e-mail misled you?

13       A.    No.

14       Q.    Did any of the "from" lines in the e-mails that we've

15   reviewed today in Exhibits No. 22, 24 or 27 mislead you?

16       A.    I don't recall seeing the "from" lines previously.

17           I may have, but I just don't recall that.

18       Q.    Have you identified in this lawsuit any "from" lines

19   that have misled you?

20       A.    I -- no.

21           My understanding is I -- I identified "from" lines

22   that misrepresent.

23           MR. NEWMAN:  Let's take a five-minute break.

24           THE WITNESS:  Okay.

25           THE VIDEOGRAPHER:  The time is now 2:22 p.m.  We are

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 395

1    off the record.

2              (A recess was taken.)

3              THE VIDEOGRAPHER:  The time is now 2:39 p.m.  We are

4    on the record.

5        Q.  Earlier during your testimony, you indicated that you

6    wished to speak with your lawyer before answering any

7    questions.

8              Now that we've taken a break, is there anything about

9    your earlier answers that you wish to clarify?

10       A.  It wasn't about any question.  It was about the

11   specific question.

12             And yes, we did talk.  And he said there's a period at

13   the end of this deposition where he has a chance to -- what --

14   redirect, it's called?  Okay.

15             I'll wait until then.

16             (Exhibit Nos. 28 & 29 marked.)

17       Q.  Do you recognize Exhibits No. 28 and 29?

18       A.  I recall them.

19       Q.  What are they?

20       A.  Defendant Virtumundo, Inc.'s First Set of Requests for

21   Admission to Plaintiff Omni Innovations and Plaintiff Omni's

22   Answers and Responses to Defendant Virtumundo's First Requests

23   for Admission to Omni.

24       Q.  Did you participate in responding to these requests

25   for admissions?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 396

1      A.    Yes.

2      Q.    Did anybody else participate in responding to the

3   Requests for Admission?

4      A.    Mr. Siegel.

5            MR. SIEGEL:  Objection.  Vague and ambiguous as to

6   what "participate" means.

7      Q.    When I used the word "participate," were you unclear?

8      A.    I guessed.

9            In terms of its usual connotation, that's what my

10  guess was.

11     Q.    Who drafted the answers to Requests for Admission?

12     A.    I believe I made the first cut of responses.

13     Q.    And then your lawyer finalized them?

14     A.    I believe that's how we -- it may not have been.  It

15  may have been the actual RFP -- requests for production -- the

16  rogs, you all call it.

17           So I'm not sure if this was a copy.

18           But I do oftentimes provide input, and Mr. Siegel and

19  I collaborate.

20           So I don't know if this is the instant case or if it

21  happened another way.

22           So I'm guessing that I provided the input first.

23     Q.    I'd like to turn your attention to Requests for

24  Admission No. 2, which provides, "Admit that you 'opted in' to

25  receive e-mail correspondence from one of Defendant

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 397

1    Adknowledge's Partners and/or affiliates," and you answer,

2    "Plaintiff has made reasonable inquiry and the information

3    known or readily obtainable by him is insufficient to enable

4    him to admit or deny this Request."

5        A.    Where are you?

6        Q.    I'm looking on the first page of Exhibit 29 and I'm

7    looking at Request for Admission No. 1 in Exhibit No. 28.

8        A.    Okay.  Hold on here.  I've got the things backwards

9    here.

10            Okay.  So I'm at -- you're reading from which document

11   first?

12       Q.    I'm looking at Request for Admission No. 1, which is

13   contained in Exhibit No. 28.  I read that.

14            And then I turned my attention to Exhibit No. 29, and

15   I read the answer.

16            I need to strike what I just said because I spoke

17   incorrectly, so I'm going to clarify.

18       A.    Okay.

19       Q.    I was looking at Request for Admission No. 2 --

20       A.    Okay.

21       Q.    -- in Exhibit No. 28.

22            And then I read the response to Request for Admission

23   No. 2, and that's contained in Exhibit No. 29.

24            And I'm going to ask you a question about your

25   response, which is in Exhibit No. 29.  The only reason I'm

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo            James S. Gordon, Jr., Vol. II

Page 398

1    showing you Exhibit No. 28 is for context.

2        A.    Okay.

3        Q.    Let me know when you've reviewed it so I can ask the

4    question.

5        A.    I've reviewed it.

6        Q.    Your response provides, "Plaintiff has made reasonable

7    inquiry and the information known or readily obtainable by him

8    is insufficient to enable him to admit or deny this Request."

9              Who is "him"?

10       A.    Plaintiff, I'm plaintiff.

11       Q.    These Requests for Admissions are directed to Omni.

12             You understand that?

13       A.    Okay.

14       Q.    Yes?

15       A.    "Okay" just means we're talking about the same

16   individual.

17       Q.    Would Omni have any responses to Requests for

18   Admissions that would be different than yours personally?

19       A.    Some, yes.

20       Q.    In Request for Admission No. 2, would Omni have a

21   different response than you would have?

22       A.    Yes.

23       Q.    Did Omni make any reasonable inquiry and what would

24   its response be?  Strike that.

25             Did Omni make any reasonable inquiry in order to

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 399

1    respond to Request for Admission No. 2?

2         A.   It's very difficult -- I'm not even sure I can do

3    it -- to distinguish between what Omni did and what Jim Gordon

4    did.

5              Omni, as best I recall, never opted in and never

6    sought to receive free prizes or anything of that nature.

7              So I have no recollection of Omni ever opting in to

8    anything at any time?

9         Q.   But Jim Gordon did?

10        A.   Jim Gordon did.

11        Q.   In the response to Request for Admission No. 2, it

12   references "him," and you testified that "him" is you, Jim

13   Gordon.

14             After you reviewed Request for Admission No. 2 and

15   understanding that it was directed to Omni and not to you,

16   would you change the answer to Request for Admission No. 2?

17        A.   This is a time of day when this stuff is just bouncing

18   right off my head.

19             I'm still not understanding specifically what you

20   said.

21        Q.   You testified that the "him" in your response to

22   Request for Admission No. 2 is you, correct?

23        A.   Yes, I did.

24        Q.   And you understand that Request for Admission No. 2 is

25   not directed to you, but rather to Omni, correct?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 400

1      A.    That's true.

2      Q.    And with that understanding, would you change the

3   response to Request for Admission No. 2?

4      A.    I don't think so.  I don't see a reason to at present.

5   And maybe it's because I'm fatigued, but I don't see a reason

6   to at present.

7      Q.    So you don't know one way or the other whether Omni

8   opted in to receive e-mail correspondence from one of Defendant

9   Adknowledge's partners and/or affiliates?

10     A.    No, I answered that.  I told you that Omni has never

11  opted in to anything at any time.

12     Q.    So would you change the answer to No. 2?

13     A.    I can't think of a reason to presently.

14     Q.    Okay.

15           So you're unable to admit or deny whether Omni has

16  opted in to receive e-mail correspondence from one of Defendant

17  Adknowledge's partners and/or affiliates?

18     A.    I'm sorry, I must have just hit a wall because I --

19  it's just blanked out.

20           I -- my best times are early morning and late night.

21  This is -- if I had the wherewithal, I'd take a siesta about

22  this time of day.

23           I -- it's just not registering with me.

24     Q.    Do you need a break?

25     A.    I don't think that would help.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                  James S. Gordon, Jr., Vol. II

Page 401

1        I don't understand whatever it is -- it's just not

2    registering, so...

3        Q.   Your response to Request for Admission No. 2 as

4    contained in Exhibit No. 29 provides "Plaintiff" -- that's you,

5    as your testimony provides -- "has made reasonable inquiry and

6    the information known or readily obtainable by him is

7    insufficient to enable him to admit or deny this Request."

8        Did you make reasonable inquiry?

9        A.   Of what?

10       Q.   In an effort to respond to Request for Admission

11   No. 2.

12       A.   I'm sorry, I just basically shut down.

13       It's very difficult for me to process anything right

14   now.  I am just that tired.  I've got about four or five hours

15   of sleep three nights in a row, and...

16       Q.   Why did you only get three our four hours of sleep

17   last night?

18       A.   I didn't have a good pill and my bed is within 15 feet

19   of the ice maker and the pop machine, and there's traffic all

20   night long.

21           MR. NEWMAN:  Mr. Siegel?

22           MR. SIEGEL:  Yes?

23           MR. NEWMAN:  What do you suggest we do at this point?

24   Because I would like to get the witness' fair and forthright

25   testimony and it doesn't seem he's capable of rendering it now.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

1          MR. SIEGEL:  Let me talk -- can we talk a minute --

2          MR. NEWMAN:  Sure.

3          MR. SIEGEL:  -- so I can decide if --

4          THE VIDEOGRAPHER:  Off the record?

5          MR. NEWMAN:  Yes, off the record.

6          THE VIDEOGRAPHER:  The time is now 2:50 p.m.  We are

7    off the record.

8              (A recess was taken.)

9          THE VIDEOGRAPHER:  The time is now 3:22 p.m.  We are

10   on the record.

11      Q.   Mr. Gordon, before we took our last break, you advised

12   that you were unclear as to some of the questions that I asked

13   and further advised that you had very little sleep and were

14   uncomfortable answering; is that right?

15      A.   I believe that's true.

16      Q.   And you took a break?

17      A.   Yes, I did.

18      Q.   And got some fresh air?

19      A.   Yes.

20      Q.   Do you believe that you can now answer the questions?

21      A.   I'd like to attempt to do that, yes.

22      Q.   I would like from you your best answers possible, and

23   if you're unable to give me those answers because you're too

24   tired or for any other reason, please let me know and we'll

25   figure out how to remedy it.  Maybe that's another break;

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 403

1    perhaps it is continuing this deposition to another time.

2        A.   Okay.

3        Q.   You advised earlier that your best times are in the --

4    early in the morning and late at night; is that right?

5        A.   Yes.

6        Q.   I'm happy to come back here tomorrow and we could

7    start at 5:00 a.m., if you'd like.

8        A.   5:00, 6:00.

9        Q.   6:00 a.m.?  We can do that.

10       A.   It depends on the other parties.  I'm not going to

11   drag them out of bed.

12       Q.   My primary concern -- and I would anticipate it would

13   be your primary concern, too -- is that we have a clean,

14   complete and accurate record.

15       A.   Okay.

16       Q.   That you understand my questions and that you give me

17   full and forthright responses, and if you think you're unable

18   to do that today, I'm happy to start again tomorrow at 5:00 or

19   6:00 a.m.

20           Would you like to do that?

21       A.   I will raise my hand if I feel that I've had enough

22   for today.

23       Q.   Okay.

24           Would you please turn your attention to Exhibits No.

25   28 and 29.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 404

1      A.    I have them open again.

2      Q.    And in particular, Request for Admission No. 2.

3            Do you see that?

4      A.    Yes, I do.

5      Q.    You testified earlier that the "him" referred to in

6   the response to Request for Admission No. 2 is you, Jim Gordon.

7            You also acknowledged that the Request for Admission

8   is directed to Omni.

9            And my question is, is now that you understand that

10  the request is directed to Omni but the answer references you

11  personally, would you change the answer to Request for

12  Admission No. 2?

13     A.    I think that's just a simple error.  I typically would

14  prefer to call a company "it."

15     Q.    So how would you change your answer to Request for

16  Admission No. 2?

17     A.    We'll change the pronoun there.  "It" in place of

18  "him."

19     Q.    Is it your testimony that Omni has made a reasonable

20  inquiry with respect to answering Request for Admission No. 2?

21     A.    The only problem I have is I can't distinguish between

22  Omni and Jim Gordon at this point in time in terms of the

23  reasonable inquiry and information known or readily attainable.

24            I can't make that distinction at present.

25     Q.    Is there any information or documents that could

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 405

1    refresh your recollection such that you could make the

2    distinction between Omni and yourself personally?

3         A.   Other than rest, I'm not sure what could help me right

4    now.

5              I -- nothing that I can think of at present.

6         Q.   Do you normally have a difficult time distinguishing

7    between yourself and Omni?

8         A.   I wouldn't -- no, is my answer.

9         Q.   Why is it difficult here to distinguish between

10   yourself and Omni?

11        A.   Lack of sleep.

12        Q.   If you were to have more sleep, do you think you could

13   better answer these questions?

