1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10   JAMES S. GORDON, Jr., a married individual,
     d/b/a 'GORDONWORKS.COM'; OMNI
11   INNOVATIONS, LLC., a Washington limited
     liability company,

12                          Plaintiffs,

13           v.

14   VIRTUMUNDO, INC., a Delaware Corporation,
     d/b/a ADKNOWLEDGEMAIL.COM;
15   ADKNOWLEDGE, INC., a Delaware
     Corporation, d/b/a
16   ADKNOWLEDGEMAIL.COM; SCOTT LYNN,
     an individual; and JOHN DOES, 1-X,
17

18                          Defendants.

CASE NO. 06-0204-JCC

ORDER

19

20           This matter comes before the Court on Defendants' Motion for Attorneys' Fees and Costs (Dkt.

21   No. 127), Plaintiff Gordon's Opposition[1] (Dkt. No. 135), and Defendants' Reply (Dkt. No. 137).  This

22   Court, having reviewed the materials submitted by the parties, as well as the complete record, and

23   determined that oral argument is not necessary, hereby finds and rules as follows.

24   //

25           [1] Plaintiff Omni did not file an opposition or join in the brief filed by Plaintiff Gordon.

26   ORDER – 1

1  **I.      BACKGROUND**

2          Plaintiffs James S. Gordon ("Gordon") and Omni Innovations, LLC ("Omni") brought this action

3  for alleged violations of the Federal CAN-SPAM Act of 2003, 15 U.S.C. §§ 7701–7713 (First Cause of

4  Action); the Washington Commercial Electronic Mail Act ("CEMA"), WASH. REV. CODE §§

5  19.190.010–.110 (Second Cause of Action); the Washington Consumer Protection Act ("CPA"), WASH.

6  REV. CODE §§ 19.86.010–.920 (Third Cause of Action); and the Washington "Prize Statute," WASH.

7  REV. CODE §§ 19.170.010–.900 (Fourth Cause of Action).  (Am. Compl. (Dkt. No. 15).)

8          As the Court has previously noted, (May 15, 2007 Order (Dkt. No. 121)), Gordon is a

9  Washington resident and registrant of the internet domain gordonworks.com ("Gordonworks").  Omni is

10  Gordon's business, which involves (1) software development and other endeavors and (2) a "spam

11  business," which entails "[n]otifying spammers that they're violating the law" and filing lawsuits if they do

12  not stop sending e-mails to the Gordonworks domain.  Defendants Virtumundo, Inc. ("Virtumundo") and

13  Adknowledge, Inc. ("Adknowledge") are non-Washington resident businesses that provide online

14  marketing services to third-party clients.  Virtumundo is a Delaware corporation with its principal place

15  of business in Kansas.  Adknowledge is also a Delaware corporation with its principal place of business in

16  Missouri.  Virtumundo and Adknowledge market products for their clients by transmitting e-mails to

17  interested consumers.  Defendant Scott Lynn ("Lynn") is a Missouri citizen and serves as Chief Executive

18  Officer of Adknowledge.  He is also the sole shareholder of both companies.  (*See id.* at 2–3.)

19          On May 24, 2006, this Court denied Defendants' motion to dismiss for lack of personal

20  jurisdiction (Order (Dkt. No. 24)) and on December 8, 2006, this Court granted in part and denied in part

21  Defendants' motion to dismiss various claims for pleading deficiencies (Order (Dkt. No. 51)), granting

22  leave to Plaintiffs to further amend their Amended Complaint to cure the identified defects.  Plaintiffs

23  never did so.  Accordingly, the Prize Statute claims (Fourth Cause of Action) were never revived, and the

24  parts of the Second and Third Causes of Action corresponding with Plaintiffs' "personally identifying

25  information" CEMA claim, WASH. REV. CODE § 19.190.080, also remained dismissed.  Defendants then

26  ORDER – 2

1 moved for summary judgment on all of Plaintiffs' remaining claims—which included CAN-SPAM claims

2 (First Cause of Action), CEMA claims (Second Cause of Action), and CPA claims (Third Cause of

3 Action) as they related to surviving CEMA claims—and Plaintiffs moved for partial summary judgment

4 on the merits of some of their CAN-SPAM claims.  On May 15, 2007, the Court granted Defendants'

5 motion for summary judgment, denied Plaintiffs' motion for partial summary judgment, and disposed of a

6 number of other motions.  (May 15, 2007 Order (Dkt. No. 121).)  Specifically, the Court dismissed

7 Plaintiffs' CAN-SPAM claims (First Cause of Action) for lack of statutory standing (*id.* at 4–15),

8 dismissed Plaintiffs' Washington CEMA claims (Second Cause of Action) as preempted by CAN-SPAM

9 (*id.* at 15–20), and dismissed Plaintiffs' Washington CPA claims (Third Cause of Action) for lack of a

10 viable CEMA foundational claim and alternatively for failure to allege injury to business or property (*id.*

11 at 20–21).  Defendants now move for attorneys' fees and costs as the prevailing parties.

12 **II.     ANALYSIS**

13         Federal Rule of Civil Procedure 54(d) governs motions for attorneys' fees and costs.  Defendants

14 have made a timely motion for attorneys' fees pursuant to Rule 54(d)(2).  Defendants request attorneys'

15 fees and costs pursuant to 15 U.S.C. § 7706(g)(4) (CAN-SPAM) as well as Washington Revised Code

16 section 19.190.090(3) (CEMA).  Because this Court's May 15, 2007 Order disposing of the remainder of

17 Plaintiffs' claims turned on application of CAN-SPAM, and because federal law governed both the

18 standing and preemption analyses, the Court will not separately consider the issue of fees and costs under

19 Washington state law.

20         CAN-SPAM provides that in a private CAN-SPAM action, "the court may, in its discretion,

21 require an undertaking for the payment of the costs of such action, and assess reasonable costs, including

22 reasonable attorneys' fees, against any party."  15 U.S.C. § 7706(g)(4).  Because CAN-SPAM authorizes

23 costs and attorneys' fees "against any party," the Court must determine (1) the correct standard to be

24 applied in deciding whether to award attorneys' fees to a prevailing CAN-SPAM defendant and (2) if fees

25 and costs are warranted, what constitutes a reasonable award in this case.

26 ORDER – 3

**A.     Legal Standard Governing Whether to Award Attorneys' Fees to Prevailing CAN-SPAM Defendants**

As an initial matter, Gordon argues that the Court "never reached the merits" of Plaintiffs' CAN-SPAM claims. (Opp'n 5.)  Accordingly, though he does not frame the question as such, he appears to be objecting to a characterization of Defendants as "prevailing" in this litigation.  In light of the fact that the Court dismissed all of Plaintiffs' claims and entered judgment in Defendants' favor (Dkt. No. 122), any suggestion that Defendants have not prevailed is meritless.  More to the point, the statute provides that the Court may award attorneys' fees and costs against any party in any private action.  Congress made no mention of any requirement that the Court also reach the merits of particular claims.