14        A.   I need a lot right now.

15             It's possible.

16        Q.   Shall we continue this deposition until tomorrow at

17   5:00 or 6:00 a.m.?

18        A.   I said I'd try to continue the best I can.

19        Q.   But I asked why it's difficult for you to distinguish

20   between yourself and Omni and you just testified it's because

21   of lack of sleep.

22             And again, I'd like for you to be able to answer

23   questions.

24             If you can't, it could adversely affect your case and

25   could adversely affect my clients' case.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 406

1      It's in both our interests to have the best possible

2   testimony today, and it seems that you can't when I'm on my

3   second question from the break and your answer is that you

4   can't answer because of lack of sleep.

5      Should we reconvene tomorrow morning?

6      A.   I'd like to continue.

7      Q.   Can you distinguish between yourself and Omni with

8   respect to Request For Admission No. 2?

9      A.   My gosh, I don't know what else to say.

10      I don't know what else to say.

11      Q.   Can you distinguish between yourself and Omni with

12   respect to Request for Admission No. 2?

13      A.   It says, "Plaintiff has made reasonable inquiry and

14   the information known or readily obtainable by him is

15   insufficient to enable him to admit or deny" that I opted in.

16      Let me just say -- and I guess because we've covered

17   opt-in so frequently before and it took several iterations and

18   changes and so forth in answers -- I never -- Omni never opted

19   in and Jim Gordon never intentionally ever opted in to anything

20   at any time.

21      Q.   Did Omni make reasonable inquiry into the substance of

22   Request for Admission No. 2?

23      A.   Yes.

24      Q.   What inquiry did Omni make?

25      A.   Nothing comes to mind presently.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 407

1    Q.   Did it make any inquiry whatsoever?

2    A.   I said nothing comes to mind.

3         I answered yes to your question, and I just said
4    nothing comes to mind immediately.

5    Q.   What could help refresh your recollection?

6    A.   I'm not sure.

7    Q.   When preparing responses for Request for Admission
8    No. 2, did you or Omni review the history in your browser?

9    A.   I don't know that I did.

10        I typically don't.

11   Q.   When preparing the response for Request for Admission
12   No. 2, did you or Omni review the cache in your computer?

13   A.   I typically delete both.

14   Q.   When you and Omni were preparing the response to
15   Request for Admission No. 2, did you review your e-mails for
16   subscribe verifications?

17   A.   I don't know what that is.

18   Q.   It's an e-mail that would be from Adknowledge or
19   Virtumundo that confirms that you had to subscribe to a mailing
20   list?

21   A.   No, in terms of intent.

22   Q.   I don't understand the question.  Strike that.

23        I don't understand the answer.

24        The question is, when preparing your response to
25   Request for Admission No. 2, did you review your e-mails for an

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

                                                              Page 408

1    e-mail confirming that you had subscribed to Adknowledge or

2    Virtumundo lists?

3        A.    What I -- sorry.

4            MR. SIEGEL:   If you have a specific recollection, then

5    tell counsel what it is.

6        A.    I have an answer to the question, and that is, I

7    simply looked for everything that was Virtumundo and

8    Adknowledge.   Everything.   Did searches on my computer inside

9    Eudora and outside of Eudora.

10           In other words, Windows Explorer-type searches of the

11   entire hard drive.

12       Q.    How did you go about doing that search?

13       A.    I simply put "Virtumundo" or "Adknowledge" in the

14   search field in Windows Explorer as well as in the search

15   fields for Eudora.

16       Q.    Did you find anything in response to your search that

17   dealt with whether you or Omni may have or may not have opted

18   in to Adknowledge or Virtumundo?

19       A.    I'm really not sure because I sometimes do searches.

20           For example, if I do one unsubscribe, I keep an

21   unsubscribe in a single folder and it's in response to a number

22   of different defendants.   So I just go into the "Unsubscribe

23   Successful" folder and get that answer.

24           So -- okay.   That's my answer.

25       Q.    Do you generally save unsubscribe confirmations?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 409

1     A.    Generally.

2           Presently, I should say, because initially I did not

3     save them all.  I saved the representative sample, which may be

4     one, two, three -- sometimes more -- of a given unsubscribe

5     run, so to speak.

6     Q.    Just to confirm, you testified you did click on

7     unsubscribe links with both Virtumundo and Adknowledge,

8     correct?

9           MR. SIEGEL:  Objection.  Mischaracterizes his

10    testimony.

11    A.    Please ask again.

12          MR. SIEGEL:  Actually, strike that.  I don't think

13    that does -- strike that.

14    A.    Please ask -- please ask the question again.

15          (The requested testimony was read.)

16    A.    That's my belief, yes.

17    Q.    You didn't, however, retain any evidence of clicking

18    on those links, correct?

19    A.    That's correct.

20    Q.    You don't have any e-mails from Virtumundo or

21    Adknowledge confirming an opt-out, correct?

22    A.    No, I don't.

23    Q.    You don't have any screen shots or .pdf printouts of

24    your computer at the time when you clicked on the links,

25    correct?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 410

1       A.   I answered your question earlier in the sense that I

2   was going to go back and do some checking.

3            There are disks that I've not looked at that may have

4   some backup data on it, and I need to -- to go back and do

5   that.

6            I just have so many -- just hundreds of disks, and I

7   don't even know where to start because they weren't dated.  I

8   just put "backup" on it.

9       Q.   You're going to go back and look at each and every one

10  of those disks, right?

11      A.   I'm going to look at everything for Virtumundo and

12  Adknowledge.

13      Q.   Why didn't you do that for today?

14      A.   I did look for everything on my computer.

15           I did not go back -- because I have no clue as to

16  where it is, and that just -- it could have taken a week or two

17  to find more.

18      Q.   Then why didn't you take that week or two?

19      A.   Because I have other things to do.

20      Q.   You understand you have obligations in this lawsuit,

21  including responding --

22      A.   Uh-huh.

23      Q.    -- fully to discovery requests?

24      A.   Uh-huh.

25      Q.   But you didn't take the time to do so because you have

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 411

1    other things to do; is that right?

2        A.    That's not true.

3        Q.    Well, why didn't you take the week or two to search

4    for the documents in response to the discovery requests?

5        A.    I did search.

6        Q.    You just testified that you could do additional

7    searching, which would take a week or two, and you just

8    committed that you would do it but advised you hadn't in the

9    past.

10       A.    It would yield nothing, possibly, and it would waste a

11   week or two.

12             I have no knowledge that anything regarding

13   Adknowledge or Virtumundo is on those disks.

14       Q.    You don't know until you search them, right?

15       A.    I don't know until I search them, yes.

16       Q.    And why didn't you search them when you were

17   responding to discovery requests in this lawsuit?

18       A.    Because I didn't believe at that time that there was

19   anything on it because it says "backup."  And that doesn't -- I

20   have no idea what "backup" is.

21       Q.    It's possible, is it not, that in that backup, you'll

22   find e-mails from Virtumundo and Adknowledge confirming that

23   you actually did subscribe to the lists, right?

24       A.    That is -- I don't believe that to be true.

25             There might be other information that I kept about the

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 412

1     company.  It could have been an article I read.

2             But most of my e-mail-related stuff I keep in my

3     e-mail folder in terms of e-mails.

4             I keep my unsubscribe folder in terms of unsubscribe,

5     successful.  I have maybe 2,000 of those.

6             So I don't have a clue as to what's on it.

7             It could have been just more duplicates, and I think

8     they are.

9        Q.   You really don't know until you search, though,

10    correct?

11       A.   Except for those few that have stickies on them that

12    say what the content is.

13            There may be some of those still.  My clients give

14    them to me from time to time.

15       Q.   So you will search to determine whether you have

16    documents responsive to the discovery requests?

17       A.   Yes.

18       Q.   And that includes confirmation of you subscribing to

19    Adknowledge or Virtumundo?

20       A.   I'll look for all things Adknowledge and Virtumundo.

21            And you want that as discovery response?  Put it on a

22    CD or whatever; is that what you're asking for today?

23       Q.   I'm asking for you to respond to the discovery

24    requests that you received in this lawsuit consistent with your

25    obligations under the federal and local rules to do so.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 413

1      A.   I'm not familiar with the rules other than what you

2  are telling me right now.

3           And I'm asking, do you want me to put on CD the

4  information from the two companies, on media?

5      Q.   I don't know that it would be fair for me to instruct

6  you how to respond to discovery requests.

7      A.   Okay.

8      Q.   I know that you're asking a fair question, which is

9  how should the discovery requests be responded to, and the

10 answer is consistent with the federal and local rules.  And

11 your lawyer will advise you about those.

12     A.   Okay.  Okay.  Then I will -- if, in fact, there is

13 information, I will get that, supplement that.

14     Q.   You should review each interrogatory and each request

15 for a document and you should respond to them each

16 individually.

17     A.   We've done that.  We've done that.

18     Q.   But you need to supplement because there's data that

19 you haven't reviewed.

20     A.   Well, backup means, typically, that it's duplicates.

21 That's what backup is in my -- the understanding that I have.

22 Backup means duplicates.

23     Q.   Duplicates of what?

24     A.   Of what's on my hard drive.

25     Q.   But you scrub your hard drive regularly, right?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 414

1      A.    I do -- I back up my e-mail from my hard drive on a

2    regular basis, and that's why they're duplicates.  Because I

3    don't go back in and say June 1, August 1 and so forth.  I back

4    it up.

5      Q.    You scrub your hard drive regularly, correct?

6      A.    Yes.

7      Q.    And you also maintain backups, right?

8      A.    Backups of my e-mail.

9      Q.    So you'll review the backups to determine whether you

10   have any additional documents or information responsive to

11   discovery requests, right?

12     A.    Yes.  I will do my best.

13     Q.    Thank you.

14           I'd like to turn your attention to Request for

15   Admission No. 5, which provides, "Admit that you voluntarily

16   provided your contact information to defendants, including your

17   e-mail address."

18           And you denied that request, correct?

19     A.    Yes.

20     Q.    Upon what information did you base your denial?

21     A.    Omni's done no such thing as opt in to anything.

22     Q.    Did you search through all of your e-mail to determine

23   whether there was any information concerning an opt-in?

24     A.    There was no need to.  I have no recollection of it.

25     Q.    So you did no search beyond your recollection?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 415

1      A.   I said that there's no -- nothing that I recall, no

2  search that I recall.

3           Jim Gordon, however, did a lot of that.

4           So it's just -- it doesn't make sense to me for Omni

5  to do one thing and then Jim Gordon to go in and do that same

6  thing.

7      Q.   I'd like to turn your attention to Request for

8  Admission No. 14.

9           Request No. 14 provides, "Admit that the allegedly

10 offending e-mails" -- these are the e-mails that form the basis

11 of your claim --

12     A.   Yes, sir.

13     Q.   -- "all contained either unsubscribed hyperlink or

14 else a return address to which you could send a unsubscribe

15 request."

16          Do you see that?

17     A.   Yes.

18     Q.   And your response to Request No. 14 is that you're

19 unable to respond.

20          Do you see that?

21     A.   Okay.  That's an interpretation, yes.

22     Q.   Why are you unable to respond?

23     A.   Okay.  Now, where do you see "unable"?

24     Q.   The word is "enable," actually.

25          It says that you have made reasonable inquiry and that

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 416

1    the information known or readily available to you is

2    insufficient to enable you to admit or deny the request.

3        A.    Okay.  When I spoke earlier today -- could have been

4    yesterday, now that I think about it -- I mentioned that I have

5    not looked at every single e-mail in terms of that specific

6    information.

7            That information is buried in point type that's below

8    8 -- and I don't know if it was 7 and a half or 7 -- and it is

9    just -- I've not looked at each one yet.

10           I can't say all.

11       Q.    Do you recall seeing any that didn't contain an

12   unsubscribe hyperlink or return address to which you could send

13   an unsubscribe request?

14       A.    I have no recollection.

15           I have no recollection of any that did not, except for

16   maybe the times that I had my graphics turned down, and then

17   I'm not positive about that.

18       Q.    Do you use your computer for purposes of commerce?

19       A.    Yes.

20       Q.    What are those purposes?

21       A.    Well, I talked about my business yesterday.

22           Omni's business is the development of software.  I

23   mentioned a little bit about the software yesterday.