A more pressing question is whether, in deciding whether to award attorneys' fees and costs to the prevailing defendant in a CAN-SPAM action, the Court should apply the "dual standard" typically applied in civil rights cases and articulated in *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978) (holding that "a [Title VII] plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so"); *see also Davis v. City and County of San Francisco*, 976 F.2d 1536, 1541 n.1 (9th Cir. 1992) (noting that the same body of United States Supreme Court and Ninth Circuit caselaw governs the reasonableness of attorneys' fees in Title VII cases as well as actions brought pursuant to 42 U.S.C. §§ 1981–1986 and Titles VI and IX of the Civil Rights Act of 1964), *vacated in part on other grounds by* 984 F.2d 345.  Under *Christiansburg*, a Court may only award fees and costs to a prevailing defendant if it finds that the plaintiff's case demonstrated frivolousness, unreasonableness, or groundlessness.  Thus, this dual standard tips the scale in favor of plaintiffs both when they win and when they lose.

The alternative to the dual standard is the "evenhanded" approach applied in *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994).  In contrast to the threshold requirement under the dual standard—that a losing plaintiff may be assessed fees and costs *only* if the original suit was "frivolous or brought in bad

ORDER – 4

1   faith"—the evenhanded approach treats prevailing defendants and prevailing plaintiffs alike.  *Id.* at

2   520–21.  In *Fogerty*, an action brought under the Copyright Act,[2] the Supreme Court rejected the dual

3   standard and held that the discretionary question of whether to award fees to a prevailing defendant must

4   be evaluated no differently than the question of whether to award fees to a prevailing plaintiff.  *Id.* at 534.

5   The Supreme Court concluded by noting "several nonexclusive factors to guide courts' discretion" in

6   making that decision.  *Id.*  As enumerated in *Lieb v. Topstone Industries, Inc.*, 788 F.2d 151, 156 (3d Cir.

7   1986), such factors include "frivolousness, motivation, objective unreasonableness (both in the factual

8   and in the legal components of the case) and the need in particular circumstances to advance

9   considerations of compensation and deterrence."  *Fogerty*, 510 U.S. at 534 n.19.  The Supreme Court

10  endorsed application of these factors, so long as they remained "faithful to the purposes of the Copyright

11  Act and are applied to prevailing plaintiffs and defendants in an evenhanded manner."  *Id.*

12          Neither the Supreme Court nor the Ninth Circuit has determined which of the foregoing tests

13  should govern in CAN-SPAM cases.  Both Defendants and Gordon, in briefing the instant motion, have

14  applied the *Fogerty–Lieb* test, which is more favorable to Defendants.  Thus, it appears that Gordon

15  agrees that this is the proper standard.  The Court also finds *Fogerty*'s standard more appropriate in this

16  case, for the following reasons.

17          The *Fogerty* Court discussed at length the reasons for the *Christiansburg* standard in civil rights

18  cases.  Among these are the "important policy objectives of the Civil Rights statutes, and the intent of

19  Congress to achieve such objectives through the use of plaintiffs as private attorneys general."  *Fogerty*,

20  510 U.S. at 523 (internal quotations and alterations omitted).  In *Christiansburg*, the United States

21  Supreme Court had found that those important policy objectives were "not at work in the case of a

22  prevailing civil rights defendant."  *Fogerty*, 510 U.S. at 523 (also discussing *Newman v. Piggie Park*

23  *Enterprises, Inc.*, 390 U.S. 400 (1968)).  Accordingly, prevailing defendants could be treated less

24  ───────────────

25          [2] As here, the Copyright Act provides that a court *may* award fees but does not require such an
    award under any circumstance.  *Id.* at 519; *see also* 17 U.S.C. § 505.

26  ORDER – 5

1   favorably than prevailing plaintiffs.  However, the factors compelling the *Christiansburg* dual standard

2   were "absent in the case of the Copyright Act."  *Id.*  The *Fogerty* Court carefully considered the goals of

3   the Copyright Act in reaching its conclusion.  *Id.* at 523–33.  This Court will do the same.

4          The purpose of the CAN-SPAM Act, as stated in the statute itself, as well as in the Senate

5   Report, is to curb false or misleading unsolicited commercial e-mail.  15 U.S.C. § 7701 ("Congressional

6   findings and policy"); S. REP. NO. 108-102, at 1 (2003) (Comm. Rep. on CAN-SPAM Act of 2003 (S.

7   877)) ("Purpose of the Bill").  Specifically, Congress intended to prohibit deception as to the source or

8   subject matter of e-mail messages, to require an opt-out provision regarding continued receipt of e-mails,

9   to enforce consumers' choices to opt out, to require inclusion of valid physical addresses in messages and

10  notice of advertising or solicitation content, and to prohibit knowingly false and misleading advertising.

11  *See* 15 U.S.C. § 7701; S. REP. NO. 108-102, at 1.  While Congress intended to protect consumers and to

12  promote honest advertising, Congress clearly did not intend to obliterate all commercial e-mail, to ban e-

13  mail marketing, or to thwart legitimate business practices.  For example, Congress acknowledged the

14  legitimacy of a significant segment of e-mail marketing traffic in its commentary on economic impact in

15  the Senate Report.  *Id.* at 12.  Thus, in enforcement, businesses which are likely CAN-SPAM defendants

16  have an interest in establishing that their practices are legitimate, just as potential plaintiffs have an

17  interest in challenging particular practices.  The twin purposes of protecting consumers and imposing a

18  regulatory structure on businesses with which they reasonably can comply lend themselves well to the

19  *Fogerty–Lieb* test.  Moreover, as in *Fogerty*, this Court finds that the weighty considerations in civil

20  rights cases—which led to the formulation of the *Christiansburg* dual standard favoring both prevailing

21  and losing plaintiffs—are not present in CAN-SPAM cases.

22         The available means of CAN-SPAM enforcement underscore this conclusion.  This Court has

23  already extensively considered Congressional intent with respect to the private right of action conferred

24  by CAN-SPAM.  (May 15, 2007 Order.)  For instance, it is clear that the CAN-SPAM Act's primary

25  enforcement provisions empower the Federal Trade Commission and other federal agencies to pursue

26  ORDER – 6

1   violators of the Act.  15 U.S.C. § 7706(a), (b).  State attorneys general may bring civil enforcement

2   actions.  *Id.* § 7706(f).  A *limited* private right of action also exists for a provider of Internet access

3   service adversely affected by various violations.  (*See* May 15, 2007 Order 4–5, 11–15.)  In moving for

4   summary judgment, Defendants argued that Plaintiffs lacked standing to bring this private right of action

5   because (1) they are not "Internet access service" ("IAS") providers as defined by the Act and (2) they

6   have not been "adversely affected" by the violations they have alleged, as required by § 7706(g)(1).  This

7   Court found that, regardless of Plaintiffs' ability to establish the former, they could not establish the

8   latter.  (May 15, 2007 Order 13–15.)

9       This Court's determination that Plaintiffs had no statutory standing relied on the fact that the most

10   significant harms enumerated by Congress were "ISP- or IAS-specific, going well beyond the consumer-

11   specific burden of sorting through an inbox full of spam."  (*Id.* at 12.)  This Court found that "even if an

12   entity could meet the ill-defined and broad definition of an IAS, the 'adverse effect' to that entity must be

13   both real and of the type uniquely experienced by IASs for standing to exist.  Any other reading would

14   expand the private right of action beyond what Congress intended."  (*Id.*)  The Court then found that the

15   "only harm Plaintiffs have alleged is the type of harm typically experienced by most e-mail users" and that

16   the "fact that Congress did not confer a private right of action on consumers at large means that 'adverse

17   effect' as a *type* of harm must rise beyond the level typically experienced by consumers—*i.e.*, beyond the

18   annoyance of spam."  (*Id.* at 14.)  The Court also concluded that because "adverse effect" is a textual

19   prerequisite to claiming statutory damages, Congress clearly intended that harm be significant.  (*Id.* at

20   14–15.)  Thus, "permitting private parties with *no harm* to invoke CAN-SPAM to collect millions of

21   dollars surely is not what Congress intended when it crafted this 'limited' private right of action."  (*Id.* at

22   15.)