24           Vision mapping.

25           I have a personal strategic planning program and other

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 417

1   programs that I've developed and wish to market.

2           I have an interactive game that I've developed.

3           So those are the kinds of things that I use my

4   computer for in addition to the Internet access service for

5   Omni.

6       Q.   I'd like to turn your attention to Request for

7   Admission No. 17, which provides, "Admit that the body of each

8   allegedly offending message contained a postal address."

9           And in response to Request for Admission No. 2, you

10  make reference to your response -- strike that.

11          In response to your Request for Admission No. 17, you

12  make reference to your response to No. 2, which provides that

13  you are unable to answer; is that right?

14      A.   No.  Unable is not there.

15      Q.   That you don't possess the information that enables

16  you to answer; is that right?

17      A.   I don't possess the information that enabled me to say

18  that each allegedly offending e-mail message contained a postal

19  address.

20      Q.   Do you have each of the allegedly offending messages?

21      A.   Yes.

22      Q.   So what more do you need in order to determine whether

23  they all contain a postal address?

24      A.   I have to go through all 14,000 of them.

25      Q.   Why haven't you?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo               James S. Gordon, Jr., Vol. II

Page 418

1      A.    I explained that in the analysis, I group things, and

2   we group them based on "subject" lines, dates, and "from"

3   lines, not on content in terms of opening the e-mail.

4      Q.    So the reason why you can't admit whether or not the

5   body of each allegedly offending message contained a postal

6   address is because you haven't looked?

7      A.    At all the e-mails.

8      Q.    Have you seen any e-mails that form a basis of your

9   claim that lack a postal address?

10     A.    I've not looked through all of them.

11     Q.    Have you seen any e-mails that form a basis of your

12  claim that lack a postal address?

13     A.    No.

14     Q.    I'd like to turn your attention to Request for

15  Admission No. 18.

16         And again, Request for Admission No. 18 contains a

17  response deferring to your answer to No. 2, which is you don't

18  have information that enables you to respond.

19         No. 18 provides, "Admit that the body of each

20  allegedly offending message contained either the word

21  'advertise' or the word 'solicitation'."

22         Why were you unable to answer that Request for

23  Admission?

24     A.    Again, the word "each" and "all" are the reasons why.

25         Until I go through each and all, I won't be able to

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 419

1   answer something each and all.

2        Q.  Do you need anything more than the e-mails that form a

3   basis of your claim to answer Request for Admission No. 18?

4        A.  The time to do it.

5        Q.  Do you need anything more than the e-mails?

6        A.  Until I go through each one, I don't know.

7            There may be some that are missing graphics and things

8   like that, and until I look at it, I won't know.

9        Q.  Have you seen any e-mail that form a basis for any of

10  your claims in this lawsuit that you believe Adknowledge or

11  Virtumundo sent that do not contain the word "advertise" or

12  "solicitation" in them?

13       A.  I believe I have.  I just -- I don't recall seeing

14  that word, especially in the older e-mails.

15           Recently, they may be in there, but in the older

16  e-mails, I don't recall seeing the words "advertisement" -- it

17  says "advertise" here.

18           I don't recall seeing that.  It could be there, but I

19  just don't recall.

20       Q.  Have you made any efforts to block receipt of e-mail

21  from Virtumundo and Adknowledge?

22           MR. SIEGEL:  Objection.  Asked and answered.

23       A.  I've made no attempts to block any specific spammer.

24       Q.  Did you make any attempt to block the e-mails that

25  form a basis of your claims in this lawsuit?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 420

1          MR. SIEGEL:  Objection.  Asked and answered.

2      A.   Did I make any attempts to block any e-mails that are

3   a part of this lawsuit; is that what you're asking?

4      Q.   Yes.

5      A.   If it's the word "block," then the answer is no.

6      Q.   Are you familiar with the term "blacklisting"?

7      A.   It's used in so many different ways.

8          If you specifically give me an application, I'll tell

9   you.

10     Q.   Sure.

11         It's possible, with respect to e-mail, to blacklist a

12  domain name at the server level, which would cause your server

13  to reject any e-mails that purport to come from that domain

14  name, correct?

15     A.   Yes.

16     Q.   It's possible with your server to blacklist domain

17  names that are registered to Virtumundo and Adknowledge,

18  correct?

19     A.   That's true.

20     Q.   And if you were to blacklist those domains, you would

21  block e-mail from Adknowledge and Virtumundo, correct?

22     A.   That I believe to be true.

23     Q.   But you've never undertaken to use the blacklist

24  function and block e-mails from Adknowledge and Virtumundo,

25  correct?

Buell Realtime Reporting, LLC
206-287-9066

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 421

1    A.    Or anyone else, yes.

2          MR. NEWMAN:  The videographer has indicated that we're

3    running out of tape and he'd like to change it, so let's take a

4    short break.

5          THE VIDEOGRAPHER:  This is the end of Tape No. 2,

6    Volume 2 of the deposition of James S. Gordon, Junior.  The

7    time is now 3:52 p.m.  We are off the record.

8              (A recess was taken.)

9          THE VIDEOGRAPHER:  This is the beginning of Tape

10   No. 3, Volume 2 of the video deposition of James S. Gordon,

11   Junior.  The time is now 4:07 p.m.  We are on the record.

12             (Exhibit No. 30 marked.)

13   Q.    Do you recognize Exhibit No. 30?

14   A.    Yes, that's my declaration.

15   Q.    Is that your signature on page 4 of the declaration?

16   A.    Yes.

17   Q.    I should actually say page 5 because there's five

18   pages, but the last is duplicated, right?

19   A.    Okay.

20   Q.    And that's your signature on page --

21   A.    I've signed it.

22   Q.    First question is, with respect to paragraph No. 3, in

23   it, you write, "The management of the massive volume of e-mails

24   sent by spammer s in general is extremely time consuming and

25   burdensome to me and Omni."

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 422

1          Do you see that?

2     A.   Yes.

3     Q.   My question is, if the management of the massive

4    volume of e-mails send by spammers in general is time consuming

5    and burdensome, why do you do it?

6     A.   I mentioned yesterday that part of what I do is

7    research, and I want to collect those e-mails to analyze.

8          I'll be talking to other experts to get opinions on

9    how best to -- to approach this.  Talk with my advisor more

10   about how to approach this.

11         So I just let it -- I have my spam filter on, and that

12   means that a lot of e-mails aren't getting in, but I've not

13   done what you suggested.

14         I've also sought the help of friends and family in

15   this particular task.

16    Q.   Further in that paragraph it provides, "My clients

17   send me e-mails that are unsorted in lots of 10- to 50,000 at

18   one time."

19         Do you see that?

20    A.   Yes.

21    Q.   Why do your clients send you e-mails?

22    A.   They know that I'm in the business of trying to

23   reclaim our collective domain, so to speak.

24    Q.   Why do they send you e-mails?

25    A.   Well, they know it's going to be part of the

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 423

1    litigation.

2         I am the Internet access service, and as the Internet

3    access service, they know that there is part of the statute

4    that speaks to Internet access services, knowing that the

5    statutory penalty, if you will, says that Internet access

6    services are -- I don't know what the word is -- entitled or --

7    to statutory damages in the amount of $1,000 for each offense.

8         So they know that I act as an Internet access service,

9    they know about my research.  They know all that.  And they

10   know about my litigation, so they send it to me.

11        In fact, I have one in my car right now.

12   Q.   What do you have in your car right now?

13   A.   A disk with tens of thousands of e-mails on it from a

14   client.

15   Q.   Why is it in your car?

16   A.   Because she gave it to me last night.

17   Q.   Which client is that?

18   A.   Emily Abbey.  She lives on Queen Anne.

19   Q.   Do your clients share in any recovery -- and by that

20   term, I mean settlement or judgment -- that you obtain in any

21   litigation that you brought?

22   A.   Yes.

23   Q.   And how do you determine the amount that they will

24   earn in connection with the settlements or judgments that you

25   obtain?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

                                                        Page 424

1        A.   I'm not sure exactly how we came to it.

2             I'm not sure just how that came about.  I don't know

3   if we had a meeting or how we ended up coming up with the exact

4   formula, so to speak.

5        Q.   Is it a percent?

6        A.   Yes.

7        Q.   What is the percent?

8        A.   It depends on how many people have e-mails from that

9   particular defendant.

10       Q.   Do you know how many people have e-mails from

11  Adknowledge or Virtumundo?

12       A.   Not offhand, no.

13       Q.   Have you determined, if you recover in Virtumundo and

14  Adknowledge, who will share in that recovery?

15       A.   No is the short answer, but that's not wholly correct,

16  I don't think.

17       Q.   Why is that not wholly correct?

18       A.   Because we talked about it, and I have other clients

19  that never participated in a lawsuit, they never share e-mails

20  with me.

21            However, it's a possibility that because I share the

22  e-mails regarding the lawsuit, that they may at some point look

23  into their repositories and find something from your clients.

24       Q.   And if they do, they'll share in the recovery of the

25  lawsuit?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 425

1      A.   I don't know.  That's something we need to discuss.

2   That hasn't been determined.

3           Forgive me for being distracted.  I keep looking at

4   that helicopter taking off and landing at the hospital over

5   there, so I'm looking away.

6      Q.   I'd like to turn your attention to paragraph 5 of the

7   declaration, which is marked Exhibit No. 30 to this deposition.

8           And in it, you testify that problems with headers

9   include missing addresses, missing or erroneous dates, missing

10  "from" fields and/or missing "subject" lines.

11          Do you see that?

12     A.   Yes.

13     Q.   Do you contend that any e-mails that form a basis of

14  your claims in this lawsuit include headers with missing

15  addresses?

16     A.   Without reviewing the e-mails, I -- let me think about

17  this a second.

18          And/or, is what I'm saying.  I can't say specifically

19  which one has which at this particular point in time, or how

20  many of each one or more would have.

21          But I believe all of those things exist in one or more

22  e-mails.

23     Q.   You believe that there are e-mails that form a basis

24  for your claims in this lawsuit against Adknowledge and

25  Virtumundo that include missing addresses?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 426

1     A.    I believe so.

2     Q.    Can you remember any?

3     A.    None.

4     Q.    Do you believe any have missing "from" fields?

5     A.    Of those I reviewed, I don't think so.

6     Q.    Do you believe any have missing "from" lines?

7     A.    I would have to review that again just to be sure.

8     Q.    Can you remember any as you sit here today?

9     A.    No, I would have to review it again.

10    Q.    The next sentence says, "The foregoing is the reason

11  for the Defendants' desire to shift the workload back on the

12  Plaintiff."

13          Do you see that?

14    A.    Yes, I do.

15    Q.    What is meant by that?

16    A.    I interpreted your motion to compel and your

17  complaints about engaging attorneys to do a lot of work -- I

18  interpret that --

19          I'm trying to remember exactly what I interpreted.  I

20  guess I need to have that motion in front of me, but...

21          There's a lot of work involved in doing what you've

22  asked to be done.  And first of all, I believe it's impossible

23  to do.  I don't believe anyone anywhere could do that.

24    Q.    What's impossible to do?

25    A.    When we were talking about -- when you were -- "you,"

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 427

1    meaning your firm -- spoke in terms of the motion to compel,

2    you wanted to have some supplementation of only new e-mails.

3            That is impossible to render.

4        Q.   What's meant by the statement, "The foregoing is the

5    reason for the Defendants' desire to shift the workload back on

6    the Plaintiff"?

7        A.   The review of e-mails is part of what I'm referring to

8    there.  The review for all of these kinds of things.

9            The inaccuracies and things like that.

10           That's what I believe I was referring to.

11       Q.   You understand you have the burden of proof in this

12   lawsuit?

13           MR. SIEGEL:  Objection to the extent it calls for a

14   legal conclusion.  Lacks foundation.

15       A.   I don't understand the legal term "burden of proof."

16           My layman's understanding is that I've got to

17   substantiate claims that I make.

18       Q.   I'd like to turn your attention to the bottom of

19   paragraph 7 and, specifically, the sentence that says,

20   "Defendants' e-mails are now commingled."

21           I said sentence; it's part of a sentence.

22       A.   Okay.

23       Q.   Do you see that?

24       A.   Yes, I do.

25       Q.   What is meant by "Defendants' e-mails are now

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 428

1    commingled"?