23       The foregoing findings are not only relevant to the actual standing analysis in which they were

24   made, but also to the question of fee-shifting now before the Court.  Where, as here, a private right of

25   action is so much more limited than, for example, the expansive private right of action in civil rights

26   ORDER – 7

1  cases, it follows that protecting plaintiffs' role as "private attorneys general" does not weigh as heavily

2  into the decision about which standard to apply.[3]  Promotion of prolific private CAN-SPAM litigation is

3  not what Congress intended.  Instead, Congress conferred only a limited private right of action,

4  unavailable to parties with no (or very little) harm.  Moreover, Congress's acknowledgment of legitimate

5  e-mail traffic suggests that preventing abuse of this limited private right of action is entirely appropriate.

6  Accordingly, the Court finds that plaintiffs and defendants in CAN-SPAM cases should be treated alike,

7  and therefore *Fogerty* should govern this Court's determination of whether to grant attorneys' fees.

8  **B.      Whether to Award Attorneys' Fees to Defendants in this Case**

9  Again, the *Fogerty* Court endorsed consideration of the *Lieb* factors, including "frivolousness,

10  motivation, objective unreasonableness (both in the factual and in the legal components of the case) and

11  the need in particular circumstances to advance considerations of compensation and deterrence."

12  *Fogerty*, 510 U.S. at 534 n.19.  Here, the balance of these factors tips in favor of awarding attorneys'

13  fees to Defendants, for the following reasons.

14  First, it is obvious that Plaintiffs are testing their luck at making their "spam business"

15  extraordinarily lucrative by seeking statutory damages through a strategy of spam collection and serial

16  litigation.  Plaintiffs are parties to ten additional cases similar to the instant case in the Western District of

17  Washington alone, *see* Case Nos. C06-1118-MJP, C06-1129-JCC, C06-1210-TSZ, C06-1284-TSZ, C06-

18  1348-MJP, C06-1350-JCC, C06-1469-MJP, C06-1537-JCC, C07-222-RSM, and C07-386-MJP, as well

19  as at least one "spam" case in the Eastern District of Washington, *see* Case No. C05-5079-FVS.  The

20  Court is not merely speculating on Plaintiffs' motives or assessment of potential profits.  In analyzing

21  Plaintiffs' CAN-SPAM standing, this Court noted that Gordon testified that the "benefits" of receiving

22

23  [3]  The Court notes that the *Christiansburg* standard has also been held to apply in environmental
    cases.  *Marbled Murrelet v. Babbitt*, 182 F.3d 1091 (9th Cir. 1999).  The contrast between
24  environmental cases and CAN-SPAM cases is similar to the contrast between civil rights cases and CAN-
    SPAM cases.  Thus, such application of *Christiansburg* beyond the civil rights context does not change
25  the analysis here.

26  ORDER – 8

spam can be quantified in terms of his dissertation research, as well as "settlement agreements for people who have said that they wouldn't spam me any longer." (May 15, 2007 Order 7.)  The Court recounted the lists of Gordon and Omni "clients," more than half of whom share the "Gordon" surname. (*Id.* at 6–7.)  The Court recognized that Gordon took over control of e-mail accounts for "gordonworks" clients in order to continue collecting spam. (*Id.* at 7.)  The Court noted that none of the Omni or Gordon clients has paid Plaintiffs for their services. (*Id.*)  Gordon testified that all of Plaintiffs' income or revenue for 2006 and 2007 has been from settlements and disputes. (*Id.* at 7–8.)  Gordon also testified regarding the "time-consuming process" of collecting, sorting, and compiling spam regarding these and other defendants. (*Id.* at 8.)  Clearly, Plaintiffs are assembling a litigation factory, which, if successful, could net millions of dollars in profit, at least theoretically.

Moreover, after assessing the utter lack of evidence going to any technical impact or financial harm due to the alleged illegal spam, this Court found it significant that Gordon did not seek actual damages in the instant litigation, because none exist, and that he is instead seeking solely statutory damages for each e-mail sent. (*Id.* at 8.)  Plaintiffs admitted that they benefit from receiving spam, and this Court concluded that "Plaintiffs' continued use of other people's e-mail addresses to collect spam and their undisputed ability to separate spam from other e-mails for generating lawsuit-fueled revenue directly contradicts any hint of adverse effect that otherwise might exist." (*Id.* at 15.)  Not only are Plaintiffs "not the type of entity that Congress intended to possess the limited private right of action it conferred on adversely affected bona fide Internet access service providers" (*id.* at 15), they are not the type of plaintiff that should be allowed to pursue the strategy outlined above without financial cost.

The Court finds that Plaintiffs' instant lawsuit is an excellent example of the ill-motivated, unreasonable, and frivolous type of lawsuit that justifies an award of attorneys' fees to Defendants under *Fogerty*.  The context of this litigation and the context of Plaintiffs' overall litigation strategy, involving at least a dozen federal actions, indicate that Plaintiffs are motivated by the prospect of multi-million-dollar statutory damages awards in exchange for their relatively paltry spam-collection and spam-

ORDER – 9

1    litigation costs.  Plaintiffs have alleged no actual damages in this action.  Under these circumstances,

2    compensation to Defendants for defending this lawsuit is warranted.  Similarly, the Court finds that the

3    goal of deterrence is particularly relevant here.  Plaintiffs should be deterred from further litigating their

4    numerous other CAN-SPAM lawsuits now that they are aware their lack of CAN-SPAM standing.

5         Further, while the Court did not reach the merits of Plaintiffs' CAN-SPAM claims, the Court did

6    have occasion to consider the substance of Plaintiffs' CEMA claims.  The results of that inquiry confirm

7    that Plaintiffs did not present a viable theory of recovery.  Specifically, Plaintiffs alleged that Defendants'

8    headers violate both CAN-SPAM and CEMA because the "from line" does not include Defendants'

9    company names or the names of company personnel.  However, this Court held that "from addresses"

10   ending with a domain that facilitates an accurate identification of Defendants could not "in any sense be

11   found 'false' or 'deceptive.'"  (May 15, 2007 Order 20.)  The Court therefore concluded that "while

12   claims actually alleging falsity or deception under CEMA would not be preempted, Plaintiffs' claims

13   here—for, at best, 'incomplete' or less than comprehensive information—are for immaterial errors that

14   may not be litigated under state law."  (*Id.*)  Because Plaintiffs did not raise any issues of material fact

15   that could prove Defendants' e-mails were materially "false or deceptive" as those terms are used in the

16   CAN-SPAM Act, their CEMA claims were held to be preempted by CAN-SPAM.  (*Id.*)  While this

17   analysis went to the preemption holding, it also indicates that the merits of Plaintiffs' CAN-SPAM "from

18   line" theory are lacking.  Thus, contrary to Gordon's conclusory assertion that this case involved

19   meritorious claims brought in good faith, the evidence suggests otherwise.