2        A.   Whenever my clients submit to me, I do a search once I

3    put them on the hard drive of the e-mails for Virtumundo and

4    Adknowledge mail and I put it in with all the rest of the

5    e-mails.

6        Q.   Why do you do it that way?

7        A.   Because, with the burden of all of the other e-mails,

8    it's the simplest thing to do.

9        Q.   Who's responsible for commingling them?

10       A.   I guess I am.  I take them out of my clients' -- off

11   my clients' disks and put them on my hard drive in the Eudora

12   application, search them and put them in the file.

13            Because I've tried keeping them other ways, and it's

14   too inefficient to do it that way.

15       Q.   Do you believe that there are millions of e-mails sent

16   to your users?

17       A.   I believe it's in excess of a million.

18       Q.   And upon what information do you base that belief?

19       A.   A simple counting of e-mails in terms of how much

20   comes in on a daily basis, and each client has given me a

21   ballpark at given times during the course of this litigation

22   and before.

23            So I know that, one -- let's say, Anthony Potts --

24   gets maybe 1,000 to 1200 a day.

25            My daughter may get 800 a day.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 429

1          My wife, 100 a day.

2          So I have ballparks in terms of estimates.

3     Q.    Do you know why Anthony Potts receives approximately

4     1200 a day?

5     A.    No idea.

6     Q.    Have you produced any duplicate e-mails in connection

7     with this lawsuit?

8     A.    Yes.

9     Q.    Do you know how many duplicates you've produced?

10    A.    No, I don't.

11    Q.    Do you know if there is a way to determine that?

12    A.    I guess you can go in and individually count.

13          In the last production, however, I found 4,900 out of

14    about 19,000 e-mails.

15    Q.    That are duplicates?

16    A.    4900 were duplicates, yes.

17    Q.    How did you determine those duplicates?

18    A.    I counted them individually.

19          "Count" is not an accurate term.  I reviewed them

20    individually and determined by date and time and addressee

21    which ones were duplicates.

22          (Exhibit No. 31 marked.)

23    Q.    Are you familiar with Exhibit No. 31?

24    A.    That's the one that I believe or thought was excised

25    from the lawsuit.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 430

1       Q.   What do you mean, "excised"?

2       A.   Taken out.

3       Q.   You do not contend that Adknowledge or Virtumundo sent

4  the e-mail contained in Exhibit No. 31 to you, correct?

5       A.   No, that's not true.

6            Because the source code for this e-mail says

7  "Virtumundo.com."

8            But with my decision -- with my attorneys, we made the

9  decision what to include and what not, and this, I thought, had

10  been excised.  It's an error if we've left it in.

11           Even if it is from Virtumundo, we just decided not to

12  prosecute this one or move forward with it.

13      Q.   So you're not pursuing a claim based upon the e-mail

14  contained in Exhibit 31, correct?

15      A.   No, we choose not to do that.

16           (Exhibit No. 32 marked.)

17      Q.   Do you recognize Exhibit No. 32?

18      A.   Not offhand.  It appears to be, to me, though -- I may

19  have seen it before.

20      Q.   Do you contend that Adknowledge or Virtumundo sent it

21  to you?

22      A.   I'd like to be able to do an analysis of this e-mail

23  because I don't have enough information here it make that

24  determination, and I'd need my forensic tools to do that.

25      Q.   How would you go about doing an analysis?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 431

1      A.   Well, first of all, I'd look at the source code and

2  see if, in fact, there is direct -- there is a hyperlink to it

3  or if there is a redirect or something in it.

4           And it could be -- and I don't know this yet -- it

5  could be just that it was mentioned in this e-mail.

6           So without having my forensic tools, I can't really

7  analyze this.

8           Oh, I see, here it says "$250 cash sweepstakes" from

9  Virtumundo.  And I don't know -- because this is printed out --

10 whether this is hyperlinked or not.

11          So I would have to have the actual e-mail to make that

12 determination with my tools.

13     Q.   Do you believe that Virtumundo sent this e-mail?

14     A.   I can't form that belief until I've analyzed it.

15     Q.   Are you seeking damages based upon this e-mail?

16     A.   I put everything -- the short answer is yes in that

17 it's from your client.

18          But I will -- I haven't completed my analysis of all

19 the e-mails.

20     Q.   Did you do any investigation into the source of this

21 e-mail before you included it in this lawsuit --

22     A.   I may have.

23     Q.    -- and sought damages for it?

24     A.   I may have.

25          I may have done a trace route.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 432

1          I may have done an EmailTrackerPro.

2          I don't recall.  This is something I hadn't seen or

3     haven't seen in several years, so I'm not sure what I did at

4     that time.

5       Q.   Did you do anything in determining that this should be

6     a part of your claims in this lawsuit?

7          When I say "anything," I mean, did you perform any

8     type of investigation to determine whether Adknowledge or

9     Virtumundo are responsible for it?

10         MR. SIEGEL:  Objection.  Asked and answered.  Lacks

11    foundation.

12      A.   I searched through Eudora, and Eudora will, in the

13    search, determine whatever texturing you have -- Virtumundo,

14    Adknowledge or whomever -- and it will pull that out of the

15    e-mail.

16         That I can tell you that I did.

17      Q.   So the basis for your claims in this e-mail is limited

18    to whether an e-mail contains the term "Adknowledge" or

19    "Virtumundo" on it?

20         MR. SIEGEL:  Objection.

21         THE WITNESS:  Okay.

22         MR. SIEGEL:  Mischaracterizes testimony, according to

23    his prior testimony.  Lacks foundation.

24      A.   No, is my answer.

25      Q.   If I sent you an e-mail that was from

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 433

1    Derek@Newmanlaw.com addressed to James@Gordonworks.com and the

2    "subject" line said, "I want to tell you about my new client"

3    and the body said, "I represent Virtumundo," would that e-mail

4    form the basis of any of your claims in this lawsuit?

5        A.   I'm sorry.  It's kind of funny to me.  I'll probably

6    end up suing you, too.

7             Not just based on what you've said.

8        Q.   You testified earlier that you haven't opened a lot of

9    the e-mails that form a basis of your claims, correct?

10       A.   I haven't opened some of them.

11       Q.   Can you estimate to me what percentage you've opened

12   and what percentage you have not?

13            MR. SIEGEL:  Objection.  Calls for speculation.

14       A.   I -- I would bet anything that I came up with would be

15   way off.

16            So I don't -- I don't know.  I don't know what the

17   range would be.

18       Q.   You testified earlier that the reason why you believe

19   this e-mail is included as part of the e-mails upon which you

20   base your claims is because you did a search for the term

21   "Virtumundo," correct?

22       A.   In general, I did that, yes.

23       Q.   In understanding that testimony, why is it that the

24   hypothetical e-mail --

25       A.   Pardon me?  I didn't hear that.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 434

1      Q.   In understanding that testimony, why is it that the

2  hypothetical e-mail that I had suggested earlier from me to you

3  would not be part of the e-mails that form a basis for your

4  claim?

5      A.   That's not -- that's not the only criteria.

6           And as I said, I may have done source code check.

7           I may have done EmailTrackerPro.

8           I may have done a Visual Route.

9           In fact, I would think that I did do that.  That's

10  like me to do something like that.  I would have done more than

11  just one thing.

12      Q.   Did you do more than one thing for every e-mail that

13  forms a basis for your claims in this lawsuit?

14      A.   No.  Not yet.

15      Q.   You intend to?

16      A.   Yes.  I am in the process, I guess I should say.

17      Q.   Why do you intend to?

18      A.   Well, I'm expecting a trial, and at the trial, I'd

19  like to be fully prepared.

20      Q.   Is it fair to say that you didn't investigate your

21  claims for each of the e-mails in this lawsuit?

22      A.   No.

23      Q.   Did you investigate your claims for this e-mail;

24  namely, the e-mail that's marked as Exhibit No. 32?

25      A.   I do not recall.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 435

1    Q.   One way or the other?

2    A.   Right.

3         (Exhibit No. 33 marked.)

4    Q.   Do you recognize Exhibit No. 33?

5    A.   This is an e-mail to Jim@Gordonworks.

6         In terms of recognizing it...

7         It's my recollection that all e-mails prior to

8    September 3rd or 4th were pulled out of lawsuit.  That's my

9    recollection.

10        And I'm surprised this is still here.

11   Q.   Are you seeking damages based on this e-mail?

12   A.   No.  For nothing prior to that -- September 4th, I

13   guess, is the opt-in date, according to EmailPrize.

14   Q.   Are you seeking damages for any e-mails that you

15   received before September 4, 2003?

16   A.   No, I'm not.

17        (Exhibit No. 34 marked.)

18   Q.   Do you recognize Exhibit No. 34?

19   A.   I believe I know what it is.

20        It appears to be an unsubscribe URL, uniform resource

21   locator.

22   Q.   For Adknowledge, correct?

23   A.   Yes.

24   Q.   You testified you know what it is.

25        Have you ever seen it before, this page, either in

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 436

1   paper form or on the Internet?

2       A.   I don't recall presently.

3       Q.   Do you know whether you've ever accessed Adknowledge's

4   privacy policy?

5       A.   I don't recall doing that.

6            (Exhibit No. 35 marked.)

7       Q.   Do you recognize Exhibit No. 35?

8       A.   It is also an unsubscribe, but this time from

9   Virtumundo.

10      Q.   Have you ever seen this page before, either in paper

11  form or on the Internet?

12      A.   I don't recall.

13           Well -- this specific page, I don't recall seeing.

14      Q.   Do you recall ever having seen a Virtumundo

15  unsubscribe page?

16      A.   My previous testimony was that I unsubscribed from

17  unsubscribe links in their e-mails, so I must have seen it at

18  some point.

19           And I believe that things like that change over time,

20  so I don't -- I can't say specifically that I've seen this

21  format of unsubscribe, but I believe I've seen numerous times

22  in 2003 the unsubscribe links.

23      Q.   Have you ever accessed Virtumundo's privacy policy?

24      A.   I may have.  Again, I was doing reconnaissance earlier

25  this year, and I may have gone in -- put in some -- an e-mail

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

                                                         Page 437

1    address -- I wouldn't know which one -- but have access to the

2    site.  I would have done something like that perhaps.  I just

3    don't know for sure.

4        Q.  In Exhibit No. 35, there is a link that says, "Global

5    Unsubscribe."

6            Do you see that?

7        A.  Yes.

8        Q.  Have you ever clicked on a link that said, "Global

9    Unsubscribe"?

10       A.  I don't recall ever doing that.

11           (Exhibit No. 36 marked.)

12       Q.  Do you recognize Exhibit No. 36?

13       A.  It's my declaration.

14       Q.  Did you sign Exhibit No. 36 at page 6?

15       A.  My signature is there.

16       Q.  Do you remember signing it?

17       A.  I remember signing this page, yes.

18       Q.  Did you review this declaration before you signed it?

19       A.  There were many drafts and I don't remember which

20   draft I actually signed.

21       Q.  Did you sign this document without reading it?

22       A.  No, I read the drafts.  I just don't know which of the

23   drafts I signed.

24       Q.  So you don't know whether the final document you

25   signed is the same as the ones that you had read?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 438

1      A.    I don't.  I don't.

2      Q.    If you'd please turn your attention to paragraph 5,

3  which is on page 3.

4      A.    Okay.

5      Q.    And specifically to the sentence that says, "I cannot

6  say how I was misled by these, but only these have the" --

7  strike that.

8            Specifically, the sentence that says, "I cannot say

9  how I was misled by these, but only that these have the

10 capacity to mislead."

11           Do you see that?

12     A.    Yes.

13     Q.    Upon what information do you base your statement there

14 that "these" -- which I believe are referring to "subject"

15 lines -- "have the capacity to mislead"?

16     A.    I don't think I understand that.

17     Q.    You made a statement, "I cannot say how I was misled

18 by these, but only that these have the capacity to mislead,"

19 correct?