20   **C.    Reasonable Hourly Attorneys' Fees**[4]

21        While varying standards may govern the determination of whether to award attorneys' fees in

22

23      [4] While Gordon generally objected to an award of fees, Plaintiffs have not objected to
Defendants' calculations or to specific attorneys' fees requested here, either by challenging the hours

24   claimed or the rates requested.  Though Plaintiffs' failure to object may be construed as a waiver of any
objection to the actual amount awarded, the Court has an independent duty to assess the reasonableness

25   of any award of fees.

26   ORDER – 10

different types of cases, once the Court has established that fees should be awarded, a single standard governs how the Court arrives at a reasonable fee award. *Blum v. Stenson*, 465 U.S. 886, 893 (1984) (holding that the *amount* of fees awarded in a civil rights case is "governed by the same standards which prevail in other types of equally complex Federal litigation"). The initial determination of a reasonable amount of attorneys' fees is the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Regarding the reasonable number of hours worked, the party seeking fees

> should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.
> . . . . Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary.

*Hensley*, 461 at 433–34; *see also Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986). After the reasonable number of hours expended is established, the Court must determine a "reasonable hourly rate considering the experience, skill, and reputation of the attorney requesting fees." *Chalmers*, 796 F.2d at 1210. The "lodestar" amount—the reasonable hours multiplied by the reasonable hourly rate—is only a "starting point," however. *Hensley*, 461 at 433; *Benton v. Oregon Student Assistance Comm'n*, 421 F.3d 901, 904 (9th Cir. 2005).

In *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1976), the Ninth Circuit adopted the twelve-factor test found in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), to guide determining both the number of hours reasonably spent and a reasonable hourly rate. *Chalmers*, 796 F.2d at 1211. The twelve factors are:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

ORDER – 11

1   *Kerr*, 526 F.2d at 70.  Not all *Kerr* factors must be separately analyzed, as long as the Court discusses the

2   factors most germane to the particular case and explains how it reached the fee awarded.  *Quesada v.*

3   *Thomason*, 850 F.2d 537, 539 (9th Cir. 1988) (citing *Kessler v. Associates Fin. Servs. Co. of Hawaii,*

4   *Inc.*, 639 F.2d 498, 500 (9th Cir. 1981)).  The *Kerr* factors may also justify increasing or decreasing the

5   "lodestar" amount.  *Benton*, 421 F.3d at 904.  However, in *Hensley*, the Supreme Court noted that most

6   of these factors are "subsumed within the initial calculation of reasonable hours expended at a reasonable

7   hourly rate, rather than the subsequent determination of whether to adjust the fee upward or downward."

8   *Chalmers*, 796 F.2d at 1212 (citing *Hensley*, 461 U.S. at 434 n.9).  Thus, because the initial lodestar

9   amount is presumptively reasonable, *Blum*, 465 U.S. at 897, particular justification is required where the

10  Court finds "exceptional circumstance[s]" warranting adjustment of the lodestar either up or down,

11  *Quesada*, 850 F.2d at 539.

12              **1.    Lodestar**

13                   **a.    Hours Reasonably Expended**

14      Defendants have requested compensation for a total of 1,975.8 hours of attorney time.

15  Defendants have broken this time down into three categories: 533.1 hours spent reviewing documents

16  and making the "Linke Log," 552 hours spent by senior attorneys on the case, and 890.7 hours spent by

17  junior attorneys on the case.  Defendants have submitted raw billing records involving entries for eight

18  different attorneys with varied billing rates.  (Defs.' Mot., Newman Decl. (Dkt. No. 128) Ex. A.)  The

19  time billed starts in February 2006 and continues through May 2007.  No paralegal or administrative time

20  is billed; all time is attorney time.  Monthly bills range from fewer than one hour (May 2006) to over 250

21  hours (January 2007).  According to the billing records, the total hours actually logged as worked totals

22  1,444, prior to cuts and discounts.[5]  Remarkably, it appears that Defendants' total request for

23

24          [5] The Court notes that, of the chronological bills submitted as part of the Newman Declaration
    (Dkt. No. 128), several pages are duplicate submittals.  Specifically, the bill dated September 30, 2006
25  (49.9 hours) was submitted twice (*compare* Ex. A at 31–34, *with id.* at 35–38), and the bill dated

26  ORDER – 12

1  compensation for 1,975.8 hours overstates the hours worked by 531.8 hours, which amounts to about

2  27% of the total hours requested.  This troubling discrepancy is discussed in further detail below.

3  Combined with a similar inexplicable inflation of the requested costs, also discussed in further detail

4  below, the Court begins by expressing serious doubts about the accuracy with which Defendants'

5  attorneys recorded and billed both costs and fees in this litigation.  Given such large discrepancies in the

6  materials submitted to this Court—over which Defendants' counsel had complete control and

7  responsibility—the Court begins the reasonableness analysis by finding that substantial cuts to the claimed

8  hours are justified.  While the Court has already found that attorneys' fees and costs should be assessed

9  against Plaintiffs in this matter, equally important is avoiding overcompensation.  Congress surely could

10  not have intended for CAN-SPAM defendants (or their attorneys) to collect a windfall via the attorneys'

11  fees provision.  More importantly, while Defendants did give discounts and cut both time and dollar

12  amounts from various bills, the Court finds that the 1,444 hours reflected in the billing records far

13  exceeds the reasonable amount of time spent on this litigation, as follows.

14                          **i.**        **"Linke Log" Hours**

15       The "Linke Log" request is for 533.1 hours.  The Court finds that 533.1 hours of document

16  review and data entry, essentially to the end of creating a lengthy spreadsheet, is excessive.  From the

17  billing records, it is apparent that the primary person working on the Linke Log was Derek Linke.  Derek

18  Linke billed a total of 590.5 hours in October 2006, November 2006, December 2006, January 2007, and

19  February 2007.  While a few of these hours were cut or spent on other matters, it appears from his daily

20  time entries that the vast majority of his time was spent on the Linke Log and therefore that the 533.1

21  Linke Log hours may be attributed to him.  Though the billing records contain references to "contract

22  attorneys" and indicate that a $40,000 flat fee was billed to the client for "seven lawyers" who "reviewed

23  and created a log" (Defs.' Mot., Newman Decl. Ex. A at 50, 56), Defendants have not submitted any

24  ────────────────────

25  February 28, 2007 (91.05 hours) was submitted twice (*compare* Ex. A at 65–68, *with id.* at 69–72).  The
   Court STRIKES the duplicates and has not considered them in the calculations herein.