20     A.    The "subject" lines, I was referring to.

21           Some "subject" lines; not all.

22     Q.    Upon what information did you base that testimony?

23     A.    Reading the "subject" lines.

24     Q.    What is your understanding as to having the capacity

25 to mislead?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 439

1      A.    In terms of the "subject" lines -- and if we looked at
2    the specific ones, I could give you specific examples.
3            We can hypothesize, I guess, about it.
4            When a "subject" line -- well, it's several things, I
5    guess.
6            A come-on, which is something to induce you to open
7    it, that is, in my opinion -- and effectively, the free prize
8    offers were come-ons that we discussed previously.
9            And when it doesn't inform you as to what the e-mail
10   communication is about.
11     Q.    Is that your definition of having the capacity to
12   mislead?
13     A.    My definition, prob- -- yes.  Yes.
14           MR. SIEGEL:  Objection.  Calls for a legal conclusion.
15   And misleading.  Vague and ambiguous as to what is meant by
16   "definition."
17     A.    If I gave it more thought, maybe something else would
18   come to mind.
19           But for the present, yes.
20     Q.    Did you register the domain name RCW19190020.com?
21     A.    Yes.
22     Q.    Why?
23     A.    I registered -- I guess my motive was more to have a
24   spam trap, and it served its purpose as a spam trap.
25     Q.    What's a spam trap?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 440

1    A.   An e-mail address -- in this case, an entire domain --

2    where e-mail addresses are set up that you don't subscribe to

3    stuff with and stuff comes to you anyway, which is spam.

4    Q.   What was the purpose in setting up the spam trap?

5    A.   Looking at -- again, this is research that I was

6    doing.

7         Looking at who collectively -- and there are nests of

8    people on the Internet that use the EmailPrizes of the world,

9    the Home4FreeStuffs of the world, who use these spammers.

10        And they assume that because you subscribe to or opted

11   in or whatever the term we want to use today -- that you went

12   to their website and put your e-mail address in, that there's

13   some universal omnibus right to send you spam based on a

14   purported agreement that was seen or not seen on a given

15   website.  And we were talking about the EmailPrize subject and

16   the Home4FreeStuff website.

17        So they assumed that that assent -- or consent, I

18   should say -- was universal.  And I don't believe that to be

19   true.

20        And the RCW domain name has -- in my way of thinking

21   -- proved that spammers will send you stuff when there is no

22   basis in terms of consent or opt-in to send it to you.

23   Q.   Did Virtumundo or Adknowledge fall for any of your

24   spam traps?

25   A.   I would have to go back and look.

Buell Realtime Reporting, LLC
206-287-9066

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo               James S. Gordon, Jr., Vol. II

Page 441

1        My first answer is yes, but I've already told you that

2   those e-mails, we're not putting on the record -- or they're

3   not a part of the lawsuit because they were prior to

4   September 4 of 2003.

5              (Exhibit No. 37 marked.)

6   Q.    Do you recognize Exhibit No. 37?

7   A.    This is to me.

8         No is the short answer.

9         Other than the fact that it's to me, no, this doesn't

10  bring back any recollection.

11  Q.    You testified earlier that you believe Virtumundo or

12  Adknowledge is engaged in identity theft, correct?

13  A.    I don't believe I said that.

14  Q.    Do you believe that Virtumundo has engaged in identity

15  theft?

16  A.    What I believe is that -- I think I said last night

17  about this time -- is that we -- we -- I -- looked at the

18  e-mails, and the e-mails solicit information -- or the web

19  page, the URL solicits information that is prohibited by

20  Washington statute RCW 19.190.080 -- I believe is the

21  subsection of that statute -- where you can't solicit financial

22  information from a Washington state resident.  At least, that's

23  my understanding.

24        And the link in this particular e-mail takes you to a

25  website which does just that, solicits financial -- personally

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 442

1    identifying information in terms of your date of birth and your

2    Social Security number, which is all -- in terms of reading

3    your C-NET or whomever, all a thief needs to take your

4    identity.

5         They facilitate, knowingly or unknowingly, identity

6    theft.

7         Q.   Do you believe that Virtumundo or Adknowledge is

8    responsible for the website that you just testified about?

9         A.   I believe that they point recipients to that website.

10        Q.   Do you believe that Virtumundo or Adknowledge is

11   responsible for the website that you just testified about?

12        A.   I would have to go back and do an analysis.

13        MR. SIEGEL:   Objection.  Calls for a legal conclusion

14   as to "responsible."

15        A.   I would have to do an analysis.  I can use my forensic

16   tools and do an analysis of that.

17        Q.   Have you ever done that?

18        A.   I've done that with some e-mails -- and it may have

19   been -- Virtumundo has sent -- and I think -- and I'm just

20   guessing now -- hundreds, 400, maybe 500 e-mails for this

21   particular bank.

22        And I don't know if I did it specifically for

23   Virtumundo or for IMG because both -- and IMG is even more

24   involved in this facilitation, I'm going to call it, since it

25   points to a website that breaks the law.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

                                                              Page 443

1          So the actual analysis could have been done for either

2    company or both companies.  I just don't recall.

3          Q.    Have you ever applied for credit with any credit

4    lending institution?

5          A.    Is that just a general question or are you talking

6    about something like this on the Internet?

7          Q.    Generally.

8          A.    Okay.

9                Yes.

10         Q.    And in connection with your credit application, did

11   you provide the type of information that you're testifying

12   violates law?

13         A.    Please restate that.  I'm not understanding.

14         Q.    You testified that you believe the website for First

15   Premiere Bank seeks information that violates law, correct?

16         A.    Yes.

17         Q.    And when you applied for credit, did you submit that

18   kind of information to a lending institution?

19         A.    In person.

20         Q.    So do you believe that it violates law on the

21   Internet, but not in person, to solicit that type of

22   information?

23         A.    Yes, if the information is not going to a lending

24   company.  It's going to private parties.

25         Q.    Do you have any information upon which you can

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 444

1    conclude that First Premiere Bank violated any laws?

2        A.   I didn't say First Premiere Bank.

3             I'm saying parties other than First Premiere Bank,

4    they -- in my estimation -- it's not a legal conclusion, but

5    it's the way I look at things -- they're negligent in that they

6    allow this to continue.

7        Q.   Do you believe that the "subject" line of the e-mail

8    in Exhibit No. 37 is false or misleading?

9        A.   No.  It mentions First Premiere Bank in the "subject"

10   line.  It mentions that.

11       Q.   Do you believe that the "from" line of Exhibit No. 37

12   is false or misleading?

13       A.   It mentions First Premiere Bank, an entity, that you

14   -- sorry -- your client spams for.

15       Q.   Do you believe that the "from" line is false or

16   misleading?

17       A.   No.  It identifies accurately, I guess, a sender or

18   someone who's on behalf an e-mail was sent.

19       Q.   Do you believe that this e-mail violates the law in

20   any regard?

21       A.   It could be with the -- the actual headers and the

22   things that we were talking about before, the hand-offs and so

23   forth.

24             But without my tools, I couldn't tell you directly?

25       Q.   Do you know whether you've used your tools to analyze

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 445

1    this e-mail?

2        A.   Not this one specifically.

3        Q.   Are you certain that you have not used your tools to

4    analyze this e-mail?

5        A.   No, I may have.  I just don't know.  I don't recall

6    that.

7        Q.   Do you know whether you conducted any kind of

8    investigation into this e-mail to determine whether it violates

9    any laws?

10       A.   Okay.  I look at e-mail headers, so I don't see the

11   stuff that you're showing me right now.

12            And looking at the headers -- because that's all you

13   can put in EmailTrackerPro -- and in the Visual Route, parts of

14   the header -- I don't recall anything below

15   "Content-Transfer-Encoding."

16            That's part of the header, bottom-most part of the

17   header.

18       Q.   Would you please look above

19   "Content-Transfer-Encoding" and tell me whether you see

20   anything that indicates to you whether this e-mail violates the

21   law?

22            MR. SIEGEL:  Objection.  Asked and answered.

23       A.   And I said I need to analyze it with my tools.

24       Q.   So as you sit here today, there's nothing that

25   indicates to you that this violates the law?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 446

1      A.   No, I didn't say that.

2           I said the way to answer that accurately, truthfully,

3    is to analyze that.

4      Q.   As you sit here today, is there anything that

5    indicates to you this e-mail violates the law?

6      A.   And I'm telling you that I can't make that

7    determination without an analysis.

8           I don't do eyeball analysis.  Every analysis I've done

9    is by way of one of my forensic applications.

10     Q.   And when you use the forensic application, does it

11   generate a report?

12     A.   Yes, it does.

13     Q.   Have you produced all of those reports in connection

14   with this lawsuit?

15     A.   I -- no, not all of them.

16     Q.   Why not?

17     A.   I've not gotten around to all of them.

18     Q.   Have you produced all of the reports that you

19   generated?

20     A.   Yes.

21     Q.   How many did you produce?

22     A.   Reports for 2,000, maybe 2500 e-mails.

23          That's a moving target.

24     Q.   What's a moving target?

25     A.   The number of e-mails I've had at any given time.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 447

1    Q.    So you've only done forensic analysis on 2500 e-mails?

2    A.    I'm guessing 2,000, 2500.

3    Q.    But you contend that 13,000 violate your rights?

4    A.    I have -- I group things together.  And let's say

5    there are 50 in the group.  I'll do an analysis on the first

6    one and not the other 49.

7    Q.    Upon how many e-mails have you done an investigation

8    in connection with this lawsuit?

9    A.    We'd have to look at the document "Virtumundo E-mail

10   Analysis," and that would have the number on there.

11   Q.    You don't recall as you sit here today?

12   A.    No.

13   Q.    But you've produced, in connection with this lawsuit

14   in response to discovery requests, all of the forensic analysis

15   that you have performed?

16   A.    I believe I've done that.

17   Q.    And do you contend that the e-mails upon which you

18   have not done forensic analysis violate the law?

19   A.    Well, there are some things like "subject" lines I

20   don't need a forensic analysis for, so they're lumped in.

21         And I go back at the "from" field and I look at those.

22   And in my opinion, it doesn't need -- a "from" field, meaning

23   the name, the "from" name, that doesn't need a forensic tool

24   investigation.

25         So those couple of things, I can eyeball and say.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 448

1        But when it comes to the transmission path, I will not

2   try to make an analysis without forensic tools.

3        Q.   Is it fair to say --

4        A.   That's -- I'm sorry.  That's not even correct.

5        The "from" field is a part of the header.  And when it

6   is something like we've seen with "bankruptcy" or "trade-in" or

7   something like that, that mischaracterization of the sender or

8   misrepresentation of the sender is in fact a violation, in my

9   estimation, in terms of the CEMA and Canned Spam because it

10  misrepresents the point of origin of the e-mail.

11       Q.   Is it fair to say that if you've not produced a

12  forensic analysis on an e-mail, that the e-mail does not

13  violate law except with respect to the "subject" line or the

14  "from" line?

15       A.   I can't even draw that conclusion right now.

16       Q.   Why?

17       A.   I'm not certain.

18       Q.   Why aren't you certain?

19       A.   I don't know why I'm not certain.

20       I'm just not certain.

21       Q.   Do you contend that there are e-mails that violate the

22  law other than with respect to the "from" line or the "subject"

23  line that aren't contained within the forensic reports that you

24  have produced?

25       MR. SIEGEL:  Objection.  Asked and answered.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

1      A.   I'm trying to figure out how that question really

2   differs from the previous question, and I don't think I've

3   figured that out.

4           So maybe we need a reiteration of it.

5      Q.   Do you contend that there are e-mails that violate the

6   law other than with respect to the "from" line or the "subject"

7   line that aren't contained within the forensic reports that you

8   have produced?

9      A.   That's likely.

10      Q.   And how do we determine whether it is certain or

11   uncertain?

12      A.   There are patterns that I've learned from

13   investigating e-mails from your clients and other spammers, and

14   I see things, and I can generalize a lot of times the things

15   that I see.

16           So I can generalize and state that because each and

17   every one of the domains that your client uses has e-mails --

18   represented e-mails that violate the law, I extrapolate that

19   the rest of them do.

20           And when I complete my analysis, then we'll know for

21   certain.

22           And if, for some reason, I'm wrong -- I don't believe

23   I am -- but if, for some reason, I am wrong, then of course we

24   don't have a claim on those.

25      Q.   Why didn't you determine whether or not you have a

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 450

1    claim on those before you filed the lawsuit?

2        A.    I receive e-mails and iterations.

3            The Gordonworks e-mails had an analysis done on most,

4    if not all -- many, I'll say -- and we had enough to go in to

5    file a lawsuit because there were thousands.