26  ORDER – 13

1   billing records that actually reflect the purported hours worked by these contract attorneys.  Nor have

2   Defendants identified these attorneys or substantiated the 533.1 hours claimed for this project as

3   exclusive of Derek Linke's time.  If the 533.1 hours requested for document review and creation of the

4   Linke Log does not account for almost all of Derek Linke's time, the Court is hard pressed to figure out

5   what does, given that most of his time entries reference that project.  Conversely, if Derek Linke did not

6   expend almost all of his recorded time on the Linke Log, it is unclear how Defendants arrived at their

7   533.1 figure, as there is no documentation anywhere in the billing records reflecting an additional 533.1

8   hours contracted out to any "team of newly admitted lawyers."  (Defs.' Mot. 3.)  Furthermore, the

9   prospect that almost all of Derek Linke's time *plus* 533.1 hours spent by unidentified attorneys—totaling

10  well over 1,000 hours—was spent on the Linke Log is absurd.  Accordingly, the Court finds that Derek

11  Linke's time records are the only viable source for the 533.1 hours claimed for the Linke Log.

12      Having seen the results of this project, the Court finds that spending the equivalent of over

13  thirteen 40-hour weeks on this process is far more than was reasonable.  Having carefully considered the

14  *Kerr* factors, particularly factor 1 (time and labor required), the Court will allow a total of 40 hours in

15  this category as a reasonable number of hours expended on document review and creation of the Linke

16  Log.

### ii.     Senior Attorney Hours

18      Defendants request 552 hours for senior attorney compensation.  Defendants request that the time

19  spent by Derek Newman and Roger Townsend be considered "senior attorney" time.  The billing records

20  reflect that Derek Newman spent 258.9 hours and Roger Townsend spent 294.4 hours, which totals

21  553.3 hours.  The Court presumes that the 552 hours requested approximates this total.  The Court finds

22  that, considering the *Kerr* factors, particularly factors 1 (time and labor required), 2 (novelty and

23  difficulty of the questions involved), 3 (skill requisite to perform the service), 8 (the amount involved and

24  the results obtained), and 9 (experience, reputation, and ability of the attorneys), this request is quite

25  high.  552 hours represents approximately 20% of the time spent by a single lawyer billing around 2050

26  ORDER – 14

1   hours per year in the time period for which billing records were submitted (16 months).  Split roughly

2   between two lawyers, it would amount to about 10% of one caseload.  It is true that this case presented

3   relatively novel legal issues, which required the Court to consider issues of first impression.  However, as

4   a consequence, while these issues required creativity to address, the body of legal authority with which

5   the attorneys had to be familiar was relatively limited.  The amount of discovery and the motions practice

6   were moderate, and at least some discovery motions practice was unnecessary.  It is well documented

7   that the statutory damages demanded in this action were significant and the stakes were potentially high

8   for Defendants.  Given the disposition of the case, the results obtained by Defendants' counsel were

9   excellent.  Nevertheless, the Court finds that on the whole, this case was not all that complex and should

10   not have required 552 senior attorney hours.

11        While Defendants have submitted declarations in support of the rate requested to compensate

12   senior attorney time, little support is offered to justify the total hours spent.  Moreover, the inaccurate

13   documentation presented with the instant motion reinforces the Court's separate conclusion that the

14   hours requested exceed the reasonable time spent on this case.  Given that in making the instant motion

15   Defendants have inexplicably inflated the total hours for which they request compensation by almost 27%

16   beyond what was even recorded in their own billing records, the Court finds it entirely appropriate to cut

17   their requested senior attorney hours by at least that much to account for other inflation that likely

18   occurred in daily billing and overcharges to their clients, which may or may not have been partially

19   balanced out by bill cuts and discounts.

20        Accordingly, considering the circumstances of this case and the record before the Court in light of

21   the *Kerr* analytical structure, the Court finds that 225 hours of senior attorney time was reasonably

22   expended on this matter.  This number of hours is in sync with the moderate complexity and novelty of

23   the case, the level of skill of the lawyers involved, and the relatively constrained universe of factual data

24   and legal authority in play.  While not overcompensating, this number of hours also acknowledges that

25   the case required substantial effort and thought.

26   ORDER – 15

### iii.     Junior Attorney Hours

Defendants have requested compensation for a total of 890.7 hours of time spent by junior attorneys on this matter.  In reviewing the billing records, however, it appears that this amount accounts for all 590.5 hours logged by Derek Linke, as well as the hours of five additional junior attorneys.  After subtracting from the 1,444 total hours reflected in the billing records both the 553.3 senior attorney hours logged and the 590.5 hours logged by Derek Linke, the leftover number of junior attorney hours logged in the billing records is 300.2.  These 300.2 hours may be broken down between five attorneys: Tara Borelli (12.5), John Du Wors (62.8), Randall Moeller (50.8), S. Christopher Winter (169.1), and Michael Spain (5).

The 590.5 hours billed by Derek Linke present a problem as they are included in the 890.7 junior attorney hours request.  Because no other obvious source of the "Linke Log" hours exists in the billing records, the Court already considered almost *all* of these hours *supra* subsection II.C.1.a.i.  Thus, in comparing the billing records to the instant motion, and in light of the lack of any documentation whatsoever showing that attorneys *other than* Derek Linke contributed 533.1 Linke Log hours, it appears to the Court that Defendants have deliberately doubled the requested compensation for the lion's share of Derek Linke's time.  Moreover, as the Court has already noted, the discrepancy between the 1,444 recorded hours and the 1,975.8 hours claimed in the instant motion is 531.8.  This number coincides almost exactly with the 533.1 hours requested for the "Linke Log."  Therefore, the Court has little choice but to conclude that 533.1 (or possibly 531.8) of the 590.5 hours worked by Derek Linke have been requested *both* as "Linke Log" hours *and* as "junior associate" hours.  Accordingly, the Court must begin by subtracting those 533.1 hours from the requested 890.7 junior attorney hours.  This leaves 357.6 hours billed by junior associates that have not been accounted for elsewhere.  In addition to the five junior attorneys' hours listed *supra*, the additional 57.4 hours reflected in this new total correspond to the only non-Linke Log hours worked by Derek Linke.

Beginning with 357.6 hours of junior attorney time, and considering the *Kerr* factors, particularly

ORDER – 16

1   factors 1 (time and labor required), 2 (novelty and difficulty of the questions involved), 3 (skill requisite

2   to perform the service), 8 (the amount involved and the results obtained), and 9 (experience, reputation,

3   and ability of the attorneys), the Court finds that this request is unreasonably high.  For the same reasons

4   the Court cut the senior attorney hours, the Court finds it appropriate to cut junior attorney time.

5   Accordingly, the Court finds that a reasonable number of junior attorney hours spent on this litigation is

6   150.

7                              **b.       Reasonable Hourly Rates**

8           In determining a reasonable rate, the Court "should be guided by the rate prevailing in the

9   community for similar work performed by attorneys of comparable skill, experience, and reputation."

10  *Chalmers*, 796 F.2d at 1210–11 (citing *Blum*, 465 U.S. at 895 n.11).  The rate actually billed does not

11  necessarily govern, particularly in cases litigated by public interest lawyers or where hourly rates in

12  accordance with the market have not been established by the attorneys.  *Blum*, 465 U.S. at 895.

13  However, such circumstances are not present in the instant case.  On the contrary, Defendants' attorneys

14  have very established billing rates and different rates for almost all of the eight lawyers who worked on

15  this case.  Defendants' attorneys are not operating out of a fledgling, nonprofit, or hybrid law firm and

16  they have not represented that they charged other than their normal billing rates to Defendants in this

17  litigation, hours cuts and discounts notwithstanding.  Defendants' attorneys' actual rates are

18  presumptively reasonable market rates, because nothing here indicates that the actual legal market would

19  sustain higher rates by this firm, even if other firms may charge more for the same or similar work.

20  Accordingly, Defendants' regular billing rates, as billed in the instant case, will be presumed to be in line

21  with the going market rates in Seattle for this type of legal work performed by attorneys with the range of

22  experience levels employed here.  Defendants have requested compensation at various rates, depending

23  on the attorneys who expended the hours.  As with the hours requested, Defendants have requested that

24  the Court order attorneys' fees at three different rates.