6            So I continue to try to analyze as I have time --

7    because this isn't the only case I'm working on -- and, as

8    Mr. Siegel promised, as we develop new information, we will

9    supplement the discovery.

10       Q.    Did you file a lawsuit simply because you have

11   received thousands of e-mails from the defendants?

12       A.    No.

13       Q.    Why else did you?

14       A.    The primary reason was because your client refused to

15   honor the requests that I made to unsubscribe, to get out of

16   the mailings that they continued to spam me with.

17            I tried unsuccessfully in '03, '04 and '05 to quit, so

18   we filed a lawsuit in '06.

19       Q.    Are there e-mails that form a basis for your claims in

20   this lawsuit that you have not reviewed?

21       A.    If reviewed is used in the largest sense, no.

22       Q.    What is the largest sense?

23       A.    Reviewed could mean just find out in a search field

24   that it's from Virtumundo or Adknowledge.

25       Q.    Have you gone through each e-mail and viewed the

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 451

1   header for every e-mail that forms the basis for your claims in

2   this lawsuit?

3       A.    Not yet.

4           And the reason I explained earlier was I know the

5   patterns.  Every one of the domains that your client uses is

6   spam -- where they spam from.  Every single one.  No exceptions

7   to that.

8           And it's pretty easy to generalize that.  I have yet

9   to find an exception when I do the analysis.

10      Q.    What patterns?

11      A.    What I contend is illegal relaying of e-mail.

12          Bad "subject" lines, "from" lines.

13          The hand-offs.

14          And everything else I may have mentioned during the

15  course of these two days.

16      Q.    Is it your conclusion that Virtumundo and Adknowledge

17  always, when sending e-mail, engage in illegal relaying?

18      A.    No.  I didn't say that.

19      Q.    As you sit here today, can you think of a single

20  e-mail where there was illegal relaying sent by Adknowledge or

21  Virtumundo?

22      A.    I can't think of a single one, but we made a count at

23  one point, and I believe it was over 1,000 that had been

24  relayed using IP addresses in block lists.

25      Q.    What is an IP address in block lists?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 452

1      A.    Well, there are block lists.  I mentioned the names

2    yesterday.  SPEWS, Spam Cop -- Spam Cop, Spamhaus, SORBS,

3    S-O-R-B-S, and there are many others.  RBL, Relay Block List.

4          And these companies, they provide organizations all

5    over the world, actually, with the IP addresses of people who

6    use relays, and my understanding is without permission of the

7    owners.

8          And those are relay -- IP addresses that are in spam

9    traps and so forth.

10          So, again, my understanding is that your clients have

11    done this.  And I can give an estimate.  It's -- maybe one in

12    10 of the e-mails are sent through these illegal relays.

13      Q.    Why do you believe they're sent through illegal

14    relays?

15      A.    Spam Assassin is what makes that determination, and

16    I'm parroting -- to use your word yesterday -- that by

17    repeating what I saw in the Spam Assassin assessment.

18      Q.    Did the Spam Assassin assessment indicate that there

19    are illegal relays used?

20      A.    I said that was my interpretation.

21      Q.    And upon what information in the Spam Assassin

22    assessment do you base that interpretation?

23      A.    I've done lots of analysis of other e-mails.

24          And I'm just extrapolating that that is the case, that

25    they are accurate in terms of their assessment.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 453

1    Q.   I asked you upon what information you based your

2   interpretation, and you answered that you're just extrapolating

3   that Spam Assassin is accurate.

4         And my question doesn't concern whether Spam Assassin

5   is accurate.

6    A.   Okay.

7    Q.   My question is, upon what information in the Spam

8   Assassin assessment do you base your interpretation?

9    A.   Please do that one more time.  Not the same question,

10  but just reiterate that so I can get what you're saying.

11   Q.   Upon what information in the Spam Assassin assessment

12  do you base your interpretation?

13   A.   Okay.

14        "Received via a relay" in a block list is the text

15  stream.

16   Q.   So the Spam Assassin assessment comes in the form of a

17  report; is that right?

18   A.   Yes, it does.

19   Q.   And the report says, "Received via a relay" in a block

20  list?

21   A.   That's one of the things it says, yes.

22   Q.   The word "relay" is used?

23   A.   Yes.

24   Q.   And that would indicate to you that an illegal relay

25  is used?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 454

1    A.    That's my interpretation.

2    Q.    Is it possible that it's a legal relay?

3    A.    I don't know that to be true.

4    Q.    Is it possible?

5    A.    Oh.  I guess.  I'm speculating right now.

6          I guess it could be true.

7    Q.    Have you done any investigation to determine whether

8    it's legal or illegal?

9    A.    Well, I go in and I look at IP addresses, Whois data,

10   I look at corporate data at the state level and so forth and

11   try to see if I can get more information about that particular

12   IP address.

13         MR. NEWMAN:  Let's take a five-minute break.

14         THE WITNESS:  Okay.

15         THE VIDEOGRAPHER:  The time is now 5:07 p.m.  We are

16   off the record.

17              (A recess was taken.)

18         THE VIDEOGRAPHER:  The time is now 5:24 p.m.  We are

19   on the record.

20   Q.    Sir, I have no further questions at this time, subject

21   to the follow-up that I may have to questions your counsel will

22   be asking, and it is likely we will be making a motion to

23   compel to seek further testimony from you because we believe

24   that you have refused to answer certain questions and have been

25   evasive on others.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 455

1          But other than those two, I'm done for today.

2      A.   Thank you.

3

4                    E X A M I N A T I O N

5

6

7  BY MR. SIEGEL:

8      Q.   Jim, this is what we sometimes call redirect.

9          I'm just going to ask you if you have anything further

10 or that you wish to clarify upon --

11     A.   Okay.

12     Q.    -- some of the issues that were gone over.

13          If you have something, then testify so.

14          Otherwise, we'll move on.  That's fine.  You may not.

15     A.   Okay.

16     Q.   I'm going to direct your attention to what Mr. Newman

17 marked as Exhibit 20 to your deposition, if I can find it.

18          Do you have it?

19     A.   Yes.

20     Q.   Great.

21          Now, you already testified about this e-mail some, and

22 I just wanted to -- you did indicate in some of your testimony

23 that at least you now see that this was apparently -- this

24 e-mail in Exhibit 20 was apparently sent from a Virtumundo

25 domain.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 456

1          Do you recall that?

2     A.   Yes.

3     Q.   I just wanted to be clear and ask, did you know at the

4     time, meaning -- and when I say "at the time," apparently the

5     date of this e-mail was December 6 of 2003.

6          Let me make sure that's right.  That's what it says at

7     the very top of the page.

8          Well, can you tell when it was sent?

9     A.   The date that I rely on is the dates and times in the

10    "received" lines because the date elsewhere -- below -- in this

11    case, below the "X" mailing i.d. of those can be fake because

12    -- not fake, but if a person -- if a person's clock is off in

13    their computer, you'd get a wrong date there.

14         The received lines are -- because other computers will

15    have a more accurate date, and some people deliberately -- some

16    spammers deliberately put wrong dates in there, dates far in

17    the past and far in the future so that your -- their e-mails

18    will stick out.

19    Q.   Well, for these purposes, when do you believe this was

20    received, then?

21         What's the date that this e-mail was received?

22    A.   I believe that it was in transit on December 6, 2003.

23    Q.   Okay.

24         Now, at that time, in December of 2003, did you have

25    any knowledge about who this domain belonged to?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 457

1          Meaning -- and when I say "this domain," I mean the
2     domain indicated by vm-admin.com.
3          A.   I don't know when I became familiar with them.  It
4     could have been December.  Possibly earlier and possibly later.
5          So I'm not sure when I actually began to recognize the
6     respective domains of the defendants.
7          Q.   Okay.
8          Well, then let me ask you this as a follow-on.
9          When -- how did you first become familiar with the --
10    what you referred to as the domains of the defendants?
11         A.   Well, let me even go back to that.
12         The way this started -- I started using
13    EmailTrackerPro and Visual Route, and those tools began to lead
14    me to data that I needed to learn to understand.  I taught
15    myself how to use them and later went to some of the police
16    detectives and the university there in Richland.
17         Oh, geez.  I'm mixing something up, and I better just
18    shut up because I'm getting something else coming to mind and
19    I'm not even sure it's even related.
20         So, I don't know, maybe we should move on or maybe you
21    can restate it because there's something else --
22         Q.   All right.  Let me ask you this way.
23         The first time that you saw any of, for instance,
24    Virtumundo's domains -- because you know -- I'll say
25    Virtumundo's domains -- those that have been identified in this

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo               James S. Gordon, Jr., Vol. II

1   lawsuit --

2       A.   Yes.

3       Q.   -- as having been used to send e-mails, e-mails at

4   issue in this lawsuit.

5            The first time that you saw any of those domains, were

6   you aware that those were Virtumundo domains?

7       A.   No.

8       Q.   And how did you become aware that any of those domains

9   were Virtumundo domains?

10      A.   Eventually, I used the forensic tools that I had and

11  did Whois look-ups on the domains.

12           If you look at all of the domains used, there would be

13  -- it looked like a Gantt chart, G-A-N-T-T, and it would have

14  periods of time -- maybe from September of one year to

15  September of the next, December of one year to December of the

16  next and so forth.

17           So they were spaced all over the place.

18           So because I came familiar with vm-admin.com doesn't

19  mean I'm familiar with the others because they didn't come into

20  existence except for over a period of time.

21      Q.   Okay.

22           So just to be clear, was the only way that you

23  initially or originally came to know that these domains that

24  we're referring to belonged to Virtumundo were from taking that

25  step -- meaning, you know, looking them up, doing research --

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                  James S. Gordon, Jr., Vol. II

1       A.    Yes.

2       Q.    -- usually was that by Whois?

3       A.    Whois look-up was it.

4             I -- I have the list somewhere in terms of -- maybe

5       it's the return receipts.

6             Virtumundo was not one of the first companies I

7       developed an interest in.  And when I say develop an interest,

8       I'm talking about maybe in August of 2003 or July of 2003.  It

9       probably was the second tier of -- of spammers I was interested

10      in.

11            And what I mean by that is, after we sent the

12      certified letters to a bunch, I started finding others that

13      were sending me tons of stuff.  And after they refused to

14      acknowledge the October 1st unsubscribe message from EmailPrize

15      and the subsequent ones that I sent directly to them, or used

16      their mechanism -- I think they've called it -- to unsubscribe,

17      they continued to do that.

18            So they got on my radar.  And in January of 2004, I

19      began personal e-mails to the firms -- or the firm to try to

20      get them to stop sending e-mails.

21      Q.    Okay.

22            So let me ask you this.

23            If you -- prior to the first time that you looked up

24      any of the Virtumundo domains -- let's use this as an example,

25      but this is also meant in a general way -- for instance, the

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 460

1    vm-admin domain, which is one of them, correct?

2        A.    Yes.

3        Q.    Prior to the first time that you looked any of those

4    domains up, when you looked at the "from" line in any of these

5    e-mails, did you --

6            First of all, did you even see the domain name in the

7    "from" line?

8        A.    No, because I looked for the subject first.  It was

9    the easiest way to sort my e-mail.

10       Q.    Okay.

11           If you had looked at the "from" line and you saw

12    vm-admin -- and this is prior to ever looking it up by Whois --

13    would that have had any meaning to you whatsoever?

14       A.    At that time -- no is the short answer.

15           And at that time, e-mail addresses were just so new to

16    me and they were so discombobulated, they'd have all kinds of

17    foreign stuff in it, a lot of spammers.

18           So, if anything, if I'm doing EmailTrackerPro analysis

19    and I end up seeing the "from" field, I sometimes would

20    highlight that based on some other reflection on it.

21           But the "subject" line was the primary thrust

22    initially.

23       Q.    Okay.

24           Have you personally, or as Gordonworks.com, ever given

25    Virtumundo or Adknowledge permission to send you commercial

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

1    e-mails?

2         A.    Never.

3         Q.    Okay.

4               Does that include directly?

5         A.    I mean never directly.

6         Q.    And does it include indirectly?

7         A.    Indirectly, I never intended to be a subscribee -- or

8    subscriber, I should say -- of anything related to the company.