25  //

26  ORDER – 17

1

### i.    "Linke Log" Rate

2    For the document review and "Linke Log," Defendants request compensation at a rate of $125

3    per hour.  However, it is clear from the billing records that Derek Linke's time was billed out at $115 per

4    hour.  He is the only attorney at or below the $125 rate, and the Court presumes that the entire "Linke

5    Log" sum is to be attributed to him.  Defendants have not justified the bump in Derek Linke's rate by

6    anything more than a conclusory statement that a "reasonable hourly rate for the document analysis

7    attorneys is $125 per hour."  (Defs.' Mot. 3.)  The Court finds that $115 is a reasonable rate, particularly

8    because Defendants were able to and did bill that rate to regular clients.  Accordingly, the lodestar for the

9    Linke Log attorneys' fees is 40 hours multiplied by $115 per hour, which totals $4,600.00 in reasonable

10   attorneys' fees for Linke Log time.

11

### ii.    Senior Attorney Rate

12   Defendants request that the hours spent by the two senior attorneys on this matter—Derek

13   Newman and Roger Townsend—be compensated at a rate of $350 per hour.  In support of this request,

14   Defendants have submitted an assortment of attorney declarations (Dkt. Nos. 129, 130, 131, 132, and

15   133) stating that $350 for senior attorneys is reasonable in the market for the skill and experience level of

16   senior attorneys at this law firm.  However, Derek Newman's actual billing rate is $300 per hour (with

17   the exception of the last 5.5 hours billed in May 2007 at a rate of $325) and Roger Townsend's actual

18   billing rate is $250 (with the exception of the last 8.6 hours billed in May 2007 at a rate of $275).  The

19   Court finds that $300 is a reasonable rate for Derek Newman and that $250 is a reasonable rate for Roger

20   Townsend, because those are the rates that these attorneys were actually able to draw in this market for

21   all but a handful of the hours spent on this litigation.

22   Because the Court cut the total hours spent by these attorneys down to a reasonable number, the

23   Court will prorate the lodestars for each.  The billing records reflect that Derek Newman logged 258.9

24   hours and Roger Townsend logged 294.4 hours.  This is approximately a 47%–53% split.  The Court cut

25   the senior attorney total to 225 hours as a reflection of the reasonable number of hours spent by these

26   ORDER – 18

1    attorneys.  Of that compensable total, 106 hours (47%) will be attributed to Derek Newman and

2    compensated at a rate of $300 per hour, and 119 hours (53%) will be attributed to Roger Townsend and

3    compensated at a rate of $250 per hour.  Multiplying 106 hours by $300 per hour ($31,800.00),

4    multiplying 119 hours by $250 per hour ($29,750.00), and adding the two together nets a lodestar for

5    senior attorneys' fees of $61,550.00.

6                          **iii.    Junior Attorney Rate**

7           Defendants request that the hours spent by the various junior attorneys on this matter be

8    compensated at an across-the-board rate of $200 per hour.  In support of this request, Defendants have

9    submitted an assortment of attorney declarations (Dkt. Nos. 129, 130, 131, 132, and 133) stating that

10   $200 for junior attorneys is reasonable in the market for the skill and experience level of such attorneys at

11   this law firm.  However, the actual billing rates for the junior attorneys vary both above and below this

12   amount.  Tara Borelli's and John Du Wors's time was billed out at $195 per hour, Randall Moeller's time

13   was billed out at $225 per hour (with the exception of the last .2 hours billed in May 2007 at $235 per

14   hour), S. Christopher Winter's time was also billed out at $225 per hour, Michael Spain's time was billed

15   out at $175 per hour, and as noted *supra*, Derek Linke's time was billed out at $115 per hour.  Given

16   that these were the rates actually billed and supported by the market, the Court finds that the 150 hours

17   that the Court found to be reasonably spent on this litigation by junior attorneys should be compensated

18   at a combination of these rates, and in proportion to the time logged by the various junior attorneys.

19          As noted *supra*, the hours logged by junior attorneys broke down in the billing records as follows:

20   Tara Borelli (12.5), John Du Wors (62.8), Randall Moeller (50.8), S. Christopher Winter (169.1),

21   Michael Spain (5), and Derek Linke (57.4 hours beyond the Linke Log hours already compensated *supra*

22   subsection II.C.1.b.i).  The proportions, grouped by rate, are roughly as follows: Tara Borelli and John

23   Du Wors (21%), Randall Moeller and S. Christopher Winter (62%), Michael Spain (1%), and Derek

24   Linke (16%).  Therefore, of the 150 hours approved as reasonably spent by these junior attorneys, 31.5

25   hours (21%) will be attributed to Tara Borelli and John Du Wors and compensated at a rate of $195 per

26   ORDER – 19

hour, 93 hours (62%) will be attributed to Randall Moeller and S. Christopher Winter and compensated at a rate of $225 per hour,[6] 1.5 hours (1%) will be attributed to Michael Spain and compensated at a rate of $175 per hour, and 24 hours (16%) will be attributed to Derek Linke and compensated at a rate of $115 per hour.  Multiplying 31.5 hours by $195 per hour ($6,142.50), multiplying 93 hours by $225 per hour ($20,925.00), multiplying 1.5 hours by $175 per hour ($262.50), multiplying 24 hours by $115 per hour ($2,760.00), and adding the four together nets a lodestar for junior attorneys' fees of $30,090.00.

*     *     *

Having calculated three separate lodestar amounts for the three separate categories of fees, the Court finds that the total of the lodestar amounts for Linke Log fees ($4,600.00), senior attorneys' fees ($61,550.00), and junior attorneys' fees ($30,090.00) amounts to a total lodestar hourly attorneys' fees award in this matter of $96,240.00.

## 2.    Multiplier

Defendants request that the Court apply a 20% multiplier to increase the lodestar.  In support of this request, Defendants cite their status as prevailing parties, the novelty and difficulty of the questions involved and the technical knowledge required to provide legal representation, and the circumstances of the litigation wherein Plaintiffs sought huge statutory damages.  (Defs.' Mot. 10–11.)

As noted *supra*, the initial lodestar amount determined by the Court is presumptively reasonable. *Blum*, 465 U.S. at 897.  Moreover, while some of the *Kerr* factors may justify an upward or downward adjustment, the Supreme Court has held that the novelty and complexity of the issues (factor 2), the special skill and experience required (factors 1, 3, and 9), the quality of representation (factors 3 and 9), and the results obtained (factor 8) *may not* serve as independent bases for adjusting the lodestar.  *Blum*, 465 U.S. at 898–901; *see also Jordan v. Multnomah County*, 815 F.2d 1258, 1262 n.6 (9th Cir. 1987). It is the fee-seeker who must carry the burden of justifying an upward departure from the lodestar.  *Blum*,

---

[6] The twelve minutes billed out at $235 per hour by Randall Moeller are not sufficient to change the $225 rate.

ORDER – 20

1   465 U.S. at 898.  Where no upward adjustment is necessary to provide fair and reasonable compensation,

2   none shall be given.  *Id.* at 901.

3          Defendants have completely failed to carry their burden regarding application of a multiplier.

4   Instead, the reasons they cite have been specifically held to be impermissible bases for increasing the

5   lodestar.  Accordingly, the Court will not adjust upward the lodestar amount of $96,240.00.