9    Never intended to do that.

10        Q.    Okay.

11              Now, because -- and the reason I'm asking these is

12   yesterday, I believe when you were asked by counsel if you ever

13   opt -- opted in again to Virtumundo -- and I believe that the

14   word "again" was used -- I want some clarification -- you

15   testified that "it's possible that I inadvertently resubscribed

16   when doing reconnaissance for this lawsuit."

17              Can you explain what you meant by that?

18        A.    I, first of all, will restate that I never intended at

19   any point in time to ever subscribe to any of their offerings.

20              When I wanted to go in last year after the lawsuit was

21   filed -- maybe it was even before -- I don't rightly know now

22   -- the thing that I tried to do was get more information about

23   the company, information about affiliate marketing that they

24   do.

25              I may have looked at a legal document of one sort or

Buell Realtime Reporting, LLC
206-287-9066

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 462

1    another, and I don't know which ones, if there were more than

2    one.

3           So I just did a general -- what I call reconnaissance

4    to see what that site entailed.

5       Q.   Okay.

6           And by your testimony, you believe that in doing that,

7    you may have inadvertently resubscribed or subscribed?

8       A.   I don't know if I did or not.  I have no way of

9    knowing that at this point.

10          If the -- if there was a requirement to put an e-mail

11   address in, it's likely I did that.

12          And if that means that I subscribed to something

13   again, then, you know, that's the case.

14      Q.   And why would you have put your e-mail address in at

15   that point?

16      A.   The only access I would have to the site to get the

17   information that I could share with my attorneys was to do that

18   reconnaissance and put my name in a block to get that

19   information.

20      Q.   Okay.

21          Yesterday when you were questioned regarding your

22   declaration in support of the motion for summary judgment now

23   pending -- I believe it was Exhibit No. 15, but I'm not going

24   to ask you -- this is more of a general question -- you

25   testified that it was -- and I quote -- "co-authored by me and

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 463

1    my attorneys," could you elaborate on that a little more?

2         Could you clarify that if you have something to

3    clarify?

4         A.   What's the specific document?

5         Q.   It was your declaration in support of the summary

6    judgement motion, Exhibit 15.

7              MR. NEWMAN:  Objection.  Question calls for a

8    narrative.

9         A.   Okay.

10             MR. NEWMAN:  It was vague.

11        A.   Sometimes I -- and I would guess it's most of the

12   times, I take the initiative to draft declarations.  I believe

13   that's the case.

14             It may not.

15             But I believe that that's the way things typically go.

16             There have been times, though, where one of my

17   attorneys may have taken the initiative and I add on to it.

18             So I guess the answer is that I typically begin

19   drafting, offer information.  The boilerplate is usually the

20   first one or two or three statements, I just would keep and try

21   to -- I would be advised to try to get information that's

22   relevant to whatever is discussed in whatever motion or

23   anything like that.

24        Q.   Do you always review your declarations before you sign

25   them?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 464

1      A.   I review the draft that I have at hand.

2      Q.   Would you ever sign anything that you did not believe

3   to be completely true?

4           MR. NEWMAN:  Objection.  Question calls for

5   speculation.

6      A.   I will say this.

7           Based on my discussion with -- discussion -- based on

8   this deposition yesterday, I discovered that the process that

9   we've used -- and you and I are remotely connected, 200 miles

10  away.

11          I talked with you this morning about ways to

12  ameliorate or to improve the communications regarding the

13  drafting of documents.

14          And I believe I suggested that we would do that by way

15  of fax because the .pdfs and the signature pages we see right

16  now, occasionally my changes would not be incorporated in the

17  documents, and I don't want that to become a big problem

18  downstream.

19          So we talked about how to correct, improve that

20  particular situation.

21     Q.   My question is, would you ever sign anything that at

22  the time you signed it, you did not believe to be completely

23  true?

24     A.   Oh.

25          MR. NEWMAN:  Objection.  Question calls for

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 465

1    speculation.  Asked and answered.  Leading, especially by tone

2    of voice.

3         A.    It wouldn't be my custom to do that.

4         Q.    Yesterday you testified that this -- with regard to

5    some things in the declaration -- and, again, this is about the

6    declaration in support of summary judgment --

7         A.    Okay.

8         Q.    That this declaration is "my best approximation" of

9    what happened years before.

10             Could you explain what that means?

11        A.    I think I need more information to expound on that.

12             That's not really fresh in my mind right now.

13        Q.    All right.  We'll leave that one alone and I'll strike

14   that.

15        A.    Okay.

16        Q.    All right.  I might have to direct you to Exhibit

17   No. 15 for this one.

18             Exhibit No. 15, paragraph 3.

19             I believe you testified to the effect that you weren't

20   sure you were registered both as the administrative contact and

21   the registrant, and then you said, but that typically is what

22   occurs.

23             In the context of your statement in this declaration,

24   could you elaborate and clarify that?

25        A.    In No. 3, I did not register the domain.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 466

1          One World Telecommunications registered the domain on

2     my behalf.  They used the information existent to put in

3     whatever forms are necessary.

4          I did not personally register the domain

5     Gordonworks.com.  It was done for me.

6          Q.   Okay.

7          And have you ever checked subsequent to the initial

8     registration to determine or confirm that the proper

9     information was in --

10         A.   Yes.  I just don't recall a date.

11         Q.   And was the proper information in there?

12         A.   Yes, it was.

13         Q.   And what did that proper information indicate?

14         A.   My name.

15         My resident -- my address in terms of it locating me

16    in Richland, Washington at the time.

17         Q.   Okay.

18         Has that information changed since you registered?

19         A.   Oh, yes.

20         Q.   And can you --

21         A.   All but my name.

22         Q.   Could you explain how so.

23         A.   My name is the same.

24         My address has changed.

25         My phone numbers have changed.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 467

1          And I believe Omni now is the owner or the registrant

2   of Gordonworks.

3       Q.   At all times, however, since you registered these,

4   were they registered to a Washington resident, including

5   yourself or Omni?

6       A.   Yes.

7       Q.   And was that information publicly available to anyone

8   who would seek it?

9       A.   My understanding, it is, yes, through Whois.

10          And also, there's a Washington Association of Internet

11  Service Providers that has a -- WAISP, I'm going to call

12  it --database -- W-A-I-S-P -- and anyone who looks that up can

13  determine that I am a Washington resident.

14      Q.   Were you registered with the WAISP?

15      A.   Yes.

16      Q.   Do you recall when you registered?

17      A.   My best guess is it was in '99, 1999.

18      Q.   And have you been registered with them --

19      A.   Continuously.

20      Q.    -- since then?  Continuously?

21      A.   Yes.

22      Q.   And do you recall what that acronym is, WAISP?

23      A.   I believe it's the Washington Association of Internet

24  Service Providers.

25      Q.   In paragraph number 7, you question regarding the

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 468

1    accounts accessed using the World Wide Web, and then there was

2    some talk about some of your clients had POP accounts, and I

3    believe you testified that you did not put "World Wide Web" in

4    the declaration or intend for it to be in the declaration.

5            Could you clarify that.

6        A.    Well, if we're referring to Web mail -- that is, World

7    Wide Web -- the accounts through mail servers at Godaddy or OWT

8    or wherever else, I don't recall them using World Wide Web, per

9    se.

10           I thought e-mail was just relayed -- if I can use that

11   term -- from one computer -- or sent from one computer to the

12   next, not necessarily --

13           I guess the term "World Wide Web" is just -- it's used

14   sometimes synonymously just with mail servers, and I take it

15   more as a collective and just typically say that World Wide Web

16   or I'll say mail server, and sometimes I end up meaning the

17   same thing when I say that.

18       Q.    I guess I'm just asking you for clarification.

19           Is the use of the World Wide Web --

20       A.    It's true.

21       Q.    Is there anything untrue about --

22       A.    No, there's nothing untrue.

23       Q.    To your knowledge?

24       A.    No.

25       Q.    Also in Exhibit No. 15, the last -- the final four

Buell Realtime Reporting, LLC
206-287-9066

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 469

1    paragraphs, I believe -- referring to Exhibits J, K, L and M,

2    do you have any reason to believe --

3            Do you recall reviewing that when you signed it; in

4    other words, seeing those paragraphs in those exhibits?

5        A.    They were there and I saw the articles.

6        Q.    And do you stand by your statement in your declaration

7    that to the best of your knowledge, that these are true and

8    correct --

9        A.    Yes, I stand by them.

10       Q.    -- as you represented them to be?

11       A.    Yes.

12       Q.    Okay.  Today -- I don't have much more.

13           But today you testified in questioning regarding the

14   "from" lines.  Counsel, I believe, asked several times, at

15   least, whether any of the "from" lines misled you or were

16   misleading to you.

17           You seemed uncomfortable with that, and I'm asking you

18   if you want to clarify or explain why you would be

19   uncomfortable testifying about whether "from" lines misled you.

20       A.    Because I don't believe that -- I'll put it another

21   way.

22           I believe the statute refers to -- CEMA statute refers

23   to misrepresenting information, and CEMA has been a part of my

24   life since 2003.  Canned Spam only, really, as of late.

25           So I guess the shorter -- oh, boy.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 470

1          What haven't I answered?  I don't want to continue on.

2      Q.   Well, I'm asking you if there's something about the

3   word or the term "misled" or "misleading" in relation to "from"

4   lines that made you feel uncomfortable or unsure about your

5   testimony.

6      A.   It's a word that I wouldn't use to characterize how I

7   felt.

8          I don't put it on me, so to speak.  I try to look at

9   that particular topic more, I guess, objectively, and I believe

10  that that particular thing misrepresents, in terms of the

11  "from" names.  That field, I should say.

12     Q.   So are you making a distinction between "misleading"

13  and "misrepresenting"?

14     A.   I believe I may have used them interchangeably a few

15  times.

16         But I know there's a difference between the two

17  concepts.  And "misrepresent" is what I intend for the record.

18     Q.   As pertaining to?

19     A.   "From" names.

20     Q.   There was some testimony -- I think this was yesterday

21  -- maybe we covered it a bit today, too -- about the issue of

22  that at some point you took control of the e-mail accounts.

23         Could you just clarify what happened.

24     A.   Okay.  I believe it was mischaracterized by

25  Mr. Newman; likely, inadvertently.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 471

1           I don't take control of Omni clients' property, so to

2    speak.

3           Gordonworks, I had my clients relinquish control of

4    those.

5           I assist my clients.  If their computers have viruses

6    and things like that, they redirect or allow me to access it.

7           But I've never reclaimed any domain other than trying

8    to reclaim Gordonworks.

9      Q.   When you testified about -- I think counsel asked

10   something to the effect that -- regarding evidence supporting

11   your opt-outs or unsubscribes, he asked if you had any

12   additional evidence in response to his inquiry, in other words.

13          I believe you testified that you didn't necessarily

14   keep the records from unsubscribes to these defendants.

15          But I'm asking you now, do you want to clarify

16   anything?  Is there any other evidence that you didn't refer to

17   in response to his questioning?

18          It's late in the day.

19     A.   The briefest answer, I guess, I can give --

20          I lost that thought.  I was getting ready to say

21   something.

22     Q.   That's all right.  Strike it.  I think we're okay.

23     A.   Okay.

24          MR. SIEGEL:  That's all I have.  It's getting -- it's

25   getting too late.

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

1

2                    F U R T H E R  E X A M I N A T I O N

3

4    BY MR. NEWMAN:

5         Q.   Mr. Gordon?

6         A.   Yes.

7         Q.   Had you heard of Virtumundo or Adknowledge before you

8    first received e-mail messages from either of them?

9         A.   No.  I don't recall ever knowing about them.

10        Q.   If Virtumundo had used the name Virtumundo instead of

11   vm-admin.com when it first sent you e-mail, would that have

12   meant anything to you?

13        A.   No.

14        Q.   When did your clients relinquish control of their

15   e-mail accounts?

16        A.   In '03.  2003.

17        Q.   Does anybody currently, other than yourself, regularly

18   use e-mail accounts that you provide?

19        A.   At Gordonworks; is that what you're asking?

20        Q.   Okay.  At Gordonworks.

21        A.   My wife is the only other person that uses a

22   Gordonworks address presently.

23             We created a brand new one that's not a part of any of

24   this litigation.