6          **D.     Costs**

7          Defendants request a variety of costs, including deposition costs ($10,383.70), the deposition

8   attendance fee for Plaintiffs' expert witness ($1,350.00), a *pro hac vice* fee ($75.00), mediator fees

9   ($2,759.37), telecommunications fees ($207.29), travel expenses for depositions ($2,343.32),

10  photocopying expenses ($10,224.94), electronic legal research expenses ($1,010.20), and mailing and

11  messenger expenses ($485.54).[7]  Defendants also seek reimbursement of their own expert fees

12  ($5,875.00).  Gordon has only generally objected to an award of attorneys' fees and costs, but he has not

13  objected to any particular costs requested by Defendants.

14         Various sources exist for this Court's authority to assess costs against Plaintiffs in this matter.

15  Federal Rule of Civil Procedure 54(d)(1) provides that "costs other than attorneys' fees shall be allowed

16  as of course to the prevailing party unless the court otherwise directs."  This rule creates a presumption in

17  favor of awarding certain costs to the prevailing party, which can only be overcome when the Court

18  exercises its discretion to disallow costs for specific reasons, which may include punishing misconduct by

19  the prevailing party or nonpunitive but compelling equitable justifications.  *Ass'n of Mexican-Am.*

20  *Educators v. Cal.*, 231 F.3d 572, 591–93 (9th Cir. 2000).  Moreover, the Court's Local Rules

21  circumscribe standard allowable costs.  Local Rules W.D. Wash. CR 54(d).  In addition to the costs listed

22

23         [7]  The subtotal (without the additional $5,875.00 requested for Defendants' expert fee) of these
    requests is $28,839.36.  It is unclear how Defendants arrived at the total of $26,338.01 requested in their
24  motion.  (Defs.' Mot. 7.)  Moreover, as discussed *infra*, the individual expense requests that total
    $28,839.36 here also are inexplicably inflated when compared with the actual billing records submitted to
25  the Court.

26  ORDER – 21

in Local Rule 54(d), the provisions of 28 U.S.C. §§ 1920 and 1923 are relevant to standard costs. *Id.* CR 54(d)(3)(D). In a civil case, taxation of fees and costs is provided for by federal statute, as follows:

> A judge or clerk of any court of the United States may tax as costs the following:
> (1) Fees of the clerk and marshal;
> (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title. A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

28 U.S.C. § 1920. The Ninth Circuit has specifically held that explicit enumeration in § 1920 is not a prerequisite to allowance of a cost, reasoning that "courts are free to interpret what constitutes taxable costs" under the statute. *Alflex Corp. v. Underwriters Laboratories, Inc.*, 914 F.2d 175, 177 (9th Cir. 1990).

It is clear that many of Plaintiffs' claimed "costs" are not § 1920 costs, even under *Alflex*. However, the Court is not constrained by § 1920. Because the CAN-SPAM Act provides that this Court may assess "reasonable costs, including attorneys' fees," 15 U.S.C. § 7706(g)(4), this Court may assess litigation costs that may not otherwise be claimed under § 1920, under the rubric of attorneys fees, and not as § 1920 costs. *See Alvarez v. IBP, Inc.*, 2001 U.S. Dist. LEXIS 25341 at *30–41 (E.D. Wash. 2001). This Court follows the example set by its sister court in the Eastern District of Washington and finds that all costs which normally would be billed to a paying client may be justifiably included in the computation of reasonable attorney fees and costs in this matter. This rule shall govern where costs are not otherwise authorized by § 1920. The Court will address Defendants' costs requests individually.

### 1.    Deposition Costs

Defendants request $10,383.70 in deposition costs. Upon review of Defendants' billing records, the Court finds that the maximum allowable for depositions, stenographic services, and court reporters is $8,503.10. (*See* Defs.' Mot., Newman Decl. Ex. A at 57, 67, 85.) Because the extra $1,880.60 is not

ORDER – 22

1    supported by the record, the Court will subtract this from Defendants' request.[8]  This reduced total

2    corresponds to all of the itemized costs of court reporters and preparation of deposition transcripts billed

3    to the client from December 2006 through May 2007.  Such expenses are taxable under § 1920(2).

4    Accordingly, the Court finds that Defendants are entitled to recover $8,503.10 in deposition costs.

5                    **2.**       **Deposition Attendance Fee for Plaintiffs' Expert**

6         Defendants request $1,350.00 to reimburse the expense of paying Plaintiffs' expert's deposition

7    attendance fee.  A portion of this fee is taxable pursuant to 28 U.S.C. § 1821, by way of Local Rule

8    54(d)(3)(A).  The maximum allowed for a witness attendance fee, under these provisions, is $40 per day.

9    The Court finds that Defendants are also entitled to the amount of the attendance fee above and beyond

10    that provided by rule or statute because such a cost normally would be billed to a paying client, as it

11    actually was here (*see* Defs.' Mot., Newman Decl. Ex. A at 82).  Accordingly, Defendants may recover

12    the full $1,350.00.

13                    **3.**       *Pro Hac Vice* **Fee**

14         Defendants' modest request for reimbursement of the $75.00 *pro hac vice* fee required for one of

15    Defendants' in-house counsel to appear in this action is reasonable.  It is a cost incident to litigation

16    normally billed to a client, it was billed to the client here, and Defendants may recover it under the rubric

17    of attorneys' fees.

18                    **4.**       **Mediator Fees**

19         Defendants seek $2,759.37 in mediator fees, which were billed to the client.  (Defs.' Mot.,

20    Newman Decl. Ex. A at 75–77.)  While § 1920 does not contemplate taxation of mediation fees as

21    statutory "costs," the Court finds that this is a component of a reasonable attorneys' fee, and therefore is

22

23                 —————————————

24         [8]  Coincidentally, as noted *supra* note 5, the bill for February 2007 was submitted twice.  It contains a court reporter cost for $1,880.60.  As with hourly attorneys' fees, the Court is unimpressed

25    with Defendants' counsel's sloppy recordkeeping, imprecise calculations, and consequent misrepresentations to the Court regarding these and other costs.

26    ORDER – 23

1    an allowable cost in that respect.  Moreover, this Court encourages alternative dispute resolution

2    procedures.  Local Rules W.D. Wash. CR 39.1.  Accordingly, the Court finds that Defendants may

3    recover their mediator fees.

4                        **5.      Telecommunications Fees**

5          Defendants seek $207.29 in telecommunications fees.  While telecommunications fees are not

6    typically allowable under § 1920, they are typically passed onto paying clients and therefore may be

7    recovered as part of attorneys' fees.  A review of the billing records in this case confirms, however, that

8    only $190.54 in such fees were passed on to Defendants.  (*See* Defs.' Mot., Newman Decl. Ex. A at 33,

9    43, 50, 67.)  The reason for the discrepancy between Defendants' request and the billing records is

10   unclear.  However, the Court notes that itemized costs for a separate matter ("Hodgell") are included

11   throughout the billing records, and this could be a potential source of the error.[9]  Whatever the reason,

12   the Court subtracts the extra $16.75 requested and finds that Defendants may recover a maximum of

13   $190.54 in telecommunications costs as an element of attorneys' fees.

14                        **6.      Deposition Travel Expenses**

15         Defendants seek $2,343.32 in deposition travel costs.  Again, these costs are not statutorily

16   allowed, but may be included in reasonable attorneys' fees.  Depositions in this matter took place in

17   Kansas and Illinois, and the billing records show a total of $2,342.32 billed to the client for these

18   expenses.  (Defs.' Mot., Newman Decl. Ex. A at 57, 75, 82.)  The Court presumes the extra $1.00 is a

19   mathematical error.  Because they are the type of cost normally passed on to a paying client, Defendants

20   are entitled to recover a maximum of $2,342.32 for travel costs as part of their attorneys' fees.