25        Q.   What about at other domains?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 473

1      A.    Okay.  I know you piggybacked there, but please ask me

2   a complete question.

3      Q.    Sure.

4            Does anybody currently, other than yourself, regularly

5   use e-mail accounts at any domain that you provide?

6      A.    Okay, the problem I'm having is that -- the

7   distinction of what Omni provides as opposed to what Godaddy

8   provides, and that's not clear in my mind when you're asking

9   about "provides."

10      Q.    Do you know the distinction between what Omni provides

11   and what Godaddy provides?

12      A.    A lot of it's blurred.

13      Q.    Do you believe that anybody currently, other than

14   yourself, uses an e-mail account that Omni or you personally

15   provide?

16      A.    Okay.  I'm still confused.

17            If it's an Omni-owned one, it's one answer.

18            If you're talking about other -- their own personal

19   ones, it's another answer.

20            So I guess I'm trying to --

21            I don't know how to answer it because I'm just not

22   sure how to -- which way to go.

23      Q.    Do you believe that anybody currently, other than

24   yourself, uses an e-mail account that Omni or you provide?

25      A.    I still don't understand.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 474

1    Q.   Do you provide e-mail accounts?

2    A.   "Provide" means what?  Let's get that clear because

3  I'm having a problem trying to understand what you're saying.

4    Q.   Are you an Internet access service?

5    A.   Internet access service.  Yes.

6    Q.   And in connection with your role as an Internet access

7  service, do you provide e-mail accounts?

8    A.   Okay.

9         Domain names -- the answer about e-mail accounts, as I

10  understand your question, is no, I don't provide e-mail

11  accounts.

12        Domain names are not provided by me.  I'm not their

13  registrar of domain names.

14   Q.   As an Internet access service, does Omni or you

15  personally currently provide service?

16   A.   You're back to that word "provide" again.

17        I'm not certain of the answer.

18   Q.   Do you currently provide Internet access service for

19  anybody other than yourself and your wife?

20   A.   Since we haven't defined it, I'm still having a

21  problem.

22   Q.   Since we haven't defined what?

23   A.   "Provide."

24        And I asked you, was it meaning ownership, was one of

25  the clarifications I asked about.

Buell Realtime Reporting, LLC
206-287-9066

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 475

1    Q.   Services, by definition, are provided, are they not?

2    A.   Okay.

3    Q.   Do you agree that services, by definition, are

4    provided?

5    A.   Okay.  Yes.

6    Q.   Do you provide any services as an Internet access

7    provider?

8    A.   Yes.

9    Q.   Do you provide any services as an Internet access

10   provider currently for anybody other than to yourself or your

11   wife?

12   A.   Yes.

13   Q.   To whom?

14   A.   To my clients.

15   Q.   Who are your clients?

16   A.   I don't believe I can name every one of them right

17   now, but I'll make an attempt.

18        My wife.

19        My three adult children.

20        Do you want their names?  My three --

21   Q.   No, thanks.

22   A.   Okay.

23        Emily Abbey.  I mentioned her name.

24        Anthony Potts.  I mentioned his name.

25        Griffin Online Domain is an LLC here in Washington

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 476

1    state.  So I provide for them.

2            Bruce Slade, S-L-A-D-E.

3            Eric Bruton, B-R-U-T-O-N.

4            Kathleen Fry, F-R-Y.

5            My brother, Will Gordon.

6            James W. Crow the Second.

7            I'm sure I'm missing someone.

8            TheGreatNorthwest-Alpha.org, which we referred to

9    yesterday.  That's a fraternal group, a national fraternal

10   group.

11           And, again, there may be some folks I'm forgetting.

12      Q.   What Internet access services do you perform for Emily

13   Abbey?

14      A.   She hosts her domain on the server that I lease.

15           And that's the same with all the -- all of my clients.

16      Q.   So each of the clients that you testified about a

17   moment ago host a domain on the server that you lease?

18      A.   Yes.

19      Q.   And that's how you provide Internet access service,

20   correct?

21      A.   That's one of the things, yes.

22      Q.   What does it mean to host a domain?

23      A.   Excuse me.

24           Godaddy allows me, if I choose, to resell space.

25   There has yet to be a charge for their space that they use, a

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 477

1    monthly or annual fee for that.

2          That's contemplated, and people knew that from the

3    very beginning.

4          So, what more?

5      Q.   Do you know what any of your clients do with their

6    domains?

7          MR. SIEGEL:  Objection.  Vague and ambiguous.

8      A.   The only thing that I do know is that they send and

9    receive e-mails from their domains.

10          I help them set up their interfaces in the Plesk

11   interface, P-L-E-S-K.

12          Not all of them, but some of them who needed the help.

13     Q.   Do you offer your Internet access services to the

14   public?

15     A.   The short answer is yes in that -- going to -- I do

16   workshops from time to time, and I speak at classes from time

17   to time.

18          And I invite people who want to -- and I think I've

19   only got -- let's see.  Slade -- I don't recall who.

20          But one or two people have decided that they want to

21   do business with me.

22          My fraternal group -- I guess because I'm a member of

23   the fraternity -- want to do business with me and add the 110

24   or -20 members.

25     Q.   What do you mean by "do business"?

Buell Realtime Reporting, LLC
206-287-9066

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 478

1      A.    Host their domain on my server.

2      Q.    Have they agreed to compensate you for hosting their

3   domain on your server?

4      A.    Yes.

5      Q.    In what respect are they compensating you?

6      A.    There would be a monthly fee, and we haven't decided

7   because the member -- not the membership, but the director has

8   changed, and I had an agreement with the former director, and

9   now -- after this person gets his feet wet, so to speak, we'll

10  revisit that.

11     Q.    When do you expect the monthly fee to begin?

12     A.    I'm not sure.

13     Q.    And if the fraternal organization refuses to pay the

14  monthly fee, will you continue to provide service?

15     A.    They won't refuse.  I've got their word and it's

16  people that I trust.

17     Q.    If they refuse, would you continue to provide service?

18     A.    I likely would.

19     Q.    What classes have you taught at which you've offered

20  your Internet access services?

21     A.    I facilitate, is my term, workshops for Columbia Basin

22  College from time to time.

23          I have been asked in as a guest speaker at the City U

24  campus that was in Wash- -- in Richland.

25          And I talk with people from Toastmasters groups to --

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                James S. Gordon, Jr., Vol. II

Page 479

1    people who saw my picture in the paper and have been asking me

2    for several years now, and I've just talked.  People see me in

3    the grocery store and ask me about it and I talk to them about

4    it and tell them what's going on.

5            So, just people -- I interact with the general public

6    in that regard.

7        Q.   Why was your picture in the paper?

8        A.   There was a lawsuit against several spammers back in

9    '03, December of '03.

10           In January, the local Tri Cities Herald newspaper

11   carried a story about that.

12       Q.   What workshops have you facilitated --

13       A.   These --

14       Q.   At which you have offered your Internet access

15   services?

16       A.   They're called the "Don't Quit" workshops at Columbia

17   Basin College.  The resource center.

18       Q.   What are the "Don't Quit" workshops?

19       A.   These are something called Workforce Development Life

20   Skills Training workshops.

21       Q.   And you've provided Internet access services at these

22   workshops?

23       A.   Yes.

24       Q.   Has anybody taken you up on it?

25       A.   Not for domains.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                    James S. Gordon, Jr., Vol. II

Page 480

1         And because I've been offering that for so long,
2    people have taken me up on publishing their poetry on the
3    Internet and things like that.
4         The first woman had this beautiful poem called "Broken
5    Woman," and I published that on her behalf on the Internet so
6    that people could access "Broken Woman."
7         It may still be on the Internet, for all I know.
8    Q.   Do you consider publishing poetry on the Internet to
9    constitute Internet access services?
10   A.   One of the duties, yes.
11        By the way, I have lots of poetry posted on the
12   Internet.
13   Q.   That you authored?
14   A.   Yes.  I love to write Haiku poetry.
15   Q.   Do you have a website that promotes your Internet
16   access service?
17   A.   No.
18        Well, that's not quite true.
19        The SiteBuilder is in that when I talk with people, I
20   say, if you want to practice doing websites, use my
21   SiteBuilder.
22        I have no way of knowing who's actually used it.
23   Q.   That's publicly accessible?
24   A.   Yes.
25   Q.   How do I access it?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 481

1      A.    We can put in http://SiteBuilder -- S-I-T-E

2   Builder.Gordonworks.com, and you can build your own website and

3   practice websites.

4      Q.    Have you made any efforts to promote or market or

5   advertise the SiteBuilder website?

6      A.    Word of mouth is the way that I've done that.

7      Q.    Do you know whether anybody has used your SiteBuilder

8   website?

9      A.    I don't know who has unless they report to me, and a

10  couple of people -- I think my daughter was one -- and someone

11  else -- said, oh, yeah, I see that there.

12         I think the other was Robert.   Robert Pritchett,

13  P-R-I-T-C-H-E-T-T.

14     Q.    Who designed the SiteBuilder website?

15     A.    It's a authored by a company called SWSoft.

16     Q.    And do you have a license to publish it on the

17  Internet?

18     A.    Yes.

19     Q.    Do you pay a fee for that license?

20     A.    Yes, I do.

21     Q.    Do you know how much?

22     A.    It's $100 a year, I believe.   Or something close to

23  that.

24     Q.    Do you provide any services to your clients that you

25  haven't about in the last 20 minutes?

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo                 James S. Gordon, Jr., Vol. II

Page 482

1      A.    I testified regarding some of it yesterday when I

2  talked about I'd go and help someone who has virus problems.

3            Emily will call me like she did last week.  Jim, I

4  have this problem with Eudora, can you help me diagnose it?  So

5  I do a lot of that.

6            I help people recover their hard drives in the sense

7  that they're virus stricken and I would use my Evidence

8  Eliminator --

9            Viruses would wipe out hard drives and I would use my

10 Evidence Eliminator to totally wipe it clean.  There are

11 processes within that to do this magnetic res- --

12 resonance-type thing and other things where it would be wiped

13 so that -- they say that it's wiped nine times, which is a

14 standard higher than NSA, the National Security Administration,

15 so that they couldn't even recover data at that point.

16           But it wipes it clean so that we could put another

17 operating system or put the same operating system back on the

18 computer.

19      Q.    Have you ever used the WAISP website?

20      A.    I don't understand what you're saying.

21      Q.    You testified earlier about the WAISP website in

22 response to questions that your lawyer asked.

23      A.    WAISP is how I pronounce it.  I apologize.

24      Q.    I apologize for pronouncing it incorrectly if I did.

25      A.    That's my understanding.

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo          James S. Gordon, Jr., Vol. II

Page 483

1      Q.   Have you ever used the WAISP website?

2      A.   I've visit the website on -- I don't know -- a number

3  of times.  Five times, 10 times.

4      Q.   And do you know how to search that website to

5  determine what e-mail addresses are provided in it?

6      A.   I haven't done it in years, so right now, I would

7  answer that no.

8          MR. NEWMAN:  I have no further questions at this time,

9  but your lawyer may follow up and I may follow up in response

10 to him.

11         MR. SIEGEL:  We're good.  No further questions.

12         THE VIDEOGRAPHER:  This concludes the videotaped

13 deposition of James S. Gordon, Junior, consisting of six tapes.

14 The time is now 6:09 p.m.  We are off the record.

15

16             (The deposition concluded at

17             6:09 p.m.)

18

19             (By agreement between counsel

20             and the witness, signature was

21             reserved.)

22

23

24

25

f14872fb-74cf-41dd-967d-534cf51d2fc8

Gordon v. Virtumundo              James S. Gordon, Jr., Vol. II

Page 484

1              A F F I D A V I T

2

3

4    STATE OF WASHINGTON    )

5                          )  ss

6    COUNTY OF KING         )

7

8    I have read my within deposition, and the same is true and

9    accurate, save and except for changes and/or corrections, if

10   any, as indicated by me on the "CORRECTIONS" flyleaf page

11   hereof.

12

13

14

15           JAMES S. GORDON, JR. - VOLUME II

16

17

18

19   SUBSCRIBED AND SWORN TO before me this

20        day of          , 2006.

21

22

23           NOTARY PUBLIC in and for the

24           State of Washington,

25           residing at                   .

f14872fb-74cf-41dd-967d-534cf51d2fc8