21   //

22

23

24        [9]  "Hodgell" costs totaling $295.51 appear on the bills for February, March, April, July, August,
     September, October, November, and December 2006, as well as January 2007.  (*See* Defs.' Mot.
     Newman Decl. Ex. A *passim*.)  These may or may not also account for a portion of the inflated requests
25   noted *infra* for photocopying, electronic legal research, and mailing and messenger costs.

26   ORDER – 24

### 7.     **Photocopying Expenses**

Defendants request $10,224.94 in photocopying expenses.  Copying expenses are allowable pursuant to § 1920(4), as long as copies were necessarily obtained.  While this is the type of cost typically passed on to the client, a review of the billing records supports "printing," "copying," and "photocopies" costs in the amount of $8,328.52, at the most.[10]  (Defs.' Mot., Newman Decl. Ex. A *passim*.)  Thus, the Court must begin by subtracting the extra $1,896.42 from Defendants' $10,224.94 request because it is completely unsupported by the record.  It appears that copying and printing costs were passed on to Defendants at a rate of $.15 per page for small jobs and at an outsourced bulk cost in some instances.  These are generally reasonable practices.  However, because there is no documentation to support the claimed "Outside Copying Fee" of $3,689.23 (*id.* at 57), the Court will subtract as unrecoverable this amount from the $8,328.52 listed on the bills.  Accordingly, Defendants' may recover at most $4,639.29 for copying costs.  While the total is still quite large, this Court has first-hand knowledge of the volume of exhibits utilized in this case.  In context, the total is not all that surprising.  The Court finds that Defendants may recover $4,639.29 in photocopying expenses.

### 8.     **Electronic Legal Research Fees**

Defendants seek $1,010.20 in electronic legal research fees.  Electronic research expenses are "properly rejected out of hand" when the inquiry is one determining an award of costs under § 1920.  *Sea Coast Foods, Inc. v. Lu-Mar Lobster & Shrimp, Inc.*, 260 F.3d 1054, 1061 n.2 (9th Cir. 2001).  However, under the rubric of reasonable attorney fees, electronic research expenses are a more than reasonable component of such fees.  Nevertheless, the Court again finds that Defendants' request is inflated and no justification is apparent for an extra $71.14.  The maximum amount supported by the billing records in this category (billed out as "Lexis/Westlaw," "public access to court records," and

---

[10]  Again, the Court notes its dismay at Defendants' failure to provide an accurate accounting in support of this motion.  Moreover, the actual amount billed to the client, $8,334.28, indicates an overcharge of $5.76 due to a mathematical error corresponding with the entry for $159.19 in January 2007.  (Defs.' Mot., Newman Decl. Ex. A at 63 (19179 x .008 = $153.43, not $159.19).)

ORDER – 25

1    "PACER") is $939.06.  (Defs.' Mot., Newman Decl. Ex. A *passim*.)  The Court finds that $939.06 is

2    reasonable.  Accordingly, Defendants may recover these legal research fees.

3                      **9.      Mailing and Messenger Fees**

4           Defendants request $485.54 in mailing and messenger fees.  Such expenses are a reasonable

5    component of attorneys' fees.  However, the billing records indicate a maximum total of $278.63 for

6    "courier expenses," "postage," and "shipping."  Defendants do not account for the extra $206.91

7    requested.  Accordingly, the Court finds that Defendants are entitled to recover only $278.63 in mailing

8    and messenger fees.

9                      **10.     Defendants' Expert Witness Fees**

10          Defendants request reimbursement of their own expert's $5,875.00 fee.  It is clear that this cost

11   was passed on to the clients.  (Defs.' Mot., Newman Decl. Ex. B.)  However, generally speaking, costs

12   associated with expert witnesses are not recoverable under federal law.  *See Davis*, 976 F.2d at 1549.

13   While such costs may be recoverable under Washington state law, *see Panorama Vill. Condo. Owners*

14   *Ass'n Bd. of Dirs. v. Allstate Insur. Co.*, 26 P.3d 910 (Wash. 2001), this Court has already determined

15   that federal law governed the disposition of this case and that federal law shall govern assessment of

16   attorneys' fees and costs.  Accordingly, Defendants are not entitled to recover their own expert witness

17   fees.

18                                   *        *        *

19          Having considered all of Defendants' requested costs, the Court hereby finds that they are entitled

20   to a maximum total of $21,077.31 in costs, either as taxable by statute or as part of their attorneys' fees.

21   Such costs include deposition costs ($8,503.10), the deposition attendance fee for Plaintiffs' expert

22   witness ($1,350.00), a *pro hac vice* fee ($75.00), mediator fees ($2,759.37), telecommunications fees

23   ($190.54), travel expenses for depositions ($2,342.32), photocopying expenses ($4,639.29), electronic

24

25

26   ORDER – 26

1   legal research expenses ($939.06), and mailing and messenger expenses ($278.63).[11]  However,

2   Defendants are not entitled to the additional cost of their own expert's fee ($5,875.00).

3         Determining the maximum costs allowable does not end the inquiry, however.  Because of the

4   inaccuracy, disorganization, and miserable accounting with which the foregoing costs requests were

5   presented to the Court, and because a majority of the allowable costs are allowable as a component of

6   discretionary attorneys' fees, but not otherwise provided for by statute, the Court finds a flat reduction in

7   the costs award justified.  The difference between the $28,839.36 requested and the $21,077.31

8   supported by the record is $7,762.05.  As with attorneys' fees, this seemingly artificial enlargement

9   represents approximately 27% of the total costs requested.  The Court finds ample reason to cut the

10  $21,077.31 maximum by at least that much to account for the lack of itemization, lack of clear

11  accounting, absence of synthesized presentation, and overall haphazard way in which even the

12  $21,077.31 in trackable costs were requested in this action.  The Court has little confidence that even the

13  $21,077.31 that the Court was able to tally is uninflated.  As with hourly attorneys' fees, while a costs

14  award is justified in this case, Congress could not have intended that costs awarded under the rubric of

15  attorneys' fees would provide a windfall to CAN-SPAM defendants.  Accordingly, the Court will award a

16  total of $15,200.00 in costs.

17  //

18  //

19  //

20  //

21  //

22  _____

23  [11]  The Court notes that all costs that appear in the billing records are accounted for by the
    foregoing analysis except for $3.00 for parking (Defs. Mot., Newman Decl. Ex. A at 18) and $1,277.76
24  for "file conversion and indexing" (*id.* at 27).  Because Defendants did not itemize or justify these costs
    or specifically indicate their inclusion in the total amount requested, the Court will not allow them to be
25  assessed against Plaintiffs.

26  ORDER – 27

## III.   CONCLUSION

For the foregoing reasons, Defendants' motion for attorneys' fees and costs is GRANTED IN PART and DENIED IN PART.  The Court ORDERS that Defendants are entitled to a total award of attorneys' fees and costs in the amount of $111,440.00.  This sum is equal to the hourly attorneys' fees award of $96,240.00, plus costs in the amount of $15,200.00.  The Clerk is DIRECTED enter an amended judgment consistent with the foregoing.

SO ORDERED this 1st day of August, 2007.

John C. Coughenour
United States District Judge

ORDER – 28